UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

RHONDA W. f/k/a  RHONDA N.,

                              Plaintiff,

v.                                                    5:24-CV-00169
                                                         (DNH/ML)

COMMISSIONER OF SOCIAL SECURITY,

                              Defendant.
_____

APPEARANCES:                        OF COUNSEL:

RHONDA W.
  *Plaintiff, Pro Se*

U.S. SOCIAL SECURITY ADMIN.        SHANNON FISHEL, ESQ.
  *Counsel for Defendant*
6401 Security Boulevard
Baltimore, Maryland 21235

**MIROSLAV LOVRIC**, United States Magistrate Judge


## REPORT-RECOMMENDATION and ORDER

Plaintiff Rhonda W. ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g)

seeking judicial review of a final decision of the Commissioner of Social Security ("Defendant"

or "Commissioner") denying her application for Disability Insurance Benefits ("DIB"). (Dkt. No.

1.)  Plaintiff is appearing *pro se*, and the Clerk provided her a copy of the Local Rules of Practice

and the *Pro Se* Handbook for the Northern District of New York.  (Dkt. Nos. 4, 5.)

Plaintiff did not consent to the disposition of this case by a Magistrate Judge. (Dkt. No.

12.)  This matter was thus referred to me for Report and Recommendation by the Honorable

David N. Hurd, Senior United States District Court Judge, pursuant to 28 U.S.C. § 636(b) and

Local Rule 72.3(d). (Dkt. Nos. 4, 5.) This case has proceeded in accordance with General Order 18, which sets forth the procedures to be followed when appealing a denial of Social Security benefits. Currently before this Court is Defendant's motion for judgment on the pleadings. (Dkt. No. 24). Plaintiff has not filed written opposition to this motion. For the reasons set forth below, this Court recommends that the Commissioner's motion be granted.

## I.    PROCEDURAL HISTORY

On January 20, 2021, Plaintiff filed an application for DIB, alleging disability dating from August 6, 2020. (Administrative Transcript[1] ("T.") 207-211.) Her application was denied initially on July 2, 2021, and her request for administrative reconsideration was denied on March 22, 2022. (T. 75-115.) Plaintiff's subsequent request for a hearing was granted. (T. 126-127, 154-161.) On August 19, 2022, Plaintiff and vocational expert ("VE") Salvatore Garozzo testified before Administrative Law Judge ("ALJ") Jeremy Eldred. (T. 49-74.) The ALJ issued an unfavorable decision on November 1, 2022. (T. 18-37.) The Appeals Council denied Plaintiff's request for review on September 7, 2023. (T. 1-6.)

Plaintiff commenced this proceeding on February 5, 2024 to challenge the Commissioner's denial of disability benefits. (Dkt. No. 1.)

## II.    GENERALLY APPLICABLE LAW

### A.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *Featherly v. Astrue*, 793 F. Supp. 2d 627, 630 (W.D.N.Y. 2011) (citations omitted); *Rosado v.*

---

[1] The Commissioner filed the original administrative record/transcript and a supplemental transcript with the Court on May 7, 2024. (Dkt. No. 17, 18.)

*Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  A reviewing court may not affirm the ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence.  *Johnson*, 817 F.2d at 986.

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision.  42 U.S.C. § 405(g) (2015); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991).  To facilitate the court's review, an ALJ must set forth the crucial factors justifying his or her findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision.  *Roat v. Barnhart*, 717 F. Supp. 2d 241, 248 (N.D.N.Y. 2010); *see also Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).  "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted).  It must be "more than a mere scintilla" of evidence scattered throughout the administrative record.  *Featherly*, 793 F. Supp. 2d at 630; *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  *Williams*, 859 F.2d at 258 (citations omitted).  Where substantial evidence supports the ALJ's findings they must be sustained "even where substantial evidence may support the plaintiff's positions and despite that the court's independent analysis of the evidence may differ from the [ALJ's]."  *Rosado*, 805 F. Supp. at 153.  In other words, a reviewing court

3

cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

### B.    Standard for Benefits[2]

To be considered disabled, a plaintiff-claimant seeking benefits must establish that he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff-claimant's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

*Id*. § 1382c(a)(3)(B).

Acting pursuant to its statutory rulemaking authority (42 U.S.C. § 405(a)), the Social Security Administration ("SSA") promulgated regulations establishing a five-step sequential evaluation process to determine disability. 20 C.F.R. § 416.920(a)(4) (2015). Under that five-step sequential evaluation process, the decision-maker determines:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or

---

[2]  The requirements for establishing disability under Title XVI, 42 U.S.C. § 1382c(a)(3) and Title II, 42 U.S.C. § 423(d), are identical, so that "decisions under these sections are cited interchangeably." *Donato v. Sec'y of Health and Human Servs.*, 721 F.2d 414, 418 n.3 (2d Cir. 1983) (citation omitted).

> equals the severity of the specified impairments in the Listing of
> Impairments; (4) based on a "residual functional capacity"
> assessment, whether the claimant can perform any of his or her
> past relevant work despite the impairment; and (5) whether there
> are significant numbers of jobs in the national economy that the
> claimant can perform given the claimant's residual functional
> capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014). "If at any step a finding of disability or

non-disability can be made, the SSA will not review the claim further." *Barnhart v. Thomas*,

540 U.S. 20, 24 (2003).

## III.   **FACTS**

As of the date of the ALJ's decision, Plaintiff was 41 years old. (T. 56, 207.) At the time

of the ALJ's decision, she resided with her husband and four year old foster daughter. (T. 56,

401.) Prior to commencing this proceeding, Plaintiff finalized a divorce from her husband. (Dkt.

No. 1-2.) She is a high school graduate who attended regular education classes. (T. 401, 502.),

She subsequently attended three years of college, but did not obtain a degree. (*Id*.) Her most

recent employment was as a medical scheduler for a hospital. (T. 57, 502.) She worked there for

four and a half years, until leaving in June 2021. (T. 57-58, 502.) She testified that she had been

allowed to work from home periodically due to her health, and that she was approved for

disability retirement by her former employer.[3] (T. 58, 318.)

Plaintiff has a history of cardiac problems, including hospitalization in 2018 and 2019 for

heart palpitations and a rapid heart rate. (T. 67, 507.) She has been diagnosed with lupus and

fibromyalgia, and was prescribed medication by her rheumatologist to address her primary

---

[3] "A determination made by another agency regarding a claimant's disability is not
binding on the Social Security Administration." *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir.
2013) (summary order) (citing 20 C.F.R. § 404.1504).

symptoms of joint pain and skin rash. (T. 63, 424-425, 451, 507.)  Plaintiff testified that her heart problems and joint pain made it difficult to walk long distances or climb stairs, with the worst pain in her lower back, hips, and left knee. (T. 63-64.)  At the time of the ALJ's decision, Plaintiff was not receiving any outpatient mental health treatment or counseling, but had been prescribed medication for anxiety and depression by her primary care physician. (T. 60, 450-451.)

The record includes Plaintiff's treatment history for her physical and mental impairments. Rather than summarizing the records at the outset, I will refer to the pertinent records during my evaluation of the ALJ's disability determination.

## IV. <u>THE ALJ'S DECISION</u>

As an initial matter, the ALJ determined that Plaintiff met the insured status requirements through December 31, 2024. (T. 23.)  Based upon his review of the administrative record, the ALJ next found that Plaintiff had engaged in substantial gainful activity after her alleged onset date of August 6, 2020, but had not engaged in substantial gainful activity since June 4, 2021. (*Id*.)  At step two, the ALJ found that Plaintiff has the following severe impairments: "fibromyalgia, polyarthralgia, hypertrophic obstructive cardiomyopathy, mitral regurgitation,[4] type 2 diabetes, obesity, depressive disorder, and anxiety disorder." (T. 24-25.)

At step three of the evaluation, the ALJ found that Plaintiff's impairments either singly or in combination did not meet or medically equal the severity of a listed impairment, including

---

[4] Mitral valve regurgitation is disease in which the valve between the left heart chambers does not fully close, causing blood to leak backward across the valve.  The primary symptoms are fatigue and shortness of breath.  The disease can be treated with medication, but severe cases may require surgery.  https://www.mayoclinic.org/diseases-conditions/mitral-valve-regurgitation/symptoms-causes/syc-20350178   [https://perma.cc/9R3F-E6N7]

Listing 1.18 (abnormality of a major joint in any extremity), Listing 12.04 (depressive, bipolar and related disorders), Listing 12.06 (anxiety and obsessive-compulsive disorders), and Listing 14.09 (inflammatory arthritis), as well as multiple listings in Section 4.00 (cardiovascular) and Listing 9.00 (endocrine disorders). (T. 25-27.) Next, the ALJ found that Plaintiff can perform less than the full range of light work. (T. 21-25.) Specifically, the ALJ found that Plaintiff can climb, stoop, or crawl no more than frequently; can understand, remember, and carry out simple and routine instructions; can use judgment to make simple work-related decisions; can interact appropriately with supervisors, co-workers, or the public; and can appropriately adopt to ordinary changes in a routine work setting. (T. 27-28.)

In making this RFC determination, the ALJ stated that he considered all of Plaintiff's symptoms, and the extent to which those symptoms could "reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. 404.1529" and Social Security Ruling ("SSR") 16-3p. (*Id*.) The ALJ further stated that he considered opinion evidence and prior administrative medical findings in accordance with 20 C.F.R. § 404.1520c. (*Id*.) The ALJ also considered Plaintiff's subjective complaints regarding pain, symptoms, and functional limitations and found that "the evidence does not fully support the claimant's allegations regarding the extent of the functional limitations caused by her symptoms." (T. 28.)

The ALJ found that there was insufficient information about Plaintiff's prior jobs to determine whether Plaintiff could perform her past relevant work, but that such finding was not material to the disability determination because the ALJ was able to proceed to step five. (T. 30-31.) She proceeded to step five, and relying on the VE testimony, the ALJ found that there are jobs existing in significant numbers in the national economy that Plaintiff can perform, citing

7

several representative unskilled light exertional occupations. (T. 31-32.) Accordingly, the ALJ found that Plaintiff was not disabled from her alleged onset date of August 6, 2020 through the date of the ALJ's decision. (T. 32.)

## V.    ISSUES IN CONTENTION

Defendant, the only moving party, argues that the ALJ's sequential analysis and his ultimate determination regarding the cessation of Plaintiff's disability was supported by substantial evidence. Dkt. No. 24 at 6-18.

Plaintiff was not represented at her hearing before the ALJ, but was briefly represented by counsel who filed correspondence challenging the ALJ's decision to the Appeals Council. (T. 49-74, 360-361.) She commenced this proceeding *pro se*. (Dkt. No. 1.) Plaintiff did not file a brief or other papers responsive to Defendant's motion, despite being given more than one opportunity to do so and being advised on the potential consequences of failing to file a brief. (Dkt. Nos. 20, 21, 26.)

In the Northern District of New York, General Order No. 18 notifies parties of the consequences of failing to file a brief in connection with a social security action: "A party's brief may be its only opportunity to set forth arguments that entitle the party to a judgment in its favor. The failure to file a brief by either party may result in the consideration of the record without the benefit of the party's arguments." N.D.N.Y. General Order No. 18 at 6. This court reminded Plaintiff of these potential consequences when it *sua sponte* extended Plaintiff's deadline to file a brief in three separate orders. (Dkt. Nos. 20, 21, 26.)

"In a case such as this, where Plaintiff is proceeding *pro se*, General Order No. 18's promise of a consideration of the merits complies with the special solicitude that the Second Circuit mandates for *pro se* litigants." *Hubbard v. Comm'r of Soc. Sec.*, No. 6:14-CV-1401

8

(GTS/WBC), 2016 WL 551783, at *4 (N.D.N.Y. Jan. 14, 2016). As such, even when a plaintiff

declines to file a brief, a court may "examine[ ] the record to determine whether the ALJ applied

the correct legal standard and reached a decision based on substantial evidence." *Id.* (citing

*Gregorka v. Comm'r of Soc. Sec.*, No. 6:13-CV-1408 (GTS/TWD), 2015 WL 3915959, at *4

(N.D.N.Y. June 25, 2015)). This Court will do so in this case, and issue its recommendation to

the District Court.

## VI.    **HEARING PROCESS**

### A. **The ALJ Properly Informed Plaintiff of Her Right to Obtain Counsel for her August 19, 2022 Hearing.**

Although a claimant does not have a constitutional right to counsel at a Social Security

disability hearing, she does have a statutory and regulatory right to be represented should she

choose to obtain counsel. 42 U.S.C. § 406; 20 C.F.R. § 404.1705. The applicable statute and

regulations state that, when notifying a claimant of an adverse determination, the Commissioner

of Social Security must "notify [the] claimant in writing" of (1) her "options for obtaining [an]

attorney[ ] to represent [her]" at her hearing, and (2) "the availability ... of ... organizations which

provide legal services free of charge" to "qualifying claimants." 42 U.S.C. §§ 406(c),

1383(d)(2)(D); *see also* 20 C.F.R. § 404.1706; *see also Drake v. Comm'r of Soc. Sec.*, No. 8:08-

CV-1007, 2010 WL 11526780, at *4-5 (N.D.N.Y. Dec. 20, 2010). At the hearing stage, an ALJ

should also take steps to ensure that a claimant is appropriately informed of her rights regarding

representation. *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 509 (2d Cir. 2009) (finding that

ALJ properly informed claimant of rights when he offered to postpone hearing to pursue

representation or move forward with hearing, and claimant confirmed twice that she preferred to

proceed with the hearing). If properly informed of this right, a claimant may waive it. *Id*. at

508-509.

In this case, the Commissioner advised Plaintiff in advance of the hearing of her right to an attorney or other representative and provided a list of organizations that may provide low or no cost legal services to qualified individuals. (T. 117, 120, 128, 138, 144-146, 155-156.)  At her hearing, the ALJ advised Plaintiff of her right to representation as well as the potential to obtain counsel on a contingent fee or low-cost basis, and offered to adjourn the hearing to allow her to pursue representation. (T. 51-54.)  Plaintiff declined this offer and elected to proceed with the hearing. (T. 52.)  The record includes multiple written and oral waivers from Plaintiff indicating that she understood her right to be represented. (T. 51-53, 120.)  Plaintiff has not alleged that she failed to understand her right to representation or was otherwise coerced into waiving those rights.  This Court is satisfied that there are no grounds for remand due to Plaintiff's decision to represent herself during the administrative process.

**B.  The ALJ Properly Developed the Record.**

An ALJ has an affirmative obligation to develop a claimant's complete and accurate medical record.  "[T]he Commissioner of Social Security ... shall develop a complete medical history of at least the preceding twelve months for any case in which a determination is made that the individual is not under a disability." 42 U.S.C. § 423(d)(5)(B); *see also Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) (citation omitted) (noting that a "hearing on disability benefits is a non-adversarial proceeding," and as such, "the ALJ generally has an affirmative obligation to develop the administrative record").  An ALJ's failure to comply with this mandate is legal error. *Rose v. Comm'r of Soc. Sec.*, 202 F. Supp. 3d 231, 239 (E.D.N.Y. 2016).  However, the ALJ's duty to develop the record is not unlimited and is discharged when the ALJ "possesses [the

10

claimant's] complete medical history" and there are no "obvious gaps or inconsistencies" in the record. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) (internal quotation marks omitted).

The duty to develop the record is "heightened" when a claimant "waives [her] right to counsel and proceeds *pro se*." *Moran v. Astrue*, 569 F.3d 108, 113 (2d Cir. 2009) (internal quotation marks omitted). This is because the ALJ "must adequately protect" the rights of a *pro se* claimant. *Id*. The ALJ's heightened duty requires him to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982); *see also Morris v. Berryhill*, 721 F. App'x 25, 27 (2d Cir. 2018) (summary order) ("When a disability benefits claimant appears *pro se*, the ALJ must 'ensur[e] that all of the relevant facts are sufficiently developed and considered.'") (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)). On appeal, the district court must undertake a "searching investigation of the record" to ensure that the rights of the *pro se* claimant were protected. *Cruz*, 912 F.2d at 11. Moreover, where a claimant is *pro se* and alleging mental impairments, courts have concluded that the ALJ bears a "doubly heightened" duty to develop the record. *Estrella o/b/o M.R.E. v. Berryhill*, No. 15 CV 6966 (CS)(LMS), 2017 WL 2693722, at *21 (S.D.N.Y. June 22, 2017) (citing *Corporan v. Comm'r of Soc. Sec.*, No. 12-Civ-6704 (JPO)(SN), 2015 WL 321832, at *6 n.7 (S.D.N.Y. Jan. 23, 2015)).

The record demonstrates that the ALJ met his heightened obligation to develop the record on behalf of the *pro se* Plaintiff. During the hearing, the ALJ inquired about Plaintiff's medical and mental health treatment history, including the names and addresses of her medical providers. (T. 59-66.) He asked her about upcoming medical appointments, and advised her that he would attempt to obtain any outstanding medical records. (T. 61, 73.) The record includes post-hearing correspondence to medical providers seeking those records. (T. 590-607.)

11

The ALJ also granted Plaintiff's request for a third party lay witness to testify by telephone during the hearing, but was unable to reach this witness at the telephone number provided by Plaintiff. (T. 54-55, 68-69, 71.)  The ALJ advised Plaintiff that he would hold the record open for two weeks to allow Plaintiff an opportunity to submit written witness testimony. (T. 69, 73.)  Plaintiff did not file any new evidence with the ALJ or Appeals Council. (T. 5, 21.)

The ALJ's decision includes a lengthy discussion of Plaintiff's medical history, and the hearing transcript does not suggest any obvious gaps or defects in the available record. Therefore, this Court is satisfied that the ALJ met his heightened obligation to develop the record on Plaintiff's behalf, and finds no grounds for remand on this basis.

## VII.   SEVERE IMPAIRMENTS

### A.  Legal Standard

A severe impairment significantly limits the plaintiff's physical and/or mental ability to do basic work activities.  *See* 20 C.F.R. §§ 404.1520(c), 416.920(c); *see also* 20 C.F.R. §§ 404.1521(a), 416.921(a) (stating an impairment is not severe at step two if it does not significantly limit a claimant's ability to do basic work activities).  The Regulations define "basic work activities" as the "abilities and aptitudes necessary to do most jobs," examples of which include, (1) physical functions such as walking, standing, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting.  20 C.F.R. §§ 404.1521(b), 416.921(b).  "Severity" is determined by the limitations imposed by an impairment, and not merely by its diagnosis.  The mere presence or diagnosis of a disease or impairment is not, by itself, sufficient to deem a condition severe.

*Monique Danielle W. v. Comm'r of Soc. Sec.*, No. 5:18-CV-184 (DNH), 2019 WL 2358529, at

\*4 (N.D.N.Y. June 4, 2019) (quoting *Zenzel v. Astrue*, 993 F. Supp. 2d 146, 152 (N.D.N.Y.

2012)). The claimant bears the burden of presenting evidence establishing severity at step two of

the disability analysis. *Rhondalee T. v. Berryhill*, No. 3:17-CV-1241 (CFH), 2019 WL 1100267,

at \*5 (N.D.N.Y. Mar. 8, 2019) (citing *Taylor v. Astrue*, 32 F. Supp. 3d 253, 265 (N.D.N.Y.

2012)).

   An ALJ should make a finding of "'not severe' . . . if the medical evidence establishes

only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's

ability to work.'" *Mark K. v. Comm'r of Soc. Sec. Admin.*, No. 5:18-CV-627 (GLS), 2019 WL

4757381, at \*1 (N.D.N.Y. Sept. 30, 2019) (quoting *Rosario v. Apfel*, No. 97 CV 5759, 1999 WL

294727, at \*5 (E.D.N.Y. Mar. 19, 1999)). Although an impairment may not be severe by itself,

the ALJ must also consider "the possibility of several such impairments combining to produce a

severe impairment . . . ." Social Security Ruling ("SSR") 85-28, 1985 WL 56856, at \*3 (1985).

However, a combination of "slight abnormalities," having no more a minimal effect on

plaintiff's ability to work, will not be considered severe. *Id.* The ALJ must assess the impact of

the combination of impairments, rather than assessing the contribution of each impairment to the

restriction of activity separately, as if each impairment existed alone. *Id.*

   The step two analysis "may do no more than screen out *de minimis* claims." *Vogt on*

*behalf of Vogt v. Comm'r of Soc. Sec.*, No. 18-CV-231, 2019 WL 4415277, at \*4 (W.D.N.Y.

Sept. 16, 2019) (quoting *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995)). If the disability

claim rises above a *de minimis* level, then the ALJ must undertake the remaining analysis of the

claim at step three through step five. *Dixon*, 54 F.3d at 1030.

Often, when there are multiple impairments, and the ALJ finds some, but not all of them severe, an error in the severity analysis at step two may be harmless because the ALJ continued with the sequential analysis and did not deny the claim based on the lack of a severe impairment alone. *Tryon v. Astrue*, No. 5:10-CV-537 (MAD), 2012 WL 398952, at *3 (N.D.N.Y. Feb. 7, 2012) (citing *Kemp v. Commissioner of Soc. Sec.*, No. 7:10-CV-1244 (GLS/ATB), 2011 WL 3876526, at *8 (N.D.N.Y. Aug. 11, 2011)). This is particularly true because the regulations provide the combined effects of all impairments must be considered, regardless of whether any impairment, if considered separately, would be of sufficient severity. 20 C.F.R. §§ 404.1523, 416.923; *Dixon*, 54 F.3d at 1031.

### B. Substantial Evidence Supports the Commissioner's Step Two Determination Regarding Plaintiff's Severe Impairments.

As discussed above, the ALJ found Plaintiff's fibromyalgia, polyarthralgia, hypertrophic obstructive cardiomyopathy, mitral regurgitation, type 2 diabetes, obesity, depressive disorder, and anxiety disorder to be severe impairments. (T. 24.) At the August 19, 2022 hearing, Plaintiff testified about her physical and mental health impairments, and the resulting functional limitations. (T. 59-69.) In his decision, the ALJ considered this testimony along with medical and vision evaluations identifying other potential diagnoses, including systemic lupus erythematosus, but found none of these other conditions rose to the level of a severe impairment. (T. 24-25.) Accordingly, the ALJ's analysis at step two provides sufficient explanation indicating adequate consideration of the evidence related to Plaintiff's alleged impairments, including those he did not find to be severe. (T. 14-15.) *See Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir, 2013); *Fuimo v. Colvin*, 948 F. Supp. 2d 260, 269-70 (N.D.N.Y. 2013).

Therefore, for the reasons above, the ALJ's findings regarding Plaintiff's impairments at step two are supported by substantial evidence and do not suggest a basis for remand.

## VIII.   LISTED IMPAIRMENTS

### A.   Legal Standards

To qualify as a Listed Impairment, a medically determinable impairment must satisfy all of the specified criteria in a Listing.  *See Rockwood v. Astrue*, 614 F. Supp. 2d 252, 272 (N.D.N.Y. 2009) (citing 20 C.F.R. § 404.1525(d)).  "If a claimant's impairment 'manifests only some of those criteria, no matter how severely,' such impairment does not qualify."  *Id.*, 614 F. Supp. 2d at 272 (quoting *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)).

### B.   The ALJ had substantial evidence to find that Plaintiff did not have a Listed Impairment.

At step three, the ALJ expressly considered whether Plaintiff's physical and mental impairments met or medically equaled the severity of a Listed Impairment, including Listing 1.18 (abnormality of a major joint in any extremity), Listing 12.04 (depressive, bipolar and related disorders), Listing 12.06 (anxiety and obsessive-compulsive disorders), and Listing 14.09 (inflammatory arthritis). (T. 25.)  The ALJ also considered the broader category under Listing 4.00 (cardiovascular system) due to Plaintiff's history of heart problems, and Listing 9.00 (endocrine disorders) due to Plaintiff's history of diabetes. (*Id.*)

Recognizing that Plaintiff met the medical definition of obese, the ALJ found that this impairment did not fall within a specific Listing, and thus considered the effect of obesity on her general health. (T. 25.)  Likewise, the ALJ recognized that there was no specific listing for fibromyalgia, but found that the Plaintiff's documented fibromyalgia symptoms did not suggest medical equivalence to any Listed Impairment. (*Id.*)  Finally, the ALJ evaluated Plaintiff's

mental health treatment history and the psychiatric consultative examination reports for the suggestion of any marked or extreme limitations that might qualify as a Listed Impairment pursuant to 20 CFR 404.1520a, but found none. (T. 26-27.)

The ALJ's thorough analysis demonstrates sufficient consideration of Plaintiff's impairments in relation to the Listings, and his findings are supported by substantial evidence. In addition, this Court's review has not identified any medical findings in the record that would contradict the ALJ's findings. As such, this Court finds no grounds for remand based upon the ALJ's determination that Plaintiff did not have a Listed Impairment.

## IX.    **RFC DETERMINATION**

### A.  **Legal Standard**

RFC is defined as "'what an individual can still do despite his or her limitations . . . . Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.'" *Pardee v. Astrue*, 631 F. Supp. 2d 200, 210 (N.D.N.Y. 2009) (quoting *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (citation omitted)). "In making a residual functional capacity determination, the ALJ must consider a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis." *Pardee*, 631 F. Supp. 2d at 210 (citing 20 C.F.R. § 404.1545(a)). "Ultimately, '[a]ny impairment-related limitations created by an individual's response to demands of work . . . must be reflected in the RFC assessment.'" *Hendrickson v. Astrue*, 5:11-CV-927 (ESH), 2012 WL 7784156, at *3 (N.D.N.Y. Dec. 11, 2012) (quoting S.S.R. 85-15, 1985 WL 56857, at *6). The RFC determination "must be set forth with sufficient specificity to enable [the Court] to decide whether the determination is supported by substantial evidence." *Ferraris v. Heckler*, 728 F.2d

16

582, 587 (2d Cir. 1984).

"In deciding a disability claim, an ALJ is tasked with 'weigh[ing] all of the evidence available to make an RFC finding that [is] consistent with the record as a whole,' even if that finding does not perfectly correspond with any of the opinions of cited medical sources." *Tanya S. v. Saul*, 410 F. Supp. 3d 436, 445 (N.D.N.Y. 2019) (quoting *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (summary order)). However, it is well established that ALJs are not medical professionals; therefore, ALJs are "not qualified to assess a claimant's RFC on the basis of bare medical findings." *Id.* (internal quotation marks and citation omitted); *see Charland v. Comm'r of Soc. Sec.*, No. 1:13-CV-492 (GTS/WBC), 2016 WL 1117515, at *2 (N.D.N.Y. Mar. 22, 2016) ("[A]n ALJ cannot assess a plaintiff's RFC based on the ALJ's own interpretation of the medical evidence."). "In other words, there must be substantial evidence to support a finding of functional limitation(s) or lack thereof." *Tanya*, 410 F. Supp. 3d at 445.

"Before assessing the claimant's RFC, the ALJ must consider the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis." *Knighton v. Astrue*, 861 F. Supp. 2d 59, 66 (N.D.N.Y. 2012) (citing S.S.R. 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996)). This requires the ALJ to "make a function by function assessment of the claimant's ability to sit, stand, walk, lift, carry, push, pull, reach, handle, stoop, or crouch." *Walters v. Astrue*, No. 11-CV-640 (VEB), 2013 WL 598331, at *3 (N.D.N.Y. Feb. 15, 2013); 20 C.F.R. §§ 404.1513(a)(2)(i), 404.1569a(a). "The claimant's RFC can be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy only after the function-by-function analysis has been completed." *Knighton*, 861 F. Supp. 2d at 66 (citation omitted); *see Walters*, 2013 WL 598331, at *3 ("Once the function-by-function analysis is completed, the RFC may be expressed in terms of exertional levels of work, e.g., sedentary,

light, medium, heavy, and very heavy.").

### B. The ALJ Marshalled Substantial Evidence to Support his RFC Determination that Plaintiff Could Perform Less than the Full Range of Light work.

"Light work" is ordinarily defined as work that

involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

As stated above, the ALJ determined that Plaintiff had the RFC to perform less than the full range of light work by incorporating postural restrictions into the RFC along with limiting Plaintiff to jobs requiring simple instructions and decision-making. (T. 27.) There is no treating source opinion in the record. The ALJ thus based his RFC determination on the available treatment record, the opinions of non-examining state agency consultants, examination reports by multiple consultative examiners and their accompanying opinions, and Plaintiff's testimony.

When evaluating Plaintiff's physical functional limitations, the ALJ considered two consultative medical opinions prepared by Dr. Elke Lorensen, who performed physical examinations on June 21, 2021 and March 7, 2022. (T. 29, 507-510.) Following both examinations, Dr. Lorensen opined that Plaintiff had "[n]o gross limitations" for sitting, standing, walking, the use of her arms, and the use of her hands. (T. 408, 510.) The ALJ found both these opinions to be generally persuasive, but discounted the findings as "somewhat optimistic" in light of Dr. Lorensen's observation of an audible heart murmur and positive

fibromyalgia trigger points, suggestive of at least some physical functional limitations. (T. 29-30, 509.)  The ALJ found greater support for the conclusions of state agency consultants Dr. S. Gandhi and Dr. I. Seok, who reached similar opinions regarding Plaintiff's ability to perform the physical requirements of light work upon review of her then-available medical records.

In July 2021, Dr. Gandhi opined that Plaintiff could occasionally lift and carry up to twenty pounds, and could frequently lift and carry up to ten pounds. (T. 85.)  Dr. Gandhi further opined that Plaintiff could stand and/or walk for up to six hours over the course of a work day, and could sit for the same total period of time. (T. 85-86.)   He found no evidence of postural, manipulative, and environmental limitations in the record. (T. 86.)  In support of this opinion, Dr. Gandhi provided a brief narrative citing imaging reports, echocardiogram results, and treatment notes from 2020 and 2021, as well as Dr. Lorensen's first consultative examination report. (T. 87.)  Dr. Gandhi noted that an RFC determination consistent with this opinion would allow an individual to perform light work. (T. 89.)

In March 2022, Dr. Seok reviewed an updated set of Plaintiff's medical records, and reached a similar opinion to Dr. Gandhi, but increased the applicable postural limitations. (T. 104-107.)  Like Dr. Gandhi, Dr. Seok opined that Plaintiff could occasionally lift up to twenty pounds and frequently lift up to ten pounds, and was able to stand and/or walk for up to six hours over the course of a work day, and sit for the same total period of time. (T. 105.)  With regard to postural limitations, Dr. Seok opined that Plaintiff could frequently[5] climb ramps, stairs, ladders, ropes, and scaffolds, frequently bend at the waist, and frequently crawl, but had no limits with

---

[5] "[T]he Social Security regulations define 'frequently' as 'occurring between one-third to two-thirds' of a workday."  *Cherry v. Comm'r of Soc. Sec.*, No. 17-CV-7999 (VEC), 2019 WL 1305961, at *7 (S.D.N.Y. Mar. 22, 2019) (original alteration omitted and quoting SSR 83-10), *aff'd*, 813 F. App'x 658 (2d Cir. 2020).

regard to balancing, kneeling, and crouching. (T. 105-106.)  Dr. Seok noted that adoption of this opinion would result in a physical RFC of light work. (T. 114.)

The ALJ also considered other evidence that he deemed consistent with the ability to physically perform light work. (T. 29-30.)  He noted Plaintiff's history of treatment for rapid heartbeat and shortness of breath as well as her more recent complaints of "occasional palpitations," but also observations from her treating cardiologist that Plaintiff's condition had improved with consistent medication. (T. 29, 369.)  The ALJ evaluated Plaintiff's fibromyalgia diagnosis, but found no evidence in treatment notes suggesting an inability to perform light work. (T. 30.)  He also considered Plaintiff's documented activities of daily living, including childcare, cooking, laundry, shopping, and socializing with family. (T. 28-29, 269-270, 295-296.)  Consideration of an individual's daily activities is a valid factor in an ALJ's analysis of the broader record.  *See Medina v. Comm'r of Soc. Sec.*, 831 F. App'x 35, 36 (2d Cir. 2020) (allowing ALJ to consider daily activities in determining consistency with alleged symptoms); *Herrington v. Berryhill*, No. 3:18-CV-315, 2019 WL 1091385, at *7 (D. Conn. Mar. 8, 2019) (activities of daily living are appropriate factors for an ALJ to consider when assessing a plaintiff's claimed symptoms and limitations); *see also* 20 C.F.R. § 404.1529 (identifying daily activities as a factor relevant to the ALJ's assessment of pain and other symptoms).

The ALJ conducted a similar analysis of the evidence regarding Plaintiff's mental health limitations.  He noted that Plaintiff had been prescribed medication for anxiety and depression by her primary care provider, but has never required psychiatric hospitalization or specialized mental health treatment. (T. 26, 60, 401, 502.)  At her March 2022 consultative examination, Plaintiff described engaging in counseling with an online therapist for approximately one month. (T. 502.)  In the absence of a mental health treating source opinion or extensive mental health

20

treatment notes, the ALJ evaluated the multiple consultative opinions in the record, and found

the psychiatric consulting opinions of Dr. Dennis Noia, Dr. Jeanne Shapiro, and Dr. J. Ochoa to

all be persuasive.  This Court will address each opinion in turn.

Dr. Noia conducted a psychiatric consultative examination of Plaintiff on June 21, 2021.

(T. 401-404.)  During the examination, Dr. Noia found Plaintiff had a cooperative demeanor and

was responsive to questions. (T. 402.)  She demonstrated coherent and goal-directed thought

processes with no evidence of hallucinations, delusions, or paranoia in the evaluation setting. (T.

402.)  Dr. Noia observed intact attention and concentration and relatively intact recent and

remote memory skills. (*Id*.)

Based on his examination, Dr. Noia opined that there is no evidence of limitations in (1)

understanding, remembering, or applying simple directions and instructions, (2) understanding,

remembering, and applying complex directions and instructions or (3) using reason and

judgment to make work-related decisions. (T. 403.)  He further opined that Plaintiff had mild

limitations with regard to interacting with supervisors, co-workers, and the public, as well "mild

to moderate" limitations regulating her emotions, controlling her behavior, and maintaining her

well-being. (*Id*.)  Dr. Noia observed no limitations in Plaintiff's ability to sustain concentration,

perform tasks at a consistent pace, maintain personal hygiene and appropriate attire or maintain

awareness of normal workplace hazards and take appropriate precautions. (*Id*.)

Dr. Jeanne Shapiro conducted a psychiatric consultative examination of Plaintiff on

March 7, 2022. (T. 502-506.)  Like her earlier examination with Dr. Noia, Plaintiff demonstrated

a cooperative demeanor and was responsive to questions. (T. 503.)  She again displayed coherent

and goal-directed thought processes with no evidence of hallucinations, delusions, or paranoia in

the evaluation setting. (T. 504.)  Dr. Shapiro observed grossly intact attention and concentration

and grossly intact recent and remote memory skills. (*Id.*)

Based on her examination, Dr. Shapiro opined that Plaintiff did not appear to have any limitations understanding, remembering, or applying simple or complex instructions and directions or using reason and judgment to make work-related decisions. (T. 505.)  She further opined that Plaintiff had "mild to moderate" limitations interacting adequately with supervisors, coworkers, and the public but no limitations sustaining concentration and performing tasks at a consistent pace. (*Id.*)  Dr. Shapiro found no limitations in Plaintiff's ability to sustain an ordinary routine and regular attendance at work, but "moderate" limitations regulating emotions, controlling behavior, and maintaining well-being. (*Id.*)  She observed no limitations in Plaintiff's ability to maintain personal hygiene and appropriate attire, and be aware of normal workplace hazards and take appropriate precautions. (T. 505.)

Dr. Ochoa reviewed Plaintiff's then-current medical records along with the consultative examination reports from Dr. Noia and Dr. Shapiro, and prepared an opinion dated March 21, 2022. (T. 108-112.)  Dr. Ochoa found no evidence of limitations in Plaintiff's ability to remember locations and work-like procedures or to understand, remember, or carry out very short and simple instructions. (T. 108-109.)  The consultant opined that Plaintiff was "not significantly limited" in her ability to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods, or to perform activities within a schedule, maintain regular work attendance, and be punctual within customary tolerances. (T. 109.)  Dr. Ochoa opined that Plaintiff was "moderately limited" in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, but was not significantly limited in her interaction with coworkers or the general public. (T. 110-

111.)  The consultant likewise found no significant limitations in Plaintiff's ability to respond appropriately to changes in the workplace, to be aware of normal work hazards and take appropriate precautions, and to set realistic goals and make plans independently of others. (T. 111.)

After reciting the evidence that formed the basis for these findings, Dr. Ochoa concluded that the "[t]otality of the evidence indicates the claimant can understand and remember detailed instructions and procedures and perform at a reasonable pace, interact in an appropriate manner to meet work related needs, and adapt to work related changes and make work related decisions." (T. 112.)

The ALJ observed that the separate opinions of Dr. Noia, Dr. Shapiro, and Dr. Ochoa were generally consistent with each other, bolstering their persuasiveness. (T. 30.)  In contrast, the ALJ rejected the non-examining opinion of Dr. J. Penny, who opined in June 2021 that Plaintiff had no severe mental health impairments, because the consultant did not have access to Plaintiff's complete medical history. (T. 29, 81-83.)

The ALJ also noted that the opinions of Dr. Noia and Dr. Shapiro were supported by their own examination reports, and that Dr. Ochoa had cited the treatment notes and examination reports on which the opinion was based. (T. 30.)  The ALJ further found the three consulting opinions to be consistent with Plaintiff's limited mental health treatment history and Plaintiff's own description of her activities of daily living, particularly her extensive childcare responsibilities. (*Id*.)

Thus, the record before this Court establishes that the ALJ resolved conflicts between the objective medical record, medical opinion evidence, and hearing testimony by placing the greatest reliance on that evidence that he deemed most consistent with Plaintiff's overall

treatment record and activities.  In doing so, the ALJ appropriately evaluated the conflicting

medical evidence and plaintiff's testimony and made an RFC finding that was consistent with the

overall record.  *See Matta*, 508 F. App'x. at 56 (although ALJ's conclusion did not perfectly

correspond with any of the opinions of medical sources, ALJ was entitled to weigh all of the

evidence available to make an RFC finding that was consistent with the record as a whole).

"There is no requirement that the ALJ pick one RFC [opinion] and use that particular evaluation

in its entirety."  *Alexandrea R.R. v. Berryhill*, No. 15-CV-756 (FPG), 2019 WL 2269854, at *6

(N.D.N.Y. May 28, 2019).  Rather, "it is the ALJ's responsibility to choose between properly

submitted medical opinions and other competent evidence to piece together an overall [RFC]

assessment."  *Id.*  In doing so, the "ALJ is entitled to rely upon the opinions of both examining

and non-examining State agency medical consultants," like Dr. Lorensen, Dr. Gandhi, Dr. Seok,

Dr. Noia, Dr. Shapiro, and Dr. Ochoa, "since such consultants are deemed to be qualified experts

in the field of social security disability."  *Monroe v. Comm'r of Soc. Sec.*, No. 5:15-CV-1235

(GTS/WBC), 2016 WL 7971330, at *7 (N.D.N.Y. Dec. 29, 2016), *rep. & rec. adopted*, 2017 WL

318838 (N.D.N.Y. Jan. 23, 2017) (collecting cases).

     In light of the ALJ's analysis, this Court concludes that his RFC determination that

Plaintiff could perform less than the full range of light work was supported by substantial

evidence, as summarized above.  *Vincent v. Shalala*, 830 F. Supp. 126, 133 (N.D.N.Y. 1993)

("[I]t is not the function of the reviewing court to reweigh the evidence.") (citing *Carroll v. Sec'y*

*of Health and Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983)).

## X.   AVAILABILITY OF WORK

### A.  Legal Standard

If the ALJ utilizes a VE at the hearing, the VE is generally questioned using a

hypothetical question incorporating Plaintiff's limitations.  *See Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981).  The ALJ may rely on a VE's testimony regarding the availability of work as long as the hypothetical facts the expert is asked to consider are based on substantial evidence and accurately reflect Plaintiff's limitations.  *Calabrese v. Astrue*, 358 F. App'x 274, 276 (2d Cir. 2009).  Where the hypothetical is based on an ALJ's RFC analysis which is supported by substantial facts, the hypothetical is proper.  *Id.* at 276-77.

### B.  The ALJ had Substantial Evidence to Find that Plaintiff Could Perform Several Representative Jobs Existing in Significant Numbers in the National Economy.

In response to the ALJ's hypothetical question, VE Garozzo testified at the August 19, 2022 hearing that an individual matching Plaintiff's RFC would be able to perform several representative jobs existing in significant numbers in the national economy. (T. 71-73.)  Because this Court has found the ALJ's RFC determination was supported by substantial evidence, it also finds the ALJ's hypothetical to VE Garozzo was proper, and the resulting determination that there were jobs Plaintiff could perform was supported by substantial evidence.

While questioning the VE, the ALJ confirmed his professional expertise, relevant experience, and the consistency of his testimony with the Dictionary of Occupational Titles. (T. 70-73.)  At the hearing, Plaintiff objected to the VE's testimony, stating that her physical and mental health impairments prevented her from performing the representative light work occupations identified by the VE – namely, housekeeper, production assembler, and marker.[6] (T. 72-73.)  Although Plaintiff disagrees with the resulting step five determination, the ALJ was

---

[6] The VE was referring to the occupation of Marker II, defined in the Dictionary of Occupational Titles as an individual who marks or affixes trademarks or other identifying information, such as size, color, grade, or process code, on products.  *See* Marker II, DICOT 920.687, 1991 WL 687992.

entitled to rely on the VE's established expertise.  *See McIntyre v. Colvin,* 758 F.3d 146, 152 (2d Cir. 2014) (finding that ALJ could reasonably rely on testimony based on VE's professional experience and clinical judgment.)

As summarized above, the ALJ's decision was based upon correct legal standards, and substantial evidence supports his ultimate determination that Plaintiff was not under a disability within the meaning of the SSA between the alleged onset date and the date of the ALJ's decision.

**ACCORDINGLY**, it is

**RECOMMENDED** that the Commissioner's decision be **AFFIRMED**, Defendant's motion for judgment on the pleadings (Dkt. No. 24) be **GRANTED** in its entirety, and Plaintiff's complaint (Dkt. No. 1) be **DISMISSED**.

**ORDERED** that the Clerk of the Court shall file a copy of this Report and Recommendation on the parties, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court. [7]

**FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v.*

---

[7] If you are proceeding *pro se* and served with this Report-Recommendation and Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections.  Fed. R. Civ P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday  Fed. R. Civ. P. 6(a)(1)(c).

*Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1);

Fed. R. Civ. P. 72.


Dated:  February 5, 2025
        Binghamton, New York

Miroslav Lovric
U.S. Magistrate Judge

27

Case 5:24-cv-00169-DNH-ML   Document 27   Filed 02/05/25   Page 28 of 223
Hubbard v. Commissioner of Social Security, Not Reported in Fed. Supp. (2016)
2016 WL 551783

2016 WL 551783
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Kim HUBBARD, Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY, Defendant.

6:14-CV-1401 (GTS/WBC)
|
Signed 01/14/2016

**Attorneys and Law Firms**

KIM HUBBARD, PRO SE, 270 Day Ave., Rome, NY 13440.

DANIEL R. JANES, ESQ., U.S. SOCIAL SECURITY ADMIN., OFFICE OF REG'L GEN. COUNSEL – REGION II, Counsel for Defendant, 26 Federal Plaza – Room 3904, New York, NY 10278.

### *REPORT and RECOMMENDATION*

William B. Mitchell Carter, U.S. Magistrate Judge

 **\*1**  This matter was referred for report and recommendation by the Honorable Judge Suddaby, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d). (Dkt. No. 19.) This case has proceeded in accordance with General Order 18.

Currently before the Court, in this Social Security action filed by Kim Hubbard ("Plaintiff") against the Commissioner of Social Security ("Defendant" or "the Commissioner") pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), is Defendant's unopposed motion for judgment on the pleadings. (Dkt. No. 17.) For the reasons set forth below, it is recommended that Defendant's motion be granted.

## I. RELEVANT BACKGROUND

### A. Factual Background

Plaintiff was born on July 20, 1982. (T. 88.) She completed four years of college. (T. 109.) Generally, Plaintiff's alleged disability consists of diabetes, attention deficit hyperactivity disorder ("ADHD"), back impairments, and anxiety. (T. 108.) Her alleged disability onset date is September 22, 2010. (T. 60.) Her date last insured is June 30, 2015. (*Id.*) She previously worked as a customer service representative, medical records scanner, processor, waitress, and child care provider. (T. 109.)

### B. Procedural History

On February 25, 2012, Plaintiff applied for a period of Disability Insurance Benefits ("SSD") under Title II of the Social Security Act. (T. 60.) Plaintiff's application was initially denied, after which she timely requested a hearing before an Administrative Law Judge ("the ALJ"). On March 11, 2013, Plaintiff appeared, pro se, before the ALJ, David J. Begley. (T. 25–59.) The ALJ advised Plaintiff of her right to be counseled by an attorney or representative, but Plaintiff waived that right. (T. 28–29.) On June 5, 2013, ALJ Begley issued a written decision finding Plaintiff not disabled under the Social Security Act. (T. 7–24.) On September 22, 2014, the Appeals Council ("AC") denied Plaintiff's request for review, rendering the ALJ's decision the final

Hubbard v. Commissioner of Social Security, Not Reported in Fed. Supp. (2016)

2016 WL 551783

decision of the Commissioner. (T. 1–4.) Thereafter, Plaintiff, again appearing pro se, timely sought judicial review in this Court. On November 19, 2014, the Court issued Plaintiff a copy of this Court's General Order 18, governing the procedural rules with respect to Social Security appeals. (Dkt. No. 3.) At that time the Court also issued Plaintiff a copy of the Pro Se Handbook and Notice. (Dkt. No. 4.)

Pursuant to General Order 18, plaintiffs are notified that "the failure to file a brief as required by this order will result in the consideration of this appeal without the benefit of plaintiff's arguments and may result in a decision heavily influenced by the commissioner's version of the facts and subsequent dismissal of your appeal." N.D.N.Y. General Order 18 at 4.

Plaintiff failed to file a brief by the April 27, 2015 deadline and because of her pro se status, the Court granted an extension to June 1, 2015. (Dkt. No. 14.) Plaintiff failed to file a brief by June 1, 2015 and the Court directed Defendant to file her brief. (Dkt. No. 15.) As of the date of this report and recommendation, Plaintiff has not filed a brief.

### C. The ALJ's Decision

**\*2** Generally, in his decision, the ALJ made the following five findings of fact and conclusions of law. (T. 12–24.) First, the ALJ found that Plaintiff met the insured status requirements through June 30, 2015 and Plaintiff had not engaged in substantial gainful activity since September 22, 2010. (T. 12.) Second, the ALJ found that Plaintiff had the severe impairments of diabetes mellitus, hyperthyroidism, degenerative disc disease of the lumbar and cervical spine, left wrist tendinitis, left wrist carpal tunnel syndrome (status post release), right wrist capsulitis, panic disorder, and ADHD. (*Id*.) Third, the ALJ found that Plaintiff did not have an impairment that meets or medically equals one of the listed impairments located in 20 C.F.R. Part 404, Subpart P, Appendix. 1. (T. 12-13.) Fourth, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work, except Plaintiff:

> [could] not climb ladders, ropes, or scaffolds; could occasionally climb ramps/stairs, balance, stoop, kneel, crouch or crawl; work [was] limited to simple, routine, and repetitive tasks, involving only simple, work-related decisions, with few, if any, work-place changes, and only occasional interaction with coworkers and supervisors; [and] no regular interaction with the general public.

(T. 13–14.) [1] Fifth, the ALJ determined that Plaintiff was incapable of performing her past relevant work; however, there were jobs that existed in significant numbers in the national economy Plaintiff could perform. (T. 20–21.)

## II. DEFENDANT'S BRIEFING ON HER MOTION FOR JUDGMENT ON THE PLEADINGS

In support of her motion for judgment on the pleadings, Defendant makes four arguments. First, Defendant argues Plaintiff knowingly and voluntarily waiver her right to representation. (Dkt. No. 17 at 11–12 [Def.'s Mem. of Law].) Second, Defendant argues the ALJ's RFC finding was supported by substantial evidence. (*Id*. at 12–14.) Third, Defendant argues the ALJ's step five finding was supported by substantial evidence. (*Id*. at 14.) Fourth, and lastly, Defendant argues Plaintiff failed to meet her burden. (*Id*. at 14–15.)

## III. RELEVANT LEGAL STANDARD

### A. Standard of Review

A court reviewing a denial of disability benefits may not determine de novo whether an individual is disabled. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Wagner v. Sec'y of Health & Human Servs*., 906 F.2d 856, 860 (2d Cir.1990). Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied, or it was not supported by substantial evidence. *See Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir.1987) ("Where there is a reasonable basis for doubt whether the

ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."); *Grey v. Heckler,* 721 F.2d 41, 46 (2d Cir.1983); *Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir.1979).

**\*3** "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *See Rutherford v. Schweiker,* 685 F.2d 60, 62 (2d Cir.1982).

"To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams v. Bowen,* 859 F.2d 255, 258 (2d Cir.1988).

If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." *Rosado v. Sullivan,* 805 F.Supp. 147, 153 (S.D.N.Y.1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." *Valente v. Sec'y of Health & Human Servs.,* 733 F.2d 1037, 1041 (2d Cir.1984).

### A. Standard to Determine Disability

The Commissioner has established a five-step evaluation process to determine whether an individual is disabled as defined by the Social Security Act. *See* 20 C.F.R. § 404.1520. The Supreme Court has recognized the validity of this sequential evaluation process. *See Bowen v. Yuckert,* 482 U.S. 137, 140–42, 107 S.Ct. 2287 (1987). The five-step process is as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform. Under the cases previously discussed, the claimant bears the burden of the proof as to the first four steps, while the [Commissioner] must prove the final one.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir.1982).

### IV. ANALYSIS

In a civil case, the Court may dismiss an action where, as here, "the plaintiff fails to prosecute or to comply with [the Federal Rules of Civil Procedure] or a court order...." Fed.R.Civ.P. 41(b); *Storey v. O'Brien,* No. 10–3303, 2012 WL 1889408, at \*1 (2d Cir. May 25, 2012). Further, other districts in the Second Circuit have dismissed Social Security appeals, sua sponte, due to a

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 31 of 223

Hubbard v. Commissioner of Social Security, Not Reported in Fed. Supp. (2016)

2016 WL 551783

pro se plaintiff's failure to prosecute. *See Gonzalez v. Commissioner of Social Security,* No. 09–CV–10179, 2011 WL 2207574, at *2 (S.D.N.Y. June 2, 2011), *see also Winegard v. Barnhart,* No. 02–CV–6231, 2006 WL 1455479, at *9–10 (W.D.N.Y. Apr. 5, 2006). However, the Court declines to do so in this case.

 **\*4** In this District, General Order No. 18 mandates a different course in Social Security cases. General Order 18 cautions plaintiffs that "Plaintiff's brief is the only opportunity for Plaintiff to set forth the errors Plaintiff contends were made by the Commissioner of Social Security that entitle Plaintiff to relief. The failure to file a brief as required by this Order will result in the consideration of this appeal without the benefit of Plaintiff's arguments and may result in a decision heavily influenced by the Commissioner's version of the facts and subsequent dismissal of your appeal." N.D.N.Y. General Order No. 18 at 4. General Order 18 thus states that the Court will "consider" the case notwithstanding a plaintiff's failure to file a brief, albeit in a way that might be "heavily influenced by the Commissioner's version of the facts." *Id.* In a case such as this, where Plaintiff is proceeding pro se, General Order No. 18's promise of a consideration of the merits complies with the special solicitude that the Second Circuit mandates for pro se litigants. Accordingly, the Court has, despite Plaintiff's failure to file a brief, examined the record to determine whether the ALJ applied the correct legal standards and reached a decision based on substantial evidence. *See Gregorka v. Comm'r of Soc. Sec.,* No. 6:13–CV–1408, 2015 WL 3915959, at *4 (N.D.N.Y. June 25, 2015).

After a careful review of the administrative record on appeal, the Court recommends the Commissioner's determination be affirmed, for the reasons stated in Defendant's memorandum of law, that (1) the Plaintiff knowingly and voluntarily waived her right to representation, (2) the ALJ's RFC finding was supported by substantial evidence, (3) the ALJ's step five finding was supported by substantial evidence, and (4) Plaintiff failed to meet her burden. (Dkt. No. 17 at 11–15 [Def.'s Mem. of Law].)

### A. Plaintiff Knowingly and Voluntarily Waived Her Right to Representation

Although plaintiffs do not have a constitutional right to counsel at a Social Security hearings, they do have a statutory and regulatory right to be represented if they chose to obtain counsel. 42 U.S.C. § 406; 20 C.F.R. § 404.1705. Here, the Commissioner sent Plaintiff an acknowledgement letter explaining the hearing process and advising her of her right to representation, as well as the availability of free legal services. (T. 77–78.) At the hearing, the ALJ again reviewed with Plaintiff her right to have representation and Plaintiff knowingly waived that right. (T. 28–30.) Therefore, the Commissioner and ALJ complied with their obligations to inform Plaintiff of her right to counsel and Plaintiff knowingly and voluntarily waived her right.

### B. The ALJ's RFC Determination

A plaintiff's RFC is the most she can do despite her limitations. 20 C.F.R. § 404.1545(a). Here, the ALJ's RFC determination was supported by substantial evidence, specifically, the medical source opinions of consultative examiners Dennis Noia, M.D. and Pamela Tabb, M.D.

An ALJ "is entitled to rely upon the opinions of both examining and non-examining State agency medical consultants," particularly where the consultant's opinion is supported by the weight of the evidence. *Garrison v. Comm'r of Soc. Sec.,* No. 08–CV–1005, 2010 WL 2776978 at *4 (N.D.N.Y. June 7, 2010).

Dr. Noia performed a psychiatric consultative exam on April 30, 2012. At that time he observed Plaintiff was cooperative and her manner of relating, social skills, and overall presentation were adequate. (T. 205.) He further observed her speech was normal, her thought process was normal, her mood was calm, and her affect was congruent. (T. 206.) Dr. Noia observed Plaintiff's attention and concentration were intact, her recent and remote memory skills were "mildly to moderately" impaired; and her intellectual functioning was average. (*Id.*) In a medical source statement, Dr. Noia opined Plaintiff was capable of understanding and following simple instructions and directions; capable of performing simple and some complex tasks; capable of maintaining attention and concentration; could regularly attend to a routing and maintain a schedule; capable of making appropriate decisions; able to relate to and interact moderately well with others; and Plaintiff had some difficulty dealing with stress. (T. 206–207.) [2]

**\*5**  Dr. Tabb performed a physical consultative exam on April 30, 2012. At that time she observed Plaintiff appeared in no acute distress, had a normal gait, could walk on heels and toes, needed no help changing for exam or getting on and off the exam table, and was able to rise from a chair without difficulty. (T. 209.) Dr. Tabb observed Plaintiff's cervical spine and lumbar spine showed full flexion, extension, later flexion bilaterally and full rotary movement bilaterally. (T. 210.) Dr. Tabb observed Plaintiff had full range of motion in her shoulders, elbows, forearms, and wrists bilaterally. (*Id.*) Dr. Tabb observed Plaintiff had mild tenderness in the medial aspect of her left wrist. (*Id.*) In a medical source statement Dr. Tabb opined Plaintiff had mild restrictions for performing activities involving repetitive movement of the left wrist. (T. 211.) [3]

In making his physical RFC determination, the ALJ also relied on objective medical imagining from March of 2012 which indicated "very minimal" degenerative change and "mild" disc space narrowing in the mid thoracic spine. (T. 200.) Medical imaging from March of 2012 indicated degenerative disc disease with "mild" multilevel bulging in the lumbar spine. (T. 201.) Medical imaging of Plaintiff's cervical spine revealed "mild" disc desiccation with "minimal" disc bulging at multiple levels.

The ALJ thoroughly discussed all the medical evidence in the record and his RFC determination was supported primarily by the consultative examiners, Drs. Noia and Tabb. In addition to Dr. Tabb's opinion, the ALJ's physical RFC determination was supported by Plaintiff's treating physicians who reported Plaintiff had normal gait and stance, appeared in no acute distress, ambulated well, and had negative straight leg raises. (T. 182–185, 192–197.)

Plaintiff's orthopedic surgeon, Gregory Shankman, M.D., completed a medical source statement in August of 2007, which the ALJ discussed in his opinion but ultimately rejected. Dr. Shankman opined Plaintiff's pain was "too severe for her to work" and she was "totally and permanently disabled." (T. 161.) Dr. Shankman further opined Plaintiff could not walk for more than five minutes without pain, could not sit for more than five minutes without severe pain, and could not sleep for more than a few hours without pain. (*Id.*) He opined Plaintiff could not lift or carry more than ten pounds. (*Id.*) The ALJ properly assigned Dr. Shankman's opinion "limited weight" because there were no records to support his opinion, Plaintiff's own allegations of limitations were not as restrictive as Dr. Shankman's, and the opinion predated Plaintiff's alleged onset date by over three years. Therefore, for the reasons stated herein, and for the reasons provided in Defendant's brief, the ALJ's RFC determination was supported by substantial evidence.

### C. The ALJ's Credibility Determination

A plaintiff's allegations of pain and functional limitations are "entitled to great weight where ... it is supported by objective medical evidence." *Rockwood v. Astrue,* 614 F.Supp.2d 252, 270 (N.D.N.Y.2009) (quoting *Simmons v. U.S. R.R. Ret. Bd.,* 982 F.2d 49, 56 (2d Cir.1992)). However, the ALJ "is not required to accept [a plaintiff's] subjective complaints without question; he may exercise discretion in weighing the credibility of the [plaintiff's] testimony in light of the other evidence in the record." *Genier v. Astrue,* 606 F.3d 46, 49 (2d Cir.2010) (citing *Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir.1979)). "When rejecting subjective complaints, an ALJ must do so explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief." *Rockwood,* 614 F.Supp.2d at 270.

**\*6**  "The ALJ's credibility assessment must be based on a two step analysis of pertinent evidence in the record. First, the ALJ must determine whether the claimant has medically determinable impairments, which could reasonably be expected to produce the pain or other symptoms alleged." *Id.,* at 271.

> Second, if medically determinable impairments are shown, then the ALJ must evaluate the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limit the claimant's capacity to work. Because an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, an ALJ will consider the following factors in assessing a claimant's credibility: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type,

Hubbard v. Commissioner of Social Security, Not Reported in Fed. Supp. (2016)

2016 WL 551783

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 33 of 223

dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms.

*Id.*, see 20 C.F.R. § 416.929(c)(3)(i)-(vii). Further, "[i]t is the role of the Commissioner, not the reviewing court, "to resolve evidentiary conflicts and to appraise the credibility of witnesses," including with respect to the severity of a claimant's symptoms." *Cichocki v. Astrue*, 534 F. App'x 71, 75 (2d Cir.2013) (citing *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir.1983)).

Here, the ALJ properly applied the Regulations in his credibility analysis. The ALJ determined that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely credible. (T. 15.) The ALJ provided an accurate synopsis of Plaintiff's testimony. (T. *Id.*) The ALJ discussed objective medical evidence and opinion evidence which he found to be inconsistent with Plaintiff's statements. (T. 15–18.) The ALJ discussed Plaintiff's activities of daily living, treatment she received for her impairments including medication, and aggravating factors. (T. 15.) Therefore, for the reasons stated herein, the ALJ properly adhered to the Regulations in making his credibility determination and substantial evidence supports the ALJ's credibility determination.

### D. The ALJ's Step Five Determination

At step five of the sequential process, the ALJ considered Plaintiff's age, education, and RFC, to determine whether there were a significant number of jobs in the national economy which Plaintiff could perform. 20 C.F.R. § 404.1569. In making his determination, the ALJ relied on the testimony of a vocational expert ("VE"). (T. 5658.) At the hearing the VE testified that based on a hypothetical individual with Plaintiff's age, education, and RFC, there were jobs that existed in significant numbers in the national economy which she could perform. (T. 56–57.) Because we find no error in the ALJ's RFC assessment, we likewise conclude that the ALJ did not err in posing a hypothetical question to the vocational expert that was based on that assessment. *See Dumas v. Schweiker,* 712 F.2d 1545, 1553–54 (2d Cir.1983) (approving a hypothetical question to a vocational expert that was based on substantial evidence in the record). **ACCORDINGLY**, based on the findings above, it is

**\*7 RECOMMENDED**, that the Commissioner's decision be **AFFIRMED**, and the Plaintiff's complaint **DISMISSED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have **FOURTEEN (14) DAYS** within which to file written objections to the foregoing report. Any objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health* and Human Services, 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

### All Citations

Not Reported in Fed. Supp., 2016 WL 551783

### Footnotes

1    Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.

2016 WL 551783

To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time. 20 C.F.R. § 404.1567(b).

2      Plaintiff did not undergo mental health treatment. In November of 2011, during an evaluation by her orthopedic provider, Plaintiff denied depression and anxiety. (T. 183.) In December of 2011, Plaintiff complained to her primary care provider of "slight depression." (T. 177.) A prescription history indicated Plaintiff was prescribed Alprazolam for her anxiety by Scott Brehaut, M.D. (T. 167.)

3      In June of 20120, subsequent to Plaintiff's examination by Dr. Tabb, she underwent CTS release surgery. (T. 255.)

---

**End of Document**                                                   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 3915959
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Leo GREGORKA; and Eve Gregorka, Plaintiffs,

v.

COMMISSIONER OF SOCIAL SECURITY, Defendant.

No. 6:13–CV–1408 (GTS/TWD).
|
Signed June 25, 2015.

**Attorneys and Law Firms**

Leo Gregorka and Eve Gregorka, Little Falls, NY, pro se.

Hon. Richard S. Hartunian, United States Attorney for the Northern District of New York, Albany, NY, Office of General Counsel, Social Security Administration, Emily M. Fishman, Esq., of Counsel, New York, NY, for Defendant.

## DECISION and ORDER

GLENN T. SUDDABY, District Judge.

**\*1** The above matter comes to this Court following a Report–Recommendation by United States Magistrate Judge Thérèse Wiley Dancks, filed on May 28, 2015, recommending that the Commissioner's decision denying benefits be affirmed with regard to Social Security income benefits ("SSI") but reversed with regard to disability insurance benefits ("DIB"). (Dkt. No. 14.) No objections to the Report–Recommendation have been filed and the time in which to do so has expired. After carefully reviewing all of the papers herein, including Magistrate Judge Dancks' thorough Report–Recommendation, the Court can find no error in the Report–Recommendation, clear or otherwise. As a result, the Report–Recommendation is accepted and adopted in its entirety; and the case is remanded to the Commissioner of Social Security for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Dancks' Report–Recommendation (Dkt. No. 20) is **ACCEPTED** and **ADOPTED** in its entirety; and it is further

**ORDERED** that the Commissioner's decision is **AFFIRMED** with regard to the denial of SSI benefits but **REVERSED** with regard to the denial of DIB benefits; and it is further

**ORDERED** that this matter is **REMANDED** to the Commissioner for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

## REPORT AND RECOMMENDATION

THÈRÈSE WILEY DANCKS, United States Magistrate Judge.

This matter was referred to the undersigned for report and recommendation by the Honorable Glenn T. Suddaby, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Northern District of New York Local Rule 72.3. This case has proceeded in accordance with General Order 18 of this Court which sets forth the procedures to be followed when appealing a denial of Social Security benefits. Oral argument was not heard. For the reasons discussed below, it is recommended that the Court affirm the Commissioner's finding that Plaintiffs are not entitled to supplemental security income ("SSI") benefits but remand the disability insurance benefits ("DIB") claim to the Commissioner for further proceedings.

## I. BACKGROUND AND PROCEDURAL HISTORY

On June 9, 2011, Thomas Leo Gregorka ("Mr.Gregorka") submitted applications for SSI and DIB. (Dkt. No. 15–2 at 21.) The applications were denied on December 13, 2011. *Id.* On January 19, 2012, Mr. Gregorka filed a request for a hearing before an Administrative Law Judge ("ALJ"). *Id.* Mr. Gregorka died on April 1, 2012. *Id.* Mr. Gregorka was fifty-eight years old when he died. *Id.* at 30.

Plaintiffs Leo and Eve Gregorka, the parents of Mr. Gregorka, filed a substitution of party to proceed with the hearing requested by their son. (Dkt. No. 15–2 at 21.) They did not, however, wish to appear at the hearing in person. *Id.* Thus, the ALJ based his decision on the record alone. *Id.*

**\*2** On June 19, 2012, the ALJ issued a decision finding that Mr. Gregorka was not disabled. (Dkt. No. 15–2 at 21–31.) Plaintiffs filed a request for review by the Appeals Council (Dkt. No. 15–2 at 16) and submitted additional evidence (Dkt. No. 15–2 at 5). On September 5, 2013, the Appeals Council issued separate decisions on Mr. Gregorka's SSI claim and his DIB claim. (Dkt. No. 15–2 at 1–4, 8 .) The Appeals Council dismissed the request for review of the SSI claim, finding that Plaintiffs were not proper parties pursuant to Social Security regulations. (Dkt. No. 15–2 at 8.) The Appeals Council denied the request for review of the DIB claim, finding that there was no basis for changing the ALJ's decision. (Dkt. No. 15–2 at 2, 3.)

Plaintiffs commenced this action on November 12, 2013. (Dkt. No. 1.)

## II. APPLICABLE LAW

### A. Standard for Benefits

To be considered disabled, a claimant seeking disability insurance benefits or SSI disability benefits must establish that he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A) (2006). In addition, the claimant's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

§ 1382c(a)(3)(B).

Acting pursuant to its statutory rulemaking authority (42 U.S.C. § 405(a)), the Social Security Administration ("SSA") promulgated regulations establishing a five-step sequential evaluation process to determine disability. 20 C.F.R. § 416.920(a) (4) (2015). Under that five-step sequential evaluation process, the decision-maker determines:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin,* 758 F.3d 146, 150 (2d Cir.2014.) "If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further." *Barnhart v. Thomas,* 540 U.S. 20, 24, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003).

**\*3** The claimant bears the burden of proof regarding the first four steps. *Kohler v. As true,* 546 F.3d 260, 265 (2d Cir.2008) (quoting *Perez v. Chater,* 77 F.3d 41, 46 (2d Cir.1996)). If the claimant meets his or her burden of proof, the burden shifts to the Commissioner at the fifth step to prove that the claimant is capable of working. *Id.*

### B. Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *Featherly v. Astrue,* 793 F.Supp.2d 627, 630 (W.D.N.Y.2011) (citations omitted); *Rosado v. Sullivan,* 805 F.Supp. 147, 153 (S.D.N.Y.1992) (citing *Johnson v. Bowen,* 817 F.2d 983, 985 (2d Cir.1987)). A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson,* 817 F.2d at 986.

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision. 42 U.S.C. § 405(g) (2012); *Rivera v. Sullivan,* 923 F.2d 964, 967 (2d Cir.1991). An ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Roat v. Barnhart,* 717 F.Supp.2d 241, 248 (N.D.N.Y.2010); [1] *Ferraris v. Heckler,* 728 F.2d 582, 587 (2d Cir.1984). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Williams ex rel. Williams v. Bowen,* 859 F.2d 255, 258 (2d Cir.1988) (citations omitted). It must be "more than a mere scintilla" of evidence scattered throughout the administrative record. *Featherly,* 793 F.Supp.2d at 630; *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams,* 859 F.2d at 258 (citations omitted). However, a reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. *Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir.1972); *see also Rutherford v. Schweiker,* 685 F.2d 60, 62 (2d Cir.1982).

### III. THE ALJ'S DECISION

Here, the ALJ found at step one that Mr. Gregorka was not engaged in any substantial gainful activity from September 27, 2008, to April 1, 2012. (Dkt. No. 15–2 at 23.) At step two, the ALJ found that Mr. Gregorka suffered from the severe conditions of hypertensive and arthroscopic cardiovascular disease, chronic obstructive pulmonary disease, degenerative disc disease of the

cervical and lumbar spine, and physical residuals from chronic alcohol abuse, including seizures, near syncope, and tremor. *Id.* at 23–24. The ALJ found that Mr. Gregorka did not have any severe mental impairment, granting "great weight" to the medical opinion of a non-examining agency medical consultant and "little weight" to the opinion of consultative psychologist Dennis Noia, Ph .D. *Id.* at 25. At step three, the ALJ found that none of Mr. Gregorka's impairments met or medically equaled a listed impairment. *Id.* at 25–26. At step four, the ALJ found that Mr. Gregorka had the RFC to perform medium work, except that he needed to avoid climbing ladders or scaffolds and should avoid working at heights or around dangerous machinery. *Id.* at 26. Based on that RFC, the ALJ found that Mr. Gregorka was not able to perform any past relevant work. *Id.* at 29. At step five, however, the ALJ found that Mr. Gregorka could perform jobs that exist in significant numbers in the national economy. *Id.* at 30. Accordingly, the ALJ found that Mr. Gregorka was not disabled. *Id.* at 30–31.

## IV. PLAINTIFFS' FAILURE TO FILE A BRIEF

**\*4** This Court's General Order 18 sets forth the briefing schedule in Social Security cases. After Plaintiffs failed to comply with General Order 18, the undersigned issued an order of June 9, 2014, which directed Plaintiffs to file their brief within forty-five days after service of Defendant's brief. (Dkt. No. 17.) Despite this, Plaintiffs filed neither papers opposing Defendant's motion nor a request to enlarge the time within which to oppose Defendant's motion.

In the usual civil case, a plaintiff's failure to comply with court orders would subject the complaint to dismissal under Federal Rule of Civil Procedure 41(b). In addition, other Districts in the Second Circuit have held that where a Social Security plaintiff files a complaint but fails to file a brief on the merits, the complaint is conclusory and insufficient to defeat a motion for judgment on the pleadings. *Winegard v. Barnhart,* No. 02–CV–6231 CJS, 2006 U.S. Dist. LEXIS 31973, at \*27–28, 2006 WL 1455479, at \*9–10 (W.D.N.Y. Apr.5, 2006); *Feliciano v. Barnhart,* Civ. No. 04–9554 KMW AJP, 2005 U.S. Dist. LEXIS 14578, at \*34–36, 2005 WL 1693835, at \*10 (S.D.N.Y. July 21, 2005); *Reyes v. Barnhart,* Civ. No. 01–4059 LTS JCF, 2004 U.S. Dist. LEXIS 3689, at \*6–7, 2004 WL 439495, at \*3 (S.D.N.Y. Mar.9, 2004).

In this District, however, General Order No. 18 mandates a different course in Social Security cases. General Order 18 cautions plaintiffs that "Plaintiff's brief is the only opportunity for Plaintiff to set forth the errors Plaintiff contends were made by the Commissioner of Social Security that entitle Plaintiff to relief. The failure to file a brief as required by this Order will result in the consideration of this appeal without the benefit of Plaintiff's arguments and may result in a decision heavily influenced by the Commissioner's version of the facts and subsequent dismissal of your appeal." (General Order No. 18 at 4.) General Order 18 thus states that the Court will "consider" the case notwithstanding a plaintiff's failure to file a brief, albeit in a way that might be "heavily influenced by the Commissioner's version of the facts." *Id.* In a case such as this, where the plaintiff is proceeding pro se, General Order No. 18's promise of a consideration of the merits complies with the special solicitude that the Second Circuit mandates for pro se litigants. Accordingly, the Court has, despite Plaintiffs' failure to file a brief, examined the record to determine whether the ALJ applied the correct legal standards and reached a decision based on substantial evidence.

## V. DISCUSSION

### A. SSI Claim

The ALJ denied Mr. Gregorka's claim for both SSI and DIB on the merits. (Dkt. No. 15–2 at 21–31.) The Appeals Council dismissed Plaintiffs' request for review of the ALJ's decision regarding SSI on the grounds that Plaintiffs were not eligible survivors for underpayment of SSI under the agency's regulations. *Id.* at 8. In their complaint, Plaintiffs explicitly challenge the denial of "Title II benefits (Social Security Disability)." (Dkt. No. 1 at 1.) The complaint does not explicitly challenge the denial of SSI benefits under Title XVI. Defendant argues that to the extent that the complaint can be construed as asserting an SSI claim, that claim is moot and was properly dismissed by the Appeals Council. (Dkt. No. 18 at 8–10.) Defendant is correct.

**\*5** Agency regulations drastically limit the categories of individuals who can recover benefit underpayments on behalf of a deceased individual. 20 C.F.R. § 416.542(b)(4). Surviving parents can recover only if the deceased underpaid recipient was a disabled or blind child when the underpayment occurred. 20 C.F.R. § 416.542(b)(2)-(3). A "child" is an individual under the

age of eighteen or an unmarried individual under the age of twenty-two who is attending school. 20 C.F.R. § 416.1856. Here, Mr. Gregorka was fifty-seven years old when he applied for SSI. (Dkt. No. 15–2 at 21, 30.) Accordingly, Plaintiffs are not the surviving parents of a disabled child pursuant to agency regulations. Therefore, it is recommended that the Court affirm the Commissioner's finding that Plaintiffs are not entitled to recover SSI benefits.

**B. DIB Claim**

Defendant concedes that remand is appropriate regarding Plaintiffs' DIB claim. (Dkt. No. 18 at 10–14.) Specifically, remand is appropriate because it is not clear from the Appeals Council's decision whether it considered four medical assessments from Mr. Gregorka's treating physician that were submitted as new evidence. (Dkt. No. 15–2 at 5; Dkt. No. 15–9 at 59–66.) Those assessments related to the period on or before the ALJ's decision and contradicted the ALJ's RFC finding. (Dkt. No. 15–9 at 59–66.) The Appeals Council was thus required to consider it. 20 C.F.R. § 404.970(b). Accordingly, it is recommended that the Court remand this matter to the Commissioner for further proceedings regarding Plaintiff's DIB claim.

**WHEREFORE,** it is hereby

**RECOMMENDED,** that this matter be remanded to the Commissioner, pursuant to sentence four of 42 U.S.C. § 405(g), [2] for further proceedings consistent with the above.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **_FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW._** _Roldan v. Racette,_ 984 F.2d 85, 87 (2d Cir.1993) (citing _Small v. Sec'y of Health and Human Servs. .,_ 892 F.2d 15, 16 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72.

Dated: May 28, 2015.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 3915959

## Footnotes

1    On Lexis, this published opinion is separated into two documents. The first is titled _Roat v. Barnhart,_ 717 F.Supp.2d 241, 2010 U.S. Dist. LEXIS 55442, 2010 WL 2326142 (N.D.N.Y. June 7, 2010). It includes only the district judge's short decision adopting the magistrate judge's report and recommendation. The second is titled _Roat v. Comm'r of Soc. Sec.,_ 717 F.Supp.2d 241, 2010 U.S. Dist. LEXIS 55442, 2010 WL 2326142 (N.D.N.Y. June 7, 2010). It includes only the magistrate judge's report and recommendation. Westlaw includes both the district court judge's decision and the magistrate judge's report and recommendation in one document, titled _Ross v. Barnhart,_ 717 F.Supp.2d 241 (N.D.N.Y.2010). The Court has used the title listed by Westlaw.

2    Sentence four reads "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

**End of Document**                                           © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 40 of 223

Drake v. Commissioner of Social Security, Not Reported in Fed. Supp. (2010)

2010 WL 11526780

2010 WL 11526780
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Olivia J. DRAKE, Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY, Defendant.

8:08–CV–1007
|
Signed 12/20/2010

**Attorneys and Law Firms**

OFFICE OF MARK A. SCHNEIDER, OF COUNSEL: MARK A. SCHNEIDER, Esq., 57 Court Street, Plattsburgh, NY 12901, Attorney for Plaintiff.

OFFICE OF REGIONAL GENERAL COUNSEL, OF COUNSEL: SIXTINA FERNANDEZ, ESQ., SOCIAL SECURITY ADMIN. REGION II, 26 Federal Plaza Room 3904, New York, NY 10278, Attorneys for Defendant.


<u>**MEMORANDUM–DECISION and ORDER**</u>

DAVID N. HURD, United States District Judge

**I. <u>INTRODUCTION</u>**

**\*1** This matter is brought pursuant to §§ 205(g) & 1631(c)(3) of the Social Security Act, as amended, 42 U.S.C. §§ 405(g) & 1383(c), to review a final determination of the Commissioner of Social Security denying the plaintiff's claim for Social Security Disability benefits and Supplemental Security Income. The parties have filed their briefs, including the Administrative Record on Appeal, and the matter has been submitted for decision without oral argument.


**II. <u>BACKGROUND</u>**

Plaintiff Olivia Drake ("plaintiff" or "Drake") filed an application for Disability Insurance Benefits and Supplemental Security Income payments on April 3, 2006, claiming a period of disability beginning on April 4, 2006. Her claim was denied on October 17, 2006. Plaintiff filed a request for a hearing on December 22, 2006, at which time she waived her right to personally appear and testify at a hearing. The ALJ rendered a decision on March 27, 2008, denying plaintiff's claims.

Plaintiff appealed the ALJ's decision to the Appeals Council. On September 12, 2008, the Appeals Council issued an order denying plaintiff's request for review. Thus, the ALJ's decision became the final decision of the Commissioner. Plaintiff filed the instant complaint in the district court on September 23, 2008.


**III. <u>DISCUSSION</u>**

**A. <u>Standard of Review</u>**

The scope of a court's review of the Commissioner's final decision is limited to determinating whether the decision is supported by substantial evidence and the correct legal standards were applied. <u>Poupore v. Astrue</u>, 566 F.3d 303, 305 (2d Cir. 2009) (per curiam) (citing <u>Machadio v. Apfel</u>, 276 F.3d 103, 108 (2d Cir. 2002)); <u>Martone v. Apfel</u>, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999) (citing <u>Johnson v. Bowen</u>, 817 F.2d 983, 985 (2d Cir. 1987)). "Substantial evidence means 'more than a mere scintilla.

Drake v. Commissioner of Social Security, Not Reported in Fed. Supp. (2010)

2010 WL 11526780

It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " <u>Poupore</u>, 566 F.3d at 305 (quoting <u>Consol. Edison Co. v. NLRB</u>, 305 U.S. 197, 229, 59 S. Ct. 206, 217 (1938)). "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." <u>Williams v. Bowen</u>, 859 F.2d 255, 258 (2d Cir. 1988) (citing <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 488, 71 S. Ct. 456, 464 (1951)). Even if the record supports contrary findings on particular issues, "the ALJ's factual findings 'must be given conclusive effect' so long as they are supported by substantial evidence." <u>Genier v. Astrue</u>, 606 F.3d 46, 49 (2d Cir. 2010) (quoting <u>Schauer v. Schweiker</u>, 675 F.2d 55, 57 (2d Cir. 1982)).

However, "where there is a reasonable basis for doubting whether the Commissioner applied the appropriate legal standards," the decision should not be affirmed even though the ultimate conclusion reached is arguably supported by substantial evidence. <u>Martone</u>, 70 F. Supp. 2d at 148 (citing <u>Johnson</u>, 817 F.2d at 986).

 **\*2** A reviewing court may enter "a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); see <u>Martone</u>, 70 F. Supp. 2d at 148. "Remand is appropriate where there are gaps in the record or further development of the evidence is needed," such as where new, material evidence has become available. 42 U.S.C. § 405(g); <u>Martone</u>, 70 F. Supp. 2d at 148 (citing <u>Parker v. Harris</u>, 626 F.2d 225, 235 (2d Cir. 1980)). A remand for rehearing directing the taking of additional evidence is warranted only if it is shown that there is new, material evidence "and that there is good cause for the failure to incorporate such evidence into the record" at the administrative hearing. <u>Carroll v. Sec'y of Health & Human Servs.</u>, 705 F.2d 638, 643–44 (2d Cir. 1983) (quoting 42 U.S.C. § 405(g), as amended in 1980). Remand may also be appropriate if the Commissioner "misapplies the law or failed to provide a fair hearing." <u>Id</u>. at 644. However, where the underlying administrative decision is not supported by substantial evidence, reversal is appropriate because there would be no useful purpose in remanding the matter for further proceedings. <u>Id</u>. (reversing and remanding solely for calculation of benefits, subject to determination by the district court of any motion by the agency to remand to consider new evidence); <u>Parker</u>, 626 F.2d at 235 (reversing and remanding solely for calculation and payment of benefits); <u>Simmons v. U.S. R.R. Ret. Bd.</u>, 982 F.2d 49, 57 (2d Cir. 1992) (same); <u>Williams</u>, 859 F.2d at 261 (same).

  **B. <u>Disability Determination—The Five–Step Evaluation Process</u>**
The Social Security Act defines "disability" to include the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In addition, the Act requires that a claimant's

> physical or mental impairment or impairments [be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

<u>Id</u>. § 423(d)(2)(A).

The ALJ must follow a five-step evaluative process to determine whether an individual is disabled. <u>See</u> 20 C.F.R. §§ 404.1520, 416.920. In the first step, the ALJ must determine whether the claimant is engaged in substantial gainful activity. If so, she is not disabled, and she is not entitled to benefits. <u>Id</u>. §§ 404.1520(b), 416.920(b).

2010 WL 11526780

If the claimant is not engaged in substantial gainful activity, then step two requires the ALJ to determine whether she has a severe impairment or combination of impairments that significantly restricts her physical or mental ability to perform basic work activities. Id. §§ 404.1520(c), 416.920(c). If the claimant is found to suffer from a severe impairment, then step three requires the ALJ to determine whether the impairment meets or equals an impairment listed in Appendix 1 of the regulations. Id. §§ 404.1520(d), 416.920(d); see also id. Part 404, Subpt. P, App. 1. If so, the claimant is "presumptively disabled." Martone, 70 F. Supp. 2d at 149 (citing Ferraris v. Heckler, 728 F.2d 582, 584 (2d Cir. 1984)); 20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant is not presumptively disabled, step four requires the ALJ to assess whether the claimant's residual functional capacity ("RFC") precludes the performance of her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). The burden of proof with regard to the first four steps is on the claimant. Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Ferraris, 728 F.2d at 584.

If it is determined that the claimant cannot perform past relevant work, the burden shifts to the agency for the fifth and final step. Perez, 77 F.3d at 46. This step requires the agency to examine whether the claimant can do any type of work. 20 C.F.R. §§ 404.1520(g), 416.920(g). The regulations provide that "factors such as a claimant's age, education, and previous work experience" should be evaluated to determine "whether a claimant has the residual functional capacity to perform work in any of five categories of jobs: very heavy, heavy, medium, light, and sedentary." Perez, 77 F.3d at 46 (citing 20 C.F.R. § 404.1567(a)). "[T]he Commissioner need only show that there is work in the national economy that the claimant can do; he need not provide additional evidence of the claimant's residual functional capacity." Poupore, 566 F.3d at 306.

*3 A claimant may seek review of an unfavorable decision by the ALJ from the Appeals Council. Perez, 77 F.3d at 44. If review is granted, the decision of the Appeals Council is the final decision of the Commissioner. Id. If review is denied, then the final decision is that of the ALJ. Id. The final decision is judicially reviewable pursuant to 42 U.S.C. § 405(g).

### C. Analysis

The ALJ determined that plaintiff had not engaged in substantial gainful activity since April 4, 2006. The ALJ next found that plaintiff's urinary incontinence, back and knee pain, and serous otitis media [1] were severe impairments that did not meet or equal those listed in the regulations. Subsequently, the ALJ determined that Drake had the RFC to perform "light" work. Specifically, plaintiff was found to have the ability to lift and carry 20 pounds occasionally and ten pounds frequently; and to sit, stand, and walk a total of six hours each in an eight-hour workday. The ALJ also noted that plaintiff should be granted access to a handicapped bathroom as needed.

The ALJ then determined that plaintiff could not perform her past relevant work as a certified nurses' assistant, which required exertional levels beyond her RFC. Therefore, the process reached step five, at which the ALJ concluded that since Drake had the RFC to perform a full range of light work she was not disabled.

Plaintiff argues that the Commissioner failed to meet his burden at step five of the disability evaluation process. Plaintiff also maintains that the ALJ failed to conduct a full and fair hearing, improperly discounted the opinion of a treating physician, did not take into account the collective impact of plaintiff's impairments, and incorrectly discredited Drake's subjective complaints.

### 1. RFC Determination and the Commissioner's Step–Five Burden

Although plaintiff claims that the Commissioner failed to meet his step-five burden, her conclusory legal argument seems to instead call into question the RFC determination made at step four. In the section of her brief devoted to the Commissioner's step-five burden, plaintiff merely asserts that "the ALJ erroneously found that Ms. Drake is able to perform a wide range of light work in the national economy." Dkt. No. 9, at 9.

After determining that plaintiff had the RFC to perform a full range of light work with the caveat that she be permitted access to a handicapped bathroom, the ALJ applied her age, education, and work experience to the appropriate Medical–Vocational Guideline: 20 C.F.R. Part 404, Subpart P, Appendix 2, Table 2. Because plaintiff is a "younger individual" with a high school

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 43 of 223

Drake v. Commissioner of Social Security, Not Reported in Fed. Supp. (2010)

2010 WL 11526780

education and has previous "unskilled" work experience [2], she is deemed "not disabled" per Rule 202.20. Assuming the ALJ's RFC determination was correct, the application of Rule 202.20 and subsequent finding of "not disabled" was proper. Thus, the issue becomes whether the RFC determination was supported by substantial evidence. In determining that Drake had the RFC to perform light work, the ALJ relied heavily on plaintiff's admissions as well as the medical opinions of Dr. Wassef and Dr. Calley. The ALJ also considered the reports of state agency medical consultants and plaintiff's treating physicians.

 *4  Plaintiff sought treatment at the Champlain Valley Physicians Hospital Medical Center ("CVPHMC") on numerous occasions between 2004 and 2007 for back pain, kidney and bladder problems, illness, and to give birth to her son. See id. at 168–243. Following a March 2006 visit to the emergency room for back pain, plaintiff was advised by Dr. Calley to remain active and not to lift anything over 20 pounds. Id. at 218, 220. Dr. Calley provided plaintiff with a "Return to Work" form on which she noted that Drake's back injury was work-related, that her "total disability" lasted from March 2 to March 6, 2006, and that she could return to work on March 6, 2006. Id. at 227.

During a July 2006 consultative medical examination, plaintiff informed Dr. Wassef of her physical limitations related to hypertension, kidney and bladder problems, obesity, stress and anxiety, knee and back pain, and headaches. See id. at 116–17. However, Dr. Wassef was "not able to detect evidence of physical limitations in the musculoskeletal system of this claimant." Id. at 119. The only limitation noted by Dr. Wassef was Drake's need to have access to a handicapped bathroom. Id. at 119–20. Also in July 2006, medical consultant Elaine Paige completed a "Physical Residual Functional Capacity Assessment" and noted that plaintiff's medical examination was "essentially benign" and therefore found Drake to have "no physical limitations." Id. at 144–47.

In a June 2007 evaluation at the Spine Institute of New England, plaintiff was found to have "a pain distribution in a dermatomal pattern and ... positive physical examination findings." Id. at 165. Drake was subsequently advised to "[p]articipate in normal daily activities without limitation." Id.

Finally, plaintiff advised that even though she had suffered from her severe impairments since birth, she was nonetheless able to work as a full-time certified nursing assistant from 2005 to 2006—a job that required her to frequently lift 50 pounds or more. Id. at 76–77. Drake also claimed that she is able to care for her son, perform household chores, cook, visit her mother daily, drive a car, and run errands. Id. at 109, 111, 113, 117.

Accordingly, the medical reports and opinions as well as plaintiff's admissions constitute substantial evidence supporting the ALJ's determination that Drake had the RFC to perform light work.

### 2. Full and Fair Hearing
Plaintiff argues that she was deprived of a full and fair hearing because she was not properly informed of her right to counsel, she did not knowingly and voluntarily waive her right to appear at a hearing, and the ALJ failed to obtain medical records for the period of November 2007 to March 2008.

Right to Counsel and Waiver of Appearance
There is no constitutional right to representation at a hearing to determine eligibility for social security benefits. Lamay v. Comm'r of Soc. Sec., 562 F.3d 503, 506 (2d Cir. 2009), cert. denied, 130 S. Ct. 1503 (2010). However, there is a right to representation set forth in the statute and regulations. Id. (citing 42 U.S.C. § 406; 20 C.F.R. § 404.1705). If a person claiming benefits is properly informed of the right to representation, it may be waived. Id. The statutory and regulatory scheme requires that the Commissioner of Social Security " 'notify [the] claimant in writing' of (1) her 'options for obtaining [an] attorney to represent [her]' at her hearing, and (2) 'the availability ... of ... organizations which provide legal services free of charge' to 'qualifying claimants.' " Id. (quoting 42 U.S.C. § 406(c), 1382(d)(2)(D); citing 20 C.F.R. § 404.1706). [3]

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 44 of 223
Drake v. Commissioner of Social Security, Not Reported in Fed. Supp. (2010)
2010 WL 11526780

**\*5**  The Notice of Disapproved Claim sent to plaintiff on October 17, 2006, set forth the procedure for her right to request a hearing and to obtain representation for the hearing. R. 30–33. This notice stressed the importance of appearing at the hearing and noted that "[t]he hearing is your chance to tell the ALJ why you disagree with the decision in your case. You can give the ALJ new evidence and bring people to testify for you." Id. at 32. Under the heading "If You Want Help With Your Appeal" the notice states:

> You can have a friend, lawyer, or someone else help you. There are groups that can help you find a lawyer or give you free legal services if you qualify. There are also lawyers who do not charge unless you win your appeal. Your local Social Security office has a list of groups that can help you with your appeal.

> If you get someone to help you, you should let us know. If you hire someone, we must approve the fee before he or she can collect it. And if you hire a lawyer, we will withhold up to 25 percent of any past due Social Security benefits to pay toward the fee. We do not withhold money from SSI benefits to pay your lawyer.

Id. at 32.

Immediately above plaintiff's signature on the December 22, 2006, Request for Hearing by Administrative Law Judge were the words: "You have a right to be represented at the hearing. If you are not represented but would like to be, your Social Security Office will give you a list of legal referral and service organizations." Id. at 39. Also on this form, Drake checked the box indicating that she did not wish to appear and requested that a decision be made based on the evidence in her case. Id. Plaintiff then filled out and signed a formal waiver of her right to appear at a hearing. Id. at 37. This one-page document contained the following:

> I have been advised of my right to appear in person before an Administrative Law Judge. I understand that my personal appearance before an Administrative Law Judge would provide me with the opportunity to present written evidence, my testimony, and the testimony of other witnesses. I understand that this opportunity to be seen and heard could be helpful to the Administrative Law Judge in making a decision.

> Although my right to a personal appearance before an Administrative Law Judge has been explained to me, I do not want to appear in person. I want to have my case decided on the written evidence.

> ...

> If I change my mind and decide to request a personal appearance before the Administrative Law Judge, I understand that I should make this request to the Hearing Office **before** the decision of the Administrative Law Judge is mailed to me.

> I understand that I have a right to be represented and that if I need representation, the Social Security office or hearing office can give me a list of legal referral and service organizations to assist me in locating a representative.

Id. Drake signed at the bottom of this form and indicated that she did not "feel well enough to fight this case in person." Id.

It was not until June 23, 2008—after the ALJ's decision had been mailed and after she obtained counsel— that plaintiff made known her desire to revoke her waiver. Along with her appeal to the Appeals Council, Drake filed an affidavit in which she explained that she only completed the waiver because she did not feel well enough and was too nervous to attend a hearing. Id. at 310–11. Plaintiff asserted that nobody advised her that she could obtain free legal representation and claimed that she would not have waived her right to a hearing had she known that she could have obtained representation. Id. However, as noted above, Drake was informed of her right to representation in writing on three separate documents. These notifications met the statutory and regulatory requirements for notification.

**\*6**  Moreover, there is no indication that plaintiff was unable to understand the documents she signed. Indeed, the record indicates that she graduated high school and earned her nurses' assistant certification. Additionally, she signed a consent form permitting the Social Security Administration to release information to the Legal Aid Society of Northeastern New York on

October 26, 2006, evidencing her understanding that organizations were available to represent her. Id. at 36. Therefore, plaintiff's waiver was knowing and voluntary. Because the waiver was effective, it is unnecessary to evaluate any alleged prejudice.

Development of the Record

An ALJ has a duty to develop the administrative record. Perez, 77 F.3d at 47. According to the regulations, the ALJ must "make every reasonable effort to help [the claimant] obtain medical reports" from the claimant's medical sources. Id. (quoting 20 C.F.R. § 404.1512(d)). When the evidence is inadequate to make a determination as to a claimant's disability, the ALJ will again contact the "treating physician ... or other medical source to determine whether the additional information need[ed] is readily available." Id. (quoting 20 C.F.R. § 404.1512(e)).

On February 29, 2008, Dr. Dodge was requested to provide "all treatment notes from December, 2007 to present", and CVPHMC was requested to provide such notes from November 2007 to present. R. 283–84. On March 5, 2008, in response to these requests, several pages of plaintiff's medical records were provided and are included in the record. Id. at 285–92. The most recent date in these records is found on a handwritten note dated December 28, 2007. Id. at 287. This note indicates that Drake was "doing well" with regard to bottle feeding her infant son and was due for a return visit in one year. Id. The lack of further medical records thereafter is thus not surprising. Accordingly, the ALJ made reasonable efforts to develop the record and obtain medical reports from Drake's treating physicians concerning the period between November 2007 and March 2008.

**3. Weight of the Treating Physician's Opinion**

Plaintiff claims that the ALJ improperly accorded more weight to the opinion of a consultative physician, Dr. Wassef, than to the treating physicians at CVPHMC and the opinions of Dr. Carbone and Dr. Hemond.

When determining the appropriate RFC, if the opinion of a treating physician is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record" it is given significant weight. Poupore, 566 F.3d at 307 (quoting 20 C.F.R. § 404.1527(d)(2)). However, where the treating physician's opinion is not supported by medical evidence, it is not entitled to significant weight. Id. The ALJ should consider the following six factors, none of which is dispositive, when determining what weight to accord treating, consulting, and non-examining sources: (1) the examining relationship; (2) the length and nature of the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) any other relevant factors. 20 C.F.R. § 404.1527(d).

Plaintiff points to the treating physician's reports and suggests that they are in conflict with the RFC determination. However, a careful review of these records actually supports the ALJ's finding that Drake could perform light work and required access to a handicapped bathroom. In his written decision, the ALJ correctly stated that "none of the claimant's treating physician [sic] noted any functional limitations in what the claimant could do." R. 23. Further, Dr. Carbone's medical reports indicate that plaintiff is "not an active patient", "has not returned for evaluation", and "is not treated by Dr. Carbone." Id. at 150–51. Dr. Carbone noted that she could not provide a medical opinion concerning plaintiff's work-related abilities. Id. at 152. Dr. Hemond evaluated plaintiff in June 2007, noted various physical ailments and impairments, and concluded that she could "[p]articipate in normal daily activities without limitation." Id. at 165. The remaining medical evidence supports the ALJ's conclusion that Drake suffers from the severe impairments of urinary incontinence, back and knee pain, and serous otitis media. Because the opinions of the treating physicians do not contradict Dr. Wassef's assessment, the ALJ did not err in assigning great weight to his opinion.

**\*7** Plaintiff's argument that Dr. Wassef is "not qualified" to assess her level of impairment because he is a pediatrician is completely without merit. A quick electronic search returns a long list of cases in the Northern District in which Dr. Wassef's medical opinion was relied upon by ALJs. Moreover, Dr. Wassef's opinion was consistent with substantial other medical evidence in the record as well as the assessment of Dr. Calley.

**4. Assessment of Plaintiff's Impairments**

Drake v. Commissioner of Social Security, Not Reported in Fed. Supp. (2010)

2010 WL 11526780

Drake next argues that the ALJ failed to consider her obesity, depression, pain, and urinary incontinence. Because the ALJ concluded that plaintiff's knee and back pain and urinary incontinence were, in fact, severe impairments, only the ALJ's consideration of plaintiff's obesity and depression will be addressed here.

Plaintiff's Obesity

Defendant acknowledges that the ALJ did not explicitly consider Drake's obesity during the disability evaluation process. Moreover, defendant does not dispute that plaintiff—at a height of 5'2" and weight of at least 252 pounds—is indeed obese. See id. at 116; Dkt. No. 10, at 9. However, defendant claims that the failure to explicitly address Drake's obesity was not error because she did not specifically raise the issue, it would not affect the outcome of the disability evaluation, and the RFC finding incorporated the assessment of Dr. Wassef, who was aware of Drake's obesity.

Defendant's assertion that Drake failed to allege that her obesity is an impairment is wrong. An ALJ is instructed to consider impairments the claimant has complained of as well as those of which the ALJ has received evidence. 20 C.F.R. § 404.1512(a); Brown v. Astrue, No. 8:08–CV–1165, 2009 WL 5219028, at *9 (N.D.N.Y. Dec. 31, 2009) (Kahn, J.). Plaintiff, who was proceeding pro se when the initial claim was filed, complained that she gained approximately 100 pounds in just one year. R. 119. There is support for this alleged significant and rapid weight gain in the record, which indicates that Drake weighed 188 pounds in January 2004 and 261 pounds in December 2006. Id. at 272, 155. Plaintiff opined to Dr. Wassef that this added weight caused her knees to "give out." Id. at 117. Additionally, plaintiff's obesity was well-documented throughout the medical record. See id. at 155, 234, 267. Thus, the issue of Drake's obesity was apparent and adequately raised.

When analyzing obesity, the ALJ is guided by Social Security Ruling 02–01p, which explains that "an individualized assessment of the impact of obesity on an individual's functioning" is proper when determining whether the impairment is severe at step two. SSR 02–01p, 67 Fed. Reg. 57859, 57862 (Sept. 12, 2002); Campbell v. Astrue, 713 F. Supp. 2d 129, 141 (N.D.N.Y. 2010) (Mordue, C.J. and Bianchini, M.J.). At step three of the process, obesity may combine with and increase the severity of other impairments to satisfy the requirements of a listing. SSR 02–01p, 67 Fed. Reg. at 57862.

Here, the ALJ did not explicitly consider Drake's obesity or mention her weight anywhere in his written decision. However, plaintiff does not explain how her obesity further impaired her ability to perform light work-related functions. Plaintiff merely asserts that she has difficulty walking and standing due to her weight. The ALJ, in relying on the medical reports that repeatedly noted Drake's obesity, implicitly factored this impairment into the evaluation. See Coburn v. Astrue, No. 07–CV–0029, 2009 WL 4034810, at *12–13 (N.D.N.Y. Nov. 19, 2009) (Bianchini, M.J.) (ALJ's failure to explicitly address obesity was not error because he relied on opinions of doctors who noted plaintiff's obesity and evaluated plaintiff's overall physical limitations); Hulbert v. Comm'r of Soc. Sec., No. 6:06–CV–1099, 2009 WL 2823739, at *11–12 (N.D.N.Y. Aug. 31, 2009) (Kahn, J.) (same). Accordingly, the ALJ did not err by failing to explicitly address Drake's obesity because he relied on the opinions of physicians who, as noted above, examined her personally, noted her obesity, and provided an overall assessment of her work-related abilities and limitations.

Plaintiff's Depression

**\*8** Unlike Drake's obesity, the ALJ explicitly considered the impact of her alleged depression. The determination that plaintiff's mental health does not constitute a severe impairment is supported by substantial evidence in the record. While plaintiff evidences signs of depression in various documents and statements contained in the record, there is insufficient evidence that her mental condition significantly impacts her ability to perform work-related functions.

Due to a lack of mental health treatment, the state agency referred plaintiff to Dr. Summerell for a consultative psychiatric evaluation in September 2006. Dr. Summerell concluded that Drake was "mildly depressed", suffered from "Major Depressive Episode", and needed "long-term supervision in regard to [managing] disability benefits." R. 124. The ALJ assigned "minimal weight" to this assessment because Drake had not been under prior mental health treatment, Dr. Summerell met with her only once, and no significant psychopathology or ongoing depression was found. Id. at 21. While the failure of a person who suffers

2010 WL 11526780

from depression to obtain treatment is common and should not be held against her, there is sufficient other evidence in the record to justify the ALJ's decision not to give great weight to Dr. Summerell's findings.

The Mental RFC Assessment prepared by the state agency consultant concluded that plaintiff had "the ability to carry out work procedures with a consistent pace, interact adequately with coworkers and supervisors, adapt to changes and handle stress in the workplace." Id. at 128. On a May 2006 Function Report plaintiff claimed that although she is "unhappy three quarters of the time," she is able to cook and care for herself, manage finances, visit her mother daily, follow written and oral instructions, and get along with authority figures. Id. at 84, 86–88. On a December 2007 Function Report plaintiff noted that she does not need reminders to care for her personal needs and grooming, gets along well with others, and is not affected by stress or schedule changes. Id. at 110, 113–15. Accordingly, there was sufficient evidence to support the ALJ's finding that Drake's mental health did not significantly impair her work-related functioning.

### 5. Credibility Assessment

Although the ALJ is required to consider plaintiff's reports of pain and other limitations when determining the RFC, he may use discretion when weighing the credibility of such subjective complaints. Genier, 606 F.3d at 49. When evaluating a claimant's assertions of pain and other limitations, the ALJ must utilize a two-step approach as outlined in the regulations. Id. First, it must be determined "whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged." Id.; 20 C.F.R. § 404.1529(b). If so, the ALJ must then consider "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" in the record. Genier, 606 F.3d at 49 (quoting 20 C.F.R. § 404.1529(b)). "It is the function of the [Commissioner], not the [reviewing courts], to resolve evidentiary conflicts and appraise the credibility of witnesses, including the claimant." Aponte v. Sec'y, Dep't of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984) (internal quotation marks omitted). As long as the ALJ's decision to discredit the claimant's subjective complaints is supported by substantial evidence, that decision must be upheld. Id.

 **\*9** The ALJ found that Drake suffered from medically determinable impairments, namely urinary incontinence, back and knee pain, and serous otitis media. He then determined that her statements related to the intensity, persistence, and limiting effect of these impairments were inconsistent with the record and were therefore not credible. This decision was supported by plaintiff's aforementioned ability to cook and care for herself, manage finances, visit her mother daily, operate a car, complete household chores, care for her son, run errands, and perform past unskilled work despite her birth defects. Moreover, a review of the function reports that plaintiff completed reveals numerous inconsistencies regarding her ability to bathe, cook for herself, go outdoors, handle savings and checking accounts, get along with others, walk, follow oral instructions, finish tasks she starts, and respond to stress. It is noted that in the time period between these two reports plaintiff was pregnant and had a baby. Nonetheless, the discrepancies in her reporting makes it difficult to accord great weight to either set of complaints. Finally, neither plaintiff's treating physicians nor the consultative examiners found that her impairments or diagnoses limited her work-related functioning beyond the need for handicapped bathroom access.

This collection of evidence undermines plaintiff's credibility and contradicts her assertion that she was completely disabled. Accordingly, the ALJ's decision to discredit Drake's subjective assessment of her limitations was supported by substantial evidence in the record.

### IV. <u>CONCLUSION</u>

The ALJ properly assessed all relevant medical reports and considered the severity of plaintiff's obesity and depression. The ALJ's determination that Drake had the RFC to perform light work with the need to access a handicapped restroom was supported by substantial evidence. The ALJ's decision to accord more weight to Dr. Wassef's opinion than those of other healthcare providers was proper in light of the fact that his assessment was consistent with other substantial evidence in the record. Moreover, the ALJ was justified in discrediting plaintiff's subjective complaints of pain and limitations as they were inconsistent with the objective evidence. Finally, the ALJ applied the appropriate legal standards and fully developed the record to afford plaintiff a full and fair proceeding.

Drake v. Commissioner of Social Security, Not Reported in Fed. Supp. (2010)

2010 WL 11526780

Accordingly, it is

ORDERED that

1. The Commissioner's motion for judgment on the pleadings is GRANTED;

2. The Commissioner's decision denying plaintiff disability benefits is AFFIRMED; and

3. The complaint is DISMISSED in its entirety.

The Clerk of the Court is directed to enter judgment accordingly.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2010 WL 11526780

---

## Footnotes

1    A collection of fluid in the middle ear.

2    "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. § 404.1568(a). Plaintiff's prior work—grocery store clerk and lifting/moving patients as a nurses' assistant—is consistent with unskilled work. See R. 92–95.

3    In support of her argument that additional disclosures of the right to representation are required, plaintiff cites cases from the Fifth and Seventh Circuits. Dkt. No. 9, at 10. However, the Lamay court specifically concluded that "the additional disclosures ... mandated in the Fifth, Seventh, and Eleventh Circuits are salutary but not required in this Circuit." Lamay, 562 F.3d at 510.

---

End of Document                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Estrella o/b/o M.R.E. v. Berryhill, Not Reported in Fed. Supp. (2017)

2017 WL 2693722

2017 WL 2693722
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jocelyn ESTRELLA, O/B/O M.R.E., Plaintiff,

v.

Nancy A. BERRYHILL, Acting Commissioner of Social Security, [1] Defendant.

15 CV 6966 (CS)(LMS)

|

Signed 06/22/2017

**Attorneys and Law Firms**

Michael Dougherty Hampden, Legal Services for Children, Inc., New York, NY, for Plaintiff.

Leslie A. Ramirez-Fisher, United States Attorney's Office, New York, NY, for Defendant.

## ORDER

CATHY SEIBEL, U.S.D.J.

**\*1** No objections to this thorough Report and Recommendation ("R&R") have been recieved. I have reviewed it for clear error, and find none. Accordingly, the R&R is adopted as the decision of the Court. Defendant's motion for judgment on the pleadings is DENIED; Plaintiff's motion for judgment on the pleadings is GRANTED; the ALJ's decision is VACATED; and this case is REMANDED for further proceedings consistent with the R&R. The Clerk of Court is respectfully directed to terminate the pending motions, (Docs. 17, 22) and remand the case to the Social Security Administration.

SO ORDERED.

## REPORT AND RECOMMENDATION

Lisa Margaret Smith, United States Magistrate Judge

**TO: THE HONORABLE CATHY SEIBEL, U.S.D.J.**

Plaintiff Jocelyn Estrella commences this action pursuant to 42 U.S.C. § 405(g). She seeks judicial review of the final decision of the Commissioner of Social Security (the "Commissioner"), which denied her application for Supplemental Security Income ("SSI") benefits. ECF No. 1. Each party has submitted a motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. ECF Nos. 17, 22. For the reasons discussed below, I conclude, and respectfully recommend that Your Honor should conclude, that the Commissioner's motion for judgment on the pleadings (ECF No. 22) be denied, and Plaintiff's motion (ECF No. 17) be granted. As such, the ALJ's decision should be vacated, and the case should be remanded to the Agency for further proceedings consistent with this Report and Recommendation.

## I. BACKGROUND

### A. Procedural History

Plaintiff filed a claim for SSI on behalf of her infant son, M.R.E. (or "the claimant"), on July 24, 2012. AR 178-87. [2] By correspondence dated August 24, 2012, the Social Security Administration (the "SSA" or "Agency") denied Plaintiff's application. AR 94-99. Plaintiff then requested a hearing before an administrative law judge ("ALJ"). AR 100. The Agency conducted two hearings, which were held on August 21 (AR 69-84) and December 6, 2013 (AR 50-68). On January 15, 2014, the ALJ issued an unfavorable decision. AR 29-49. Plaintiff subsequently filed a request for review of the ALJ's decision with the Appeals Council, which was denied on July 24, 2015. AR 1-7. Accordingly, the ALJ's January, 2014, decision became the final action of the Commissioner.

The instant lawsuit followed. See ECF No. 1. In her papers, Plaintiff argues that the Commissioner's findings are contrary to law and regulations promulgated pursuant to the Social Security Act (the "Act") and not supported by substantial evidence. ECF No. 1. She asks this Court to reverse the Commissioner's decision and award benefits, or in the alternative, to vacate the decision and remand the matter to the Agency for further proceedings. ECF No. 1, at 4.

### B. Medical & Educational Records

#### 1. Evidence Before the ALJ

#### a. Records Pre-dating Plaintiff's SSI Application [3]

#### i. Steinway Child and Family Services

**\*2** M.R.E. began receiving treatment through Steinway Child and Family Services, Inc. ("Steinway"), a non-profit agency, in February, 2009. AR 377. On March 19, 2009, Lauren McEvoy, a licensed master social worker ("LMSW"), completed an Intake Summary, which recorded M.R.E.'s educational and developmental histories to date. AR 377-80. [4] M.R.E., who was then five years old, had first been referred to Steinway from Elmhurst Hospital's Child and Adolescent Walk-In Clinic, where he was diagnosed with attention deficit/hyperactivity disorder ("ADHD"), combined type, and oppositional defiant disorder ("ODD"). AR 377. [5]

Ms. McEvoy's notes with respect to the frequency and intensity of M.R.E.'s symptoms are somewhat equivocal. At times, she noted, M.R.E. demonstrated the ability to follow directions and accept limits. AR 377. On other occasions, he was susceptible to temper tantrums and spells of yelling, "especially when limits [were] set by his mother." AR 377. M.R.E. displayed marked impulsivity, distractability, and low frustration tolerance, but was able "to appropriately take turns and to stick to a game at other times[ ]." AR 377. She also wrote that M.R.E. appeared to be of average intelligence and was, at times, friendly and easily engaged, while at other times he displayed impulsive and oppositional behavior. AR 377. Ms. McEvoy determined that M.R.E. was in need of therapy "to support he and his mother in decreasing his impulsivity, distractibility and occupational behavior." AR 378. She also found that M.R.E. would benefit from further psychiatric evaluation and possible medication management, in order to address his symptoms of ADHD and ODD. AR 380.

On June 22, 2011, Dr. Salvacion Bonete, a psychiatrist at Steinway, evaluated the claimant. AR 369. M.R.E. was six years old at the time, and had previously been diagnosed with ADHD, combined type, and ODD, rule out bipolar disorder, by Dr. Jose Vito on March 21, 2009. AR 369. [6] M.R.E. was prescribed Concerta, 72 mg, and Risperidone, 2 mg. AR 369. [7] Despite these medications, Plaintiff reported that M.R.E.'s ADHD symptoms had escalated; M.R.E. was constantly provoked and provocative of other students in his school, and prone to aggressive outbursts. AR 369. [8]

**\*3** Dr. Bonete found that M.R.E. was cooperative and relatable throughout much of the evaluation, but could be resistant and oppositional to direction at times. AR 370. Generally, the claimant appeared to be in an excited mood—he was fidgety, restless,

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 51 of 223

**Estrella o/b/o M.R.E. v. Berryhill, Not Reported in Fed. Supp. (2017)**

2017 WL 2693722

talkative, and unable to sit still—and was easily distracted. AR 370. Although he was fully oriented and displayed an appropriate affect, M.R.E.'s concentration was impaired, and he demonstrated poor judgment, insight, and impulse control. AR 371-72. Dr. Bonete diagnosed M.R.E. with ADHD, combined type, and ODD, rule out bipolar disorder. AR 373. She also assigned him a global assessment of functioning ("GAF") score of 48, which indicates a serious impairment in social, occupational, or school functioning. AR 373. [9] Dr. Bonete added a prescription for Ritalin, 5 mg, in response to an exacerbation of M.R.E.'s ADHD symptoms. [10] She also recommended that he continue with behavioral therapy and, if practicable, be placed in a smaller class setting with more structure and supervision, as well as a school bus with fewer children and a school bus monitor. AR 373.

On June 30, 2011, Ms. McEvoy noted that the claimant continued to struggle with aggressive outbursts. AR 374. Additionally, M.R.E. demonstrated difficulty accepting limits, managing his responses to provocation, and was often provocative in his interactions with classmates. AR 374. Ms. McEvoy found that the claimant was intelligent, curious, and capable of interacting in a friendly and engaging manner, but struggled with impulsivity, hyperactivity, and difficulty focusing, while also exhibiting oppositional behavior. AR 374, Although M.R.E. made progress toward decreasing the intensity of these symptoms, Ms. McEvoy found that he continued to struggle "significantly with aggression at school, which [was] getting in the way of overall functioning and peer relationships." AR 376.

On August 16, 2011, Dr. Bonete and Ms. McEvoy wrote to the New York City Department of Education ("DOE") concerning M.R.E.'s academic placement. AR 263. [11] They indicated that M.R.E. continued to struggle with aggressive outbursts and had difficulty managing his behavior. AR 63. They believed that he would benefit from a smaller educational setting which could provide "more intensive, hands-on support [.]" AR 263.

M.R.E. was discharged from Steinway on September 14, 2011. AR 367-68. According to a summary prepared by Ms. McEvoy on the same date, M.R.E.'s symptoms "fluctuated significantly" over the course of treatment. AR 367. After a period of sustained improvement, M.R.E. began displaying increased aggression, difficulty accepting limits, and poor frustration tolerance. AR 368. The claimant was therefore transferred to Bellevue Hospital's Child and Adolescent Day Treatment Program (the "Bellevue Program"), where he could receive a higher level of care. AR 368. The final diagnoses rendered by Ms. McEvoy was consistent with the prior findings: ADHD, combined type, and ODD, rule out bipolar disorder. AR 368. At the time of his discharge from Steinway, M.R.E. had been prescribed Concerta, 72 mg, Ritalin, 5 mg, and Risperidone, 2.5 mg. AR 374.

### ii. Bellevue Hospital's Child and Adolescent Day Treatment Program [12]

**\*4** M.R.E. enrolled in the Bellevue Program in the Fall of 2011, through which he was placed in a highly structured educational setting at PS 35, and was provided psychiatric care and individual therapy on a weekly basis. ECF Nos. 19, at 13-14; 23, at 7. On December 15, 2011, M.R.E. met with Debra McVey, a licensed clinical social worker (" LCSW"). AR 434. Ms. McVey noted that the claimant could follow directions, did not "boss other peers," and was able to complete his school work. AR 434. On the following day, December 16, M.R.E. saw Dr. Eric Alcera, who reported that M.R.E. had been struggling to follow directions at school. AR 435. Dr. Alcera noted that the claimant was cooperative, well-related, oriented, alert, and possessed normal judgment and insight. AR 435. He diagnosed M.R.E. with ADHD, with significant hyperactivity and inattention, as well as a history of aggression. AR 436.

On December 19, 2011, Courtney Karp, a social work intern, met with M.R.E. for a weekly therapy session. AR 431. M.R.E. reported that he was "fine," but provided poor eye contact. AR 431. Otherwise, he was cooperative, alert, and oriented, and his insight and judgment were both intact. AR 431. On December 20, 2011, Dr. Kathryn Kavanaugh, a psychologist, and Christina Laitner, a psychology extern, co-authored notes which described M.R.E.'s struggles in the classroom. AR 433. He had difficulty waiting his turn and frequently requested to be called on by his teachers before other students. AR 43. When he was not, he became "vocal." AR 433. Ms. Karp and M.R.E. met once again on December 22, 2011. AR 437. M.R.E. had been "acting out"

**Estrella o/b/o M.R.E. v. Berryhill, Not Reported in Fed. Supp. (2017)**

2017 WL 2693722

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 52 of 223

in class, and was very upset when confronted about his behavior. AR 437. The claimant also reported that he and his family would soon be moving to the Bronx, which made him feel overwhelmed and anxious. AR 437.

On January 3, 2012, Dr. Kavanaugh and Ms. Laitner described that M.R.E. often "pout[ed] and whine[d]" when he was not called on before other students. AR 439-40. The claimant could also "be bossy with his peers." AR 440. At the same time, Dr. Kavanaugh and Ms. Laitner noted, M.R.E. actively sought interpersonal connections with his classmates, and was motivated by the point system in place at school, which rewarded good behavior. AR 440.

On January 10, 2012, Dr. Alcera wrote that M.R.E. continued to exhibit "some oppositional behavior," although the intensity and frequency of such outbursts had decreased. AR 443. Citing a recent school report, Dr. Alcera noted that M.R.E. performed adequately academically. AR 443. Results from a mental status examination were also unremarkable. AR 443. [13] Dr. Alcera diagnosed ADHD, but noted that, generally, M.R.E.'s symptoms continued to improve, as demonstrated by the decreased frequency and intensity of his outbursts. AR 444. On January 20, Ms. Karp and M.R.E. met for a weekly therapy session. AR 457. M.R.E. reported being "happy," and that he was in a good mood, excited for his upcoming eighth birthday. AR 457. He had also been performing well and behaving in class. AR 457.

On January 24, 2012, Dr. Kavanaugh, along with Debroh Zlotnik, a psychology extern, noted that M.R.E. participated actively and appropriately in group activities. AR 445. Indeed, he "encourage[d] his peers not to get upset when they were not winning" during a class exercise. AR 445. On January 26, Ms. Karp reported that M.R.E. had "been doing really well and will soon be ready to move on to a new school." AR 459. On January 27, Dr. Kavanugh and Ms. Zlotnik wrote that M.R.E. demonstrated good behavioral control, was not disruptive, and appeared fully engaged in group activities. AR 447. Once again, on February 3, M.R.E. was an active, and appropriately behaved, participant in group activities. AR 451.

 **\*5** Also on February 3, 2012, M.R.E. met with Ms. Karp, appearing in a good mood, and with a cooperative attitude. AR 453. Ms. Karp noted that M.R.E. spoke at a normal rate and rhythm, "varying between a normal volume and very loud outbursts when [he became] excited." AR 453. The claimant sat still in his chair during the session, and demonstrated sound insight and judgment. AR 455. On February 9, however, he apparently regressed; as Dr. Kavanaugh and Ms. Zlotnik noted, M.R.E. exhibited hyperactive behavior, impulsivity, and difficulty focusing during group exercises. AR 450. Nevertheless, they noted, M.R.E. could be redirected to engage in appropriate behavior when instructed to do so. AR 450.

On February 13, 2012, Dr. Alcera reported that M.R.E. was compliant with his medications. AR 465. A mental status examination was normal, and Dr. Alcera noted that M.R.E.'s aggression and outbursts in class had improved. AR 465. As of February 16, M.R.E. was once again comporting himself well in the classroom. AR 461. Dr. Kavanaugh and Ms. Zlotnik described his euthymic mood and active, appropriate behavior, as well as his positive responses to verbal praise and reinforcement. AR 461. Also on February 16, M.R.E. met with Ms. Karp; although he appeared calm, he was easily distracted and had to be redirected multiple times throughout the session. AR 463. Ms. Karp indicated that M.R.E. had "done very well behaviorally in school over the past month, earning [moderate scores] on the behavioral point sheet." AR 463. [14] When they met again on the following day, February 17, Ms. Karp noted that the claimant was calm, cooperative, alert and oriented. AR 468. His mood was euthymic and he required little redirection throughout the therapy session. AR 468.

According to notes prepared by Ms. Zlotnik on March 1, 2012, M.R.E. was generally on task during class exercises. Ar 470. Although he demonstrated hyperactivity and impulsivity, the claimant participated actively and appropriately with his classmates. AR 470. Additionally, Ms. Zlotnik noted, M.R.E. was responsive to positive reinforcement of his good behavior, and generally well behaved. AR 471. Ms. Zlotnik's notes from March 8 are substantively indistinguishable from the above. AR 475. [15] On March 9, Ms. Karp and M.R.E. discussed a recent altercation in which he bullied a classmate on the school bus. AR 473. M.R.E. was calm and cooperative; he understood that his actions were unnecessary and hurtful. AR 473. On March 19, Dr. Alcera noted that M.R.E. was "doing well, with no noted difficulties at home and at school." AR 479. A mental status examination was once again normal. AR 479. [16]

Estrella o/b/o M.R.E. v. Berryhill, Not Reported in Fed. Supp. (2017)

2017 WL 2693722

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 53 of 223

On March 22, Ms. Zlotnik provided an apparently conflicting account of M.R.E.'s behavior in class. On the one hand, she noted, he was generally on task and well behaved; at the same time, however, M.R.E. "often told tangential stories that were not on topic and it was difficult to redirect him." AR 481. On March 23, Ms. Karp met with M.R.E. to discuss a recent threat he had made to a fellow classmate while on the school bus. AR 484. [17] M.R.E. explained that he threatened the other student because he was annoyed with her and wanted to scare her. AR 484. He made sparse eye contact during the session, but was readily redirected. AR 484.

**\*6** M.R.E. met with Ms. Karp once again on March 30, 2012, at which time he admitted that his threatening actions the previous week were "wrong" and that he and his classmate were "fine." AR 486. Although M.R.E. appeared happy at the beginning of the meeting, he grew upset after discussing his transition to a new school. AR 486-87. [18] On April 3, the claimant met once again with Ms. Karp for an individual therapy session. AR 492. M.R.E.'s mood vacillated over the course of the session, "ranging from happy when discussing [his] good behavior to depressed when upcoming transitions were discussed." AR 493. The claimant was otherwise alert and oriented, with his thought process coherent and goal-directed. AR 492.

M.R.E. presented to Ms. Zlotnik on April 5, 2012, in an irritable mood; he had continuously been provoked by one of his classmates. AR 490. M.R.E. threatened to fight the classmate, and Ms. Zlotnik noted that he demonstrated hyperactivity and impulsivity throughout the group meeting. AR 490. On April 9, 2012, Dr. Alcera reported that the claimant remained compliant with his medication, and that both home and school reports showed that M.R.E.'s attention and focus had improved. AR 494. M.R.E. was also less irritable and argumentative, and "more flexible", complying "without difficulty with staff, teachers and [his] mom." AR 494. A mental status examination was normal. AR 494. Dr. Alcera observed that M.R.E. was generally doing better but still suffered from significant hyperactivity and inattention. AR 495.

On April 13, 2012, Plaintiff informed Ms. Karp that M.R.E., who was home from school at the time on a scheduled break, had been "difficult" but "not out of control." AR 496. Indeed, Plaintiff was capable of redirecting M.R.E. to behave appropriately, but it often required threatening to call the police or a hospital to calm him down. AR 496. Upon his return to school, on April 16, M.R.E. met with Ms. Karp for an individual therapy session. AR 500. Although the claimant remained cooperative and calm throughout the session, he told Ms. Karp that he sometimes felt as though he was incapable of controlling himself. AR 500. On April 19, Ms. Zlotnik noted that M.R.E. had been verbally aggressive toward a classmate, but "responded well to redirection and was [thereafter] able to use effective problem solving skills to resolve peer conflict." AR 498. Aside from the initial conflict, M.R.E. was generally on task and well-behaved. AR 498.

Ms. Karp, who was leaving the Bellevue Program at the end of the month, met with M.R.E. for the final time on April 27, 2012. During their meeting, they discussed a minor altercation between the claimant and other students on the bus, and went out for ice cream to celebrate M.R.E.'s otherwise good behavior. AR 502. Ms. Karp noted that, in general, the claimant got along well with his peers and was well-behaved. AR 502. During the meeting M.R.E. interacted with Ms. Karp in a friendly and appropriate manner. AR 502.

In group sessions on both April 26 and May 3, 2012, M.R.E. became verbally aggressive toward a classmate, but responded well to redirection. AR 504, 506. As Ms. Zlotnik wrote, M.R.E. appropriately sought extra help from the staff and generally behaved well after the initial conflict. AR 504, 506. On May 10, Ms. Zlotnik reported that M.R.E. was generally on task and interacted well with his peers. AR 488. The claimant responded well to redirection from his teachers and demonstrated "good team work." AR 488.

**\*7** Also on May 10, 2012, M.R.E. met with Debra McVey, who had replaced Ms. Karp as his therapist at the Bellevue Program. AR 508. Ms. McVey noted that M.R.E. had a short temper in the classroom, and was incapable of responding to redirection from his teachers. AR 508. Less than one week later, on May 16, Dr. Alcera wrote that M.R.E. was doing well in the program, remaining "engaged academically with minimal to nil tantrums or outbursts." AR 509. M.R.E. exhibited good behavior at home

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 54 of 223

Estrella o/b/o M.R.E. v. Berryhill, Not Reported in Fed. Supp. (2017)

2017 WL 2693722

and continued to demonstrate improved frustration tolerance at school. AR 509. A mental status examination was unremarkable; M.R.E. was alert, oriented, and cooperative. AR 509.

On May 24, 2012, Ms. Zlotnik rendered an apparently conflicting account of M.R.E.'s behavior during group activities. AR 512. She began her narrative by stating that the claimant was generally on task and well behaved during the group activity, but wrote in the next sentence that he "demonstrated bossy behavior towards group members." AR 512. [19] On May 25, Plaintiff spoke with Ms. McVey to inform her that M.R.E. was having trouble getting along with two peers in his after school program. AR 512.

M.R.E. told Ms. McVey on June 1, 2012, that he felt "in control" and did not think he required more medication. AR 515. He reported that two students in his after school program were being provocative by "always saying bad or mean things" about his mother, but he was able to ignore them. AR 515. On June 8, Ms. McVey noted that M.R.E. behaved well in class over the previous week. AR 515. According to Ms. Zlotnik's notes of June 14, 2012, M.R.E. was generally on task and interacted well with his peers. AR 517. On the following day, June 15, Ms. McVey noted that M.R.E. was "doing better" in the after school program. AR 518. Plaintiff also reported that the claimant's behavior at home had improved. AR 518. On June 22, Ms. Mcvey wrote that M.R.E. had a good week, and was able to play with a classmate without "being too bossy[.]" AR 519.

Dr. Alcera, writing on July 11, 2012, noted that M.R.E. did not have any tantrums or aggressive outbursts in the previous month. AR 520. The claimant continued to show improvement in his behavior at school; his attention, focus, and mood were each considered "good" as well. AR 520. M.R.E. was compliant with his medications, and a mental status examination was normal. AR 520. On the same day, July 11, Ms. McVey met with M.R.E. for an individual therapy session. AR 523. They discussed a recent altercation between the claimant and a classmate of his during an after school program, wherein the claimant threatened to hit the peer for jumping ahead of him in line. AR 523. M.R.E., according to Ms. McVey, "agreed that learning is more important ... than being the first on line." AR 523.

On July 20, 2012, Ms. McVey wrote that M.R.E.'s anger management had improved. AR 524. She had also spoken with Plaintiff, who confirmed that the claimant would begin attending PS 96 in the fall and receiving additional care from Astor Services for Children and Families, a clinic located in the Bronx, New York. AR 524. Both Ms. McVey and Plaintiff "agreed that [M.R.E.] improved and he did great in the [Bellevue Program]." AR 524.

### iii. PS 35 Riverview School [20]

 **\*8** At the end of the Spring Term of 2012, M.R.E.'s principal at PS 35, Marta Barnett, completed a report card which detailed the claimant's social behavior. AR 260. According to Ms. Barnett, M.R.E. demonstrated a low threshold and tolerance for others, and got "set off very easily." AR 260. She also noted that M.R.E. had a difficult time recovering from spells of frustration. AR 260. Although he had good friends in the class, with whom he interacted on a daily basis, he could, according to Ms. Barnett, stand to "learn to keep an indoor voice and how to keep himself together in a group setting." AR 260. [21]

### b. Records Post-dating Plaintiff's SSI Application

### i. Bellevue Hospital's Child and Adolescent Day Treatment Program

On July 27, 2012, Ms. McVey noted that the claimant had another good week in school, where he continued to display behavioral improvement. AR 525. M.R.E. acknowledged that he was in better control of his anger, and that he had made many friends at the Bellevue Program whom he would miss upon leaving. AR 525. Ms. McVey, speaking on behalf of the staff, wrote that "we will miss him also, and it's nice to see him mature so nicely." AR 525.

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 55 of 223
**Estrella o/b/o M.R.E. v. Berryhill, Not Reported in Fed. Supp. (2017)**
2017 WL 2693722

On August 14, 2012, Dr. Alcera noted that M.R.E. had continued to do well behaviorally, and did not exhibit any tantrums or outbursts over the prior month. AR 527. A mental status examination revealed that M.R.E. had a good mood and full affect. AR 527. The claimant was compliant with his medications and treatment, and got along well with his classmates. AR 527. Writing on August 16, Ms. McVey indicated that M.R.E. had perfect attendance over the previous two weeks, and had "matured as a person" over the course of the Bellevue Program. AR 529.

### ii. PS 35 Riverview School

Ms. Susan Berman, the claimant's second grade teacher at PS 35, noted on a report card that M.R.E had "come a long way since the beginning of the year." AR 289. Although M.R.E. was still working on certain behavioral issues—using his "indoor voice" within the classroom—he was, "for the most part," able to control himself. AR 289.

On August 8, 2012, Ms. Berman completed a questionnaire at the request of the SSA. AR 248. She first found that M.R.E.'s ability to acquire and use information was not impaired. AR 249. Next, she found that, generally, M.R.E. had no difficulty attending and completing tasks, but had some trouble finishing his work within a reasonable period of time. AR 250.[22] With respect to interacting and relating with others, M.R.E. had "slight problems" in the categories of playing cooperatively with classmates, seeking attention and expressing anger appropriately, and taking turns in conversation. AR 251.[23] Ms. Berman explained that M.R.E. often helped others in his class, "however sometimes [his] tone need[ed] to be adjusted." AR 251. She found that he could benefit from learning how to use an "indoor voice and a friendly tone when conversing with others." AR 251. Ms. Berman then indicated that M.R.E. had no problems in the domain of moving about and manipulating objects. AR 252.

**\*9** With respect to the final domain of functioning, caring for himself or herself, Ms. Berman found that M.R.E. had an "obvious problem" being patient when necessary, and a "slight problem" with respect to handling his frustration and responding appropriately to changes in his mood. AR 253.[24] She noted that M.R.E. "can become very frustrated and drastic changes can occur. He becomes sullen when he doesn't get his way ... he has been able to control this more but it's still present." AR 253. On a separate form, also signed and dated August 8, 2012, Ms. Berman indicated that M.R.E.'s reading, writing, and math skills were commensurate with his grade level. AR 256.

### iii. PS 96

On October 21, 2012, Heather Sutorius, M.R.E.'s third grade teacher at PS 96, completed a questionnaire at the request of the SSA. AR 410. M.R.E. was in an integrated co-teaching ("ICT") class, with twenty-nine other students and two teachers. AR 410.[25] At the time she completed the report Ms. Sutorius had taught the claimant for a period of roughly two months. AR 410.

Ms. Sutorius found that M.R.E. exhibited "slight problems" in nine of the ten categories listed under the domain of acquiring and using information. AR 411.[26] He had one "obvious problem" with respect to his ability to express ideas in the written form. AR 411. With respect to the domain of attending and completing tasks, Ms. Sutorius indicated that M.R.E. had obvious difficulties working without distraction and in sustaining attention during sports or play activities. AR 412. Generally, however, she indicated that the claimant could be re-focused to task, and had no problems completing his assignments or carrying out simple instructions. AR 412. Otherwise, Ms. Sutorius found that M.R.E. had "slight problems" in a number of other categories, such as paying attention when being spoken to directly and waiting to take turns. AR 412.[27]

With respect to interacting and relating with others, M.R.E. exhibited "slight problems" in five categories: playing cooperatively with classmates; seeking attention; expressing anger; asking permission appropriately; as well as following rules. AR 413. Otherwise, M.R.E. had "no problem" in each of the eight remaining categories listed on the form. AR 413.[28] Like Ms. Berman,

Estrella o/b/o M.R.E. v. Berryhill, Not Reported in Fed. Supp. (2017)

2017 WL 2693722

Ms. Sutorius found that M.R.E. had no difficulty in the domain of moving about and manipulating objects. AR 414. As to his ability to care for himself, however, Ms. Sutorius noted that M.R.E. had "slight problems" in five categories, with "no problems" in five others. AR 415. He had slight difficulties handling frustration appropriately; being patient when necessary; identifying and appropriately asserting emotional needs; responding appropriately to change in his mood; and using appropriate coping skills to meet daily demands of the school environment. AR 415. [29]

### iv. Astor Services for Children and Families

**\*10**  On September 13, 2012, staff members at Astor Services for Children and Families ("Astor Services") in the Bronx, New York, prepared an intake form in connection with M.R.E.'s admission into their comprehensive outpatient program. AR 404. Upon admission, M.R.E. was diagnosed with disruptive behavior disorder and ADHD. AR 404. Atara Hiller, a doctoral intern in psychology with Astor Services, met with M.R.E. for weekly therapy sessions. AR 422. On April 3, 2013, she authored a letter which indicated that the claimant had been diagnosed with ADHD and disruptive behavior disorder; he was then taking Vyvanse, 60 mg, to address these conditions. AR 422. [30]  According to Ms. Hiller, although M.R.E. continued to make progress, he still had some difficulty managing his anger, impulsivity, hyperactivity, and ability to focus at home and at school. AR 422. On November 6, 2013, an Astor Services nurse whose name is illegible completed a treatment plan. AR 539. The nurse indicated that M.R.E. possessed a good attitude and was able to complete his work, but continued to suffer from hyperactivity, impulsivity, inattention, irritability, and a labile mood. AR 539.

### c. Other Evidence

### i. SSA Consultant: Dr. Altmansberger

On August 20, 2012, Dr. R. Altmansberger, a non-examining Agency consultant, considered the record that was submitted to date and determined that M.R.E. was not disabled. AR 91. Relying on Ms. Berman's responses to the teacher questionnaire, Dr. Altmansberger determined that M.R.E. had no limitation in the domain of acquiring and using information. AR 89. He then found that M.R.E. suffered from less than marked restrictions in the domain of attending and completing tasks. AR 90. Once again, he based this determination on Ms. Berman's responses to the teacher questionnaire. AR 90. He also relied on notes from the Bellevue Program, citing to a mental status examination on May 16, 2012, wherein Dr. Alcera found that M.R.E. was doing well and was stable on his medication regimen. AR 90. Dr. Altmansberger found that the claimant possessed less than marked restrictions in the domains of interacting and relating with others, health and physical well-being, and caring for himself. AR 90. The consultative doctor concluded that M.R.E. was not limited in the domain of moving about and manipulating objects. AR 90.

In the narrative section of his report, Dr. Altmansberger explained that by most accounts M.R.E. was doing well, had improved at the Bellevue Program, and was stable on his medication. AR 90. M.R.E.'s mental status examination results, moreover, fell within normal limits. AR 90. The claimant was repeatedly found to be cooperative, not aggressive, and in a euthymic mood. AR 90. In addition to Dr. Alcera's notes, Dr. Altmansberger relied heavily on Ms. Berman's teacher questionnaire. AR 91. Otherwise, the consultative doctor noted, the record lacked any opinionative evidence form any other sources. AR 91.

### ii. Function Report

On July 24, 2012, Plaintiff completed a Function Report in connection with her son's application for SSI benefits. [31]  She indicated that M.R.E. had difficulty making new friends and getting along with her and other adults. AR 230. He would often hit, argue, and lose control, but Plaintiff noted that the program he was then attending—Bellevue—was helping him resolve these issues. AR 230. Plaintiff indicated that M.R.E.'s ability to care for himself was unimpaired. AR 231. She described slight

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 57 of 223
**Estrella o/b/o M.R.E. v. Berryhill, Not Reported in Fed. Supp. (2017)**

2017 WL 2693722

difficulties in M.R.E.'s capacity to pay attention and adhere to tasks; he could keep busy on his own, finish things he started, work on projects, and complete most chores, but not his homework. AR 232.

### iii. August 21, 2013, Hearing

**\*11**   The first of two administrative hearings was held on August 21, 2013. AR 71. Both Plaintiff and Dr. Sriti Vishan Resicart, a medical expert, testified at the hearing. AR 70. Plaintiff and the claimant did not appear with counsel. AR 72.

#### A. Plaintiff's Testimony

The ALJ first informed Plaintiff of her right to proceed with an attorney, and gave her the option to adjourn the hearing so that she may attempt to find counsel. AR 72. Plaintiff opted to go forward without an attorney. AR 72.

Plaintiff testified that M.R.E., who was nine and one-half years old at the time, was disabled as a result of his ADHD and extreme hyperactivity, conditions which led to "incidents within the school[.]" AR 73. The claimant had apparently been out of school for approximately six months before beginning at the Bellevue Program. AR 74. She explained that her son was accepted into the program because his previous school could no longer handle his out of control behavior. AR 73. At that prior school, M.R.E. was hyper, unable to focus, and "very destructive"; he would hit the teacher as well as his classmates. AR 74-75.

M.R.E. was scheduled to begin attending PS 96 in September, where he would be placed in special education classes. AR 75-76. At the time, he was also receiving therapy and psychiatric treatment through Astor Services. AR 75-76. Plaintiff testified that M.R.E. made progress through treatment. AR 77. She added that, for at least half of the school day, M.R.E.'s medication kept his symptoms under control. AR 77.

#### B. Dr. Sriti Vishan Resicart's Expert Testimony

Dr. Sriti Vishan Resicart, a board certified pediatrician, family physician, and internist, testified as a medical expert at the first hearing. AR 77. She diagnosed M.R.E. with ADHD, combined type; ODD; seasonal allergies; and problems with his primary support group and in school. AR 79. M.R.E. was taking Concerta, Risperidone, Depakote, and Ritalin at the time. AR 79. [32] Citing to notes from the Bellevue Program dated May through July, 2012, Dr. Resicart testified that M.R.E. was doing well and appeared stable on his medication. AR 80.

Dr. Resicart found that, looking at M.R.E.'s impairments in combination, the claimant neither met nor medically equaled the severity of listed impairment. AR 80-81. Turning next to the six domains of functioning, Dr. Resicart found as follows: M.R.E. had (1) a less than marked limitation in the domain of acquiring and using information, as demonstrated by the fact that he was below grade level in math and writing; (2) a less than marked limitation in the domain of attending and completing tasks, due to his attention deficit disorder; no limitation with respect to each of the next three domains—(3) interacting or relating with others, (4) moving about or manipulating objects, and (5) caring for himself; and (6) a less than marked limitation in the domain of health and physical well-being, because he suffered from seasonal allergies. AR 81. [33]

### iv. December 6, 2013, Hearing

**\*12**   A second hearing was held on December 6, 2013, where Plaintiff and M.R.E., appearing pro se, as well as Dr. Edward Halperin, a psychological expert, testified. AR 51.

Estrella o/b/o M.R.E. v. Berryhill, Not Reported in Fed. Supp. (2017)

2017 WL 2693722

### A. Plaintiff's Testimony

The ALJ began the hearing by reminding Plaintiff of her right to proceed with an attorney, and she responded that she wished to go forward pro se. AR 52. Plaintiff explained that she believed her son was disabled due to his diagnosis of ADHD. AR 54. [34] He remained "very hyperactive," and had difficulty focusing in school. AR 55. M.R.E.'s medication tended to lose its effectiveness toward the latter part of the school day, at approximately 1:30 or 2:00 PM. AR 55. Plaintiff then testified that her son was enrolled in special education classes, but had never been asked to repeat a grade. AR 56. Additionally, he received treatment at Astor Services once or twice each week. AR 63. Plaintiff believed that the group therapy which M.R.E. received at school "help[ed] out through the day." AR 61.

### B. M.R.E.'s Testimony

M.R.E. testified that he had friends in school, but only enjoyed gym class, where he was able to run around. AR 57-58. Although he recognized that he misbehaved in school, he did "not really" believe it to be his fault. AR 59. M.R.E. described getting mad and throwing his book bag in the closet, before acknowledging that doing so was generally not a good idea. AR 60. He also described getting upset when he did not get his way. AR 60. M.R.E. stated that he liked the group therapy he received at school, which his mother also found helpful. AR 62. Outside of school he was friendly with other children in the neighborhood, and enjoyed playing basketball and soccer as well as listening to music on the radio. AR 58.

### C. Dr. Edward N. Halperin's Expert Testimony

Dr. Edward N. Halperin, a board certified adolescent psychiatrist, testified as a psychological expert at the second administrative hearing. AR 62. He began by noting M.R.E.'s diagnosis of ADHD, which was "responding moderately well" to Vyvanse. AR 65. The claimant had also been diagnosed with ODD, which Dr. Halperin described as a mild case, noting that there had been much less evidence of related symptoms in the chart than there were previously. AR 66.

Dr. Halperin testified that M.R.E.'s conditions did not meet nor equal the severity of a listed impairment. AR 66. As to the six domains of functioning, M.R.E. had less than marked limitations with respect to acquiring and using information, attending and completing tasks, interacting and relating with others, and with respect to his health and physical well-being. AR 67. According to Dr. Halperin, M.R.E. did not suffer from any limitations in the domains of caring for himself or moving and manipulating objects. AR 67.

### 2. Evidence Submitted to the Appeals Council

On March 6, 2014, Plaintiff sought review of the ALJ's unfavorable decision by the Appeals Council. AR 25. In support of that appeal, she submitted additional records from the DOE, Astor Services, the Bellevue Program, and Steinway. AR 5-7. In its Notice of Denial of Review, the Appeals Council stated that it had considered this new evidence, but that it did not provide a basis for changing the ALJ's decision. AR 1-2. [35]

### a. Records Pre-dating Plaintiff's SSI Application

Estrella o/b/o M.R.E. v. Berryhill, Not Reported in Fed. Supp. (2017)

2017 WL 2693722

Case 5:24-cv-00169-DNH-ML   Document 27   Filed 02/05/25   Page 59 of 223

### i. DOE Records & M.R.E.'s Early Childhood Education

**\*13**   On November 2, 2009, Plaintiff wrote to the DOE, requesting that a full psychological test be provided to M.R.E. in order to determine if he was eligible for special education classes. AR 294. [36]   M.R.E.'s kindergarten teacher also requested that he undergo an evaluation, citing the claimant's "defiant and aggressive behavior [which had become] so severe [that the teacher was] concerned about his safety to himself and his peers." AR 340.

On January 13, 2010, Dr. Guadalupe Coll, a school psychologist, conducted a psycho-educational evaluation of M.R.E. AR 340. Dr. Coll found that the claimant was alert and active, but required constant attention and direction, throughout the evaluation. AR 341. He frequently grabbed nearby materials, and tried to climb on the table. AR 342.

M.R.E.'s verbal IQ score was in the average range, while both his performance and full scale IQ scores fell within the high average range. AR 342. On a Woodcock-Johnson test, M.R.E. scored in the 91 $^{st}$ percentile in reading/coding and spelling, and the 95 $^{th}$ percentile in math computing, placing his academic skills in reading, writing, and math above grade level and all in the "superior range." AR 343.

Dr. Coll concluded that M.R.E. lacked self-control and an ability to respond appropriately to authority and social constraints. AR 344. These behavioral limitations, the examiner opined, prevented the claimant from "functioning in a regular classroom despite his overall high level in cognitive and academic functioning." AR 344. Accordingly, Dr. Coll recommended that M.R.E. be provided an educational setting which had a crisis paraprofessional who could provide additional structure and individualized attention. AR 344.

On April 1, 2011, M.R.E.'s teachers prepared an Individualized Education Program ("IEP") for the claimant's upcoming 2011-2012 school year. AR 296-305. M.R.E.'s teachers found that he had difficulty controlling his anger and could be argumentative at times. AR 296-97. As noted elsewhere in the record, M.R.E. was described as having a low frustration tolerance and a susceptibility to distraction. AR 296. Although he responded well to praise and reinforcement, he often sought it when it was "not earned." AR 296. His teachers opined that he would benefit from special attention, repetition, redirection, and praise. AR 296. Accordingly, they recommended that M.R.E. be placed in an ICT classroom, and receive individual counseling on a weekly basis. AR 300.

### ii. Steinway Child and Family Services

On March 21, 2009, Dr. Jose Vito of Steinway conducted a psychiatric evaluation of the claimant. AR 544. M.R.E.'s teachers had complained that he was hyperactive, oppositional, impulsive, and unable to focus on tasks in school. AR 544. Additionally, Plaintiff reported having difficulty with the claimant at home; he could not sit still and had tantrums. AR 544. Dr. Vito diagnosed the claimant with ADHD, combined type, ODD, rule out bipolar disorder, and seasonal allergies, while assigning him a GAF score of 50, indicating a serious impairment. AR 547. During a mental status examination, M.R.E. was uncooperative at times, easily distracted, and displayed poor impulse control and judgment, as well as a brief attention span. AR 545.

On January 12, 2010, Dr. Vito, along with Ms. McEvoy, the claimant's therapist at Steinway, wrote to the DOE in connection with determining M.R.E.'s appropriate educational placement. AR 548. At the time, the claimant's medications had recently been changed from Adderral XR, 30 mg, to Focalin XR, 20 mg, which he took on a daily basis, along with .5 mg of Risperidone. AR 548. According to Dr. Vito and Ms. McEvoy, M.R.E. was very bright, but struggled significantly with frustration tolerance, impulsivity, difficulty focusing, hyperactivity, oppositional behavior, and affect regulation. AR 548. In their joint opinion, M.R.E. had dual academic needs: "the need to be both challenged academically and socially, while also having the intensive support necessary to be successful in both of these realms." AR 548.

Estrella o/b/o M.R.E. v. Berryhill, Not Reported in Fed. Supp. (2017)

2017 WL 2693722

**\*14**  On April 6, 2011, Dr. Vito completed a form titled "Medical Report for Determination of Disability." AR 549. M.R.E. was seven years old at the time. AR 549. Although the claimant showed some behavioral improvement since beginning his treatment at Steinway, in February, 2009, significant symptoms persisted. AR 549. Dr. Vito noted that the claimant continued to experience hyperactivity, difficulty focusing, impulsivity, difficulty regulating the tone and volume of his voice, excessive talking, low frustration tolerance, trouble regulating his emotions, difficulty accepting limits, frequently losing his temper, and he was argumentative as well as easily annoyed by others. AR 549. Dr. Vito opined that M.R.E.'s frequent mood swings and oppositional behavior would interfere with his responsibilities at home and at school, and lead to conflicts with peers. AR 549.

In a "Request for Medical Accommodations" form, completed on June 27, 2011, Dr. Salvacion Bonete and Ms. McEvoy indicated that M.R.E. suffered from several limitations as a result of his ADHD and ODD. AR 551. [37] They found that, although these limitations would improve over time, M.R.E. would require frequent support and redirection in order to remain on task and able to handle day-to-day stressors. AR 551. They also recommended that M.R.E, learn in a small class setting with support staff in addition to a lead teacher, "such that significant structure and support [could be] available." AR 551.

### iii. Bellevue Hospital's Child and Adolescent Day Treatment Program

On April 17, 2012, Ms. Berman, Ms. McVey, and Plaintiff, along with a school psychologist and district representative, completed an IEP for M.R.E.'s 2012-2013 school year. AR 306-16. They described the claimant as "a very respectful youngster who [got] along well and enjoy[ed] helping out with the younger students in his class." AR 306. M.R.E. had, according to the authors of the IEP, "come a long way fast" since beginning at the Bellevue Program; he was "no longer argumentative and [was] described as being a 'gentleman' [who was] easily redirected if there [was] a conflict, but ha[d] not been in conflict in a long while." AR 306. They recommended that the claimant receive counseling services twice weekly in a group setting, and once each week on an individual basis. AR 307. M.R.E. was also best suited for placement in an ICT classroom. AR 307, 310-11. [38]

On July 5, 2012, M.R.E.'s primary clinician, Ms. McVey, and attending physician, Dr. Alcera, completed a treatment plan. M.R.E. still carried the diagnoses of ADHD, combined type, ODD, and had a GAF score of 50. AR 564. He was taking Vyvanse, 50 mg, at the time. AR 564. The claimant was compliant with his medication, but his teacher, Ms. Berman, reported that he often lost focus, and patience, near the end of the school day. AR 564-65. The authors of the treatment plan noted that, although M.R.E. got along nicely with older classmates, he continued to boss around his peers. AR 565. Overall, however, M.R.E.'s teachers noted that he was less easily agitated. AR 565. [39]

### b. Records Post-dating Plaintiff's SSI Application

### i. PS 96

**\*15**  On November 26, 2012, Ms. Sutorius, along with school psychologist and district representative Jose Roque, social worker Helen Crespo, general education teacher Diana Shkreli, and Plaintiff completed an updated IEP for M.R.E.'s 2012-2013 school year. Although he "tried hard to stay on task," M.R.E. continued to experience difficulty focusing, and could often get "fidgety," in the classroom. AR 345-46. The authors of the IEP nevertheless described him as "well behaved," "respectful," and having a "good attitude." AR 345.

On March 19, 2014, Ms. Sutorius completed a second teacher questionnaire. AR 331-39. [40] At the time she completed the questionnaire, Ms. Sutorius had known the claimant for two years, and was teaching him five days each week for the duration of the school day. AR 331. Although M.R.E. was in the fourth grade, his reading and math were at third grade levels, and his

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 61 of 223

Estrella o/b/o M.R.E. v. Berryhill, Not Reported in Fed. Supp. (2017)
2017 WL 2693722

written language skills were at a second grade level. AR 331. Ms. Sutorius noted that the claimant was generally able to function well in an ICT class setting, where he received extra attention, support, and structure. AR 337.

With respect to the domain of acquiring and using information, Ms. Sutorius found that M.R.E. had "slight problems" in nine of the ten categories which appeared on the questionnaire, and an "obvious problem" expressing his ideas in written form. AR 332.[41] Ms. Sutorius noted that the claimant was approaching grade level in most areas, but required "a lot of structure and explicit instructions" with respect to writing. AR 332. M.R.E. also benefited from a small group setting. AR 332.

As to the second domain of functioning, attending and completing tasks, Ms. Sutorius indicated that the claimant possessed a number of serious problems. AR 333. On a daily basis M.R.E. had difficulty refocusing to task when necessary, completing his homework assignments, finishing his work accurately without careless mistakes, and working without distracting himself or others. AR 333. Additionally, Ms. Sutorius found that the claimant had an "obvious problem" focusing long enough to finish assigned activities or tasks, changing from one activity to another without being disruptive, and working at a reasonable pace. AR 333. She also noted that M.R.E. had "slight problems" in several other categories within the second domain of functioning, such as paying attention when being spoken to directly and waiting to take turns. AR 333.[42]

**\*16** The third domain of functioning fell under the title of "interacting and relating with others." Here, of the thirteen categories listed under this title, Ms. Sutorius found that M.R.E. exhibited a "serious problem" in expressing anger appropriately, five "obvious problems," six "slight problems," and no problem with respect to interpreting meaning of facial expression, body language, or hints. AR 334.[43] M.R.E. would get easily frustrated with his peers, and, at times, overreact when his classmates looked at him, which led to conflict. AR 334.

As to the fourth domain of functioning, moving about and manipulating objects, Ms. Sutorius opined that M.R.E. had "slight problems" with managing the pace of physical activities or tasks, and showing a sense of his body's location and movement in space. AR 335. He was often fidgety and wrote on his fingers, and, at times, required sensory stimulation to calm down. AR 335.

The next domain of functioning fell under the title of "caring for himself." Here, Ms. Sutorius found that M.R.E. exhibited "serious problems" responding appropriately to changes in his mood and using appropriate coping skills to meet the daily demands of the school environment. AR 336. The claimant exhibited "obvious problems" handling frustration appropriately, being patient when necessary, identifying and appropriately asserting his emotional needs, and knowing when to ask for help. AR 336. He had "slight problems" caring for his physical needs, taking his medications, and using good judgment regarding personal safety and dangerous circumstances. AR 336. Ms. Sutorius indicated that M.R.E. had no problem taking care of his personal hygiene. AR 336. She noted that M.R.E. often had difficulty beginning the school day in the morning, but could begin functioning appropriately within the first hour and a half of the day, and regress toward the end of the day, when he could become irritiable, especially on extended days. AR 336.

### ii. Astor Services for Children and Families

On August 27, 2012, an Astor Services employee, whose name appears illegible, completed an intake summary. AR 553. M.R.E. presented with ADHD and low frustration tolerance;[44] the primary goals of treatment were for him to improve his focus, behavioral control, and relationships with others. AR 555. A mental status examination revealed that the claimant was fully oriented, clear and logical in his speech and thought, and cooperative, but restless and hyperactive. AR 559. His affect was happy, his mood euthymic, and his cognitive functioning largely intact. AR 560. He exhibited limited insight and impaired judgment. AR 560. The examiner diagnosed M.R.E. with disruptive behavior disorder ("DBD"), a history of ADHD, and scored his GAF level at 50. AR 560.

Case 5:24-cv-00169-DNH-ML   Document 27   Filed 02/05/25   Page 62 of 223

Estrella o/b/o M.R.E. v. Berryhill, Not Reported in Fed. Supp. (2017)

2017 WL 2693722

**\*17** On the same date, Tisha John, a licensed mental health counselor ("LMHC"), met with M.R.E. for an initial assessment. AR 568. The claimant was cooperative and easily engaged in conversation. AR 568. Based on the history provided by Plaintiff and her own assessment of M.R.E., Ms. John found that there was sufficient evidence to support the diagnoses of DBD and ADHD, and to warrant admission for outpatient treatment. AR 568.

On September 25, 2012, M.R.E. met with Dr. Desmond Heath of Astor Services for a psychiatric assessment. AR 569-70. Dr. Heath diagnosed the claimant with ADHD, rule out bipolar disorder and stimulant-induced psychosis, and assigned a GAF score of 50. AR 569-70. The claimant intimated that he felt as thought others were looking at him, talking about him, and laughing at him at times. AR 570. Upon conducting a mental status evaluation, Dr. Heath noted that M.R.E. did not appear to have mood swings and denied OCD symptoms. AR 570.

On June 10, 2013, staff members at Astor Services noted that M.R.E. still took Vyvanse, 60 mg, as well as Vitamin E, 200 units, per day. AR 575. Although the claimant continued to experience symptoms related to ADHD, he had apparently been able to identify certain triggers which elicited anger, and began utilizing coping methods and problem-solving skills to better regulate his emotions. AR 576-77. Collaborative problem-solving techniques also proved successful in addressing the claimant's behavior at home. AR 577. The author of the treatment plan review wrote that M.R.E.'s ADHD symptoms had improved with medication, "and [he] continue[d] to succeed academically and behaviorally at school." AR 578. On September 10, 2013, a nurse practitioner whose name is illegible on the document completed a medical only treatment plan, noting that M.R.E. continued to struggle from ADHD and took Vyvanse, 60 mg. AR 579. [45]

On April 1, 2014, LMSW Pinchus Brecher, LCSW June Helme, and Dr. Christina Atkin completed a treatment plan. AR 571-74. M.R.E.'s diagnosis of ADHD remained unchanged. AR 571. His disruptive, attention-seeking behavior persisted as well; he interfered with his classmates' attention and concentration by "talking excessively, blurting out remarks, speaking without permission, and laughing or making noises[.]" AR 572. The claimant continued to "talk back" to his teachers and mother, and would throw tantrums that lasted for long periods of time. AR 572. To treat these symptoms, the staff at Astor Services prescribed individual therapy with Mr. Brecher two to four times each month as well as monthly medication management with Dr. Atkin. AR 573.

On April 9, 2014, Enca Silen, a nurse practitioner, wrote that M.R.E. continued to exhibit impulsivity, inattention, hyperactivity, and irritability. AR 325. Ms. Silen described a recent incident in which the claimant apparently threw a tantrum in the street which led to emergency medical services being called. AR 325. According to Ms. Silen, M.R.E.'s symptoms had worsened in recent months, resulting in the need for increased medication and therapy visits. AR 325. In addition to an increase in the dosage of Vyvanse, from 60 to 70 mg, M.R.E. began taking Strattera, 18 mg, as well as participating in weekly therapy. AR 325. [46]

## II. APPLICABLE LEGAL PRINCIPLES

### A. Standard of Review

**\*18** The scope of review in an appeal from a social security disability determination involves two levels of inquiry. First, the court must review the Commissioner's decision to determine whether the Commissioner applied the correct legal standard when determining that the plaintiff was not disabled. Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999). Failure to apply the correct legal standard is grounds for reversal of the ruling. Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984). Second, the court must decide whether the Commissioner's decision was supported by substantial evidence. Green-Younger v. Barnhart, 335 F.3d 99, 105-06 (2d Cir. 2003). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. at 106 (internal quotation marks and citations omitted). When determining whether substantial evidence supports the Commissioner's decision, it is important that the court "carefully consider[ ] the whole record, examining evidence from both sides." Tejada, 167 F.3d at 774 (citing Quinones v. Chater, 117 F.3d 29, 33 (2d Cir. 1997)). "It is not the function of a reviewing court to decide de novo whether a claimant was disabled." Melville v. Apfel, 198 F.3d 45, 52 (2d Cir.

Estrella o/b/o M.R.E. v. Berryhill, Not Reported in Fed. Supp. (2017)

2017 WL 2693722

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 63 of 223

1999) (citation omitted). If the "decision rests on adequate findings supported by evidence having rational probative force, [the court] will not substitute [its own] judgment for that of the Commissioner." Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002).

### B. Determining Disability

The SSI program provides benefits to "needy aged, blind, or disabled individuals" who meet certain statutory income and resource limitations. Ruff ex rel. LMF v. Colvin, No. 14-Civ-2433 (RWS), 2015 WL 694918, at *8 (S.D.N.Y. Feb. 18, 2015) (citing 42 U.S.C. § 1381 et seq.). A child under the age of 18 is "disabled" for purposes of SSI eligibility if he or she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i).

Pursuant to SSA regulations, an ALJ applies a three-step analysis to determine whether a particular child claimant is disabled. 20 C.F.R. § 416.924. First, the ALJ determines whether the claimant is engaged in substantial gainful activity. 20 C.F.R. § 416.924(b). If the claimant is not, the ALJ proceeds to the second step, where he or she considers whether the claimant has a medically determinable impairment which is severe. 20 C.F.R. § 416.924(c). An impairment is "severe" if it results in more than a "slight abnormality" or if it constitutes a "combination of slight abnormalities that causes ... more than minimal functional limitations." 20 C.F.R. § 416.924(c).

At the third and final step, the ALJ determines whether the claimant's impairment(s) meets, medically equals, or functionally equals the criteria of an impairment found in 20 C.F.R. Pt. 404 Subpt. P., App. 1 (the "listings"). 20 C.F.R. § 416.924(d). To "functionally equal" a listing, the claimant must demonstrate that his or her impairments "result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." 20 C.F.R. 416.926a. There are six domains of functioning: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) self-care; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1). A "marked" impairment is one which is "more than moderate" but "less than extreme." 20 C.F.R. § 416.926(e)(2)(I). An "extreme" limitation is one which "interferes very seriously" with a child's ability to initiate, sustain, or complete activities; it is a rating reserved for the worst limitations. 20 C.F.R. § 416.926(e)(3)(i).

### III. DISCUSSION

Plaintiff's instant lawsuit challenges the ALJ's unfavorable decision, which become the final determination of the Agency on July 24, 2015. AR 1-6. She asks this Court to reverse that decision and award benefits, or, alternatively, to vacate the decision and remand the case to the Agency for additional proceedings. ECF No. 1, at 5. Plaintiff raises four arguments in support of such relief. She contends that (1) the ALJ failed to develop the record; (2) the decision was not supported by substantial evidence; (3) the Appeals Council failed to provide "good reasons" for rejecting post-hearing treating source evidence when it denied Plaintiff's request for review; and (4) remand is appropriate in the "interests of justice." ECF Nos. 19, at 29-45; 23. For the reasons that follow, the Court recommends that the Agency's decision be vacated and the case be remanded for further proceedings consistent with this Report and Recommendation.

### A. The ALJ's Decision

**\*19** On January 15, 2014, the ALJ issued a written decision denying Plaintiff's application for SSI benefits on behalf of M.R.E. AR 35-45. Performing the three-step analysis set forth above, the AU first determined that M.R.E. had not been engaged in substantial gainful activity since July 24, 2012, the date the application was filed. AR 38. At step two, he concluded that M.R.E. suffered from two severe impairments, asthma and ADHD. AR 38. At the third step, the ALJ concluded that M.R.E.'s impairments, whether considered singly or in combination, neither met, medically equaled, nor functionally equaled a listing. AR 38.

Estrella o/b/o M.R.E. v. Berryhill, Not Reported in Fed. Supp. (2017)

2017 WL 2693722

In reaching this conclusion, the ALJ found that Plaintiff's allegations regarding the severity of M.R.E.'s impairments were not supported by the evidence of record. AR 38. The ALJ noted that M.R.E. did not require "full time therapy" and had been responding well to medication. AR 38. Moreover, mental status examination results were all within normal limits, and a May 16, 2012, examination, performed by Dr. Alcera of the Bellevue Program, stated that M.R.E. was doing well and was stable on his medication regimen. AR 38. The ALJ then considered the fact that the teacher evaluations of record did not find that M.R.E. had a marked limitation in any of the six domains of functioning. AR 38. Ms. Sutorius, on a teacher questionnaire from October, 2012, described M.R.E. as suffering from "slight problems" in some areas of functioning and "no problems" in others. AR 39. Likewise, the ALJ noted, consultative examiner Dr. Altmansberger and testifying expert Dr. Halperin both found that the claimant had less than marked limitations in various levels of functioning but never any marked or extreme impairments. AR 39. Although teacher reports described M.R.E.'s "moderate difficulty in being patient, and his tendency to become moody when he did not get his way, other records noted an improvement in these behaviors. AR 39. As to the Astor Services records, the ALJ noted that the administrative file did not include progress notes or detailed assessments from M.R.E.'s treatment providers at the program. AR 40. Nevertheless, a letter from Ms. Hiller dated April 3, 2013, stated that, although the claimant had some difficulty managing his anger, impulsivity, hyperactivity, and ability to focus, he continued to make progress. AR 40.

The ALJ then considered M.R.E.'s limitations in reference to the six domains of functioning. AR 40-44. He found that M.R.E. had a less than marked limitation in the following four domains: acquiring and using information, attending and completing tasks, interacting and relating with others, and health and physical well-being. AR 40-44. [47] He also determined that the claimant had no limitations in the domains of moving about and manipulating objects and caring for himself. AR 42-44. [48] Based on these findings the ALJ concluded the claimant did not have an impairment or combination of impairments that resulted in either marked limitations in two domains of functioning or an extreme limitation in one. AR 44. Accordingly, the ALJ concluded that M.R.E. was not disabled. AR 44.

### B. Duty to Develop the Record

**\*20** Plaintiff contends that the ALJ failed to develop the administrative record, particularly in light of the fact that M.R.E. was an unrepresented minor at the time of the hearing. ECF Nos. 19, at 29-41; 26, at 1-5. This error, Plaintiff argues, falls into two categories. First, she contends that the ALJ did not correct gaps in the psychiatric and academic evidence, errors which were compounded by the ALJ's failure to request an opinion from one of M.R.E.'s treating psychiatrists. Second, she argues that the ALJ did not conduct a full and fair hearing. The Court, for the reasons that follow, finds merit in both contentions. As such, this case should be remanded for further development of the record. See Rodriguez v. Astrue, 07-Civ-534 (WHP) (MHD) 2009 WL 637154, at \*18 (S.D.N.Y. Mar. 9, 2009) (order adopting report and recommendation) ("Remand is appropriate when the ALJ neglects to pursue information that would fill gaps in the record." (citations omitted)).

### 1. Development of M.R.E.'s Psychiatric and Academic Records

The claimant bears the burden of proving that he or she is disabled, and must therefore provide evidence to support a claim for SSI disability. 20 C.F.R. § 416.912(a)(1). Due to the non-adversarial nature of social security hearings, however, an ALJ also has the affirmative duty to develop a "complete medical history for at least the 12 months preceding the month in which [the claimant] file[d] [his or her] application." 20 C.F.R. § 416.912(b); see also Lamay v. Comm'r of Soc. Sec., 562 F. 3d 503, 508-09 (2d Cir. 2009). This obligation is accentuated when a claimant appears pro se, as the ALJ must "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." Lamay, 562 F. 3d at 509 (quoting Hankerson v. Harris, 636 F. 2d 893, 895 (2d Cir. 1980)). Additionally, courts in the Southern District of New York have recognized that the ALJ's duty to develop the record is heightened where the claimant alleges he or she suffers from a mental illness. Hidalgo v. Colvin, No. 12-Civ-9009 (LTS) (SN), 2014 WL 2884018, at \*4 (S.D.N.Y. June 25, 2014); see also Gabrielsen v. Colvin, No. 12-Civ-5694 (KMK) (PED), 2015 WL 459548, at \*4-5 (S.D.N.Y. July 30, 2015) (collecting cases in order adopting report and recommendation). The duty is also enhanced when, as in this case, the claimant is a child. See, e.g., Price ex rel. A.N. v. Astrue, 42 F. Supp. 3d 423, 432 (E.D.N.Y. 2014) (citing Encarnacion ex rel. George v. Barnhart, No. 00-Civ-6597 (LTS) (THK),

Estrella o/b/o M.R.E. v. Berryhill, Not Reported in Fed. Supp. (2017)

2017 WL 2693722

2003 WL 1344903, at *2 (S.D.N.Y. Mar. 19, 2003)). Nevertheless, where there are no obvious gaps, and the record provides "a complete medical history," the ALJ is under no obligation to obtain additional information before rejecting a claim. Rosa v. Callahan, 168 F. 3d 72, 79 n.5 (2d Cir. 1999) (citing Perez v. Chater, 77 F. 3d 41, 48 (2d Cir. 1996)).

Here, the ALJ failed to fulfill his heightened duty to develop the record. As an initial matter, the ALJ's duty was elevated in this case because, at the time of his decision, he was confronted with an (1) unrepresented (2) minor claimant (3) alleging mental impairments. The record, moreover, contained glaring gaps. Regarding the relevant period between the application date and the date of the ALJ's decision, an 18-month span, the record included only 14 pages [49] of psychiatric notes and approximately 18 pages of academic documents. AR 46-49. [50] AR 422. As the following discussion sets forth, this left obvious holes in the record, which the ALJ never sought to develop despite his affirmative and heightened duty to do so. See Rosa, 168 F. 3d at 79 ("where there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history [.]").

 **\*21**  One such gap was the paucity of records from M.R.E.'s treating psychotherapists at Astor Services. At the time of the decision, the record included a letter dated April 3, 2013, from Ms. Atara Hiller of Astor Services. AR 422. Therein, Ms. Hiller wrote that she had provided M.R.E. weekly psychotherapy, and that Erica Silen, a nurse practitioner, had provided the claimant with monthly medication management since September 13, 2012. AR 422. Plaintiff also testified that M.R.E. was receiving ongoing treatment at Astor Services. AR 63. The record, however, was devoid of any treatment notes from these sessions; nor did it include an opinion regarding M.R.E.'s ability to perform in the six functional domains from any treating mental health profession. Aside from Ms. Hiller's letter, the next most recent notes from Astor Services were dated in early October, 2012. AR 404. This left nearly six months of treatment records unaccounted for. See, e.g., Velez v. Comm'r of Soc. Sec., No. 14-Civ-3084 (CS)(JCM), 2017 WL 1831103, at *15 (S.D.N.Y. May 5, 2017) (order adopting report and recommendation) (six-month gap in mental health treatment notes constituted gap in the record). The ALJ, though, made no efforts to obtain these critical records, let alone request an opinion from Ms. Hiller or another mental health professional from Astor Services. This gap in the psychiatric records is also troubling because the ALJ based his disability determination, largely, on the opinions of two non-examining sources—Drs. Halperin and Altmansberg—who were also relying on an incomplete record, and therefore their opinions were entitled to less deference. AR 40-42. See Pratts v. Chater, 94 F. 3d 34, 38 (2d Cir. 1996) (opinion of a non-examining consultant or expert rendered without the benefit of a complete record cannot constitute substantial evidence). [51] The ALJ's failure to address this glaring gap in the record constituted legal error.

Additionally, the ALJ failed to assist Plaintiff in seeking evidence to resolve an apparent gap in M.R.E.'s academic records. SSA regulations "require adjudicators to try to get ... school records whenever they are needed to make a determination or decision regarding a child's disability." Social Security Ruling ("SSR") 09-2p(IV): Title XVI: Determining Childhood Disability —Documenting a Child's Impairment-Related Limitations, 74 Fed. Reg. 7525 (Feb. 18, 2009); see also 20 C.F.R. 416.924a(a) (2)(iii) ("If you go to school, we will ask for information from your teachers and other school personnel about how you are functioning on a day-to-day basis ...). Here, at the time the ALJ issued his January, 2014, decision, the most recent academic document was a teacher questionnaire prepared by Ms. Sutorious over one year earlier, in October, 2012. The ALJ made no attempt to secure additional school records, despite the fact that M.R.E. had completed a full year of third grade, and was well into his fourth grade year at PS 96, by the time the decision was issued. Such records, whether in the form of a teacher questionnaire, report card, or IEP, were of particular relevance to M.R.E.'s claims. See Cespedes ex rel. Cespedes v. Barnhart, No. 00-Civ-8276 (GEL), 2002 WL 1359728, at *4 (S.D.N.Y. June 21, 2002) (noting that the SSA places importance "upon school records as a source of documentary evidence of mental disorders in children[.]"). The ALJ's failure to attempt to seek these files marks a breach of his heightened duty to develop the record.

Nevertheless, the Commissioner argues that, despite "the few records before the ALJ from the period at issue", the "SSA fully discharged its regulatory obligation" to develop the record, 2012. ECF No. 23, at 27-28. In developing a claimant's complete medical history, the regulations require that the SSA make "every reasonable effort to obtain medical evidence from [a claimant's] medical sources." 20 C.F.R. § 416.912(d). "Every reasonable effort" means making an initial request for evidence from the medical source, followed by a subsequent request at any time between 10 to 20 calender days later. 20 C.F.R. § 416.912(d). If, after making such requests, "the documents received lack any necessary information, the ALJ should recontact

**Estrella o/b/o M.R.E. v. Berryhill, Not Reported in Fed. Supp. (2017)**

2017 WL 2693722

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 66 of 223

the treating [sources]." Oliveras ex rel. Gonzalez v. Astrue, No. 07-Civ.-2841 (RMB)(JCF), 2008 WL 2262618, at *6 (S.D.N.Y. May 30, 2008), report and recommendation adopted, 2008 WL 2540816 (S.D.N.Y. Jun. 25, 2008). Importantly, these regulations prescribe "only minimal requirements. Where, as here, a doubly heightened duty applies [because claimant was pro se and alleging mental impairments], greater efforts are necessary." Corporan v. Comm'r of Soc. Sec., No. 12-Civ-6704 (JPO) (SN), 2015 WL 321832, at *6 n. 7 (S.D.N.Y. Jan. 23, 2015) (order adopting report and recommendation). In this case, the parties do not dispute that in August, 2012, the SSA made initial requests for documents from every treating source Plaintiff identified in her application, as well as from PS 96. ECF Nos. 23, at 28; 26, at 2; see also AR 283-87. These efforts, however, were insufficient to absolve the ALJ of his heightened responsibility to further develop the record. The requests were made over one year prior to the date of the decision. They were, furthermore, never followed by any subsequent requests. Such follow-up requests should have been made when, as here, the ALJ acknowledged the paucity of treating opinion evidence in his decision, only to leave this absence of evidence unaddressed before rejecting M.R.E.'s claim.[52] The Court therefore finds the Commissioner's argument, that the ALJ satisfied his duty to develop the record by way of the Agency's initial requests in August, 2012, unavailing. See Jones v. Apfel, 66 F. Supp. 2d 518, 523-24 (S.D.N.Y. 1999) (describing that, in the context of pro se claimants, 'reasonable efforts' "entails more than merely requesting reports from the treating physicians. It includes issuing and enforcing subpoenas requiring the production of evidence, as authorized by 42 U.S.C. § 405(d), and advising the plaintiff of the importance of the evidence.").[53]

## 2. Full & Fair Hearing

**\*22**  The full and fair hearing requirement is derived from the ALJ's affirmative duty to develop the record. Lamay, 562 F. 3d at 508-09; see also Estrada v. Comm'r of Soc. Sec., No. 13-Civ-4278 (CM) (SN), 2014 WL 3819080, at *3 (S.D.N.Y. June 25, 2014) (adopting report and recommendation). "Before determining whether the Commissioner's conclusions are supported by substantial evidence, [the Court] must first be satisfied that the claimant has had a full hearing under the ... regulations and in accordance with the beneficent purposes of the [Social Security] Act." Moran v. Astrue, 569 F.3d 108, 113 (2d Cir. 2009) (internal quotations and citation omitted). When, as here, the claimant appears pro se, the ALJ must make a diligent effort to help the claimant further develop the record at the hearing. Id. Whether a claimant received a full and fair hearing depends on various factors, such as "whether the ALJ asked questions regarding the disposition and extent of the claimant's subjective symptoms, the number of witnesses, and the length of the transcript." Smith v. Colvin, No. 14-Civ-5868 (ADS), 2016 WL 5395841, at *14 (E.D.N.Y. Sept. 27, 2016) (quoting Almonte v. Apfel, No. 96-Civ-1119, 1998 U.S. Dist. LEXIS 4069, at *21-23, 1998 WL 150996 (S.D.N.Y. Mar. 31, 1998)). At core, an ALJ should "question the claimant adequately about any subjective complaints and the impact of the claimant's impairments on the claimant's functional capacity." Brown v. Comm'r of Soc. Sec., 709 F. Supp. 2d 248, 256 (S.D.N.Y. 2010).

The December, 2013, hearing in this case consumed 18 minutes, and generated a 16-page transcript. AR 52-68.[54] Plaintiff argues that this proceeding was brief, perfunctory, and fell short of providing M.R.E. a full and fair hearing. ECF Nos. 19, at 38-39; 26, at 5. Such brevity, "while not conclusive, is indicative of the ALJ's failure to conduct an investigation sufficient to fulfill his [or her] duty to develop the record." Miranda v. Barnhart, No. 04-Civ-7257 (LAK) (JCF), 2006 WL 6174093, at *13 n. 15 (S.D.N.Y. Feb. 1, 2006) (order adopting report and recommendation). As such, the Second Circuit, and district courts within the Circuit, have looked to the length of both the proceeding and the transcript in determining whether the claimant was afforded a full and fair healing. See Gallo v. Colvin, No. 15-Civ-9302 (AT) (BCM), 2016 WL 7744444, at *10 (S.D.N.Y. Dec. 23, 2016) (collecting Second Circuit cases demonstrating that 10, 11, 13, and 14-page transcripts may evidence unusually short hearings indicative of insufficient questioning by the ALJ). Here, the length of the December hearing, alone, whether measured by the time it took to complete (18 minutes) or the transcript it yielded (16 pages), is sufficient to raise concern that the ALJ failed to conduct an adequate inquiry. See ECF No. 19, at 39 (citing Robinson v. Sec'y of Health and Human Servs., 733 F. 2d 255, 257 (2d Cir. 1984) [30-minute hearing]; Hankerson, 636 F. 2d at 894 [16-page transcript]; Torres v. Comm'r of Soc. Sec., No. 13-Civ-730 (KBF), 2014 WL 406933, at * (S.D.N.Y. Feb. 3, 2014) [11-minute hearing]; Miranda, 2006 WL 6174093, at *13 [10-page transcript] ).

Estrella o/b/o M.R.E. v. Berryhill, Not Reported in Fed. Supp. (2017)

2017 WL 2693722

A closer examination of the hearing transcript, moreover, shows that the ALJ's questioning of the medical expert was especially wanting. Dr. Halperin simply repeated M.R.E.'s diagnoses, and stated that the claimant was "responding moderately well" to Vyvanse, although the medication wore off in the afternoon. AR 65. The ALJ then prompted the expert with a series of questions as he walked Dr. Halperin through the three-step disability analysis. AR 66-67. [55] Dr. Halperin did not cite to any evidence in support of his findings. Moreover, not once did the ALJ ask the expert a substantive follow-up question or inquire into the bases of his opinions. Such a "consistent pattern of neglecting to follow up on pertinent topics of inquiry" with a medical expert represents a failure of the ALJ's heightened duty to develop the record in this case. Miranda, 2006 WL 6174093, at *13 (citing Cruz, 912 F. 2d at 12). As such, on remand, a new hearing should be conducted, wherein the ALJ summons a medical expert, elicits his or her opinions, and inquires into the bases of those findings.

### C. Substantial Evidence

**\*23** The parties also dispute whether the ALJ's decision was supported by substantial evidence, both as written and in light of the newly submitted evidence. ECF Nos. 23, at 24-27; 26, at 6. Where, as here, an ALJ has "failed to develop the record, the reviewing court 'need not—indeed, cannot—reach the question of whether the Commissioner's denial of benefits was based on substantial evidence.' " Oliveras ex rel. Gonzalez, 2008 WL 22622618, at *8 (quoting Jones, 66 F. Supp. 2d at 542), report and recommendation adopted, 2008 WL 2540816 (S.D.N.Y. Jun. 25, 2008); see also Pratts, 94 F. 3d at 38 (incomplete record precluded finding that decision was supported by substantial evidence). Where "there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that the claimant will be deprived of the right to have [his or] her disability determination made according to the correct legal principles." Johnson v. Bowen, 817 F. 2d 983, 986 (2d Cir. 1987). Here, as discussed above, the ALJ committed legal error in failing to develop the record. Accordingly, the Court cannot assess whether the ALJ's decision, as written, is supported by substantial evidence.

Likewise, the Court cannot conclude that the ALJ's decision was supported by substantial evidence in light of the records first submitted to the Appeals Council. See ECF Nos. 23, at 38-43; 26, at 7-10. When, as here, "the Appeals Council denies review of a case, the ALJ's decision, and not the Appeals Council's, is the final agency decision." Lesterhuis v. Colvin, 805 F. 3d 83, 87 (2d Cir. 2015) (citing Perez, 77 F. 3d at 44). The reviewing court must then evaluate that decision in light of the "entire administrative record, which includes the new evidence, and determine, as in every case, whether there is substantial evidence to support the decision of the [Commissioner]." Id.; see also Perez, 77 F. 3d at 45. Nevertheless, the Court may not "affirm an administrative action on grounds different from those considered by the agency." Burgess v. Astrue, 537 F. 3d 117, 128 (2d Cir. 2008) (quoting Melville, 198 F. 3d at 52). Here, Plaintiff submitted three tranches of post-hearing evidence to the Appeals Council. First, she augmented the record with evidence pertaining to the relevant period, between the application date, July 24, 2012, and the date of the ALJ's decision, January 15, 2014. [56] Next, she also added new evidence detailing M.R.E.'s treatment in the years prior to the application date. [57] Lastly, Plaintiff submitted evidence generated after the ALJ's decision. [58] As the Commissioner notes, this evidence includes findings that may support the ALJ's determination that M.R.E. was not disabled. [59] Nevertheless, as Plaintiff argues, other aspects of the newly submitted records contradict that determination, and could, reasonably, lead a fact finder to reach the opposite conclusion. [60] Ultimately, though, the weighing of this newly submitted evidence must be made by the ALJ in the first instance rather than the Court. See Lesterhuis, 805 F. 3d at 88 ("On remand, the ALJ might conclude that [the treating source] opinion is not entitled to any weight, much less controlling weight, but that determination should be made by the agency in the first instance, and we should refrain from 'affirm[ing] an administrative action on grounds different from those considered by the agency.' ") (quoting Burgess. 536 F. 3d at 125 (quoting Melville, 198 F. 3d at 52)). Accordingly, the Court cannot conclude that the ALJ's decision, in light of the newly submitted records, is supported by substantial evidence. [61] On remand, the newly submitted records should be considered by the ALJ in evaluating M.R.E.'s claim.

## CONCLUSION

**\*24**  For the foregoing reasons, I conclude, and respectfully recommend that Your Honor should conclude, the Commissioner's motion for judgment on the pleadings (ECF No. 22) be denied, Plaintiff's motion (ECF No. 17) be granted, the ALJ's decision vacated, and the case be remanded to the Agency for further proceedings consistent with this Report and Recommendation.

## NOTICE

Pursuant to 28 U.S.C. § 636(b)(1), as amended, and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days, plus an additional three (3) days, pursuant to Fed. R. Civ. P. 6(d), or a total of seventeen (17) days, see Fed. R. Civ. P. 6(a), from the date hereof, to file written objections to this Report and Recommendation. Such objections, if any, shall be filed with the Clerk of Court with extra copies delivered to the chambers of The Honorable Cathy Seibel at the United States Courthouse, 300 Quarropas Street, White Plains, New York, 10601, and to the chambers of the undersigned at the United States Courthouse, 300 Quarropas Street, White Plains, New York, 10601.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.

Requests for extensions of time to file objections must be made to Judge Seibel.

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2017 WL 2693722

---

## Footnotes

1       Ms. Berryhill is the current Acting Commissioner of Social Security, effective January 20, 2017, and is automatically substituted herein as Defendant pursuant to Fed. R. Civ. P. 25(d).

2       Citations to " AR" refer to the certified copy of the administrative record filed by the Commissioner as part of her answer. See ECF No. 13.

3       Because SSI benefits are not payable for any month prior to the month in which an application is filed, the relevant period at issue in an SSI claim runs from the date of filing through the date of the ALJ's decision. 20 C.F.R. § 416.330. Here, that relevant period began on July 24, 2012. AR 178-87 (filing of the application). A recitation of the evidence prior to that date is nevertheless relevant, as a claimant's complete medical history should be considered when determining his or her disability as of the filing date. See, e.g., Hollaway v. Colvin, No. 14-Civ-5165, 2016 WL 96172, at *2 (S.D.N.Y. Jan. 8, 2016) (citing 20 C.F.R. § 416.912(d)), report and recommendation adopted, 2016 WL 1275658 (S.D.N.Y. Mar. 31, 2016).

4       LMSW McEvoy reported that, at the time, M.R.E. was a pre-kindergarten student at the Milestone School for Child Development, which he had attended since he was 15 months of age. AR 379-80. Plaintiff began noticing an increase in M.R.E.'s hyperactive and impulsive behavior beginning in September, 2008, when M.R.E. was removed from a small

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 69 of 223
**Estrella o/b/o M.R.E. v. Berryhill, Not Reported in Fed. Supp. (2017)**
2017 WL 2693722

classroom setting. AR 379. An evaluation conducted at Elmhurst Hospital at the time indicated that M.R.E. demonstrated "marked impulsivity, hyperactivity, difficulty focusing, low frustration tolerance, temper tantrums, oppositional and 'out of control' behaviors at school." AR 380.

5    ADHD includes a combination of persistent symptoms, such as difficulty sustaining attention, hyperactivity, and impulsive behavior. Diseases & Conditions: Attention-deficit/hyperactivity disorder (ADHD) in children, Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/adhd/home/ovc-20196177 (last visited May 19, 2017). Additionally, children struggling with ADHD may also experience symptoms of low self-esteem, troubled relationships, and poor performance in school. Id. Children with ODD present with symptoms of frequent and persistent patterns of anger, irritability, arguing, and defiance or vindictiveness toward authority figures. Diseases & Conditions: Oppositional defiant disorder (ODD), Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/oppositional-defiant-disorder/basics/definition/con-20024559 (last visited May 19, 2017).

6    The notes from Dr. Vito's March 21, 2009, psychiatric evaluation, which contain this diagnosis, were provided to the Appeals Council but were not submitted to the ALJ. AR 544-47.

7    Concerta is used to treat ADHD by increasing attention and decreasing restlessness in overactive patients, Drugs & Supplements: Methylphenidate (Oral Route), Mayo Clinic, http://www.mayoclinic.org/drugs-supplernents/methylphenidate-oral-route/description/drg-2006 8297 (last visited May 19, 2017). "Risperidone is used to treat schizophrenia, bipolar disorder, or irritability associated with autistic disorder." Drugs and Supplements: Risperidone (Oral Route), Mayo Clinic, http://www.mayoclinic.org/drugs-snpplements/risperidone-oral-route/description/drg-20067189 (last visited May 19, 2017).

8    M.R.E. was then in a regular rather than special education class of 30 students with three teachers, and traveled to school in a bus with 25 other children. AR 369. His mother believed that he would benefit from a smaller class setting with more supervision. AR 369.

9    The GAF tests a patient's level of functioning along a continuum of mental health, from 1 to 100. See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32-34 (4th ed. 2000).

10    Ritalin, like Concerta, is a central nervous system (CNS) stimulant used to treat ADHD. Drugs & Supplements: Methylophenidate (Oral Route), Mayo Clinic, 8297 (last visited May 19, 2017). Dr. Bonete also increased M.R.E.'s dosage of Risperidone, and directed him to continue taking Concerta. AR 373.

11    A duplicate copy of this letter was submitted to the Appeals Council. AR 563.

12    The Bellevue Program "provides a comprehensive hospital-based 12-month psychiatric and educational program for 'emotionally disturbed students aged 5-19 years who are unable to function in a less restrictive school environment,' providing classroom instruction with 'weekly individual psychotherapy and weekly group therapy, including Anger Management groups.' " ECF No. 19, at 13 n. 16 (quoting http://childrenofbellevue.org/child-adolescentpsychiatry/outpatient-psychiatric-care/.). The academic component of the Bellevue Program is known as the PS 35 Riverview School @ Bellevue Hospital Center. AR 260; ECF No. 19, at 13 n. 16.

13    For example, M.R.E. was cooperative, well-related, and normally behaved; he demonstrated adequate eye contact, normal speech and thought content, and intact insight and judgment; he was alert and oriented, and did not exhibit aggressive behavior. AR 443.

14    Plaintiff corroborated M.R.E.'s good behavior during a telephone call with Ms. Karp on the same date. AR 467. According to Ms. Karp, Plaintiff said that her son had "been doing very well" and had recently attended a Bible study class where he "kept himself occupied quietly and appropriately." AR 467.

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 70 of 223

Estrella o/b/o M.R.E. v. Berryhill, Not Reported in Fed. Supp. (2017)

2017 WL 2693722

15    As Ms. Zlotnik did in her previous notes, she once again described that the claimant presented in a "a euthymic mood and his behavior was generally on task. However, he continued to demonstrate[ ] hyperactivity and impulsivity. [M.R.E.] was responsive to verbal praise and reinforcement of positive behaviors." AR 475.

16    M.R.E. was cooperative, his thought process and content were both normal, he had no aggressive or homicidal ideations, his mood was euthymic, his affect was appropriate and full, his impulse control was intact, and he was alert and oriented. AR 470.

17    M.R.E. apparently told his classmate, "my mom is in the FBI and she will bring her tank to school and shoot you with it." AR 484.

18    M.R.E. would soon be leaving the Bellevue Program to begin attending PS 96, and receiving outpatient treatment through Astor Services for Children and Families in the Bronx, New York. See ECF Nos. 19, at 17; 23, at 11; see also AR 520, 530, 554.

19    Ms. Zlotnik gave the same description when she entered her notes the following week, on May 31. AR 514 (writing that M.R.E.'s "behavior was generally on task and he was generally well behaved during group. [M.R.E.] demonstrated bossy behavior towards group members.").

20    PS 35 Riverview School is the academic component of the Bellevue Program. AR 260; ECF No 19, at 13 n. 16. It is part of the DOE's "District 75" program, which "provides citywide educational, vocational, and behavior support programs for students who are on the autism spectrum, have significant cognitive delays, are severely emotionally challenged, sensory impaired and/or multiply disabled." ECF No. 19, at 13-14 n. 16 (quoting http://schools.nyc.gov/Academics/SpecialEducation/D75/Programs/default.htm).

21    The report card also addressed M.R.E.'s proficiency in math and literacy. He was generally strong in all areas of literacy, and reading at grade level, but could occasionally benefit from encouragement and time limits in order to complete his work. AR 260. M.R.E. enjoyed learning math, but tended to look at problems quickly, which led to careless mistakes. AR 260.

22    On the questionnaire, there are a total of 13 categories listed under the domain of attending and completing tasks. AR 250. Of those categories, Ms. Berman indicated that M R E had "no problem" in 12 of them, but an "obvious problem" with respect to "working at a reasonable pace/finishing on time." AR 250. She elaborated that, "[M.R.E.] always completes his work but most of the time he takes more time than the class. He seems to take his time writing so that everything is perfect [and] just so. He erases frequently" AR 250.

23    There are a total of 13 categories listed on the form under the domain of interacting and relating with others; Ms. Berman found that M.R.E. had "no problem" in 9 of them. AR 251.

24    Ms. Berman found that M.R.E. had "no problem" in many of the other categories under this domain, including knowing when to ask for help; appropriately asserting emotional needs; and using good judgment regarding personal safety and dangerous circumstances. AR 253.

25    An ICT classroom allows for "the provision of specially designed instruction and academic instruction provided to a group of students with disabilities and nondisabled students." 8 N.Y.C.R.R. § 200.6(g). These classes contain, at a maximum, no more than 12 students with disabilities, and, at a minimum, a special education teacher and a general education teacher. 8 N.Y.C.R.R. §§ 200.6(g)(1)(ii), (g)(2).

26    These categories include: comprehending oral instructions; understanding school and content vocabulary; reading and comprehending written material; comprehending and doing math problems; understanding and participating in class discussions; providing organized oral explanations and adequate descriptions; learning new material; recalling and applying previously learned material; and applying problem-solving skills in class discussions. AR 411.

Estrella o/b/o M.R.E. v. Berryhill, Not Reported in Fed. Supp. (2017)

2017 WL 2693722

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 71 of 223

27    The other categories listed are: focusing long enough to finish assigned activities or tasks; refocusing to task when necessary; carrying out multi-step instructions; changing from one activity to another without being disruptive; organizing his own things or school materials; completing work accurately; and working at a reasonable pace. AR 412.

28    These categories include: making and keeping friends; respecting/obeying adults in authority; relating experiences and telling stories; using language appropriate to the situation and listener; introducing and maintaining relevant and appropriate topics of conversation; taking turns in a conversation; interpreting the meaning of facial expressions, body language, hints, or sarcasm; and using adequate vocabulary and grammar to express ideas and thoughts in general, everyday conversation. AR 413.

29    Ms. Sutorius indicated that M.R.E. had no difficulty taking caring of his personal hygiene; caring for his personal needs; taking his medications; using good judgment with respect to personal safety and dangerous circumstances; and knowing when to ask for assistance. AR 415.

30    Vyvanse is an ADHD medication which increases attention and decreases restlessness in patients who are overactive, cannot concentrate for long periods of time, or are easily distracted and impulsive. Drugs & Supplements: Lisdexamfetamine Dimesylate (Oral Route), Mayo Clinic, http://www.mayoclinic.org/drugs-supplements/lisdexamfetamine-dimesylate-oral-route/description/drg-20070888 (last visited May 19, 2017).

31    Plaintiff also completed an undated Disability Report, which accompanied the claimant's application, submitted on July 24, 2012. AR 237. She alleged that M.R.E. had ADHD and bipolar disorder, conditions which became disabling on January 20, 2004, when the claimant was born. AR 238.

32    Depakote is used to treat certain types of seizures, as well as bipolar disorder and migraine headaches. Drugs & Supplements: Depakote, Mayo Clinic, http://www.mayoclinic.org/drugs-supplements/valproic-acid-oral-route/description/DRG-20072 931 (last visited May 22, 2017).

33    After concluding with the testimony of the medical expert, the ALJ then asked Plaintiff if she wished to provide additional comments or follow-up questions. AR 82. Plaintiff then inquired into which records had been received from the Bellevue Program. AR 82. When the medical expert responded that she had a report from May through July, 2012, Plaintiff indicated that she had submitted a full year's worth of treatment notes from the Bellevue Program. AR 82-83. Plaintiff was particularly concerned that certain reports from Ms. McVey had been omitted from the administrative record. AR 83. The ALJ then advised her that he would review the record once again and request any missing documents in post-hearing development. AR 83. He then asked for the spelling of Ms. McVey's name as well as her phone number. AR 83-84. It appears that, after the first hearing, these records were received by the Agency, which prompted the ALJ to conduct a second hearing, in December, 2013.

34    Plaintiff also testified that M.R.E. was disabled due to a "vision problem," explaining that he had a lazy eye. AR 55. She then testified that, despite this condition, her son could read, and M.R.E. then stated that he could do the same "sometimes." AR 55.

35    The Appeals Council wrote: "We found no reason under our rules to review the [ALJ]'s decision. Therefore, we have denied your request for review." AR 1. It noted that, in looking at M.R.E.'s case, it considered the reasons Plaintiff disagreed with the ALJ's decision and "the additional evidence listed on the enclosed Order of Appeals Council. We considered whether the [ALJ]'s action, findings, or conclusion is contrary to the weight of evidence currently of record (see 20 C.F.R. § 416.1470). We found that this information does not provide a basis for changing the [ALJ]'s decision." AR 1-2.

36    Previously, on March 25, 2009, the DOE's Committee on Special Education recommended that the claimant be placed in a general education classroom. AR 294.

Case 5:24-cv-00169-DNH-ML   Document 27   Filed 02/05/25   Page 72 of 223
Estrella o/b/o M.R.E. v. Berryhill, Not Reported in Fed. Supp. (2017)
2017 WL 2693722

37    These limitations generally tracked those listed above in the April 6, 2011, Medical Report completed by Dr. Vito. For example, M.R.E. had difficulty with frustration tolerance, regulating impulses, focusing, handling his emotions, and, as a result, required frequent redirection. AR 551.

38    With respect to testing accommodations the IEP provided for 50% additional time, placement in a separate, quiet location with minimal distractions in a group size no greater than 12 students, and directions and re-reading allowed in all state and local examinations. AR 312.

39    On August 7, 2012, shortly before M.R.E.'s discharge, staff members at the Bellevue Program issued a final treatment plan. AR 566-67. Again, notes indicated that M.R.E. was compliant with his medication, but tended to lose focus near the end of the school day. AR 567. The claimant continued to be bossy with his classmates, and showed less patience in his class later in the afternoon. AR 567.

40    Attached to the questionnaire was a letter, dated March 7, 2014, addressed to Plaintiff, which was completed by Ms. Sutorius, and a Mrs. Nikaj, the claimant's second grade teacher. AR 339. As the teachers described, M.R.E.'s behavior in class that day had prevented him from completing any of his work, resulting in two additional homework assignments. AR 339. He had engaged in a series of disruptive acts, which he described as "fooling around," including: (1) standing on a toilet seat and breaking it; (2) shouting and calling out in class; (3) breaking a class pencil; (4) answering back to his teachers in a disrespectful manner; and (5) kicking his chair/desk and swinging his sleeves. AR 339. According to the teachers, M.R.E. refused to correct his behavior after he was given several chances to do so.

41    The nine categories in which M.R.E. exhibited a "slight problem" included: comprehending oral instructions; understanding school and content vocabulary; reading and comprehending written material; comprehending and doing math problems; understanding an participating in class discussions; providing organized oral explanations and adequate descriptions; learning new material; recalling and applying previously learned material, and applying problem-solving skills in class discussions. AR 332.

42    The other categories in which M.R.E. exhibited a "slight problem" included: sustaining attention during sports activities or play, carrying out single-step instruction and multi-step instructions, and organizing his school materials or possessions. AR 333.

43    The claimant had "obvious problems" playing cooperatively with others, seeking attention appropriately, following rules, respecting and obeying adults in authority, and using language appropriate to the situation and listener. AR 334. M.R.E. had "slight problems" making and keeping friends, asking permission appropriately, relating experiences and telling stories, introducing and maintaining relevant and appropriate topics of conversation, taking turns in conversation, and using adequate vocabulary and grammar to express his thoughts and ideas in everyday conversation. AR 334.

44    His symptoms included hyperactivity, impulsivity, poor attention span, poor school work, and behavioral problems in school. AR 556. In addition, he displayed aggression and oppositionality, which were listed as symptoms of ODD. AR 556.

45    A medication sheet from Astor Services confirms that M.R.E. was prescribed 70 mg of Vyvanse on November 26, 2012, which was changed to 60 mg the following month, and prescribed on a monthly basis thereafter through February, 2014. AR 541. Additionally, Astor Services prescribed Strattera, 10 mg, beginning on December 19, 2013. AR 541.

46    Strattera is an ADHD medication, which works to decrease restlessness, and improve concentration. Drugs & Supplements: Atomoxetine (Oral Route), Mayo Clinic, http://www.mayoclinic.org/drugs-supplements/atomoxetine-oral-route/description/drg-20066904 (last visited May 19, 2017).

47    As to each of these domains, the ALJ relied on the opinions of Drs. Halperin and Altmansberger, both of whom found that the claimant had less than marked limitations, as well as Ms. Sutorious's October, 2012, teacher questionnaire. AR 41-44. With respect to the domain of acquiring and using information, Ms. Sutorius indicated that M.R.E. had only

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 73 of 223

Estrella o/b/o M.R.E. v. Berryhill, Not Reported in Fed. Supp. (2017)

2017 WL 2693722

slight problems. AR 41. As to the domain of attending and completing tasks, Ms. Sutorious wrote that M.R.E. would often be distracted but could be refocused to task and, aside from difficulties sustaining concentration and working with others, he had no more than slight problems in this area. AR 41. As to interacting and relating with others, the ALJ's conclusion was based in part on Ms. Sutrious' finding that M.R.E. had only slight problems—or none—in this domain, as well as M.R.E.'s testimony that he had friends at school. AR 42. The ALJ found that the claimant's asthma caused less than marked limitations in the domain of health and physical well-being; M.R.E. was compliant with his medication regimen and never visited the emergency room or was hospitalized due to this condition. AR 44. Moreover, the ALJ noted, M.R.E. testified that he was an active child who enjoyed playing sports, and his teacher noted no problems in this area of functioning. AR 44.

48    The ALJ found that there was no evidence in the record that M.R.E. suffered from limitations with respect to the domain of moving about and manipulating objects, whereas the claimant testified that he enjoyed playing sports. AR 43. Likewise, the ALJ concluded, there was no evidence to support a finding that M.R.E. was in any way limited in the domain of self-care. AR 44.

49    The psychiatric records included: August 6, 2012, treatment notes from Ms. McVey, the claimant's therapist at the Bellevue Program (AR 526); Dr. Alcera's notes from an August 14, 2012, medication management session while M.R.E. was still at the Bellevue Program (AR 430, 527-29); Ms. McVey's treatment notes from August 16 and September 14, 2012 (AR 529-30); a comprehensive treatment plan completed by Astor Services staff members in October, 2012 (AR 404-06); three photocopies of Vyvanse prescriptions, dated from November, 2012, through November, 2013 (AR 407, 408, 540); a one-page letter from Ms. Hiller, M.R.E.'s treating psychotherapist at Astor Services, dated April 3, 2013 (AR 422); and a one-page treatment plan completed by a nurse with Astor Services on November 6, 2013 (AR 539).

50    The academic records included: two PS 35 report cards, one of which was completed at the end of third term of 2011 (AR 262), and the other following the spring term of 2012 (AR 260); and two teacher questionnaires, the first of which was completed by Ms. Berman, of PS 35, on August 8, 2012 (AR 248-57), and the second was prepared by Ms. Sutorius, M.R.E.'s teacher at PS 96, on October 21, 2012. AR 410-17.

51    Faced with this situation, it was well within the ALJ's discretion to direct M.R.E. to attend a consultative examination. See 20 C.F.R. § 416.920b(b)(2)(iii) ("If the evidence is consistent but we have insufficient evidence to determine whether you are disabled, ... [w]e may ask you to undergo a consultative examination at our expense[.]"). His failure to do so indicates an area where further development of the record could have been made.

52    Indeed, the ALJ noted that, but for the two non-examining sources no medical professionals offered an opinion regarding M.R.E.'S performance in the six domains. AR 40-42.

53    The Commissioner's argument that the ALJ's duty to develop the record was confined to the 12-month period preceding the filing of M.R.E.'s application for SSI was unsuccessful. The Court finds that the ALJ in this case had an affirmative duty to develop M.R.E. s record up to the decision date. Although the regulations require the Commissioner to develop a claimant's complete medical history "for at least the 12 months preceding the month" in which the application is filed, 20 C.F.R. § 416.912(b), this represents the floor, not the ceiling, with respect to the ALJ's responsibility to develop the record; some courts within this circuit have "held that the ALJ is responsible for developing a full and complete record between the time that elapses between plaintiff's application and plaintiff's hearing date." Scott v. Astrue, No. 09-Civ-3999 (KAM) 2010 WL 2736879, at *14 n. 60 (E.D.N.Y. July 9, 2010) (citing Pettey v. Astrue, 582 F. Supp. 2d 434 (W.D.N.Y. 2008), and Lisa v. Sec'y of the Dep't of Health & Human Servs., 940 F. 2d 40 44 (2d Cir. 1991)). "Whether the ALJ has a duty to develop the record with respect to treating sources after the date of filing is not settled and may depend on the facts of the case." Moreira v. Colvin, No. 13-Civ-4850 (JGK), 2014 WL 4634296, at *5 n. 2 (S.D.N.Y. Sept. 15, 2014) (emphasis in original). Such affirmative development is particularly appropriate in cases where a pro se claimant alleges mental impairments. Corporan, 2015 WL 321832 at *26 (citing Cruz v Sullivan, 912 F. 2d 8, at 11 (2d Cir. 1990), and Camilo v. Comm'r of Soc. Sec., No. 11-Civ-1345 (DAB)(MHD), 2013 WL 5692435, at *22 (S.D.N.Y. Oct. 2, 2013) (order adopting report and recommendation)). Another important factor is whether the claimant is under ongoing

Estrella o/b/o M.R.E. v. Berryhill, Not Reported in Fed. Supp. (2017)

2017 WL 2693722

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 74 of 223

treatment for the alleged disability at the time of the decision. Moreira, 2014 WL 4634296, at *5 n. 2. Here, M.R.E. was a pro se claimant, alleging mental impairments, and received treatment for those conditions through the decision date. Plaintiff informed the ALJ at the hearing that M.R.E. was then receiving care for his related symptoms at Astor Services, and attending special education classes. AR 63. These facts were confirmed by evidence, albeit incomplete, that was in the record before the ALJ. He should therefore have sought treatment notes and opinions from these centrally important sources whose records could "reasonably [be] expected to produce information necessary" for a complete decision. Corporan, 2015 WL 321832, at *27.

54    In the foregoing analysis, the Court only addresses Plaintiff's claim with respect to the December, 2013, hearing. Although the ALJ conducted two hearings, he relied solely on the December proceeding in his decision. Likewise, the parties' arguments focus exclusively on the December hearing.

55    ALJ: Doctor, are you familiar with the domains of functionality that are published in the regulation to evaluate the functional limitations on children?

Expert: Yes

ALJ: What about domain one, acquiring and using information.... No limitation, less than marked, marked, or extreme?

Expert: Less than marked.

ALJ: And domain two, attending and completing tasks?

Expert: Less than marked.

ALJ: Domain three, interacting, relating with others?

Expert: That varies. It's from, again, less than marked.

The ALJ then continued with the same questioning through all six domains, before asking the expert whether had anything to add, to which he responded that he did not, and the inquiry concluded. AR 66-67.

56    This evidence included: a final treatment plan completed by the staff at the Bellevue Program on August 7, 2012 (AR 567); an intake summary which the staff at Astor Services completed on August 27, 2012 (AR 553-61); Tisha John's initial assessment of M.R.E. upon his admission into Astor Services, also dated August 27, 2012 (AR 568); Dr. Desmond Heath's September 25, 2012, psychiatric assessment (AR 569-70); an updated 2012-2013 IEP completed by M.R.E.'s teachers at PS 96, dated November 26, 2012 (AR 345-57); June 10, 2013, staff notes from Astor Services (AR 575-78); and a September 10, 2013, treatment plan by Nurse Practitioner Silen of Astor Services (AR 579).

57    This evidence included: Dr. Vito's psychiatric evaluation of March 21, 2009 (AR 544-47); a November 2, 2009, letter from Plaintiff addressed to the DOE (AR 294); a letter from Dr. Vito and Ms. McEvoy, both of Steinway, to the DOE, dated January 12, 2010 (AR 548); Dr. Coll's psychological evaluation of January 13, 2010 (AR 340-44); an IEP for the 2011-2012 school year completed on April 1, 2011 (AR 296-305); Dr. Vito's report of April 6, 2011 (AR 549); a June 27, 2011, letter from Dr. Bonete and Ms. McEvoy ( AR 551); an IEP for the 2012-2013 school year, completed on April 17, 2012 (AR 306-16); and a July 5, 2012, treatment plan completed by Ms. McVey and Dr. Alcera of the Bellevue Program (AR 564-65).

58    These records included: a March 19, 2014, teacher questionnaire completed by Ms. Sutorious (AR 331-39); an Astor Services treatment plan prepared on April 1, 2014 (AR 571-74); and Nurse Practitioner Silen's notes of April 9, 2014. AR 325.

59    Some of this evidence is consistent with information already before the ALJ. For example, the newly submitted Bellevue Program notes dated July 5, 2012, indicate that M.R.E. was making improvements, compliant with his medication, but

Estrella o/b/o M.R.E. v. Berryhill, Not Reported in Fed. Supp. (2017)

2017 WL 2693722

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 75 of 223

became less focused near the end of the school day and continued to act bossy with classmates. AR565, 567. These findings matched earlier notes from the Bellevue Program, and hearing testimony, which were before the ALJ. AR 55, 383, 440. Mental status examinations completed at Astor Services, and first submitted to the Appeals Council, generally lined up with Dr. Alcera's evaluations, which found M.R.E. was within normal limits. AR 435, 443, 509, 520-21, 558, 560. The newly submitted IEPs, from September and November, 2012, described M.R.E.'s improving behavior in school, describing him as a "gentleman" and respectful, which would support the ALJ's finding that M.R.E. had less than marked limitations in the domain of interacting and relating with others. Some of the newly submitted evidence was also cumulative of information already before the ALJ. Namely, a June 10, 2013, treatment plan by Astor Services describing M.R.E.'s anger management problems and difficulty focusing was substantively indistinguishable from a letter, dated April 3, 2013, from the same organization, which was included in the record before the ALJ. AR 422, 575-78.

60    Some of this evidence appears to contradict the ALJ's findings with respect to the domains of attending and completing tasks, and interacting and relating with others. In each of these domains, the ALJ found that M.R.E. had less than marked limitations. The ALJ, however, did not consider any of the opinionative evidence first submitted to the Appeals Council. This evidence included the Astor Services intake summary, which described M.R.E.'s "disrespectful [behavior] to [his] teachers," and his hyperactivity, which was "always a problem[.]" AR 553. The same report documents M.R.E.'s impulsivity, verbal and physical aggression, and poor attention span. AR 556. In March, 2014, Ms. Sutorious, after having known M.R.E. for two years, completed a second teacher questionnaire, wherein she noted that the claimant suffered from a number of "serious" and "obvious" problems in the domains of attending and completing tasks, and interacting and relating with others. AR 333-34. Additionally, a report completed in April, 2014, from M.R.E.'s treating sources at Astor Services indicated a worsening of M.R.E.'s behavioral problems. AR 572. These notes described M.R.E.'s classroom disruptions, prolonged tantrums, speaking without permission, and disrespect toward Plaintiff and his teachers. AR 572. Although some of these records were generated after the ALJ's decision date, that fact alone does not render them immaterial. See Pollard v. Halter, 377 F. 3d 183, 193 (2d Cir. 2004) (in a case involving a pro se minor, evidence generated after the hearing date was material because it "directly support[ed] many of [the plaintiff's] earlier contentions regarding [her son]'s condition."). Here, although dated after the ALJ decision, the March and April, 2014, evidence "sheds light on [MRE]'s condition[s] prior to the ALJ determination[,]" and, importantly, presents "a reasonable possibility that [it] would have influenced" the ALJ to decide the case differently. Santiago-Jiminez v. Comm'r of Soc. Sec., No. 15-Civ-3884 (GBD) (JCF), 2016 WL 5942318, at *3 (S.D.N.Y. Oct. 13, 2016) (order adopting report and recommendation) (quoting Pollard, 377 F. 3d at 193). As such, it may be considered on remand.

61    The parties also dispute whether the Appeals Council has an independent obligation to provide "good reasons" before declining to review an ALJ decision. ECF Nos. 19, 42-45; 23, 43-45; 26, 10-13. Here, however, as in Lesterhuis, the Court does not consider this alternative argument because it finds that the ALJ's decision is not supported by substantial evidence. See Lesterhuis, 805 F. 3d at 89.

---

**End of Document**                                                                                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 321832

Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.

Elizabeth CORPORAN, Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY, Defendant.

No. 12–CV–6704 (JPO).

|

Signed Jan. 23, 2015.


*OPINION AND ORDER ADOPTING REPORT AND RECOMMENDATION*

J. PAUL OETKEN, District Judge.

 **\*1**  Plaintiff Elizabeth Corporan filed this action under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her application for disability benefits.

On March 27, 2014, Judge Netburn issued a Report and Recommendation addressing both parties' motions for judgment on the pleadings. (Dkt. No. 44 ("the Report").) Judge Netburn concluded that the administrative law judge (the "ALJ") failed to adequately develop the record, leaving her unable to determine whether the ALJ's decision was supported by substantial evidence. Judge Netburn recommended that that the case be remanded to the Commissioner for further development of the record.

On May 21, 2014, the Commissioner filed objections to the Report. (Dkt. No. 47 ("Def.Obj.").) The Commissioner argues that the decision to deny Corporan benefits is supported by substantial evidence and therefore should be affirmed. Corporan has filed no objections to the Report.

For the reasons that follow, the Court adopts the Report and remands to the Commissioner.


**I. Standard of Review**

The district court is entitled to "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). Portions of the magistrate judge's findings or recommendations to which objection is made, if any, are reviewed *de novo* by the district court. *Id.* However, only objections "clearly aimed at particular findings" in a magistrate judge's report earn *de novo* review. *Molefe v. KLM Royal Dutch Airlines,* 602 F.Supp.2d 485, 487 (S.D.N.Y.2009). Where a party does not object, or files objections of a merely "general" or "conclusory" nature, courts review reports for clear error. *Legall v. Colvin,* No. 13–CV–1426, 2014 WL 4494753, at *1 (S.D.N.Y. Sept. 10, 2014).

Both Corporan and the Commissioner move for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure. (Dkt. Nos. 19 & 35.) A Rule 12(c) motion will be granted "if, from the pleadings, the moving party is entitled to judgment as a matter of law." *Wells Fargo Bank, Nat'l Ass'n v. Davidson Kempner Capital Mgmt. LLC,* —— F.Supp.2d ——, 2014 WL 1883547, at *2 (S.D.N.Y. May 12, 2014) (internal quotation marks omitted).

The scope of review of a Commissioner's decision to deny disability benefits is limited. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive. 42 U.S.C. § 405(g). "[Substantial evidence] is more than a mere

scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Zabala v. Astrue,* 595 F.3d 402, 408 (2d Cir.2010) (alteration in original) (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). A decision supported by substantial evidence will be upheld even where there is substantial evidence in support of the plaintiff's position, or where the court would have reached a decision different than the Commissioner's. *Alves v. Colvin,* No. 13–CV–3898, 2014 WL 4827886, at *5 (S.D.N.Y. Sept.29, 2014).

**\*2** However, a threshold question for the reviewing court is whether "the claimant has had a full hearing under the ... regulations and in accordance with the beneficent purposes of the [Social Security] Act." *Moran v. Astrue,* 569 F.3d 108, 112 (2d Cir.2009) (alteration in original). Remand is appropriate if the reviewing court concludes that the claimant did not receive a full and fair hearing. *Selmo v. Barnhart,* No. 01–CV–7374, 2002 WL 31445020, at *7 (S.D.N.Y. Oct. 31, 2002).

## II. Discussion

Judge Netburn's Report describes the factual and procedural background of this case in great detail, and the Court need not recount it here.

The Commissioner identifies the following three alleged errors in the Report: (1) that the Report unreasonably imposed a "doubly heightened duty" on the ALJ to develop the record (Def. Obj., at 4–8); (2) that the Report erroneously treated Dr. Jorge Farrat's medical opinion as that of a treating physician, even though he examined Corporan only once and did not have an ongoing treatment relationship with her (*Id.* at 9–10); and (3) that the Report incorrectly concluded that, in failing to obtain certain medical records, the ALJ did not meet his duty to develop the record (*Id.* at 10–17).

### A. The ALJ's Duty to Develop the Record

The Report concluded that, in the circumstances of this case, the ALJ's duty to develop the record was "doubly heightened." Two factors gave rise to this enhanced duty: Corporan's claim of a mental (rather than physical) impairment, and her *pro se* status at the ALJ hearing. [1] (Report, at 26–28.) The Report reasoned that a claim based on a mental disability requires "a robust examination that is sensitive to the dynamism of mental illnesses and the coping mechanisms that claimants develop to manage them." (*Id.* at 27.)

The Commissioner objects on this point. In the Commissioner's view, the proposition that an ALJ's duty to develop the record varies based on the nature of a claimant's alleged impairment is novel and without any basis in law. (Def. Obj., at 8.)

The Court adopts the Report's conclusion for the reasons explained below. The law in this circuit and elsewhere points to the commonsense conclusion that, where a claimant is both unrepresented by counsel and obviously handicapped by a mental impairment, an ALJ bears a doubly heighted duty to develop the record.

The Second Circuit has long recognized that a "social security ALJ, unlike a judge in a trial, must on behalf of all claimants ... affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Moran,* 569 F.3d at 112 (internal quotation marks omitted); *accord Pratts v. Chater,* 94 F.3d 34, 37 (2d Cir.1996). This duty to develop the record has its roots in the Commissioner's regulatory obligation to ascertain a claimant's complete medical history before making a disability determination. *Pratts,* 94 F.3d at 37 (citing 20 C.F.R. § 404.1512(d)-(f) (2014)).

**\*3** Equally well established is the principle that when a disability claimant is unrepresented, an ALJ's duty to develop the record is "heightened." *Cruz v. Sullivan,* 912 F.3d 8, 11 (2d Cir.1990); *accord Echevarria v. Sec'y of Health and Human Servs.,* 685 F.2d 751, 755 (2d Cir.1982). In particular, the ALJ is required "to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." *Cruz,* 912 F.3d at 11 (internal quotation marks omitted). The reviewing court, in turn, must make a "searching investigation of the record" to ensure that the claimant received "a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the [Social Security] Act." *Hankerson v. Harris,* 636 F.2d 893, 895 (2d Cir.1980) (internal quotation marks omitted).

At the same time, a claimant's *pro se* status is only one of many impairments that courts consider in reviewing an ALJ's decision to deny benefits. In *Gold v. Sec'y of Health, Ed. & Welfare,* 463 F.2d 38 (2d Cir.1972), for example, the court determined that it had an obligation to make a "searching investigation" of the record not merely because the claimant was without counsel at the ALJ hearing, but also because she was in "ill health" and had an "inability to speak English well." *Id.* at 43; *accord Cruz,* 912 F.3d at 11. Likewise, in *Moran,* the court faulted the ALJ for inadequately assisting the *pro se* claimant in light of his "manifest debilitating condition" and "the age of the factual issues [the claimant] was required to address." 569 F.3d at 114. These impediments, the court explained, made it "especially important for the ALJ to help [the claimant] develop a testimonial record of the critical events." *Id.*

That a claimant's mental illness may, in the same way, impede her from presenting her own case and necessitate greater assistance from the ALJ is evident. And other courts agree. In *Morlando v. Astrue,* No. 3:10–CV–1258, 2011 WL 4396785 (D.Conn. Sept.20, 2011), for example, Judge Kravitz held that the ALJ was bound by a "doubly-heightened duty" to develop the record because the claimant both lacked counsel and suffered from "cognitive impairments and mental illness." *Id.* at *4. In so concluding, Judge Kravitz heeded the Second Circuit's instruction in *Chapman v. ChoiceCare Long Island Term Disability Plan,* 288 F.3d 506 (2d Cir.2002), that "courts should exercise an extra measure of caution when adjudicating the claims of a litigant whose mental capacity is in question." *Id.* at 514. *Chapman* itself addressed a claim for disability benefits under the Employee Retirement Income Security Act, but it cited with approval a Ninth Circuit decision holding that "independent of whether a Social Security applicant is represented by counsel, an administrative law judge's duty to develop the record is 'especially important' in cases involving mental impairment." *Id.* (quoting *DeLorme v. Sullivan,* 924 F.2d 841, 849 (9th Cir.1991)).

 **\*4**  The Ninth Circuit is far from alone in this conclusion. Several circuits share the view that an ALJ's duty to develop the record is more pronounced when a claimant lacks counsel and suffers from a mental impairment. *See, e.g., Thompson v. Sullivan,* 933 F.2d 581, 586 (7th Cir.1991) ("When a claimant is both unrepresented *and* suffers from a mental impairment ... the ALJ's duty to carefully develop the record is even greater.") (emphasis in original); *Krishnan v. Barnhart,* 328 F.3d 685, 695 (D.C.Cir.2003) ("[The] duty [to develop the record] is heightened if 'the claimant is unrepresented by an attorney,' ... or suffers from mental illness.") (citation omitted); *Deblois v. Sec'y of Health & Human Servs.,* 686 F.2d 76, 81 (1st Cir.1982) ("[T]he [Comissioner]'s responsibility to develop evidence is even greater when the claimant is obviously mentally impaired."). In other words, the principle that an ALJ is under a greater responsibility to elicit relevant evidence when a claimant is "too ill to act in his own best interests" has widespread acceptance. *Higbee v. Sullivan,* 975 F.2d 558, 562 (9th Cir.1992); *see also* SSR 83–20 ("Because mentally ill persons may not be capable of protecting themselves from possible loss of benefits by furnishing necessary evidence concerning onset, development should be undertaken in such cases to ascertain the onset date of the incapacitating impairment.").

Here, Corporan sought disability benefits based on her mental condition, which consists of severe depression, difficulties with memory, and recurring and painful headaches. (Report, at 5.) In her disability application, Corporan stated that she often forgets to take her medication, is unable to go out alone, and has trouble sleeping because of her depression. (*Id.*) Indeed, the ALJ himself recognized that Corporan's mental impairments were "severe." (Dkt. No. 17, Administrative Record ("AR"), at 9.) These impairments, along with Corporan's *pro se* status, gave rise to a doubly heightened duty to affirmatively develop the factual record.

### B. Dr. Farrat's Evidence

Next, the Commissioner contends that the Report erred in its treatment of the opinion of Dr. Jorge Farrat, a physician who treated Corporan through the Federation Employment and Guidance Service (FEGS) program. According to the Report, Dr. Farrat did not have an "ongoing treatment relationship" with Corporan, and the Commissioner argues that the Report wrongly "recommend[ed]" that the Court find that the ALJ erred in failing to accord [Dr. Farrat's] opinion the deference accorded a treating physician's opinion." (Def.Obj.9–10.)

The "treating physician" rule requires that the opinion of a claimant's treating physician be accorded "controlling weight" if it is well supported and not inconsistent with other substantial evidence in the record. *Shaw v. Chater,* 221 F.3d 126, 134 (2d Cir.2000); 20 C.F.R. § 404.1527(c)(2). This is so because a treating physician's opinion is more likely "to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence." 20 C.F.R. § 404.1527(c)(2). A physician is considered a treating source if she has performed a medical treatment or evaluation of the claimant and has, or has had, an "ongoing treatment relationship" with the claimant. 20 C.F.R. § 404.1502.

**\*5**  As the Report notes, Dr. Farrat examined Corporan at least once, on June 10, 2009. After that examination, he referred Corporan for a "Phase II" evaluation, which took place on June 22, 2009. It is unclear whether that evaluation was performed by Dr. Farrat or another physician.[2]  Following the Phase II examination, Dr. Farrat completed a FEGS evaluation form, in which he diagnosed Corporan with "major depression, generalized anxiety disorder, and alcohol use, in addition to a skin disorder, high levels of lipids in the blood, and mild anemia."[3]  (Report, at 9.)

It is unclear whether Dr. Farrat was, in fact, a treating source within the meaning of the relevant regulations. The Commissioner correctly notes that a physician who examines a claimant "once or twice" is typically not considered a treating source. *Mongeur v. Heckler,* 722 F.2d 1033, 1039 n. 2 (2d Cir.1983). That appears to be the case here. However, in light of the possibility that further evidence may emerge on remand, the Court leaves Dr. Farrat's status as a matter for the ALJ to resolve.[4]

In any event, the Report correctly found that the ALJ erred in disregarding Dr. Farrat's evidence. Even if Dr. Farrat is not considered a treating source, it was an error for the ALJ to omit any mention of his examination in his decision.[5] *See* 20 C.F .R. § 404.1527 (requiring the ALJ to "explain in the decision the weight given to the opinions of ... nontreating sources"); *Cichocki v. Astrue,* 534 F. App'x 71, 75 (2d Cir.2013) (summary order) ("The ALJ is required to consider all available evidence, including ... statements from ... the claimant's treating or nontreating source ...."); *Pagan v. Chater,* 923 F.Supp. 547, 556 (S.D.N.Y.1996) ("The ALJ's failure to acknowledge relevant evidence or to explain its implicit rejection is plain error."); *Correale–Englehart v. Astrue,* 687 F.Supp.2d 396, 422 (S.D.N.Y.2010) ("The ALJ must also adequately explain his reasoning in making the findings on which his ultimate decision rests, and in doing so must address all pertinent evidence."). The failure to consider and weigh Dr. Farrat's evidence constitutes plain error and warrants remand.

### C. The Missing Medical Records
Finally, the Commissioner argues that the Report erred in finding that the ALJ failed to make sufficient efforts to obtain relevant medical documents. Analyzed against the backdrop of the ALJ's affirmative, doubly heightened duty to develop the record, the Commissioner's objections are, for the most part, unavailing. The Court addresses the Commissioner's specific arguments below.

#### 1. Bowen Center
According to the Report, the missing records from the Emma L. Bowen Community Service Center (the "Bowen Center"), also known as the Upper Manhattan Health Center, constitute "the most significant gap in the record" because of their likely probative value and the length of Corporan's treatment there. (Report, at 31.)

**\*6**  The Report details this treatment. In brief, Corporan was initially assessed at the Bowen Center by psychiatrist Dr. R. Pierre–Louis on July 30, 2009. (*Id.* at 10.) She had monthly meetings with him for medication management until she was discharged from the Bowen Center in March 2010. (*Id.* at 10–11.) Corporan also attended, albeit inconsistently, individual and group counseling sessions at the Bowen Center multiple times a week. (*Id* . at 11.) However, the only documents in the record from the Bowen Center were Dr. Pierre–Louis's initial assessment in July 2009 and a termination summary prepared in March 2010 by a social worker. Corporan drew the missing records to the ALJ's attention during the hearing. In response, he noted "now that's important," but gave Corporan only one day to obtain and deliver the records.

The Commissioner disputes none of this. Instead, she argues that the Commissioner made adequate attempts to obtain documents from the Bowen Center and that the record was fully developed in this regard. (Def. Obj., at 11–12.) The Commissioner says that she contacted the Bowen Center to request records twice, both times unsuccessfully. (*Id.* at 11.) She also says that the ALJ afforded Corporan the opportunity to submit additional evidence from the Bowen Center after the hearing. (*Id.*)

These arguments are unavailing. The central importance of the Bowen Center records demanded a meaningful attempt by the ALJ to retrieve those documents. The Commissioner could have renewed its request for the records with the Bowen Center. It did not. The ALJ could have given Corporan more than one day to submit any additional records from the Bowen Center, or offered to assist Corporan in obtaining the records. He did not. [6] (AR, at 35–36.) The ALJ could have exercised his discretion to "stop the hearing temporarily and continue it a later date" in light of the missing records. 20 C.F.R. § 404.944. He did not. In short, the ALJ had several options available to him but did not exercise any of them. [7] More was required to satisfy his duty to develop the record.

The Court rejects the Commissioner's objections on this ground.

### 2. St. Luke's

The Report identifies missing records with respect to four events during the course of Corporan's treatment at St. Luke's Roosevelt Hospital ("St.Luke's"): (1) an appointment on November 16, 2009; (2) an appointment on January 11, 2010; (3) a head MRI/CT scan in December 2009; and (4) participation in an outpatient alcohol treatment program sometime after March 19, 2010. (Report, at 7.) The Commissioner objects on the grounds that it requested and received documents twice from St. Luke's, on October 13 and November 21, 2009, and that it received no documentation with regard to a November 16 appointment. Further, the Commissioner says that beyond Corporan's own statements, there is no indication that these events in fact took place.

The Court adopts the Report's findings on this point in part. The Commissioner's explanation for the absence of records about Corporan's purported appointment on November 16, 2009 is reasonable. St. Luke's ought to have released any such records in the documents it produced in response to the Commissioner's November 21 request; one might reasonably conclude from the fact that it did not do so that no appointment occurred on that date. However, the Commissioner's failure to make subsequent inquiries about the later treatment Corporan said she received at St. Luke's is unexplained. Real efforts to obtain documents related to this treatment are warranted on remand.

### 3. FEGS

**\*7**  The sole FEGS records that are missing pertain to an appointment that Corporan stated she had in September 2009. (*Id.* at 30.) The Commissioner says that no records about such an appointment were produced when the Commissioner requested and obtained 70 pages of records from FEGS in October 2009. (Def. Obj., at 13.)

This objection is a fair one. The Court is persuaded that the Commissioner has made reasonable efforts with regard to these records. However, as explained above, on remand the ALJ should attempt to ascertain who conducted Corporan's Phase II examination and weigh this and other available evidence from FEGS.

### 4. Metropolitan Hospital

At the time of the hearing, Corporan was undergoing treatment at the Metropolitan Hospital Center ("Metropolitan Hospital"). (Report, at 15.) However, the only document in the record related to this treatment is a "Verification of Appointment" form, dated September 23, 2010. (*Id.* at 15.) This form is merely a record attesting to the fact that Corporan attended her appointment; it says nothing about the substance of the appointment or Corporan's treatment at the Metropolitan Hospital more generally. (*See* AR, at 118.) Nonetheless, the Commissioner disputes the Report's conclusion that the absence of other records deprived Corporan of a full and fair hearing. (Report, at 14.)

The Commissioner's arguments are unpersuasive. A substantive record relating to Corporan's September 23 appointment was likely to be probative and should have been sought. Moreover, the ALJ could have requested a retrospective report from Metropolitan Hospital about whether Corporan was disabled on her stated onset date. (*Id*. at 32.) The Commissioner's argument that there was sufficient evidence on which to base a decision without these records is at odds with the ALJ's own finding that "[t]he claimant did not provided [sic] opinion evidence from a treating source." (AR, at 13 .) The dearth of evidence in this case makes records from the Metropolitan Hospital all the more likely to be valuable.

### 5. Children's Services

The Report found that there are likely to be records pertaining to investigations of Corporan's home conducted by children's services. (Report, at 17.) These records, the Report notes, have potential to assist in assessing Corporan's health issues and capacity to work. (*Id.* at 33.) However, the Commissioner objects that these records do not qualify as "medical evidence" and are therefore outside the scope of the duty to develop the record.

On this ground, the Commissioner's argument has merit. To be sure, an ALJ is required to consider both medical and non-medical evidence in the record. *See Monette v. Astrue,* 269 F. App'x 109, 113 (2d Cir.2008) (summary order). But the duty to develop extends only to a claimant's "medical history," or "records of [a claimant's] medical source(s)." 20 C.F.R. § 404.1512(d)(2). The records from children's services, while potentially relevant to the merits of Corporan's disability claim, are not medical records. The Commissioner's objection with regard to these records is accordingly sustained.

### 6. Examination by Dr. Alexander

**\*8**  Finally, the Report faulted the ALJ for considering the medical evaluation by Dr. Michael Alexander, a psychologist who acted as the SSA's consultative examiner, prior to attempting to obtain the documents missing from the record. (Report, at 39.) The Commissioner argues that it acted within its discretion in ordering the consultative examination, and that the ALJ properly considered it in his decision denying Corporan benefits. (Def. Obj., at 15–17.)

The Court adopts the Report's finding on this issue. Prior to evaluating evidence from a consultative source, the Commissioner must make a reasonable effort to obtain medical evidence from the claimant's treating physician or other treating health care provider. 42 U.S.C. § 423(d)(5)(b). Thus, the Commissioner's objection rests on the premise that the ALJ made a sufficient attempt to fill the glaring gaps in the record. As discussed above, he did not. The ALJ therefore erred in giving weight to Dr. Alexander's opinion.

### III. Conclusion

For the foregoing reasons, Magistrate Judge Netburn's Report and Recommendation is hereby ADOPTED; the Commissioner's motion for judgment on the pleadings is hereby DENIED; and Corporan's motion for judgment on the pleadings is hereby GRANTED. This matter is REMANDED for further development of the administrative record.

The Clerk of Court is directed to close the motions at docket numbers 19 and 35 and to close this case.

SO ORDERED.


### *REPORT AND RECOMMENDATION*

SARAH NETBURN, United States Magistrate Judge.

**TO THE HONORABLE J. PAUL OETKEN:**

The plaintiff Elizabeth Corporan brings this action pursuant to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of the final determination of the Commissioner of Social Security denying her application for disability benefits. The Commissioner and Corporan have each moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. At issue in this case is the duty of the administrative law judge to develop the administrative record where the claimant is *pro se* and asserting a disability based on mental illness. The Court concludes that the administrative law judge did not meet his affirmative duty to develop the record because he did not make adequate effort to procure relevant medical documents that appear likely to be missing from the administrative record. He further erred by disregarding, without explanation, Corporan's treating physicians and by failing to resolve ambiguities in the record regarding Corporan's work history. In the absence of a complete record, this Court is unable to determine whether the administrative law judge's determination regarding Corporan's disability was supported by substantial evidence. The case should thus be remanded to the Commissioner for further development.

For the reasons set forth below, I recommend that the Commissioner's motion be DENIED, Corporan's motion be GRANTED in part and DENIED in part, and the case be remanded to the Commissioner for further development of the record.

## PROCEDURAL BACKGROUND

**\*9** On September 14, 2009, the plaintiff Elizabeth Corporan ("Corporan") filed the first part of her application for Disability Insurance Benefits and Supplemental Security Income [1] with the Social Security Administration (the "SSA"). [2] On December 11, 2009, the Commissioner denied her application, and on December 31, 2009, Corporan requested review of the Commissioner's decision at a hearing before an administrative law judge. Corporan appeared *pro se* for a hearing before Administrative Law Judge Jerome Hornblass (the "ALJ") on October 7, 2010, and was denied disability benefits in a November 2, 2010 written decision. The Appeals Council denied Corporan's application for review of the ALJ's decision on July 11, 2012, thereby rendering the decision of the Commissioner final.

On September 4, 2012, Corporan, proceeding *pro se,* filed this action pursuant to § 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), before the Honorable J. Paul Oetken. On November 8, 2012, Judge Oetken referred this case to my docket for a report and recommendation. The Commissioner filed the administrative record on March 25, 2013, and filed a motion for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure on May 24, 2013. On September 4, 2013, counsel William Peairs Gottlieb made an appearance on Corporan's behalf and filed a letter requesting an extension of time for Corporan to file her motion for judgment on the pleadings, which the Court granted. On November 4, 2013, Corporan filed her counseled motion, and the Commissioner opposed it on December 18, 2013. Corporan sought an extension of time to file her reply, which the Court granted. On January 10, 2014, however, Gottlieb filed a letter stating that Corporan no long wished to file a reply. The Court thus considers this matter fully submitted.

## FACTUAL BACKGROUND

The following facts are taken from the administrative record.

### I. Family and Work History

Corporan was born in New York on January 27, 1975. She graduated from high school and completed nine or twelve college credits. As of her hearing before the ALJ on October 7, 2010, Corporan lived in a one-bedroom apartment in a shelter with two of her three children—her six-year-old daughter, who suffers from severe asthma, and her fourteen-year-old son. Much of Corporan's time is spent taking care of her children, though she notes that her son "helps me a lot" and that her mother "picks up my daughter at school when I can't." (R. 91.) Corporan stated that she had not worked for two years at the time of the hearing and that she supported herself and her children through public assistance. Corporan's prior work experience includes employment as

a babysitter, housecleaner, bank teller, customer service worker, telemarketer, and store salesperson. As discussed below in this section of the report and the following section setting out Corporan's medical history, the details of these prior work experiences are ambiguous as a result of Corporan's sporadic memory functioning.

 **\*10**  Corporan states that she became unable to work on June 10, 2009, due to her disabling conditions of depression, alcohol dependence, and migraine headaches. Corporan has had difficulty remembering details and time periods regarding her prior work experience; she has stated at different times that the last day she worked was either June 1, 2009, as a babysitter; March 2009 as a housecleaner; 2008 as a babysitter; and 2007 as a receptionist. In her SSA application, Corporan listed the following facts regarding her work history, several of which are inconsistent: In 2009, Corporan worked as a babysitter for three hours per day, four days per week, earning $17.00 a day. In 2008, and possibly through March 2009, she worked as a housecleaner, either for five hours per day, three days a week, earning $250.00 a week, or for eight hours per day, five days per week, earning $200.00 a week. Corporan maintained this job for four months but had to quit because she was allergic to the chemicals that were used for cleaning. In 2007, she worked for two months as a telemarketer[3] for either seven hours per day, five days per week, earning $9.00 an hour, or for eight hours per day, five days per week, earning $9.00 an hour. Corporan worked as a bank teller for a period in 2005 and 2006, which is her longest period of employment in one job. As a bank teller, she either worked for four hours per day, six days per week, earning $7.50 per week,[4] or for five or six hours per day, five days per week, earning $8.50 an hour. Corporan also worked as a salesperson in a store in 2001, but provided no additional details.

## II. Medical History

### A. SSA Applications

In her application to the SSA for disability benefits, Corporan stated, "I used to be able to have a normal life [but] now I have to depend on medication and I'm very depress[ed] and need to be in rehab for alcohol." (R. 91.) She asserted that her depression has affected her sleep, sometimes preventing her from falling asleep until 4:30 a.m. Her application and her SSA field office interview indicate that Corporan was having problems with memory. (See R. 79 (SSA field office interviewer's notes stating that Corporan "had a difficult time remembering which job she had last" and was not sure when she attended her one year of college); R. 82 ("My memory is not good right now"); R. 91 ("Sometimes I forget if I took a shower in the morning"); R. 92 (stating that "[m]y 13 year old son reminds me to shower," "I always forget to take my medicine," and "I'm always forgetting things[;] I'm afraid I might leave the stove on and have an accident"); R. 93 ("Sometimes my mind blacks out and I forget"); R. 95 ("I don't want to walk to[o] far because I'm afraid I might forget how to get back"); R. 99 (listing three previous jobs and noting, "I know I had more jobs but I can't remember at the moment"). Due to her depression, memory problems, and/or migraine headaches, Corporan stated that she cannot go out alone; she cannot read as much as she used to; she does not go out with friends; she cannot follow instructions without having them repeated; and she sometimes has difficulty motivating herself to get out of bed.

 **\*11**  Along with her notice of appeal of the Commissioner's decision denying her benefits, Corporan submitted an updated disability report (the "appeal disability report"), which is undated but was completed sometime after December 20, 2009. (See R. 110 (noting in the appeal disability report that her condition began to deteriorate on December 20, 2009).) In the appeal disability report, Corporan stated that her migraine headaches and her depression had grown more severe, and that her doctor had increased her medication.

Between the alleged onset of her disability on June 10, 2009, and March 2010, Corporan was at different times prescribed the following relevant medications: Sertraline/Zoloft, which is used to treat depression and anxiety; Trazadone, which is used to treat depression; Campral, which is used to treat alcoholism; Lexapro, which is used to treat depression and generalized anxiety disorder; Maxalt and prescription acetaminophen, which are used to treat migraine headaches and pain; and Prozac, which is used to treat depression.[5]

### B. St. Luke's Roosevelt Hospital

Corporan had sought treatment at St. Luke's Roosevelt Hospital ("St.Luke's") multiple times for physical and mental health issues, beginning when she was 20 years old or younger and continuing through her alleged disability period. [6] At some point before 1995, Corporan received four months' outpatient treatment at St. Luke's for depression, and approximately three weeks' inpatient treatment following a suicide attempt when she was approximately 20 years old. In late 2008, Corporan had a head CT scan, which was negative.

In 2009, Corporan received treatment at St. Luke's for her headaches and for relatively minor physical conditions, such as temporary infections and a leg abscess. The most recent St. Luke's report, and the only one produced after the alleged disability onset date, is from October 29, 2009, when Corporan sought treatment for her headaches and was provided prescription acetaminophen. The doctor noted Corporan's medical history of depression and anxiety and, in the "Psychiatric" field for the physical examination notes, wrote "Depressed appearing." (R. 197–98.) According to Corporan, she had an appointment at St. Luke's on November 16, 2009, at which she was prescribed Maxalt to treat her migraine headaches.

The administrative record does not contain any documents arising from the following events at St. Luke's that are referred to elsewhere in the record: (1) a November 16, 2009 appointment, including the prescription for Maxalt; (2) a January 11, 2010 appointment (listed as Corporan's next scheduled appointment in her appeal disability report); (3) a December 2009 head MRI/ CT scan; [7] and (4) participation in an outpatient alcohol treatment program starting sometime after March 19, 2010.

### C. Federation Employment and Guidance Service Program Evaluation

On June 10, 2009, Corporan sought treatment at the Institute for Family Health ("IFH") through the Federation Employment and Guidance Service program ("FEGS"), where she was seen by physician and IFH medical director Dr. Jorge Farrat ("Dr.Farrat"), and social worker Robin Kaynor ("Kaynor"). Kaynor reported that Corporan was misusing alcohol, was concerned about her HIV status, [8] and had a history of depression, including a past suicide attempt, for which she received treatment at St. Luke's before 1995. Kaynor also reported that, when asked how frequently she felt "down, depressed, or hopeless," Corporan responded "[n]early [e]veryday." (R. 167.) Corporan scored a 14 on a Patient Health Questionnaire ("PHQ–9") scale, which indicates moderate depression severity. Kaynor noted in the category of Psychosocial Barriers to Employment that Corporan had "medical and/or mental health conditions that significantly affect functioning." (R. 169.) Regarding her daily activities, Corporan told Kaynor that she spent her time caring for her daughter, who suffers from severe asthma, and enjoyed going to movies, but had no contact with friends.

**\*12** Corporan was also examined by Dr. Farrat on June 10, 2009, who found her to be physically healthy except for a skin rash. Regarding Corporan's mental health, Dr. Farrat noted that she had depressive symptoms, including "crying for anything" and drinking alone; that she was losing her appetite and having difficulty sleeping; and that she presented the following: "recent & remote memory not intact; easily distracted; speech not normal; abnormal fund of knowledge, abnormal gait & station normal; abnormal mood & affect[.]" (R. 173.) He also wrote, "[Corporan] denies suicidal ... thoughts presently but afraid she might do same as she tried when she was a teenager when she attempted suicide." (R. 173.) He also noted that Corporan's depression was exacerbated by her difficulty in taking care of her sick daughter.

Dr. Farrat referred Corporan for "Phase II" of the FEGS assessment, which was conducted on June 22, 2009. (R. 178–81) (document titled "F.E.G.S. WeCARE BPS Phase II Patient Medical Information (Psychiatry)".) It is unclear from the record whether Phase II of the examination was conducted by Dr. Farrat or a different physician or psychiatrist. During the Phase II psychiatric assessment, Corporan reported symptoms including depressed mood, panic, insomnia, rapid heart rate, anxiety, and irritability ("yelling at people"). (R. 178.) The Phase II examiner diagnosed Corporan with major depressive order, recurrent, and generalized anxiety disorder, in addition to "problems with primary support group," "housing problems," and "other psychosocial and environmental problems." (R. 180.) Her "mental status exam" showed depressed mood, neat appearance, calm activity, constricted affects, normal thought content, no homicidality, cooperative manner, normal speech cadence, and no suicidality. (R. 179.) Corporan was found to have a normal ability to follow work rules, accept supervision, and relate to co-workers; a mild functional impairment in dealing with the public and maintaining attention; and a moderate functional

impairment in adapting to change and adapting to stressful situations. Corporan's Global Assessment of Functioning ("GAF") was assessed at 75, which indicates transient symptoms causing no more than slight impairments in functioning. [9] Corporan was found to be "temporarily disabled from work" due to her mental health problems, with a likely date of return of three months with treatment. (R. 180.) Her recommended treatment was "psychotherapy with medication." (R. 180.)

After the Phase II psychiatric examination, Dr. Farrat diagnosed Corporan with major depression, generalized anxiety disorder, and alcohol use, in addition to a skin disorder, high levels of lipids in the blood, and mild anemia. He noted that Corporan's anxiety and depression were related to family and medical issues and that they required stabilization, psychotherapy, and medication. With respect to "employment disposition," Dr. Farrat found that Corporan's "unstable" mental health condition required a "wellness plan" before he could make a determination as to functional capacity. (R. 176.)

**\*13** On July 1, 2009, Corporan met with a FEGS case manager as part of the FEGS Wellness Rehabilitation Plan, which Corporan was to participate in for three months. Corporan was referred to the Emma L. Bowen Community Service Center for completion of this program.

Corporan reported that her last FEGS visit was in September 2009, but there are no FEGS record from this period in the administrative record.

### D. Emma L. Bowen Community Service Center Evaluation

Pursuant to a referral from FEGS, Corporan sought treatment at the Emma L. Bowen Community Service Center (the "Bowen Center"), which is also known as the Upper Manhattan Mental Health Center. [10] On July 30, 2009, Corporan underwent an initial assessment, for which she was examined by psychiatrist Dr. R. Pierre–Louis ("Dr.Pierre–Louis") and social worker Sedgwick Ogilvy ("Ogilvy"). [11] Dr. Pierre–Louis noted Corporan's history of alcohol abuse and depression. He found that Corporan's emotional reactions were "constricted" and her mood was "sad," though all other attitude and behavior categories appeared normal. (R. 261.) Corporan exhibited good attention and concentration, adequate impulse control, and fair insight and judgment. Dr. Pierre–Louis assessed a GAF of 55, which indicates moderate impairment. He diagnosed Corporan with depression, not otherwise specified, and alcohol dependency, for which he prescribed Zoloft, an anti-depressant, and Campral, an alcohol withdrawal drug. Corporan met with Dr. Pierre–Louis monthly from August 2009 through March 2010 for medication management. In addition, Corporan had appointments at the Bowen Center multiple times per week for group and individual counseling. [12]

Over the course of Corporan's treatment at the Bowen Center, Dr. Pierre–Louis consistently prescribed her Campral every month, with a dosage of 333 mg to be taken three times per day, but changed her other medications, to be taken daily, multiple times by either increasing the dosage or switching to a new medication. At Corporan's first appointment on July 30, 2009, Dr. Pierre–Louis prescribed her Campral and Zoloft at 50 mg. Over the next eight months, Dr. Pierre–Louis (1) added Trazodone at 50 mg in September 2009; (2) switched Zoloft to Lexapro at 10 mg in October 2009; (3) increased the dosage of Lexapro from 10 mg to 15 mg in December 2009; (4) increased the dosage of Trazodone from 50 mg to 100 mg in December 2009; (5) increased the dosage of Lexapro from 15 mg to 20 mg in January 2010; (6) switched Lexapro to Prozac at 20 mg in February 2010; and (7) increased the dosage of Trazodone from 100 mg to 150 mg in March 2010.

On August 13, 2009, Dr. Pierre–Louis completed a two-page "Wellness Plan Report" for the New York City Department of Social Services. The report summarized his findings from the July 30, 2009 initial assessment and recorded that Corporan was prescribed Zoloft at 50 mg and Campral at 333 mg. The one substantive difference between the report and the initial assessment completed two weeks earlier was that Dr. Pierre–Louis changed his initial diagnosis of depression, not otherwise specified, to diagnoses of major depression, recurrent, and generalized anxiety disorder. [13] He also wrote in the report, "Client is stable," and he checked the box for "No functional limitations" with respect to employment. (R. 185.)

**\*14**  In a Bowen Center termination summary dated March 19, 2010, Ogilvy wrote that Corporan had engaged in group therapy for alcoholism, psychiatric treatment for medication management, and individual counseling. Ogilvy stated that Corporan's attendance had shown "a sharp decline that had culminated with over 1 month of consecutive absences," a result of Corporan having "inadequate childcare" and needing to care for her daughter. (R. 253; *see also* R. 30 (Corporan stating at her hearing that she missed appointments at the Bowen Center "because my daughter kept on getting sick").) Because of these absences, Corporan was discharged from treatment at the Bowen Center and referred to an outpatient alcohol treatment program St. Luke's. Ogilvy wrote in the termination summary that she "will contact client within 30 days to check in." (R. 255.)

Other than the July 30, 2009 initial assessment, the March 19, 2010 termination summary, and the Medication Order Sheet, there are no records regarding Corporan's visits to the Bowen Center contained in the administrative record.

### E. Examination by Dr. Michael Alexander

On November 11, 2009, Corporan underwent a consultative evaluation conducted by psychologist Dr. Michael Alexander ("Dr.Alexander"). Corporan told Dr. Alexander that she left her housekeeping job—her only work experience since 2007—in March 2009 due to her allergic reaction to the chemicals and that, since then, she has been too mentally unstable to work. She had not consumed alcohol on a daily basis since 2008, though she continued to drink frequently in 2009. She also stated that she had difficulty falling asleep and that the Lexapro and Trazodone she had been prescribed were not alleviating her depression. Additionally, Corporan reported what Dr. Alexander described as "a history of dysphoric mood, decreased motivation to engage in daily tasks, intermittent feelings of hopelessness, and loss of energy." (R. 218–19.) Corporan could not remember when she was hospitalized for depression at St. Luke's or when she began seeing mental health professionals.

Dr. Alexander found that Corporan's mood was "neutral," her recent and remote memory skills "intact," her thoughts "coherent" and "goal-directed," and that there was no evidence of hallucinations or delusions. (R. 219–20.) Dr. Alexander assessed that she would be able to cook and clean if she had her own apartment, though these tasks would be difficult at times due to her migraine headaches. Corporan reported to Dr. Alexander that she could shop, manage money, and take public transportation.

Dr. Alexander diagnosed Corporan as suffering from depressive disorder, not otherwise specified, alcohol dependence, and headaches. He found that she could follow and understand simple directions, perform simple and complex tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks, make appropriate decisions, relate adequately with others, and deal with limited amounts of stress. Dr. Alexander noted that "her substance abuse problem does not appear completely controlled." (R. 221.) Dr. Alexander listed the prognosis as "Guarded." (R. 221.)

### F. Records Review Evaluation by A. Hochberg

**\*15**  On December 1, 2009, psychologist A. Hochberg ("Hochberg"), the state agency consultant, reviewed the recorded medical evidence and assessed Corporan's "residual functional capacity." [14]  Hochberg did not examine Corporan. He found that Corporan had depression, not otherwise specified, and "substance induced mood disorder." (R. 225.) He did not check any boxes for "anxiety related disorders." (R. 227.) Based on his review, Hochberg found that Corporan was not significantly limited in her ability to: (1) remember locations and work-like procedures; (2) understand, remember, and carry out very short and simple instructions; (3) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (4) sustain an ordinary routine without special supervision; (5) work in coordination with or proximity to others without being distracted by them; (6) make simple work-related decisions; (7) ask simple questions or request assistance; (8) get along with co-workers or peers without distracting them or exhibiting behavior extremes; (9) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; (10) be aware of normal hazards and take appropriate precautions; (11) travel in unfamiliar places or use public transportation; and (12) set realistic goals or make plans independently of others.

Hochberg also assessed that Corporan was moderately limited in her ability to: (1) understand, remember, and carry out detailed instructions; (2) maintain attention and concentration for extended periods of time; (3) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an

unreasonable number and length of rest periods; (4) interact appropriately with the general public; (5) accept instructions and respond appropriately to criticism from supervisors; and (6) respond appropriately to changes in the work setting.

Hochberg concluded that Corporan had "no marked limitation in any of the four basic areas needed for unskilled entry-level work." (R. 238.)

### G. Metropolitan Hospital Center

At the time of the hearing on October 7, 2010, Corporan was being treated at the Adult Mental Health Clinic at the Metropolitan Hospital Center ("Metropolitan Hospital"). The administrative record contains a "Verification of Appointment" form, dated September 23, 2010, confirming that Corporan attended an appointment at Metropolitan Hospital. (R. 118.) There are no other records regarding Metropolitan Hospital contained in the administrative record.

## II. The Administrative Hearing

On October 7, 2010, Corporan appeared *pro se* for a hearing before ALJ Hornblass. The hearing began with Corporan providing information about her life, family, and living situation, including that she was 35 years old, graduated from high school and completed nine credits of college, lived with two of her three children, and had never received support from the father, who was not in their lives. For the past year, Corporan, her six-year-old daughter, and her 14–year–old son had been living in a one-bedroom apartment in a shelter, which Corporan described as "a living hell." (R. 23–24.) Corporan and her daughter share a bed in the living room while her son sleeps in the bedroom. Corporan told the ALJ that she supported herself through welfare, which she had been receiving since moving to New York City from Allentown, Pennsylvania. Corporan testified that her son and mother help to take her daughter to school and pick her up, that her mother cooks for the children sometimes, and that her son helps to wash dishes and clean the house, among other household tasks.

**\*16**  The ALJ then asked Corporan about her work experience "from 1999 to about 2008 or so." (R. 26.) Corporan began to reply, "Customer service and then the last job I had, it was—well, no not the last job," at which point the ALJ interjected, "Babysitting job?" Corporan continued, "I had a babysitting job. I used to clean houses. I had a bank teller job. I did a lot of different jobs." (R. 27.) Corporan then told the ALJ that it had been two years since she last worked and that her depression was currently preventing her from finding employment, adding that "sometimes my depression doesn't let me do anything." (R. 27.) After Corporan explained that she could not work because of her depression, the ALJ inquired into the inpatient treatment Corporan received for depression at St. Luke's approximately 15 years earlier. The ALJ then said, "But you've been managing since then. You managed to hold a job, to keep a job, and to raise two children, and then you have a third. Right?" Corporan replied, "Yes." (R. 27.) Finally on the subject of work, Corporan testified that, in response to pressure from the shelter, she "applied online to a couple of jobs," but had not had any job interviews. (R. 28.)

The ALJ then turned to the subject of medical treatment. Corporan testified that she got headaches daily, "day and night," which lasted for approximately 45 minutes to an hour after she took Tylenol or Advil. (R. 28.) Corporan later added that "[s]ometimes I cannot get off my bed because of my headaches ... [S]ometimes they're ... really, really bad, and I cannot do anything." (R. 33.) The ALJ asked if she sees a psychiatrist. Corporan replied, "Yes.... I just started seeing the new [psychiatrist] I have now." (R. 28–29.) In response to the ALJ's inquiry into when she started seeing the new psychiatrist, she said she had one previous appointment and another scheduled for October 19, 2010. The ALJ then moved on to Corporan's previous psychiatric treatment, and Corporan stated that she was treated at "Upper Manhattan" (the Bowen Center). (R. 29.)

On the topic of Corporan's alcoholism, she testified that she struggled with a drinking problem since she was 20, but that at the moment she had been sober for two months. Corporan then stated that she had been sober previously for nine months, but relapsed after she was discharged from the Bowen Center. When the ALJ asked why she was discharged, Corporan said that she had missed too many appointments, explaining that she was frequently absent "[b]ecause my daughter kept on getting sick." (R. 30.) The ALJ's next question was, "Would you be able to say that you—that maybe your chief issue that affects you and the children is your drinking?" (R. 30.) Corporan responded, "No.... It's my depression." (R. 30.)

The ALJ also asked if children's services ever investigated her home, to which Corporan replied "Yes." (R. 31.) Corporan stated that the investigation did not result in any action or negative findings. The ALJ asked, "Wasn't there an effort to take away the children from you?" Corporan responded, "No." (R. 31.)

**\*17**  At the end of the hearing, when the ALJ asked if Corporan had anything further to add, she pointed out that she provided the ALJ with "new paperwork for the psychiatrist I see now," which Corporan appears to have given to a member of the ALJ's staff before the hearing. (R. 33.) The ALJ confirmed that the documents were from Metropolitan Hospital and consisted of a "verification of appointment" and a copy of Corporan's medical identification card. (R. 33.) Corporan then stated that, when she checked her file, she realized it did not contain her records from "Mental Health Upper Manhattan," referring to the Bowen Center. The ALJ replied, "Okay, now that's important" and asked Corporan if she could retrieve the files. Corporan told the ALJ that she would try, but that "[t]hey take forever." (R. 34–35.) The ALJ said, "I'm just going to give you until today or tomorrow." (R. 35.) The following day, Corporan faxed the ALJ 10 pages of Bowen Center records. [15]

## DISCUSSION

### I. Standard of Review

A party may move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial." Fed.R.Civ.P. 12(c). A Rule 12(c) motion should be granted "if, from the pleadings, the moving party is entitled to judgment as a matter of law." *Dargahi v. Honda Lease Trust,* 370 F. App'x 172, 174 (2d Cir.2010) (citation omitted).

In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner ... with or without remanding the cause for a rehearing." 42 U .S.C. § 405(g). A determination of the ALJ may be set aside only if it is based upon legal error or is not supported by substantial evidence. *Rosa v. Callahan,* 168 F.3d 72, 77 (2d Cir.1999). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Halloran v. Barnhart,* 362 F.3d 28, 31 (2d Cir.2004) (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). If the findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive. *Diaz v. Shalala,* 59 F.3d 307, 312 (2d Cir.1995). "Where there is substantial evidence to support either position, the determination is one to be made by the factfinder." *Alston v. Sullivan,* 904 F.2d 122, 126 (2d Cir.1990). This means that if there is sufficient evidence to support the final decision, the Court must grant judgment in favor of the Commissioner, even if there also is substantial evidence for the plaintiff's position. *See* Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir.2012) (finding that "[t]he substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would *have to conclude otherwise"* (citation and internal quotation marks omitted; emphasis in original)).

**\*18**  "Before determining whether the Commissioner's conclusions are supported by substantial evidence, however, 'we must first be satisfied that the claimant has had a full hearing under the ... regulations and in accordance with the beneficent purposes of the [Social Security] Act." *Moran v. Astrue,* 569 F.3d 108, 110 (2d Cir.2009) (quoting *Cruz v. Sullivan,* 912 F.2d 8, 11 (2d Cir.1990)). The Act "must be liberally applied, for it is a remedial statute intended to include not exclude." *Cruz,* 912 F.2d at 11. This is particularly true in the case of *pro se* claimants, who "are entitled to a liberal construction of their pleadings," and, therefore, their complaints "should be read to raise the strongest arguments that they suggest." *Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001) (citation and internal quotation marks omitted); *see Alvarez v. Barnhart,* 03 Civ. 8471(RWS), 2005 WL 78591, at \*1 (S.D.N.Y. Jan. 12, 2005) (articulating liberal *pro se* standard in reviewing denial of disability benefits).

### II. Definition of Disability

A claimant is disabled under the Act if the claimant demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted

or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A determinable physical or mental impairment is defined as one that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). A claimant will be determined to be disabled only if the impairments are "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy...." 42 U.S.C. § 423(d)(2)(A).

Under the authority of the Act, the SSA has established a five-step sequential evaluation process when making disability determinations. *See* 20 C.F.R. §§ 404.1520, 416.920. The steps are followed in order: if it is determined that the claimant is not disabled at a step of the evaluation process, the evaluation will not progress to the next step. The Court of Appeals for the Second Circuit has described the process as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Comm issioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or m ental ability to do basic work activities. If the claimant suffers such an impair ent, the third in quiry is whether, based solely on m edical evidence, the claimant has an impairment that is listed in 20 C.F.R. Pt. 404, subpt. P, app. 1.... Assum ing the claim ant does not have a listed im pairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work. Finally, if the claim ant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

 **\*19** *Jasinski v. Barnhart,* 341 F.3d 182, 183–84 (2d Cir.2003) (citation omitted). A claimant bears the burden of proof as to the first four steps. *Melville v. Apfel,* 198 F.3d 45, 51 (2d Cir.1999). It is only after the claimant proves that she cannot return to prior work that the burden shifts to the Commissioner to show, at step five, that other work exists in the national and local economies that the claimant can perform, given her residual functional capacity, age, education and past relevant work experience. 20 C.F.R. 404.1560(c)(2); *Rosa,* 168 F.3d at 77; *Melville,* 198 F.3d at 51.

### III. The ALJ's Determination

On November 2, 2010, the ALJ issued a decision affirming that Corporan was not disabled and thus not entitled to disability benefits. He concluded that Corporan was ineligible for disability benefits at step four of the evaluation and he thus did not reach step five. Corporan contests the ALJ's step-four finding and argues that the ALJ's determination was made without a full and fair hearing.

#### A. Steps One, Two, and Three

At step one, the ALJ found that Corporan had not engaged in substantial gainful activity since the onset of her claimed disability on June 10, 2009. At step two, the ALJ found that Corporan had three "severe impairments: depressive disorder, not otherwise specified, alcohol dependence and headaches." (R. 9.) At step three, the ALJ determined that Corporan's severe impairments, individually or in combination, did not meet the criteria for a *per se* disability as set forth in the applicable Social Security Regulations (the "Regulations"). *See* 20 C.F.R. Pt. 404, Subpt. P, App'x 1; 20 C.F.R. 404.1520(d), 404.1526, 416.920(d), 416.925, 416.926; *DeChirico v. Callahan,* 134 F.3d 1177, 1180 (2d Cir.1998) ("The Social Security regulations list certain impairments, any of which is sufficient, at step three, to create an irrebuttable presumption of disability."). The ALJ found that Corporan had mild restriction in activities of daily living and mild difficulties in social functioning. "With regard to concentration, persistence or pace, [Corporan] ha[d] moderate difficulties." (R. 10.) The ALJ further found that Corporan had

"no episodes of decompensation ... of extended duration." (R. 10.) Accordingly, he found that Corporan's mental impairment did not satisfy the criteria for finding a disability at step three of the evaluation.

### B. Step Four: Residual Capacity to Perform Prior Work

The ALJ made two findings with respect to step four. First, he found that Corporan had "the residual functional capacity to perform a full range of work at all exertional levels but with the ... non-exertional limitation [that she] is capable of performing work in a low stress environment." (R. 10.) Second, he concluded that Corporan was "capable of performing past relevant work as a babysitter" because such work was not "precluded by [Corporan's] residual functional capacity." (R. 13.)

### 1. Residual Functional Capacity Assessment

**\*20**  After reciting the legal standard, the ALJ provided a four-paragraph overview of the record evidence. First, he summarized the evidence regarding Corporan's family life, living situation, work history, and health. "In terms of her health, [Corporan] stated that she gets headaches in the morning, and cannot get out of bed," though her headaches are typically alleviated with "Tylenol or Advil." (R. 11.) He then described Corporan's alcohol abuse, including her recent relapses and her discharge from a rehabilitation center "for noncompliance." (R. 11.) He concluded the paragraph by noting, "She is depressed. She can sit for two hours, stand for a couple of hours and walk for 10 blocks. She can lift things." (R. 11.)

The ALJ introduced the next paragraph by stating that Corporan "alleges a history of mental illness and headaches." (R. 11.) The remainder of the paragraph pertains to the minor physical conditions mentioned in Corporan's records from St. Luke's. The ALJ made note of her headaches at the end of the paragraph, stating that she had a negative CT scan and was prescribed acetaminophen.

In the following paragraph, the ALJ reviewed Corporan's treatment starting on June 10, 2009, her alleged disability onset date. Regarding her treatment at FEGS, the ALJ stated that Corporan "was concerned about her HIV status" and scored a 14 on the PHQ–9 scale, indicating "only moderate depression." (R. 12.) He then summarized her initial assessment at the Bowen Center, noting that her speech, thoughts, attention, alertness, concentration, intellectual capacity, impulse control, insight, and judgment were normal, and that there was no evidence of delusions or perpetual disorders. He observed that the assessment showed that she was "cooperative, but negativistic" and that her "affect was constricted and her mood was sad." (R. 12.) "In the end, her initial diagnosis consisted of alcohol dependence, depressive order, not otherwise specified and anemia with a score of 55 on the [GAF] scale." (R. 12, 13.) He then acknowledged that Corporan was "discharged from the program after excessive absences." (R. 12.)

In his final paragraph reviewing the record evidence, the ALJ detailed Corporan's November 11, 2009 consultative evaluation with Dr. Alexander, who is the only source the ALJ specifically identifies in his summary of evidence. The ALJ recited that Corporan did not negatively present on various criteria and that Corporan "could follow and understand simple directions[,] ... perform simple tasks independently, maintain attention and concentration [,] ... maintain a regular schedule[,] ... learn new tasks, perform tasks that are more complex independently, make appropriate decisions and relate adequately with others." (R. 12.) The ALJ concluded by stating, "According to Dr. Alexander, [Corporan] could appropriately deal with limited amounts of stress at the current time, as her substance abuse problem does not appear completely controlled." (R. 12.)

**\*21**  Based on this evidence, the ALJ recited the boilerplate conclusion that Corporan's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." [16] (R. 12–13.) In finding Corporan's "allegations of inability to function in the workplace generally not credible," the ALJ noted that Corporan had received only "a limited amount of psychiatric treatment" and that "the only record of any psychiatric evaluation in the file from an acceptable source is from [the Bowen Center]." (R. 13.) After reciting the July 30, 2009 Bowen Center report stating that Corporan was not exhibiting various symptoms and behaviors,

the ALJ declared that, "[m]ost importantly, [Corporan] was unsatisfactorily discharged from the program ... due to repeated unexcused absences." (R. 13.)

The ALJ explained that his conclusions were based on "all records and reports submitted by the claimant, especially those from" the Bowen Center, St. Luke's, and FEGS. (R. 13.) He noted that Corporan did not provide "opinion evidence from a treating source." (R. 13.) He gave "significant weight" to Dr. Alexander, the consultative psychologist, and "some, but little, weight" to Hochberg, the state agency consultant. (R. 13.) The ALJ concluded that Corporan "has the residual functional capacity of the full range of work at all exertional levels in a low stress environment" and that Corporan's "environmental and mental limitations do not significantly affect her ability to perform in the workplace (SSRs 85–15)." (R. 13.)

### 2. Capacity to Perform Prior Work

Based on the foregoing assessment, the ALJ concluded that Corporan could perform her past work as a babysitter. The ALJ noted the specific physical demands of babysitting (*e.g.,* movement of the fingers, hands, and arms, and lifting up to 50 pounds) and found Corporan physically capable of performing these functions. He then stated that "[a] function-by-function comparison of [Corporan's] [residual functional capacity] to the functional demands and job duties of this [past relevant work] shows that [Corporan] does have the physical and mental capacity to perform this [past relevant work] as she actually performed it." (R. 14.)

## IV. Legal Errors

Corporan's contention that the administrative hearing was invalid because the ALJ did not adequately develop the record must be addressed as a threshold issue. Indeed, the Court cannot make a recommendation as to whether the ALJ's decision regarding Corporan's functional capacity was supported by substantial evidence if the determination was based on an incomplete record.

The central issue before this Court, therefore, is the extent of the ALJ's duty to develop the record before making a determination of disability. The ALJ did not fulfill his duty to develop Corporan's record. First, the ALJ did not attempt to procure the pertinent medical records that very likely exist but are missing from the administrative record, nor did he attempt to procure opinion reports from Corporan's treating physicians. Second, the ALJ disregarded treating sources or salient findings by treating sources without any explanation. Third, the ALJ did not resolve factual ambiguity with respect to Corporan's work history before determining that she was capable of performing prior work. These errors render the record incomplete and the Court unable to evaluate the final agency determination. This action must therefore be remanded for further development.

### A. Applicable Law

#### 1. The ALJ's Duty to Develop the Record

**\*22**   When the ALJ assesses a claimant's alleged disability, the ALJ must develop the claimant's medical history for at least a twelve-month period. 42 U.S.C. § 423(d)(5)(b), 20 C.F.R. § 404.1512(d). Further, the Act authorizes the Commissioner to "issue subpoenas requiring the attendance and testimony of witnesses and the production of any evidence that relates to any matter under investigation." 42 U.S.C. § 405(d).

The Court of Appeals for the Second Circuit considers this statutory authorization to impose an affirmative duty on the ALJ to develop the record. *See Pratts v. Chater,* 94 F.3d 34, 37 (2d Cir.1996) (finding that the duty of an ALJ to develop the record personally "arises from the Commissioner's regulatory obligations to develop a complete medical record before making a disability determination"). Indeed, before a district court can evaluate the ALJ's conclusions, the court must ensure that the claimant received a full and fair hearing. *See Echevarria v. Sec'y of Health & Human Servs.,* 685 F.2d 751, 755 (2d Cir.1982) (holding that an ALJ must ensure that the claimant had a "full hearing under the Secretary's regulations and in accordance with the beneficent purposes of the Act"); *Cullinane v. Sec'y of Dep't of Health & Human Servs.,* 728 F.2d 137, 137 (2d Cir.1984). "The ALJ's duty to develop the administrative record encompasses not only the duty to obtain a claimant's medical records and

reports but also the duty to question the claimant adequately about any subjective complaints and the impact of the claimant's impairments on the claimant's functional capacity." *Brown v. Comm'r of Soc. Sec.,* 709 F.Supp.2d 248, 256 (S.D.N.Y.2010).

"Even when a claimant is represented by counsel, it is the well-established rule in our circuit 'that the social security ALJ, unlike a judge in a trial, must on behalf of all claimants ... affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding.' " *Moran,* 569 F.3d at 112 (quoting *Lamay v. Comm'r of Soc. Sec.,* 562 F.3d 503, 508–09 (2d Cir.2009)). When a claimant is *pro se,* however, "the ALJ is under a heightened duty 'to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts.' " *Cruz v. Sullivan,* 912 F.2d 8, 11 (2d Cir.1990) (quoting *Echevarria,* 685 F.2d at 755) (internal quotation marks omitted). This entails a heightened obligation to ensure both the completeness and the fairness of the administrative hearing. *See Cullinane,* 728 F.2d at 137 (describing an ALJ's "affirmative duty to ensure that *pro se* disability insurance benefit claimants receive full and fair hearings"). When the ALJ has failed to develop the record adequately, the district court must remand to the Commissioner for further development. *See, e.g., Pratts,* 94 F.3d at 39.

The ALJ's duty to develop the record is enhanced when the disability in question is a psychiatric impairment. *See Camilo v. Comm'r of the Soc. Sec. Admin.,* 11 Civ. 1345(DAB)(MHD), 2013 WL 5692435, at *22 (S.D.N.Y. Oct. 2, 2013) ("[I]t is the ALJ's duty to develop the record and resolve any known ambiguities, and that duty is enhanced when the disability in question is a psychiatric impairment."). The Regulations articulate that claims concerning mental disorders require a robust examination that is sensitive to the dynamism of mental illnesses and the coping mechanisms that claimants develop to manage them:

> **\*23** Particular problems are often involved in evaluating m ental impairments in individuals who have long histories of repeated hospitalizations or prolonged outpatient care with su pportive therapy and medication. For instance, if you have chronic organic, psychotic, and affective disorders, you may commonly have your life structured in such a way as to minimize your stress and reduce your symptoms and signs. In such a case, you may be much more impaired for work than your symptoms and signs would indicate. The results of a single examination may not adequately describe your sustained ability to function. It is, therefore, vital that we review all pertinent information relative to your condition, especially at tim es of increased stress.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(E). Similarly, Social Security Ruling 85–15 directs the Commissioner to consider that "determining whether these individuals will be able to adapt to the demands or 'stress' of the workplace is often extremely difficult." Ruling 85–15 explains that this difficulty arises because persons with mental illnesses "adopt a highly restricted and/ or inflexible lifestyle within which they appear to function well." When claimants are in structured settings, they are able to function adequately "by lowering psychological pressures, by medication, and by support from services." SSR 85–15 (Jan. 1, 1985).

### 2. The Treating Physician Rule

The ALJ's development of the record centers around the opinions and diagnoses of the claimant's treating physician. The "treating physician rule" instructs the ALJ to give controlling weight to the opinions of a claimant's treating physician, as long as the opinion is well-supported by medical findings and is not inconsistent with the other evidence in the record. 20 C.F.R. § 404.1527(c)(2). While the decision on the ultimate issue of disability is one reserved for the Commissioner, 20 C.F.R. § 404.1527(d)(2), the ALJ may not discredit the opinion without "affirmatively seek[ing] out clarifying information from the doctor," *Duncan v. Astrue,* 09 Civ. 4462(KAM), 2011 WL 1748549, at *19 (E.D.N.Y. May 6, 2011). Indeed, the ALJ may not discount a treating physician's opinion unless the ALJ believes that it "lack[s] support or [is] internally inconsistent." *Id.*

If the ALJ decides to discredit the opinion of a treating physician, the ALJ must follow a structured evaluative procedure. This procedure evaluates the following factors: (1) the length of the treatment relationship and the frequency of examination; (2) the

nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other significant factors. 20 C.F.R. § 404.1527(c)(2)-(6). This process must be transparent: the Court of Appeals for the Second Circuit has warned that "we will continue remanding when we encounter opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion." *Halloran v. Barnhart,* 362 F.3d 28, 33 (2d Cir.2004); *see also* 20 C.F.R. § 404.1527(c)(2) (stating that the SSA "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion"); *Snell v. Apfel,* 177 F.3d 128, 134 (2d Cir.1999) (holding that, where an ALJ does not credit the findings of a treating physician, the claimant is entitled to an explanation of that decision).

**\*24** Thus, the "treating physician rule" is inextricably linked to the duty to develop the record. Proper application of the rule ensures that the claimant's record is comprehensive, including all relevant treating physician diagnoses and opinions, and requires the ALJ to explain clearly how these opinions relate to the final determination. In this circuit, the rule is robust. *See, e.g., Schaal,* 134 F.3d at 503–05 (remanding a case to the SSA for further development "because we are unsure exactly what legal standard the ALJ applied in weighing [the treating physician's] opinion, because application of the correct standard does not lead inexorably to a single conclusion, and because the Commissioner failed to provide plaintiff with 'good reasons' for the lack of weight attributed to her treating physician's opinion as required by SSA regulations").

Consideration of the duty to develop the record, together with the treating physician rule, produces an obligation that encompasses the duty to obtain information from physicians who can provide opinions about the claimant. *Cf. Calzada v. Astrue,* 753 F.Supp.2d 250, 277 (S.D.N.Y.2010) (citing *Perez v. Chater,* 77 F.3d 41, 47 (2d Cir.1996)) ("If the ALJ is not able to fully credit a treating physician's opinion because the medical records from the physician are incomplete or do not contain detailed support for the opinions expressed, the ALJ is obligated to request such missing information from the physician."); *Cruz,* 912 F.2d at 12 ("[W]hen the ALJ rejects the findings of a treating physician because they were conclusory or not supported by specific clinical findings, he should direct a *pro se* claimant to obtain a more detailed statement from the treating physician."). The need for such rigorous development of the record is particularly acute when claimants with mental disorders do not have an extensive medical record from the period of alleged disability. *See* SSR 85–15. Indeed, the ALJ possesses the statutory authority to request that physicians provide clarification regarding the claimant's condition during the relevant period. 42 U.S.C. § 405(d).

### B. Assessment of the ALJ's Development of Corporan's Record

#### 1. Incomplete Administrative Record

##### a. Missing Medical Documents

The administrative record contains numerous references to, but no documents for, medical events that are likely to have produced relevant records with respect to Corporan's disability claims. For the Bowen Center, the record contains only two substantive documents: Corporan's initial assessment, prepared by Dr. Pierre–Louis, and Corporan's termination summary, prepared eight months later by social worker Ogilvy. There are no records pertaining to Corporan's treatment at the Bowen Center between July 30, 2009, and March 19, 2010, despite her many visits and appointments, and there is no record from her reported first visit on July 13, 2009. For Metropolitan Hospital, Corporan's most recent source of psychiatric treatment before her hearing, there are no substantive documents in the record. For St. Luke's, there are no records with respect to Corporan's appointments on November 16, 2009, or January 11, 2010; her prescription for Maxalt; her December 2009 head MRI/CT scan; or her participation in the outpatient alcohol treatment program starting after her discharge from the Bowen Center. For FEGS, there is no record of her appointment in September 2009.

**\*25** The Court also notes that the Commissioner appears to have had no records from the Bowen Center when he first denied Corporan's application on December 11, 2009. The SSA, through its Disability Determinations Services department, requested Bowen Center records on October 5, 2009, but the Bowen Center apparently did not respond to the request. Thus, the ALJ had no Bowen Center documents before the hearing other than Dr. Pierre–Louis's August 13, 2009, wellness report prepared for

the New York City Department of Social Services, which was included in the FEGS records. When Corporan pointed out the missing records during her hearing, the ALJ said, "now that's important," and then told Corporan that he was "just going to give [her] until today or tomorrow" to obtain and deliver the Bowen Center records. (R. 35.)

Additionally, with respect to non-medical records, there likely exist records from the investigation into Corporan's home conducted by children's services. The ALJ apparently was aware of this investigation at the hearing and indicated his belief that children's services had attempted to remove Corporan's children from her care.

### b. Relevance of the Missing Records

The missing Bowen Center reports create the most significant gap in the record because of their likely probative nature and because of the lengthy period to which they pertain, which extended for eight months and began approximately two months before Corporan submitted her SSA application. The ALJ considered Dr. Pierre–Louis's initial assessment of Corporan on July 30, 2009, to be "the only record of any psychiatric evaluation in the file from an acceptable source." [17] (R. 13.) Corporan, however, was seen at least eight times by Dr. Pierre–Louis at the Bowen Center. Moreover, she attended treatment programs at the Bowen Center multiple times per week, albeit inconsistently, for eight months. Yet the only substantive reports in the record from the Bowen Center are Dr. Pierre–Louis's initial assessment and Ogilvy's termination summary eight months later. Because of this gap in the record, the Court cannot know, for instance, why, two weeks after the initial assessment, Dr. Pierre–Louis changed his original diagnosis of depression not otherwise specified to diagnoses of major depression, recurrent, and generalized anxiety disorder. Nor can the Court know why, over the course of Corporan's treatment, Dr. Pierre–Louis switched her prescription from Zoloft to Lexapro to Prozac, or added Trazodone and then tripled the dosage, or twice increased the dosage of Lexapro. Moreover, the Court has no information regarding what appear to be dozens of visits to the Bowen Center for different types of therapy and treatment, including the frequency or nature of those visits or whether Corporan's mental health improved or deteriorated over that time. Finally, there is no record from Ogilvy's follow-up with Corporan 30 days after the Bowen Center disallowed her to continue treatment, which would likely have illuminated Corporan's alcohol relapse triggered by her discharge after she had sustained nine months of sobriety.

**\*26** With respect to Metropolitan Hospital, the ALJ could have sought records from Corporan's treating physician that were probative of whether Corporan was disabled at that time, or could have sought a retrospective report probative of whether Corporan was disabled at the time of her alleged on-set date. *See Rogers v. Astrue,* 05 Civ. 7506(KMK)(LMS), 2012 WL 4473266, at \*9 (S.D.N.Y. Sept. 28, 2012) ("[I]t was legal error for the ALJ to rely on Plaintiff's lack of evidence from the relevant time period to deny benefits without first attempting to adequately develop the record, or to pursue the possibility of retrospective diagnosis.") (citations omitted); *Brown v. Apfel,* 97 Civ. 4404(JG), 1998 WL 767140, at \*4–5, n. 5 (E.D.N.Y. July 22, 1998) (holding that an ALJ's failure to request a retrospective report from a treating physician required remand where there was sparse evidence in the record from the period of the alleged disability); *Byam v. Barnhart,* 336 F.3d 172, 183 (2d Cir.2003) (holding that retrospective reports are afforded substantial weight unless contradicted by other medical evidence or by "overwhelmingly compelling" non-medical evidence). Further, an opinion report from either Metropolitan Hospital or the Bowen Center would have been highly relevant given the ALJ's consideration of the fact that "[t]he claimant did not provided [sic] opinion evidence from a treating source." (R. 13.)

The missing records from St. Luke's and FEGS are likely to be less significant than those from the Bowen Center and Metropolitan Hospital, but, given the sparse record, would still be relevant and helpful, particularly with respect to Corporan's alcohol dependence and migraine headaches. And the missing records from children's services would likely be relevant to Corporan's capacity to work, particularly as a babysitter, to Corporan's "psychosocial and environmental problems" (R. 180 (FEGS psychiatric assessment)), and to her level of stress, which is a salient consideration according to Corporan's examiners [18] and the Regulations. [19]

Finally, the missing records from the Bowen Center and Metropolitan Hospital, as well as those from St. Luke's and FEGS, were especially relevant and necessary for a full and fair hearing in light of the SSA's arrangement for Corporan to be assessed

by its consultative examiner, Dr. Alexander, in November 2009, a period for which there is no other relevant evidence in the record. Before considering an evaluation from a consultative source like Dr. Alexander, "the SSA is required to make every reasonable effort to obtain from the claimant's treating physician or other treating health care provider all medical evidence, including diagnostic tests, necessary to make the determination properly[.]" 3 Soc. Sec. Law & Prac. § 37:28 (2014) (citing 42 U.S.C. § 423(d)(5)(B)).

### c. The ALJ's Duty to Attempt to Obtain the Missing Records

The Commissioner argues that the ALJ fulfilled his duty because he was obligated to develop the record only for the 12–month period before the date Corporan filed her SSA application. [20] (Opp'n at 3.) This argument is unavailing. The ALJ's affirmative duty to personally develop Corporan's record was especially demanding because Corporan was a *pro se* claimant seeking disability benefits for a psychiatric impairment. *See Cruz,* 912 F.2d at 11; *Camilo,* 2013 WL 5692435, at \*22. Thus, the ALJ had substantial obligations to "probe into, inquire of, and explore for *all* the relevant facts," *Cruz,* 912 F.2d at 11 (emphasis supplied), and "review *all* pertinent information relative to [Corporan's psychiatric] condition," 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(E) (emphasis supplied).

**\*27**  The Regulations hold that the Commissioner "will develop your complete medical history for at least the 12 months preceding the month in which you file your application unless there is a reason to believe that development of an earlier period is necessary or unless you say that your disability began less than 12 months before you filed your application." 20 C.F.R. § 404.1512(d); *see also* 42 U .S.C. § 423(d)(5)(b) ("In making any determination with respect to whether an individual is under a disability ..., the Commissioner ... shall develop a complete medical history of at least the preceding twelve months for any case in which a determination is made that the individual is not under a disability."); *DeChirico v. Callahan,* 134 F.3d 1177, 1184 (2d Cir.1998) ("[B]y statute, the ALJ was required not only to develop [the claimant's] complete medical history for at least the twelve-month period prior to the filing of [the] application, but also to gather such information for a longer period if there was reason to believe that the information was necessary to reach a decision."). If a claimant alleges that her disability began less than 12 months before filing her application, however, the SSA "will develop your complete medical history beginning with the month you say your disability began." 20 C.F.R. § 404.1512(d)(2). Some courts in this circuit have "held that the ALJ is responsible for developing a full and complete record between the time that elapses between plaintiff's application and plaintiff's hearing date ." *Scott v. Astrue,* 09 Civ. 3999(KAM), 2010 WL 2736879, at \*14 n. 60 (E.D.N.Y. July 9, 2010) (citing *Pettey v. Astrue,* 582 F.Supp.2d 434 (W.D.N.Y.2008), and *Lisa v. Sec'y of the Dep't of Health & Human Servs.,* 940 F.2d 40, 44 (2d Cir.1991)). Additionally, if an ALJ discovers at the hearing that material evidence is missing from the record, the ALJ "may stop the hearing temporarily and continue it at a later date" and "may also reopen the hearing at any time before he or she mails a notice of the decision in order to receive new and material evidence." 20 C.F.R. § 404.944; *see also McClesky v. Astrue,* 606 F.3d 351, 354 (7th Cir.2010) (observing that the SSA encourages claimants to submit relevant post-hearing evidence, that post-hearing evidence is commonly considered in social security disability cases, and that "[t]he implication [of the SSA's guidance to claimants] is that evidence can be submitted up to the date an ALJ decision is issued") (internal quotations marks omitted).

The ALJ here had a duty to develop Corporan's record up to the hearing, which includes attempting to obtain evidence he learned about during the hearing. In sum, the Regulations establish only a minimally acceptable national standard for the duration of an ALJ's obligation to develop the record and in fact require an extended period of development where that period would be reasonably expected to produce information necessary for a decision; the Regulations allow for particular flexibility where the claimant files an application less than 12 months after she becomes disabled, in which case the month the application was filed is not used to measure the period of an ALJ's duty; some courts in the Second Circuit require the ALJ generally to develop the record up until the date of the hearing; and the SSA encourages and ALJs routinely consider post-hearing evidence, including evidence submitted up until the time of the decision. Further, this case is not a "closed period case" (R. 78), making it less reasonable to apply a strict 12–month period to the ALJ's duty to develop the record. [21] Therefore, if an ALJ's heightened duty to develop the record for a *pro se* claimant alleging a psychiatric impairment means anything, it must mean a duty to develop the record beyond a three-month period during which a paucity of relevant records were produced, particularly where there are strong indications of probative documents missing from the record. *Cf. Brown,* 709 F.Supp.2d at 257 (finding that the ALJ's

duty to obtain records did not extend beyond the 12–month period preceding the application filing date, but noting that the claimant was represented by counsel, that the reports at issue were from a physician whose "extensive records ... for the relevant time period" were already contained in the record, and that the nature of the claimed disability was physical).

 **\*28**  Here, the ALJ found that the record contained only one acceptable psychiatric evaluation, the initial assessment from the Bowen Center. In the case of mental disabilities, "[t]he results of a single examination may not adequately describe [the claimant's] sustained ability to function. It is, therefore, vital that we review all pertinent information relative to [the claimant's] condition, especially at times of increased stress." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(E). The ALJ erred by not seeking additional records from the Bowen Center where only two reports were produced for eight months of treatment, and where the evidence showed that Corporan met at least eight times with Dr. Pierre–Louis, who on multiple occasions modified Corporan's psychotropic medications and changed her diagnoses. [22] The Commissioner contends that, despite there being no records for almost the entirety of Corporan's treatment at the Bowen Center, an intake report and a social worker's termination summary constitute a "fully developed [record] ... adequate to support the ALJ's determination." (Opp'n at 3.) The Commissioner's contention is plainly insupportable and relies on a definition of "adequate" that bears no relationship to the Regulations or case law. In fact, not only did the ALJ not "fulfill his affirmative obligation to assist this *pro se* claimant in developing her case," *Eiden v. Sec'y of Health, Ed. & Welfare,* 616 F.2d 63, 65 (2d Cir.1980), he impeded Corporan from developing her case by giving her only one day to obtain and deliver the Bowen Center records, despite noting that the missing records were "important" and despite Corporan's statement that it is difficult to get records timely from the Bowen Center. [23]

Similarly, the ALJ erred by not attempting to procure current records from Metropolitan Hospital after Corporan told him during the hearing that she recently began treatment with one of the hospital's psychiatrists. Further, even if the ALJ erroneously considered the relevant disability period to have ended at the time Corporan filed her application, he could have requested a retrospective report probative of whether Corporan was disabled during that period. Despite the Commissioner's contention otherwise, a Verification of Appointment form, addressed to "Whom It May Concern" and stating only that the claimant "kept his/her appointment" (R. 118), does not constitute "notes from the hospital clinic" and "up-to-date ... hospital records" (Opp'n at 3). *Cf. Calzada,* 753 F.Supp.2d at 278 ("Among the many deficiencies in the administrative record, it is notable that a number of the medical examinations performed by plaintiff's treating physicians ... over the course of his alleged disability are represented in the record only by letters addressed to 'whom it may concern.' ... The fact that the medical evidence in the administrative record varies between full medical reports and limited cover letters should have raised a red flag as to the record's incompleteness and triggered the ALJ's duty to supplement the record."). Additionally, before considering that Corporan did not provide "opinion evidence from a treating source" in his allocation of weight to different items of evidence, the ALJ had the duty to at least attempt to procure such evidence. (R. 13.)

 **\*29**  Finally, the ALJ erred by not attempting to obtain the missing medical reports before considering the report of Dr. Alexander, the consultative examiner who assessed Corporan on November 11, 2009. *See* 42 U.S.C. § 423(d)(5)(B). Had the ALJ developed the administrative record adequately, Corporan's health during this period would likely have been clarified by a retrospective report from Metropolitan Hospital and by Bowen Center records regarding Corporan's counseling and alcohol treatment, her November appointment with Dr. Pierre–Louis, and her December appointment with Dr. Pierre–Louis, at which he increased Corporan's dosage for both Lexapro and Trazodone. St. Luke's records would also have helped to illuminate this period, particularly with respect to Corporan's treatment for migraine headaches, her prescription for Maxalt, and her head CT scan. Thus, the ALJ erred by affording "significant weight" to a consultative examiner (R. 13) without making any effort to first obtain pertinent medical evidence from treating sources that was conspicuously missing from the record. 42 U.S.C. § 423(d)(5)(B).

The ALJ's failure to develop fully Corporan's record left substantial gaps in the evidence and deprived Corporan of a full and fair hearing. The ALJ did not meet the minimum requirements of his enhanced duty "to develop a complete medical record before making a disability determination," *Pratts,* 94 F.3d at 37, which included "mak[ing] every reasonable effort to help [Corporan] get medical reports from [her] own medical sources," 20 C.F.R. § 404.1512(d), and personally requesting missing information from Corporan's treating physicians, *Perez,* 77 F.3d at 47. [24] In light of the doubly heightened duty imposed on

Corporan v. Commissioner of Social Sec., Not Reported in F.Supp.3d (2015)

the ALJ to conduct a full and fair hearing based on a complete record here, the inadequately developed administrative record compels remand. *See Pratts,* 94 F.3d at 39; *Vega v. Astrue,* 08 Civ. 1525(LAP) (GWG), 2010 WL 2365851, at *2 (S.D.N.Y. June 10, 2010) (stating that, where a claimant is *pro se,* the ALJ must " 'explore for all relevant facts' " and, "[i]f the ALJ has not discharged this duty, leaving gaps in the record, the Court of Appeals has, 'on numerous occasions, remanded to the [Commissioner] for further development of the evidence' ") (quoting *Cruz,* 912 F.2d at 11, and *Atkinson v. Barnhart,* 87 F. App'x 766, 768 (2d Cir.2004)). In the absence of a complete record and a full and fair hearing, the Court cannot determine whether the ALJ's conclusions are supported by substantial evidence and thus must remand for further development. *Moran,* 569 F.3d at 110; *Pratts,* 94 F.3d at 39. [25]

## 2. Disregarded Medical Evidence

In the ALJ's decision, he briefly referred to Corporan's treatment at FEGS on June 9, 2009. [26] He made no references, however, to Dr. Farrat's two examinations or to Corporan's Phase II psychiatric assessment on June 22, 2009. The ALJ's summary of the 70 pages of FEGS records appears to be based entirely on two pages—R. 167 and R. 168—which consist of notes from the social worker, Kaynor. The ALJ erred by, with no explanation, failing to mention Dr. Farrat's two examinations and the Phase II psychiatric assessment. [27] These three examinations at FEGS resulted in diagnoses of major depressive disorder, recurrent, generalized anxiety disorder, and alcohol use, in addition to relevant findings, such as that Corporan feared she might again attempt to commit suicide and that her recent and remote memory was not intact.

**\*30** Further, as of August 13, 2009, Dr. Pierre–Louis diagnosed Corporan with major depressive disorder, recurrent, and generalized anxiety disorder, in apparent agreement with the FEGS Phase II examiner and Dr. Farrat, who also diagnosed her with alcohol use. Yet, with no explanation, the ALJ in his decision found that Corporan's impairments were "depressive disorder, not otherwise specified, alcohol dependence and headaches," never mentioning major depressive disorder, recurrent, or generalized anxiety disorder. (R. 9.) The ALJ appears to have disregarded the diagnoses of Corporan's treating physicians and instead directly recited the impairments found by Dr. Alexander, a psychologist acting as the SSA's consultative examiner.

Finally, the Court notes that, even if the ALJ had provided a reasonable explanation for disregarding the diagnoses of Dr. Pierre–Louis, Dr. Farrat, and the FEGS Phase II examiner, he would still have been obligated to afford Corporan the opportunity to obtain supplemental statements from the treating physicians before disregarding their opinions. *Cruz,* 912 F.2d at 12 ("We have repeatedly stated that when the ALJ rejects the findings of a treating physician because they were conclusory or not supported by specific clinical findings, he should direct a *pro se* claimant to obtain a more detailed statement from the treating physician."); *Hankerson v. Harris,* 636 F.2d 893, 896 (2d Cir.1980) ("Before the ALJ can reject an opinion of a *pro se* claimant's treating physician because it is conclusory, basic principles of fairness require that he inform the claimant of his proposed action and give [the claimant] an opportunity to obtain a more detailed statement.") Corporan was denied a full and fair hearing as a result of the ALJ's clear violation of the treating physician rule. 20 C.F.R. § 404.1527(c)(2–6). This action must therefore be remanded on this ground. *Halloran,* 362 F.3d at 33; *Snell,* 177 F.3d at 134.

## 3. Ambiguous Work History

The ALJ's duty to develop the record includes resolving known ambiguities in the record that may bear on the ALJ's disability determination. *See Camilo,* 2013 WL 5692435, at *22 ("[I]t is the ALJ's duty to develop the record and resolve any known ambiguities[.]"); *cf.* 42 U.S.C. § 405(d) (explaining that the duty to develop the record applies to "any matter under investigation"). This includes developing the record and resolving significant ambiguities relating to a claimant's work history, particularly when the claimant is *pro se. See, e.g., Rivera v. Barnhart,* 379 F.Supp.2d 599, 605 (S.D.N.Y.2005) (remanding for failure to develop fully the record with regard to the claimant's work history); *Warren v. Astrue,* 12 Civ. 6043, 2013 WL 425938, at *2 (W.D.N.Y. Feb.1, 2013) (finding that an ALJ has a heightened duty in *pro se* cases to develop the record with respect to employment history and earnings); *Williams v. Mathews,* 427 F.Supp. 63, 66 (S.D.N.Y.1976) (remanding where ALJ failed to subpoena employment records from uncooperative employer and then held against claimant for lack of evidence).

**\*31**  Factual errors require remand when there is insufficient information in the record to support the ALJ's position without the disputed fact. *See, e.g., Cruz v. Barnhart,* 04 Civ. 9011(GWG), 2006 WL 1228581, at \*10 n. 6 (S.D.N.Y. May 8, 2006). When the record leaves significant facts of a case ambiguous, the record is rendered inadequate and the reviewing court is unable find whether the ALJ's decision is supported by substantial evidence. *See, e.g., Pratts,* 94 F.3d at 38 (holding that a factual error involving a missing portion of a transcript required remand because the ALJ's conclusions were not corroborated by the full record); *Valerio v. Comm'r of Soc. Sec.,* 08 Civ. 4253(CPS), 2009 WL 2424211, at \*15 (E.D.N.Y. Aug. 6, 2009). Remand due to factual mistakes is unnecessary only where the excluded evidence is duplicative of the evidence considered or correct application of legal principles could lead to only one conclusion. *Zabala,* 595 F.3d at 409.

Here, the ALJ determined that Corporan was not disabled at step four of the evaluation, which inquired whether, despite Corporan's severe impairments, she had the residual functional capacity to perform her past work. Corporan's work history was thus critical to the ALJ's decision to deny her benefits. The only employment information in the record comes from Corporan's vague and often contradictory statements, many of which were made at a time when her memory was functioning erratically. The ALJ found that Corporan was not disabled because she was "capable of performing past relevant work as a babysitter." (R. 14–15.) Corporan has stated that she worked as a babysitter at some point in 2009, or possibly 2008, for three hours per day, four days per week, earning \$17.00 a day. She has also stated that the only job she had after 2007 was as a housekeeper, and that she had not worked for two years prior to the October 7, 2010 hearing. The ALJ did not ask Corporan any questions about specific jobs during the hearing; he only asked, "what kind of work did you do from 1999 to about 2008 or so?" (R. 26.)

To be considered "past work" at step four of the evaluation, a job must have been "substantial gainful activity" during the past 15 years and must have "lasted long enough for [the claimant] to learn how to do it." 20 C.F.R. § 404.1560(b)(1). A job in 2009 was considered "substantial gainful activity" if it paid at least \$980.00 per month. Based on the information contained in the record, Corporan earned approximately \$292.40 [28] per month from babysitting in 2009, well below the minimum for substantial gainful activity. Additionally, "past work" does not include "unsuccessful work attempts," which are defined in part as work that the claimant was "forced to stop" due to the impairment within either three months or six months, depending on certain factors. *See* SSR 05–02, 2005 WL 568616, at \*1–3, (Feb. 28, 2005). Therefore, the evidence shows that babysitting was not substantial gainful activity and leaves ambiguous whether babysitting constituted an unsuccessful work attempt.

**\*32**  The ALJ concluded that Corporan was capable of performing her babysitting job "as she actually performed it" (R. 14), despite having no information as to how, in practice, she actually performed it, or when and for what duration she actually performed it. The ALJ declined to seek this critical information as he was authorized to do under the Regulations. *See* 20 C.F.R. § 404.1565(b) ("Under certain circumstances, we will ask you about the work you have done in the past. If you cannot give us all of the information we need, we may try, with your permission, to get it from your employer or other person who knows about your work, such as a member of your family or a co-worker."). Further, despite finding that Corporan had a limitation requiring any work to be "in a low stress environment" (R. 10), the ALJ justified his conclusion that Corporan could work as a babysitter by citing only Corporan's ability to lift up to 50 pounds, a requirement under the U.S. Department of Labor's definition of "child monitor" (R. 14). The ALJ did not explain how babysitting was work "in a low stress environment," particularly given the extent to which Corporan relies on help from her mother and her teenage son to care for her daughter.

The Commissioner argues that, even if the ALJ erred in finding "babysitter" to be Corporan's relevant past work for step four of the evaluation, "the record demonstrates that [Corporan] had other past jobs that would qualify as past relevant work." (Opp'n at 6.) Courts may find remand unnecessary where an ALJ's factual error was not significant, *Cruz,* 2006 WL 1228581, at \*10 n. 6, or where the records an ALJ overlooked would not have changed the ALJ's determination, *Zabala,* 595 F.3d at 409. The Court is not aware, however, of any cases affirming an ALJ's denial of disability benefits on grounds that the ALJ never discussed and on which the Commissioner did not rely in her original decision or her motion for judgment on the pleadings, but raises for the first time in an opposition brief. Were the Court inclined to do so here, such a determination would be impossible in light of lack of clear information on any of Corporan's past jobs. Therefore, due to the inadequately developed record with respect to Corporan's work history, the Court cannot determine whether substantial evidence supports the ALJ's finding at step four that Corporan is not disabled.

## CONCLUSION

For the foregoing reasons, the Court recommends that the Commissioner's motion for judgment on the pleadings be DENIED, and that Corporan's motion for judgment on the pleadings be GRANTED. The Court recommends REMAND for further development of the administrative record.

* * *

## NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. *See also* Fed.R.Civ.P. 6(a), (d) (adding three additional days when service is made under Fed.R.Civ.P. 5(b)(2) (C), (D), (E), or (F)). A party may respond to another party's objections within fourteen days after being served with a copy. Fed.R.Civ.P. 72(b)(2). Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable J. Paul Oetken at the Thurgood Marshall Courthouse, 40 Foley Square, New York, New York 10007, and to any opposing parties. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Oetken. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(b), 72(b); *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

**\*33  SO ORDERED.**

DATED: March 27, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 321832

---

## Footnotes

1    In its brief, the Commissioner objects that the Report imposed "a 'doubly heightened duty' on the Commissioner to develop the record whenever a claimant asserts disability based on a mental impairment." (Def. Obj., at 4.) This mischaracterizes the Report. The Report clearly premised the ALJ's "doubly heightened duty" on the nature of Corporan's alleged impairment *and* the absence of counsel on her part at the ALJ hearing. (Report, at 26–28; *see also id.* at 34, 36, 39.)

2    The Report rightly notes that the ALJ was required to resolve this ambiguity in the record. (*Id.* at 40–41 n. 27.)

3    The Report states that, the Phase II evaluation aside, Dr. Farrat conducted "two examinations" of Corporan. (Report, at 40.) However, the record suggests that Corporan had only two examinations at FEGS: one on June 10, by Dr. Farrat, and a Phase II evaluation on June 22, by Dr. Farrat or another physician. (*See* AR, at 174–76 .)

4    The Commissioner points to the fact that, even in her own brief, Corporan "does not allege that Dr. Farrat was a treating physician." (Def. Obj., at 9.) The Court does not share that reading of Corporan's brief. (*See* Dkt. No. 35, Memorandum

of Law in Support of Plaintiff's Cross–Motion for Judgment on the Pleadings, at 24–25 ("The ALJ compounded his error in failing to seek medical information about Ms. Corporan from *treating mental health sources,* by ignoring, in large part, the results of an extensive evaluation of Ms. Corporan undertaken by the FEGS/WeCARE group.") (emphasis added).)

5    It appears that the ALJ's error was based on his mistaken belief that the FEGS records consisted exclusively of reports by social workers, not physicians. (Report at 41, n. 27.)

6    Indeed, the Commissioner's own difficulty in procuring the records from the Bowen Center makes the ALJ's failure to give Corporan greater leeway all the more problematic. (Report at 38, n. 23.)

7    The Commissioner argues that, by twice requesting records from the Bowen Center, it made "every reasonable effort" to obtain the relevant documents. (Def. Obj., at 11 (citing 20 C.F.R. §§ 404.1512(d), 416.912(d)).) But the regulations spell out only minimum requirements. Where, as here, a doubly heightened duty applies, greater efforts are necessary. *Cf. Jones v. Apfel,* 66 F.Supp.2d 518, 523–24 (S.D.N.Y.1999) ( " 'Every reasonable effort' has been defined by the regulations to require an initial request for medical evidence from the medical source, and a follow-up request, followed by a ten-day extension, if the requested evidence has not been received within ten to twenty calendar days. However, in cases involving pro se plaintiffs, this affirmative duty is heightened. The ALJ must take all reasonable steps to obtain past and current medical evidence and assessments from treating sources identified by a pro se plaintiff, in order to complete the administrative record. 'Reasonable efforts' in this context entails more than merely requesting reports from the treating physicians. It includes issuing and enforcing subpoenas requiring the production of evidence, as authorized by 42 U.S.C. § 405(d), and advising the plaintiff of the importance of the evidence. The ALJ must also enter these attempts at evidentiary development into the record.") (citations omitted).

1    Because the definition of "disabled" governing eligibility for benefits is the same for Disability Insurance Benefits and Supplemental Security Income, the Court uses the term "disability benefits" in this report to refer to both. *See Chico v. Schweiker,* 710 F.2d 947, 948 (2d Cir.1983) (referring to "disability insurance benefits" because Supplemental Security Income regulations mirror Disability Insurance Benefits regulations); *Calzada v. Astrue,* 753 F.Supp.2d 250, 266–67 (S.D.N.Y.2010) (same).

2    Corporan submitted additional SSA application forms on October 10, 2009.

3    Corporan has stated at different times that she worked for an insurance company in 2007 as a "customer service" worker (R. 99, 102), a "receptionist" (R. 165), and a "telemarketer" (R. 83). These references all appear to be different titles that refer to the same job.

4    The Court assumes that Corporan intended to mark "per hour" instead of "per week" on the application form.

5    United States National Library of Medicine, http:// www.ncbi.nlm .nih.gov/pubmedhealth (last visited Mar. 17, 2014).

6    The administrative record contains St. Luke's records generated between May and October 2009. Facts related to Corporan's treatment at St. Luke's not occurring within this period are taken from statements made by Corporan or healthcare providers that are reported in other medical records.

7    Corporan stated that her head CT scan was conducted after she submitted her previous disability report on December 16, 2009. This appears to be her second head CT scan, as there are references in other medical records to a negative head CT scan conducted around October 2008. (*See* R. 196 (St. Luke's doctor's notes dated October 29, 2009, stating "Negative CT head one year ago").)

8    Corporan has not been diagnosed with HIV but was concerned due a former boyfriend's positive diagnosis.

9    GAF refers to a person's overall level of functioning and is assessed using a scale that provides ratings in ten ranges, with higher scores reflecting greater functioning. *See* DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM–IV–TR") 27 (4th ed. Text Revision 2000). The GAF scale was removed for the fifth edition of the

DSM, which was published in 2013, because of the GAF's "conceptual lack of clarity" and "questionable psychometrics in routine practice." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM–V–TR") 16 (5th ed.2013). In addition, before the DSM–V abandoned the GAF scale, the SSA declined to endorse GAF scores for "use in the Social Security and SSI disability programs" because GAF scores have no "direct correlation to the severity requirements in [the SSA's] mental disorders listings." *Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury,* 65 Fed.Reg. 50746–01, 50764–65, 2000 WL 1173632 (August 21, 2000); *see also Santiago v. Colvin,* 12 Civ. 7052(GBD)(FM), 2014 WL 718424, at *20 n. 10 (S.D.N.Y. Feb. 25, 2014) (citing *id.*) ("The [SSA] Commissioner has made clear that the GAF scale does not have a direct correlation to the severity requirements contained in the [regulations] that the ALJ considers [to determine whether the claimant has a *per se* disability].").

10  Corporan refers to this facility as the "Upper Manhattan Mental Health Center" in the hearing transcript and in various record documents. Forms used by the Bowen Center note that the facility goes by both names. (*See, e.g.,* R. 253.)

11  According to Corporan, her first visit to the Bowen Center was on July 13, 2009, but there is no other information regarding this visit or confirming that date.

12  The Bowen Center records do not indicate how frequently Corporan attended or was supposed to attend sessions, only that she was terminated from the program for being absent for "30+ days." (R. 253.) In November 2009, Corporan told a psychologist outside the Bowen Center that she had been attending sessions at a program four times per week.

13  "Major depression, recurrent" is distinguished from "depressive disorder, not otherwise specified." Examples of "depressive disorder, not otherwise specified" include minor depressive disorder, recurrent brief depressive disorder, and "[s]ituations in which the clinician has concluded that a depressive disorder is present but is unable to determine whether it is primary, due to a general medical condition, or substance induced ." DSM–IV–TR at 381–82. *Accord* Jerry Von Talge, Ph.D., *Major Depressive Disorder* § 26, 26 Am.Jur. Proof of Facts 3d 1 (updated February 2014) (citing DSM–IV–TR) ("The diagnosis depressive disorder not otherwise specified may be appropriate for presentations of depressed mood with clinically significant impairment that do not meet criteria for duration or severity.").

14  "Residual functional capacity" is, as one court put it, "the bureaucratic term for ability to work." *Bjornson v. Astrue,* 671 F.3d 640, 645 (7th Cir.2012).

15  To clarify, before the hearing, the file provided to the ALJ contained Dr. Pierre–Louis's two-page "Wellness Plan Report" prepared for the New York City Department of Social Services; all other Bowen Center records were faxed to the ALJ the day after the hearing.

16  The ALJ's finding is taken verbatim from a "template ... drafted by the Social Security Administration for insertion into any administrative law judge's opinion to which it pertains" *Bjornson v. Astrue,* 671 F.3d 640, 644–45 (7th Cir.2012) (internal quotation marks omitted).

17  The term "acceptable source" refers to acceptable medical sources "who can provide evidence to establish an impairment." 20 C.F.R. § 404.1513(a). The Regulations' listing of acceptable medical sources includes licensed physicians as well as licensed or certified psychologists. *Id.* § 404.1513(a)(1–2). Social workers and therapists who are not licensed psychologists are considered "other sources" whose reports may be considered "to show the severity of [a claimant's] impairment(s) and how it affects [a claimant's] ability to work." *Id.* § 404.1513(d). *See also Santiago v. Colvin,* 12 Civ. 7052(GBD)(FM), 2014 WL 718424, at *3, 20 (S.D.N.Y. Feb. 25, 2014) ("[T]herapists ... are not considered 'medical sources' under the Regulations. The ALJ thus may use their opinions to help her understand the effects of the claimant's impairments on his capacity to work, but need not afford them the controlling weight that ordinarily attaches to a treating physician's opinion.") (internal citations omitted).

18  *See* R. 180 (finding a moderate functional impairment in adapting to stressful situations (FEGS psychiatric assessment)); R. 221 (finding that Corporan can only "deal with limited amounts of stress at the current time" (Dr. Alexander)).

19    *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(E) (stating that it is especially important for the SSA to consider information regarding a claimed psychiatric impairment "at times of increased stress"); SSR 85–15 (stating that "determining whether these individuals [claiming psychiatric impairments] will be able to adapt to the ... stress of the workplace is often extremely difficult" and noting that such individuals, when not working, may be in structured settings where they are able to "lower[ ] psychological pressures").

20    The Commissioner does not identify a specific date, but is likely referring to either September 24, 2009, when Corporan filed the first part of her application, or October 10, 2009, when she filed additional components of her application.

21    "A closed period of disability refers to when a claimant is 'found to be disabled for a finite period of time which started and stopped prior to the date of the administrative decision granting disability status.' " *Carbone v. Astrue,* 08 Civ. 2376(NGG), 2010 WL 3398960, at \*13 n. 12 (E.D.N.Y. Aug. 26, 2010) (quoting Alan G. Skutt, Annotation, *Social Security: Applicability of Medical–Improvement Standard in Determining Continuing Eligibility for Disability Benefits to "Closed Period" Beneficiaries,* 93 A.L .R. Fed. 161 (1989)).

22    Even if the Court were to accept the Commissioner's argument that the ALJ did not have a duty to develop the record after the application filing date, the ALJ still would have erred by not seeking Bowen Center records for August and September 2009, during which time Corporan was treated by Dr. Pierre–Louis and attended many counseling sessions.

23    In allowing Corporan only one day to obtain the Bowen Center records, the ALJ presumably expected her to be more effective than the SSA, which requested Bowen Center records on October 5, 2009, and apparently was still waiting for them at the time of the hearing over a year later.

24    A document enumerating the SSA's requested records and the ALJ's "List of Exhibits" attached to his decision show that the ALJ did not obtain any evidence to add to the record.

25    The Commissioner argues that Corporan's "speculation as to the existence of additional records is not a basis for finding that the ALJ did not properly develop the record[.]" (Opp'n at 4.) The Court acknowledges that records may not exist with respect to several of the medical events referenced in this section of the report, particularly where those events were indicated only by dates Corporan included in her application. Nevertheless, there are strong indications that many of the pertinent records referenced do exist and, even if they do not, the ALJ had the duty to discover that information in his attempts to obtain them.

26    Corporan had her initial FEGS appointment on June 9, but the examinations appear to have begun on June 10.

27    As noted, there is an ambiguity in the record as to who conducted the FEGS Phase II psychiatric assessment, an ambiguity that the ALJ was obligated to resolve in order to determine the weight to afford the assessment. Additionally, if, as it appears, the ALJ mistakenly believed that the FEGS records were all reports by social workers, and not physicians, "[s]uch an error ordinarily requires remand to the ALJ for consideration of the improperly excluded evidence, at least where the unconsidered evidence is significantly more favorable to the claimant than the evidence considered." *Zabala v. Astrue,* 595 F.3d 402, 409 (2d Cir.2010).

28    This figure, submitted by Corporan, is calculated using 4.3 weeks per month. (*See* Corporan Mot. at 19.)

---

**End of Document**                                                © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 103 of 223
Monique Danielle W. v. Commissioner of Social Security, Not Reported in Fed. Supp....
2019 WL 2358529, 268 Soc.Sec.Rep.Serv. 46

2019 WL 2358529
United States District Court, N.D. New York.

MONIQUE DANIELLE W., Plaintiff,
v.
COMMISSIONER OF SOCIAL SECURITY, Defendant.

5:18-CV-184
|
Signed 06/04/2019

**Attorneys and Law Firms**

OF COUNSEL: KENNETH R. HILLER, ESQ., JUSTIN M. GOLDSTEIN, ESQ., LAW OFFICES OF KENNETH, HILLER, PLLC, 6000 North Bailey Avenue, Suite 1A, Amherst, NY 14226, Attorneys for Plaintiff.

OF COUNSEL: PRASHANT TAMASKAR, ESQ., Special Ass't United States Attorney, OFFICE OF REGIONAL GENERAL COUNSEL, SOCIAL SECURITY ADMINISTRATION, REGION II, 26 Federal Plaza, Room 3904, New York, NY 10019, Attorneys for Defendant.

<u>**MEMORANDUM–DECISION and ORDER**</u>

DAVID N. HURD, United States District Judge

**I. <u>INTRODUCTION</u>**

**\*1** Plaintiff Monique Danielle W.[1] ("Monique" or "plaintiff") brings this action seeking review of defendant Commissioner of Social Security's ("Commissioner" or "defendant") final decision denying her applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). Both parties have filed their briefs, and defendant has filed the Administrative Record on Appeal. The motions will be considered on the basis of these submissions without oral argument.[2]

**II. <u>BACKGROUND</u>**

On November 18, 2014,[3] Monique filled applications for SSI and DIB alleging that her various physical and mental impairments rendered her disabled beginning on July 11, 2012. R. at 216-30, 242, 246.[4] Plaintiff's consolidated claim was initially denied on January 26, 2015. *Id.* at 148-55.

At Monique's request, a video hearing was held before Administrative Law Judge ("ALJ") David J. Begley on September 20, 2016. R. at 94-123. Plaintiff, represented by non-attorney James M. Redmond, appeared and testified. *Id.* The ALJ also heard testimony from Vocational Expert ("VE") Alissa Smith. *Id.*

Thereafter, the ALJ issued a written decision denying Monique's application for benefits through January 11, 2017, the date of his decision. R. at 10-24. The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review. *Id.* at 1-3.

**III. <u>DISCUSSION</u>**

**A. <u>Standard of Review</u>**

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 104 of 223

Monique Danielle W. v. Commissioner of Social Security, Not Reported in Fed. Supp....
2019 WL 2358529, 268 Soc.Sec.Rep.Serv. 46

A court's review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence and the correct legal standards were applied. *Poupore v. Astrue*, 566 F.3d 303, 305 (2d Cir. 2009) (per curiam). "Substantial evidence means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Id.* (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

If the Commissioner's disability determination is supported by substantial evidence, that determination is conclusive. *See Williams*, 859 F.2d at 258. Indeed, where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's decision must be upheld—even if the court's independent review of the evidence may differ from the Commissioner's. *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982); *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992).

**\*2** However, "where there is a reasonable basis for doubting whether the Commissioner applied the appropriate legal standards," the decision should not be affirmed even though the ultimate conclusion reached is arguably supported by substantial evidence. *Martone v. Apfel*, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

## B. Disability Determination—The Five-Step Evaluation Process

The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In addition, the Act requires that a claimant's:

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

*Id.* § 423(d)(2)(A).

The ALJ must follow a five-step evaluation process in deciding whether an individual is disabled. *See* 20 C.F.R. §§ 404.1520, 416.920. At step one, the ALJ must determine whether the claimant has engaged in substantial gainful activity. A claimant engaged in substantial gainful activity is not disabled, and is therefore not entitled to benefits. *Id.* §§ 404.1520(b), 416.920(b).

If the claimant has not engaged in substantial gainful activity, then step two requires the ALJ to determine whether the claimant has a severe impairment or combination of impairments which significantly restricts his physical or mental ability to perform basic work activities. *Id.* §§ 404.1520(c), 416.920(c).

If the claimant is found to suffer from a severe impairment or combination of impairments, then step three requires the ALJ to determine whether, based solely on medical evidence, the impairment or combination of impairments meets or equals an impairment listed in Appendix 1 of the regulations (the "Listings"). *Id.* §§ 404.1520(d), 416.920(d); *see also id.* Pt. 404, Subpt.

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 105 of 223

Monique Danielle W. v. Commissioner of Social Security, Not Reported in Fed. Supp....

2019 WL 2358529, 268 Soc.Sec.Rep.Serv. 46

P, App. 1. If the claimant's impairment or combination of impairments meets one or more of the Listings, then the claimant is "presumptively disabled." *Martone*, 70 F. Supp. 2d at 149 (citing *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984)).

If the claimant is not presumptively disabled, step four requires the ALJ to assess whether—despite the claimant's severe impairment—he has the residual functional capacity ("RFC") to perform his past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). The burden of proof with regard to these first four steps is on the claimant. *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996) (citing *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983)).

If it is determined that the claimant cannot perform his past relevant work, the burden shifts to the Commissioner for step five. *Perez*, 77 F.3d at 46. This step requires the ALJ to examine whether the claimant can do any type of work. 20 C.F.R. §§ 404.1520(g), 416.920(g).

**\*3** The regulations provide that factors such as a claimant's age, physical ability, education, and previous work experience should be evaluated to determine whether a claimant retains the RFC to perform work in any of five categories of jobs: very heavy, heavy, medium, light, and sedentary. *Perez*, 77 F.3d at 46 (citing 20 C.F.R. § 404, Subpt. P, App. 2).

"[T]he Commissioner need only show that there is work in the national economy that the claimant can do; [she] need not provide additional evidence of the claimant's residual functional capacity." *Poupore*, 566 F.3d at 306 (citing 20 C.F.R. § 404.1560(c)(2)).

## C. ALJ's Decision

Applying the five-step disability determination process, the ALJ found that: (1) Monique had not engaged in any substantial gainful activity since July 11, 2012, the alleged onset date; (2) plaintiff's myalgia/arthralgia, obesity, depression, and anxiety were severe impairments within the meaning of the Regulations; and (3) these impairments, whether considered individually or in combination, did not meet or equal any of the Listings. R. at 12-14.

At step four, the ALJ determined that Monique's impairments caused exertional, non-exertional, and environmental limitations. R. at 15-16. In particular, the ALJ found that plaintiff retained the RFC to:

> perform light work ... except [she] should not be expected to climb ladders, ropes or scaffolds, but she may occasionally perform activities that require her to climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. Additionally, [plaintiff] should avoid concentrated exposure to extreme cold, to humidity and wetness. She should avoid hazardous machinery, unprotected heights and open flames. [Plaintiff] is further limited to simple, routine and repetitive tasks, and she should have only occasional interaction with coworkers, supervisors and the general public.

*Id.*

Next, the ALJ determined that these limitations precluded Monique from performing her past relevant work as a "data entry clerk," as a "telephone solicitor," or as a "cashier/checker." R. at 22.

However, the ALJ found that Monique's RFC, considered together with her age and education, allowed her to perform jobs such as "price marker," "routing clerk," and "garment sorter." R. at 22-23. Because these jobs fit in with plaintiff's assessed limitations and were present in sufficient numbers in the national economy, the ALJ concluded plaintiff was not disabled during the relevant time period. *Id.* at 23-24. Accordingly, the ALJ denied plaintiff's application for benefits.

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 106 of 223

Monique Danielle W. v. Commissioner of Social Security, Not Reported in Fed. Supp....

2019 WL 2358529, 268 Soc.Sec.Rep.Serv. 46

#### D. **Monique's Appeal**

Monique contends the ALJ's rejection of her fibromyalgia ("FM") as a "severe" impairment at step two "tainted" the entire sequential analysis. Pl.'s Mem. at 13.[5] The Commissioner responds that the ALJ evaluated plaintiff's alleged FM using the appropriate standards and guidance set forth in Social Security Ruling ("SSR") 12-2p.

At step two, the ALJ must determine whether a claimant has one or more "severe" impairments that significantly limits his or her physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). These so-called "basic work activities" include "walking, standing, sitting, lifting, carrying pushing, pulling, reaching, handling, seeing, hearing, speaking, understanding, remembering and carrying out simple instructions, using judgment, and responding appropriately to supervision, co-workers, and usual work situations." *Brown v. Comm'r of Soc. Sec.*, 2017 WL 2312914, at *5 (N.D.N.Y. May 26, 2017) (Suddaby, J.).

 **\*4**  As a general matter, this step of the sequential evaluation process sets a low bar that is intended only to screen out disability claims based on *de minimis* impairments. *See, e.g., Zenzel v. Astrue*, 993 F. Supp. 2d 146, 152 (N.D.N.Y. 2012) (Kahn, J.) (adopting Report & Recommendation of Bianchini, M.J.).

Even so, the "mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment," is insufficient to render a condition "severe" within the meaning of the Regulations. *Zenzel*, 993 F. Supp. 2d at 152 (quoting *Coleman v. Shalala*, 895 F. Supp. 50, 53 (S.D.N.Y. 1995)).

Rather, the burden at this step falls on the claimant to identify how the particular symptomatology stemming from the impairment claimed to be "severe" actually works to "significantly limit" his physical or mental ability to complete "basic work activities." *Lake v. Colvin*, 2016 WL 2757750, at *4 (N.D.N.Y. May 12, 2016).

Monique's principal argument on appeal is that the ALJ improperly rejected her FM diagnosis at step two. According to plaintiff, this early-stage error caused a cascade of problems at the later steps of the analysis. The Commissioner responds that the ALJ properly rejected plaintiff's claim because, in essence, her treatment providers failed to rule out other possible diagnoses. Def.'s Mem. at 7-8.

Fibromyalgia is an "elusive and mysterious" disease. *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996) (Posner, J.). "Its cause or causes are unknown, there is no cure and, of greatest importance to disability law, its symptoms are entirely subjective." *Id.* Unlike the vast majority of other impairments that come up in disability proceedings, "[t]here are no laboratory tests for the presence or severity of fibromyalgia." *Id.*; *see also Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003) ("[T]here are no objective tests which can conclusively confirm the disease." (citation omitted)).

"In stark contrast to the unremitting pain of which fibrositis patients complain, physical examinations will usually yield normal results—a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions." *Lisa v. Sec'y of Dep't of Health & Human Servs.*, 940 F.2d 40, 45 (2d Cir. 1991) (quoting *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 817 (6th Cir. 1988)).

Instead, "[t]he principal symptoms are 'pain all over,' fatigue, disturbed sleep, stiffness, and—the only symptom that discriminates between it and other diseases of a rheumatic character—multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch." *Sarchet*, 78 F.3d at 306.

Clearly, then, the disease is a challenging one to evaluate in the disability context. After all, "these symptoms are easy to fake." *Sarchet*, 78 F.3d at 307. However, in an attempt to bring some more analytical rigor to bear on the problem, the Commissioner has promulgated Social Security Ruling ("SSR") 12-2p, which sets forth explicit guidance on how to evaluate a claimant's alleged FM.

Monique Danielle W. v. Commissioner of Social Security, Not Reported in Fed. Supp....
2019 WL 2358529, 268 Soc.Sec.Rep.Serv. 46

SSR 12-2p "sets forth the following requirements for finding that fibromyalgia is a medically determinable impairment: (1) a physician has diagnosed fibromyalgia; (2) the physician has provided evidence described either by the 1990 American College of Rheumatology (ACR) criteria or the 2010 ACR Preliminary Diagnostic Criteria; and (3) the physician's 'diagnosis is not inconsistent with other evidence in the person's case record.' " *Casselbury v. Colvin*, 90 F. Supp. 3d 81, 93 (W.D.N.Y. 2015) (quoting SSR-12-p, 2012 WL 3104869, at *2 (July 25, 2012)).

 **\*5** Under the 1990 ACR criteria, a person must show: (1) "[a] history of widespread pain—that is, pain in all quadrants of the body (the right and left sides of the body, both above and below the waist) and axial skeletal pain (the cervical spine, anterior chest, thoracic spine, or low back—that has persisted (or that persisted) for at least 3 months," though the pain "may fluctuate in intensity and may not always be present"; (2) "[a]t least 11 positive tender points on physical examination," provided these points are "found bilaterally" and "both above and below the waist"; and (3) "[e]vidence that other disorders that could cause the symptoms or signs were excluded."

Alternatively, under the 2010 ACR criteria a person must show: (1) "[a] history of widespread pain" as defined above; (2) "[r]epeated manifestations of six or more FM symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems ('fibro fog'), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome" and (3) "[e]vidence that other disorders that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions were excluded."

Finally, to show that other possible disorders were excluded, SSR 12-2p indicates that "it is common in cases involving FM to find evidence of examinations and testing that rule out other disorders that could account for the person's symptoms and signs. Laboratory testing may include imaging and other laboratory tests (for example, complete blood counts, erythrocyte sedimentation rate, anti-nuclear antibody, thyroid function, and rheumatoid factor."

The ALJ concluded that Monique's FM was a "nondeterminable impairment for the purpose of disability review in accordance with SSR 12-2p." R. at 13. According to the ALJ, plaintiff's (1) various treatment providers diagnosed her with FM based solely "on her reported history of an initial diagnosis" and (2) evidence failed to show that other causes for her symptoms were considered and excluded. *Id.* In the ALJ's view, plaintiff's FM diagnosis was "essentially diagnosis by repetition." *Id.*

Upon review, this conclusion amounts to reversible error. At the outset, it seems suspect to appear to discount a claimant's fibromyalgia—a disease characterized by the subjective experience of constant pain and tenderness—merely because a claimant kept telling treating providers about it. *Cf. Durodoye v. Comm'r of Soc. Sec.*, 2018 WL 1444212, at *5 (N.D.N.Y. Mar. 20, 2018) (Hummel, M.J.) (rejecting ALJ's conclusion that claimant's FM was not medically determinable where plaintiff self-reported an initial diagnosis and where physicians later assessed the condition).

Indeed, other courts have rejected the notion that a physician's diagnosis of FM can be discounted merely because it is based, in part or possibly even in whole, on a claimant's self-report of a prior FM diagnosis. *See, e.g., Buell v. Berryhill*, 716 F. App'x 600, 602 (9th Cir. 2017) (memorandum disposition) (holding claimant's physician "appropriately relied upon [her] reports in diagnosing [her] with fibromyalgia, and the fact that he did so is not a clear and convincing reason for discrediting his diagnosis").

But even if the ALJ's comment were construed as a wholly benign one, it appears to be incorrect. Contrary to the ALJ's observation, the record repeatedly suggests that various medical professionals went beyond just accepting Monique's self-diagnosis. Instead, these providers conducted examinations that produced results consistent with FM. [6]

Take for example a January 19, 2015 consultative physical examination by Seema Khaneja, M.D. R. at 623-27. Although this document does note that plaintiff self-reported a diagnosis of fibromyalgia going all the way back to 2006, Dr. Khaneja's actual examination found a total of eighteen FM trigger points, *id.* at 625-26, and the diagnosis included fibromyalgia, *id.* at 627.

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 108 of 223
Monique Danielle W. v. Commissioner of Social Security, Not Reported in Fed. Supp....
2019 WL 2358529, 268 Soc.Sec.Rep.Serv. 46

This looks less like a diagnosis based solely on Monique's self-reported history and more like a diagnosis based on a medical examination.

**\*6** The same is true in a progress note dated January 14, 2013 from Raj Bala Thakur, M.D., a physician at Sawgrass Pain Treatment Center. R. at 559-60. There, Dr. Thakur conducted a physical examination that found "diffuse tenderness" across multiple points and concluded that plaintiff's pain was "consistent with fibromyalgia." *Id.* at 560.

To the extent the ALJ faults her various treating providers for failing to rule out *any* other possibilities, that too appears to be a misreading of the record. For instance, June 19, 2012 progress notes from Dr. Thakur indicate that a physical exam revealed "multiple tender points" and that plaintiff has also "been evaluated by rheumatology." R. at 557.

Further, an April 28, 2016 progress note from Janet A. Pennellavaughan, a Nurse Practitioner at the Pain Treatment Center of the University of Rochester, assessed "multiple tender points" and noted that x-ray imaging studies conducted on April 15, 2016 revealed nothing that would satisfactorily explain the ongoing pain. *Id.* at 687-89.

Prior to that, a February 17, 2016 progress note from Nurse Practitioner Pennellavaughan at the Pain Treatment Center references a February 9, 2016 imaging study of Monique's lumbar spine. R. at 691. Again, though, this imaging study, along with a lumbar MRI done in 2007, indicated nothing of apparent significance. *Id.*

At the very least, these imaging studies and the referral to rheumatology indicate that Monique's providers made some attempt track down an explanation for her pain and tenderness beyond just relying on a "diagnosis by repetition." *Cf. Thomas v. Colvin*, 826 F.3d 953, 959 (7th Cir. 2016) (faulting the ALJ for rejecting claimant's FM as medically determinable diagnosis where claimant pointed to evidence that "includes many reports of symptoms" and "details tests that her doctors conducted while looking for explanations").

Notably, "SSR 12-2p directs an ALJ to take additional steps, such as recontacting the claimant's treating physicians, when the record lacks adequate information to determine whether the claimant has a medically determinable impairment of fibromyalgia." *Cooper v. Comm'r of Soc. Sec.*, 2019 WL 1109573, at \*4 (W.D.N.Y. Mar. 11, 2019). Under the particular circumstances of this case, the ALJ should have re-contacted one or more of Monique's treating providers, or taken one of a number of other steps set forth in SSR 12–2p, if he wanted more information to help him determine whether the criteria were satisfied. *See id.* Accordingly, the ALJ erred at step two.

## IV. CONCLUSION

The ALJ's decision to exclude Monique's fibromyalgia as a medically determinable impairment is not supported by substantial evidence. Accordingly, the case is remanded to the ALJ to properly evaluate plaintiff's FM under SSR 12-2p.

Aside from this early-stage misstep, the rest of the ALJ's written decision appears to be a thorough analysis of the medical evidence in the record. However, out of an abundance of caution, on remand the ALJ should consider anew each successive step of the sequential disability analysis. *See Cooper*, 2019 WL 1109573, at \*5 (observing that the failure to find FM a medically determinable impairment impacts the later credibility analysis); *see also Buell*, 716 F. App'x at 602 ("If the ALJ had in front of him a valid diagnosis of fibromyalgia, it stands to reason that [claimant's] symptoms and behavior would have appeared in a different and more favorable light.").

**\*7** Therefore, it is

ORDERED that

1. Monique's motion for judgment on the pleadings is GRANTED in part and DENIED in part;

Monique Danielle W. v. Commissioner of Social Security, Not Reported in Fed. Supp....

2019 WL 2358529, 268 Soc.Sec.Rep.Serv. 46

2. The Commissioner's motion for judgment on the pleadings is DENIED;

3. The Commissioner's decision is VACATED; and

4. The case is remanded to the Commissioner for further administrative proceedings consistent with this Memorandum–Decision & Order.

The Clerk of the Court is directed to close the file.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 2358529, 268 Soc.Sec.Rep.Serv. 46

---

**Footnotes**

1    In accordance with a May 1, 2018 memorandum issued by the Judicial Conference's Committee on Court Administration and Case Management and adopted as local practice in this District, only claimant's first name and last initial will be used in this opinion.

2    Pursuant to General Order No. 18, consideration of this matter will proceed as if both parties had accompanied their briefs with a motion for judgment on the pleadings.

3    The parties refer to plaintiff's filing date as October 21, 2014, but the distinction is immaterial.

4    Citations to "R." refer to the Administrative Record. Dkt. No. 9.

5    Pagination corresponds to CM/ECF.

6    How, if it all, this is different from the "myalgia/arthralgia" the ALJ assessed is not explained.

---

**End of Document**                                                           © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Rhondalee T. v. Berryhill, Not Reported in Fed. Supp. (2019)

2019 WL 1100267

2019 WL 1100267
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

RHONDALEE T., Plaintiff,

v.

Nancy BERRYHILL, Acting Commissioner of Social Security, Defendant.

3:17-CV-1241 (CFH)
|
Signed 03/08/2019

**Attorneys and Law Firms**

OF COUNSEL: PETER A. GORTON, ESQ., LACHMAN & GORTON, P.O. Box 89, 1500 East Main Street, Endicott, New York 13761-0089, Counsel for Plaintiff.

OF COUNSEL: MONIKA K. CRAWFORD, ESQ., U.S. SOCIAL SECURITY ADMIN. OFFICE OF REG'L GEN. COUNSEL REGION II, 26 Federal Plaza - Room 3904, New York, New York 10278, Counsel for Defendant.

## MEMORANDUM-DECISION & ORDER

Christian F. Hummel, U.S. Magistrate Judge

**\*1** Currently pending before the Court, [1] in this Social Security action filed by Rhondalee T. [2] ("Plaintiff") against the Commissioner of Social Security ("Defendant" or "the Commissioner") pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), are Plaintiff's motion for judgment on the pleadings and Defendant's motion for judgment on the pleadings. (Dkt. Nos. 9 and 15.) For the reasons set forth below, Plaintiff's motion for judgment on the pleadings is denied and Defendant's motion for judgment on the pleadings is granted. The Commissioner's decision denying Plaintiff's disability benefits is affirmed, and Plaintiff's Complaint is dismissed.

## I. RELEVANT BACKGROUND

### A. Factual Background

Plaintiff was born in 1976, making her 37 years old at the amended alleged onset date and 40 years old at the date of the ALJ's decision. Plaintiff reported completing the twelfth grade and being in special education classes. At the initial level, Plaintiff alleged disability due to a disc impairment in her lower back, scoliosis, a learning disability, a right knee impairment, and a stress disorder.

### B. Procedural History

Plaintiff applied for a period of disability and disability insurance benefits as well as Supplemental Security Income on November 4, 2014, alleging disability beginning at her birth in 1976. She subsequently amended her alleged onset date to December 1, 2013. (T. 60-61.) [3] Plaintiff's applications were initially denied on March 18, 2015, after which she timely requested

Rhondalee T. v. Berryhill, Not Reported in Fed. Supp. (2019)

2019 WL 1100267

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 111 of 223

a hearing before an Administrative Law Judge ("ALJ"). Plaintiff appeared at a hearing before ALJ Shawn Bozarth on March 16, 2017. (T. 34-73.) On May 26, 2017, the ALJ issued a written decision finding Plaintiff was not disabled under the Social Security Act. (T. 12-30.) On October 10, 2017, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (T. 1-6.)

### C. The ALJ's Decision

Generally, in his decision, the ALJ made the following seven findings of fact and conclusions of law. (T. 17-25.) First, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2013. (T. 17.) Second, the ALJ found that Plaintiff has not engaged in substantial gainful activity since December 1, 2013, the amended alleged onset date. (T. 17.) Third, the ALJ found that Plaintiff's lumbar spine disorder and thoracic spine disorder are severe impairments. (T. 17.) Fourth, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (T. 20.) Specifically, the ALJ considered Listing 1.04 (disorders of the spine). (*Id.*) Fifth, the ALJ found that Plaintiff has the residual functional capacity ("RFC") to perform sedentary work

> **\*2** except she should only occasionally engage in climbing ladders, ropes, scaffolds, as well as balance, kneel, crouch, stoop and crawl, but otherwise has no limitation concerning other postural activities. She can change from sitting to standing at the workstation every forty-five minutes, remaining at the workstation in the changed position for forty-five minutes before resuming the sitting position.

(T. 20.) Sixth, the ALJ found that Plaintiff has no past relevant work. (T. 23.) Seventh, and lastly, the ALJ found that Plaintiff is capable of performing other jobs existing in significant numbers in the national economy. (T. 23-24.) Therefore, the ALJ concluded that Plaintiff is not disabled.

### D. Arguments

#### 1. Plaintiff's Arguments

First, Plaintiff argues that the ALJ erred in finding no diminishment to work pace and/or attendance notwithstanding the unanimous opinion of all sources. (Dkt. No. 9 [Pl.'s Mem. of Law] at 11-13.) Specifically, Plaintiff argues that two uncontradicted opinions from Eric Seybold, M.D., and consultative examiner Mary Ann Moore, Psy.D., indicated that Plaintiff has limitations in the ability to work consistently, and that the ALJ improperly substituted his judgment for these undisputed, competent medical opinions. (*Id.*) Plaintiff argues further that limitations to attendance are supported by the ALJ's factual findings. (*Id.* at 12.)

Second, Plaintiff argues that the ALJ erred at Step Two by failing to find her psychiatric or intellectual impairments to be severe and by failing to find any limitations stemming from these conditions. (*Id.* at 13-23.) Plaintiff again argues that the ALJ improperly substituted his lay judgment for undisputed medical opinions from Dr. Moore and Patricia Rourke, Ph.D., indicating Plaintiff has severe psychiatric and/or intellectual impairments causing more than *de minimis* work-related limitations. (*Id.* at 13-15, 22-23.) Plaintiff also argues the ALJ erred in affording only partial evidentiary weight to Dr. Moore's opinion and failed to provide sufficient explanation for this weight to allow for meaningful judicial review. (*Id.* at 15-16.) Plaintiff argues that the ALJ erred in (1) affording limited weight to Dr. Rourke's opinion because his reasoning is internally inconsistent and contradictory, ignoring that Plaintiff's prior work was performed on an unskilled basis; and (2) failing to include any cognitive-related limitations in the RFC. (*Id.* at 18-19.) Plaintiff contends that the ALJ did not cite any medical opinion contradicting the

2019 WL 1100267

opinions from Dr. Moore and Dr. Rourke and rejected these opinions based on his lay interpretation of the medical evidence. (*Id.* at 16-18, 23.) Plaintiff argues that the ALJ understated the extent of Plaintiff's psychiatric and cognitive issues and failed to adequately address these issues by including such limitations in a proper hypothetical to the vocational expert ("VE"). (*Id.* at 19-22.) Plaintiff contends that there is no meaningful explanation as to how or why limiting her to unskilled work accommodates her psychiatric and cognitive issues, and that the ALJ did not address her psychiatric or cognitive impairments when discussing her RFC. (*Id.* at 20-22.)

Third, Plaintiff argues that the ALJ's Step Five determination is not supported by substantial evidence because it does not properly account for Plaintiff's true limitations in standing/walking, work pace, absenteeism, and a need for a sit/stand option or those limitations related to her cognitive and psychiatric impairments, which renders the resulting VE testimony unreliable. (*Id.* at 23.) Plaintiff also argues that the VE testimony concerning job numbers is not reliable and does not constitute substantial evidence that jobs exist in significant numbers because said job numbers referred to a broad range of positions and were not limited to the specific titles within the Dictionary of Occupational Titles ("DOT") that the VE identified. (*Id.* at 24-25.) Plaintiff contends the VE did not attempt to eliminate the jobs that Plaintiff cannot perform within that broad range of jobs and the resulting job numbers are therefore ambiguous and do not satisfy Defendant's burden at Step Five. (*Id.* at 25.)

## 2. Defendant's Arguments

**\*3** First, Defendant argues that substantial evidence supports the ALJ's finding that Plaintiff had no limitations in work pace and/or attendance. Dkt. No. 15, at 7-10 [Def.'s Mem. of Law]. Specifically, Defendant argues that the ALJ properly gave little weight to Dr. Seybold's opinion that Plaintiff would be off-task 20-33 percent of the workday and absent from work four days per month because it was inconsistent with his own treatment notes and other evidence of record. (*Id.* at 7-9.) Defendant contends that the ALJ may set aside the opinion of a treating physician that is contradicted by the weight of other record evidence. (*Id.* at 7-8.)

Defendant also argues that the ALJ properly gave little weight to the portion of Dr. Moore's opinion indicating that plaintiff had no more than moderate limitations in maintaining a regular work schedule and maintaining attention and concentration and that, even if Dr. Moore's opinion was accepted, this portion of the opinion does not support Plaintiff's contention that she would be off-task and absent from work more than customarily acceptable. (*Id.* at 9.) Defendant argues that moderate limitations like those assessed by Dr. Moore have previously been found to be compatible with the work pace and attendance demands of competitive work. (*Id.*) Defendant also argues that the ALJ pointed to other evidence indicating Plaintiff's attention and concentration and ability to maintain a schedule were consistent with the demands of competitive work. (*Id.* at 10-11.)

Second, Defendant argues that the ALJ properly evaluated Plaintiff's alleged mental impairments at Step Two and any error therein is harmless because he considered all of her impairments at Steps Four and Five of the sequential analysis. (*Id.* at 10-13.) Defendant argues that the ALJ reasonably concluded that Plaintiff's mental impairments were not severe at Step Two and reasonably gave partial weight to Dr. Moore's opinion. (*Id.* at 10.) Defendant also argues that the ALJ provided a detailed analysis of the objective evidence within his decision and that neither Dr. Moore or Dr. Rourke's opinions suggested limitations that preclude the unskilled jobs identified by the VE. (*Id.* at 11-13.)

Third, Defendant argues that substantial evidence supports the ALJ's conclusion that Plaintiff could perform work that exists in significant numbers in the national economy. (*Id.* at 13-15.) Specifically, Defendant contends that where a VE has adjusted the incidence numbers based on his or her experience to represent only those jobs available to a claimant based on the claimant's limitations, courts have found the VE's testimony sufficient to meet Defendant's Step Five burden. (*Id.* at 14.) Defendant argues that the VE acknowledged the numbers she was using were not broken down by DOT code and testified she would be giving a reduced number to account for Plaintiff's specific limitations. (*Id.*) Defendant argues the VE also testified that the numbers she gave were based not only on the U.S. Statistical Publishing report, but on her judgment as a VE. (*Id.* at 14-15.) Defendant argues

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 113 of 223

Rhondalee T. v. Berryhill, Not Reported in Fed. Supp. (2019)

2019 WL 1100267

that the VE testimony could be reasonably accepted by the ALJ and constitute substantial evidence because the VE relied on acceptable statistical publications and her experience. (*Id.* at 15.)

### 3. Plaintiff's Reply

On reply, Plaintiff reasserts her arguments that the ALJ substituted his own opinion for that of the medical opinions of record and without any supporting medical opinion. (Dkt. No. 16, at 2-4 [Pl.'s Reply Mem. of Law].) Plaintiff also argues that there is no support for Defendant's contention that moderate limitations are not incompatible with competitive work. (*Id.* at 4-5.) Plaintiff contends that Dr. Seybold found that plaintiff had limitations in time off-task and/or attendance that exceeded employer standards, and Dr. Moore indicated moderate limitations, yet the ALJ failed to articulate a reason as to why these identified limitations did not rise above the employer tolerances identified by the VE. (*Id.* at 5.) Finally, Plaintiff argues that the VE reduced her overall job numbers to account for a sit-stand option, but did not reduce the job numbers to account for the fact that her numbers overstated the number of jobs available to Plaintiff. (*Id.* at 5-6.)

## II. LEGAL STANDARDS

**\*4** A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled. 42 U.S.C. § 405(g); *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Commissioner's determination will be reversed only if the correct legal standards were not applied, or it was not supported by substantial evidence. *See Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."); *accord. Grey v. Heckler*, 721 F.2d 41, 46 (2d Cir. 1983), *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979). "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

"To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984).

The Commissioner has established a five-step evaluation process to determine whether an individual is disabled as defined by the Social Security Act. 20 C.F.R. §§ 404.1520, 416.920. The Supreme Court has recognized the validity of this sequential evaluation process. *Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287 (1987). The five-step process is as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the

Rhondalee T. v. Berryhill, Not Reported in Fed. Supp. (2019)

2019 WL 1100267

[Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform. Under the cases previously discussed, the claimant bears the burden of the proof as to the first four steps, while the [Commissioner] must prove the final one.

**\*5** *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *accord. McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014). "If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further." *Barnhart v. Thompson*, 540 U.S. 20, 24 (2003).

## III. ANALYSIS

### A. Step Two

At Step Two, the ALJ must determine whether the claimant has a severe impairment that significantly limits her physical or mental abilities to perform basic work activities. 20 C.F.R. §§ 404.1520(c), 416.920(c). Basic work activities include walking, standing, sitting, lifting, carrying, pushing, pulling, reaching, handling, seeing, hearing, speaking, understanding, remembering and carrying out simple instructions, using judgment, and responding appropriately to supervision, co-workers, and usual work situations. *Taylor v. Astrue*, 32 F. Supp. 3d 253, 265 (N.D.N.Y. 2012) (citing *Gibbs v. Astrue*, 07-CV-10563, 2008 WL 2627714, at \*16 (S.D.N.Y. July 2, 2008); 20 C.F.R. §§ 404.1521(b)(1)-(5) ). "Although the Second Circuit has held that this step is limited to 'screening out *de minimis* claims,' [ ] the 'mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment' is not, by itself, sufficient to render a condition severe." *Taylor*, 32 F. Supp. 3d at 265 (quoting *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995); *Coleman v. Shalala*, 895 F. Supp. 50, 53 (S.D.N.Y. 1995) ). Overall, the claimant retains the burden of presenting evidence to establish severity. *Id.* (citing *Miller v. Comm'r of Soc. Sec.*, 05-CV-1371, 2008 WL 2783418, at \*6-7 (N.D.N.Y. July 16, 2008) ).

This Court has indicated the failure to find a specific impairment severe at Step Two is harmless where the ALJ concludes (1) there is at least one other severe impairment, (2) the ALJ continues with the sequential evaluation, and (3) the ALJ's analysis demonstrates that she adequately considered the evidence related to the non-severe impairment. *Fuimo v. Colvin*, 948 F. Supp. 2d 260, 269-70 (N.D.N.Y. 2013) (citing *Dillingham v. Astrue*, 09-CV-0236, 2010 WL 3909630 (N.D.N.Y. Aug. 24, 2010), *Report and Recommendation adopted by* 2010 WL 3893906 (N.D.N.Y. Sept. 30, 2010) ); *see also Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013) (summary order) (finding that any error in failing to find plaintiff's anxiety and panic disorder severe at Step Two would be harmless because the ALJ found other severe impairments present, continued through the sequential evaluation process, and specifically considered plaintiff's anxiety and panic attacks at those subsequent steps).

Here, the ALJ found Plaintiff's lumbar spine disorder and thoracic spine disorder to be severe impairments. (T. 17.) The ALJ indicated that the record did not support the conclusion that Plaintiff's mental impairments are severe, noting that plaintiff graduated from high school, and that, despite reports of a learning disorder, her report card indicated she passed her courses and was ranked 85 in a class of 316 students. (T. 18, 247, 448-54.) The ALJ also pointed to Plaintiff's mental health treatment history and her consultative psychiatric evaluation with Dr. Moore and noted that her treatment records supported the conclusion her mental impairments did not result in significant functional limitations. (T. 18-19, 448-54, 494-555.)

**\*6** At the psychiatric consultative examination in February 2015, Dr. Moore concluded that Plaintiff's attention and concentration were impaired due to learning issues and that her recent and remote memory skills were impaired specifically for more complex information. (T. 451.) Plaintiff's cognitive functioning was possibly borderline-to-deficient, her insight and judgment appeared fair, with learning issues as well as depression and anxiety. (*Id.*) Dr. Moore diagnosed posttraumatic stress disorder, an unspecified learning disorder, and the need to rule out borderline intellectual functioning and mild intellectual disability. (T. 452.) She opined that Plaintiff showed no limitation with regard to following and understanding simple directions and instructions and performing simple tasks independently. (T. 451-52.) Dr. Moore concluded that Plaintiff has moderate limitations with maintaining attention and concentration, learning new tasks, performing complex tasks independently, appropriately dealing with stress, relating with others, making appropriate work decisions, and maintaining a regular work schedule, with the results of the examination appearing to be consistent with psychiatric and cognitive issues which might significantly interfere with her ability to function on a daily basis. (T. 452.)

At the initial determination level in March 2015, non-examining state Agency medical consultant T. Harding, Ph.D., opined that Plaintiff had mild restriction of activities of daily living; mild difficulties in maintaining social functioning and concentration, persistence or pace; and no repeated episodes of decompensation of extended duration. (T. 79-80.)

In November 2016, Dr. Rourke conducted a psychological evaluation and indicated Plaintiff showed some impairment in attention and concentration during the interview. (T. 733.) Plaintiff tested with a full scale IQ ("FSIQ") of 81 and Dr. Rourke diagnosed a specific learning disorder with impairment in mathematics as well as a provisional diagnosis of an unspecified depressive disorder. (T. 734, 737.) Dr. Rourke indicated that Plaintiff's intellectual limitations with respect to working memory, processing speed, and perceptual reasoning as well as learning difficulties in mathematics needed to be considered in determining appropriate vocational placements and that Plaintiff would likely benefit from supportive services including the provision of a job coach. (T. 737-38.)

The ALJ noted that Dr. Moore found moderate limitations for maintaining attention and concentration, but that counseling records indicated that Plaintiff's energy and attention was intact and her thought processes were coherent. (T. 19, 364, 448-54.) The ALJ afforded partial evidentiary weight to the opinions of Dr. Moore and Dr. Harding based on their programmatic expertise, but rejected the moderate limitations they identified because such limitations were not consistent with the objective evidence in record. (T. 19, 74-86, 88-94, 448-54, 486-89.) The ALJ also afforded limited weight to the Global Assessment of Functioning ("GAF") scores in the record because these subjectively assessed scores revealed only snapshots of Plaintiff's behavior and were neither standardized nor based on normative data. (T. 19-20, 359-90.) The ALJ afforded limited weight to Dr. Rourke's opinion because the limitations she identified were based on Plaintiff's learning disorder, which did not previously interfere with her ability to engage in work activity. (T. 20, 245, 730-38.)

In considering Plaintiff's alleged mental impairments, the ALJ found Plaintiff has at most mild restriction in understanding, remembering or applying information; interacting with others; maintaining concentration, persistence or pace; and adapting or managing oneself. (T. 19.) Within his RFC analysis, the ALJ also noted that although Plaintiff's mental impairments are not severe, the VE identified only unskilled positions, which the ALJ concluded fully accommodates Plaintiff's non-severe psychological impairments. (T. 22.)

Plaintiff argues that the ALJ erred at Step Two by failing to find her psychiatric or intellectual impairments to be severe despite the opinions from Dr. Moore and Dr. Rourke and by failing to find any limitations stemming from these conditions. (Dkt. No. 9, at 13-23 [Pl.'s Mem. of Law].) Plaintiff also argues that the ALJ erred in the weights he afforded to the opinions of Dr. Rourke and Dr. Moore, failed to provide sufficient explanation for these weights, improperly substituted his lay judgment for these opinions, and failed to discuss Plaintiff's psychiatric or cognitive impairments when discussing her RFC. (Dkt. No. 9, at 13-23 [Pl.'s Mem. of Law]; Dkt. No. 16, at 2-4 [Pl.'s Reply Mem. of Law].) The Court finds these arguments unpersuasive for the following reasons.

Rhondalee T. v. Berryhill, Not Reported in Fed. Supp. (2019)

2019 WL 1100267

**\*7** First, although the ALJ did not find that plaintiff had a severe mental impairment, he did find the existence of at least one severe impairment and continued the sequential evaluation through Step Five, considering both Plaintiff's severe and non-severe impairments throughout that process. (T. 17-23.) Further, the ALJ's analysis at Step Two reflects careful consideration of Plaintiff's alleged mental impairments and related limitations and provides ample explanation for why he found Plaintiff's mental impairments to be non-severe. (T. 18-20.) The ALJ also addressed Plaintiff's alleged mental impairments and related limitations in discussing her RFC, albeit briefly, when he noted that the VE identified only unskilled positions, which properly accommodated Plaintiff's non-severe psychological impairments. (T. 22.) In the alternative, the Court finds that any error by the ALJ in failing to find Plaintiff's alleged mental impairments to be severe is harmless because the ALJ found other severe impairments, continued with the sequential evaluation, and provided adequate explanation showing that he properly considered the evidence related to Plaintiff's various impairments. (*Id.*)

Second, as discussed further below, the Court finds that the ALJ properly considered the opinion evidence of record regarding Plaintiff's alleged mental impairments and related limitations -- including those opinions from Dr. Moore, Dr. Harding, and Dr. Rourke -- and provided explanation for the weights afforded to these opinions. (T. 19-20.) This Court will not now reweigh that evidence before the ALJ. *See Lewis v. Colvin*, 122 F. Supp. 3d 1, 7 (N.D.N.Y. 2015) (noting that it is not the role of the court to "re-weigh evidence" because "a reviewing court 'defers to the Commissioner's resolution of conflicting evidence' " where that resolution is supported by substantial evidence) (quoting *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012); citing *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009) ); *Vincent v. Shalala*, 830 F. Supp. 126, 133 (N.D.N.Y. 1993) ("[I]t is not the function of the reviewing court to reweigh the evidence.") (citing *Carroll v. Sec'y of Health and Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983) ). Therefore, for the reasons herein discussed, the ALJ's findings regarding Plaintiff's impairments at Step Two are supported by substantial evidence and remand is not required on this basis.

### B. Opinion Evidence and RFC

The Second Circuit has long recognized the 'treating physician rule' set out in 20 C.F.R. §§ 404.1527(c), 416.927(c). " '[T]he opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record.' " *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (quoting *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) ). However, there are situations where the treating physician's opinion is not entitled to controlling weight, in which case the ALJ must "explicitly consider, *inter alia*: (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist.' " *Greek*, 802 F.3d at 375 (quoting *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) ). However, "[w]here an ALJ's reasoning and adherence to the Regulations is clear, she is not required to explicitly go through each and every factor of the Regulation." *Blinkovitch v. Comm'r of Soc. Sec.*, 15-CV-1196, 2017 WL 782979, at \*4 (N.D.N.Y. Jan. 23, 2017), *Report and Recommendation adopted by* 2017 WL 782901 (N.D.N.Y. Feb. 28, 2017) (citing *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) ). After considering these factors, "the ALJ must 'comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion.' " *Greek*, 802 F.3d at 375 (quoting *Burgess*, 537 F.3d at 129). The factors for considering opinions from non-treating medical sources are the same as those for assessing treating sources, with the consideration of whether the source examined the claimant or not replacing the consideration of the treatment relationship between the source and the claimant. 20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6).

**\*8** RFC is defined as " 'what an individual can still do despite his or her limitations ... Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.' " *Pardee v. Astrue*, 631 F. Supp. 2d 200, 210 (N.D.N.Y. 2009) (quoting *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) ). "In making a residual functional capacity determination, the ALJ must consider a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis." *Pardee*, 631 F. Supp. 2d at 210 (citing 20 C.F.R. § 404.1545(a) ). "Ultimately, '[a]ny impairment-related limitations created by an individual's response to demands of work ... must be reflected in the RFC assessment.' " *Hendrickson v. Astrue*,

11-CV-0927, 2012 WL 7784156, at *3 (N.D.N.Y. Dec. 11, 2012) (quoting Social Security Ruling ("SSR") 85-15, 1985 WL 56857, at *8). The RFC determination "must be set forth with sufficient specificity to enable [the Court] to decide whether the determination is supported by substantial evidence." *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

Here, the ALJ found that Plaintiff can perform a modified range of sedentary work. (T. 20.) In so finding, the ALJ considered the various opinions of record, along with Plaintiff's testimony and treatment history. (T. 20-23.) The ALJ indicated that Plaintiff's allegations of debilitating symptoms were not fully consistent with the opinion evidence from consultative examiner Justine Magurno, M.D., and treating orthopedic surgeon Dr. Seybold. (T. 21.) The ALJ also noted that treating primary care physician Michelle Boyle, M.D., was unwilling to provide a medical source statement. (T. 22, 492-93.)

In March 2015, orthopedic consultative examiner Dr. Magurno observed that Plaintiff had a normal gait and station, her squat was half of full, she could walk on her heels and toes without difficulty, she needed no help changing for the exam or getting on and off the exam table, and she was able to rise from a chair without difficulty. (T. 481.) Dr. Magurno observed some limitation of range of motion in the thoracolumbar spine, no tenderness or spasm, negative straight leg raising testing bilaterally, and limited range of motion in the right knee due to back and knee pain. (T. 482.) She diagnosed back pain, disc disease, scoliosis, bilateral knee pain, acid reflux, sinus allergies, irritable bowel syndrome, temporomandibular joint dysfunction, and a history of stress disorder. (*Id.*) Dr. Magurno opined that plaintiff had moderate limitations for bending, lifting, carrying, and squatting. (T. 483.)

In February 2017, treating physician Dr. Seybold noted Plaintiff was status post lumbar fusion and had lower back pain with foot numbness intermittently. (T. 490.) He indicated that her conditions would cause pain, fatigue, and diminishment of concentration and work pace; Plaintiff would need to rest at work; and she would be off-task greater than 20 percent of the day, but less than 33 percent. (*Id.*) Dr. Seybold determined that Plaintiff's conditions would produce good days and bad days and cause more than four absences per month. (T. 490-91.) He further opined that Plaintiff could sit for approximately three hours out of an eight-hour day, should change position every three hours, could stand/walk for two hours out of an eight-hour day, and could frequently lift up to 10 pounds and occasionally lift over 10 pounds. (T. 491.)

The ALJ afforded great weight to Dr. Magurno's opinion based on her "programmatic expertise" and noted that her opinion was supported by her evaluation of Plaintiff. (T. 21.) The ALJ stated that he found greater exertional limitations than those identified by Dr. Marguno in finding Plaintiff to be capable of a range of sedentary work activity. (*Id.*) The ALJ afforded some weight to Dr. Seybold's opinion because he was a treating specialist and included his limitations for lifting, carrying, standing and walking and a sit/stand option within the RFC, but rejected the remainder of his limitations because they were not consistent with his treatment notes. (T. 21-22, 557, 691, 701.) The ALJ noted that, although Plaintiff has lower back pain and underwent lumbar surgery in October 2015, the record supports the conclusion that she can perform a range of sedentary work. (T. 22.) The ALJ also noted findings from December 2016 indicating that Plaintiff had full range of motion of her back without any changes related to deformity, lumbar and thoracic tenderness was present, range of motion was full in the upper and lower extremities, grip strength was normal and non-tender, gait was steady, and sensation was intact to light touch, supported the conclusion that she could perform a range of sedentary work and contradicted Dr. Seybold's conclusion that she would be off-task or frequently absent. (T. 22-23, 591.)

 **\*9**  Plaintiff next argues that the ALJ erred in finding no diminishment to work pace and/or attendance despite the opinion evidence from Dr. Seybold and Dr. Moore and that the ALJ improperly substituted his own judgment for these undisputed, competent medical opinions. (Dkt. No. 9, at 11-15, 22-23 [Pl.'s Mem. of Law]; Dkt. No. 16, at 2-4 [Pl.'s Reply Mem. of Law].) Plaintiff also argues that the ALJ erred in the weight he afforded to Dr. Moore and Dr. Rourke's opinions. (Dkt. No. 9, at 15-19 [Pl.'s Mem. of Law].) The Court finds these arguments unpersuasive.

First, the ALJ's analysis and resulting RFC indicate sufficient consideration of the various medical opinions, the medical evidence pertaining to Plaintiff's impairments and treatment, and Plaintiff's testimony. (T. 18-23.) In his decision, the ALJ indicated that he had considered Plaintiff's symptoms based on the requirements of 20 C.F.R. §§ 404.1529 and 416.929 and had the opinion evidence in accordance with the requirements of 20 C.F.R. §§ 404.1527 and 416.927. (T. 20.) It is apparent from

Rhondalee T. v. Berryhill, Not Reported in Fed. Supp. (2019)

2019 WL 1100267

the decision that the ALJ adequately considered the evidence of record, contrary to Plaintiff's arguments that he substituted his own lay opinion and failed to provide sufficient explanation of his analysis. (T. 18-23; Dkt. No. 9, at 11-23 [Pl.'s Mem. of Law]; Dkt. No. 16, at 2-4 [Pl.'s Reply Mem. of Law].)

Second, the ALJ's analysis provides sufficient consideration of the opinions of record, and, as noted above, specific reasons for the weights afforded to each of them, reasons which the Court finds supported by the objective evidence of record. (T. 18-23.) Plaintiff argues that the ALJ substituted his own opinion for that of the medical sources and improperly failed to cite to evidence contradicting the opinions form Dr. Moore and Dr. Rourke. (Dkt. No. 9, at 11-23 [Pl.'s Mem. of Law].) However, the Court notes that there is a difference between analyzing medical records to assess what the weight of the evidence supports and interpreting raw medical data that would require the expertise of a trained medical source; the ALJ is precluded only from the latter. *See Hanson v. Comm'r of Soc. Sec.*, 15-CV-0150, 2016 WL 3960486, at *9 (N.D.N.Y. June 29, 2016), *Report and Recommendation adopted by* 2016 WL 3951150 (N.D.N.Y. July 20, 2016) (noting that, while it is impermissible for an ALJ to interpret "raw medical data" and substitute his own opinion for that of a medical source, it is within the ALJ's power to resolve conflicts in the medical record). It was also within the ALJ's purview to weigh the evidence of record and resolve conflicts therein. *See Bliss v. Colvin*, 13-CV-1086, 2015 WL 457643, at *7 (N.D.N.Y. Feb. 3, 2015) ("It is the ALJ's sole responsibility to weigh all medical evidence and resolve material conflicts where sufficient evidence provides for such."); *accord. Petell v. Comm'r of Soc. Sec.*, 12-CV-1596, 2014 WL 1123477, at *10 (N.D.N.Y. Mar. 21, 2014).

Finally, as discussed above, the Court also finds that the ALJ properly weighed the opinions from Dr. Harding, Dr. Moore, and Dr. Rourke in considering Plaintiff's alleged mental impairments and related limitations. For the reasons stated herein, the ALJ's analysis of the opinion evidence as well as the resulting RFC are supported by substantial evidence. Thus, remand is not required on these bases.

### C. Step Five Finding

Although the claimant has the general burden to prove he has a disability under the definitions of the Social Security Act, the burden shifts to the Commissioner at Step Five " 'to show there is other work that [the claimant] can perform.' " *McIntyre*, 758 F.3d at 150 (quoting *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 445 (2d Cir. 2012) ); *see also Walker v. Colvin*, 15-CV-0465, 2016 WL 4768806, at *4 (N.D.N.Y. Sept. 13, 2016) ("it is the Commissioner's burden to prove there are jobs that exist in significant numbers in the national economy that the claimant can perform.") (internal citations omitted).

 **\*10**  "An ALJ may rely on a vocational expert's testimony regarding a hypothetical [question] as long as 'there is substantial record evidence to support the assumption[s] upon which the vocational expert based his opinion' [and] ... [the hypothetical question] accurately reflect[s] the limitations and capabilities of the claimant involved." *McIntyre*, 758 F.3d at 151 (quoting *Dumas v. Schweiker*, 712 F.2d 1545, 1553-54 (2d Cir. 1983); citing *Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981) ). "If a hypothetical question does not include all of claimant's impairments, limitations, and restrictions, or is otherwise inadequate, a vocational expert's response cannot constitute substantial evidence to support a conclusion of no disability." *Pardee*, 631 F. Supp. 2d at 211 (citing *Melligan v. Chater*, 94-CV-0944, 1996 WL 1015417, at *8 (W.D.N.Y. Nov. 14, 1996) ).

After determining the RFC, the ALJ found that Plaintiff has no past relevant work. (T. 23.) The ALJ then concluded that Plaintiff could perform other jobs existing in significant numbers in the national economy, including information clerk (DOT code 237.367-046, 88,000 jobs nationally), general office worker (DOT code 249.587-018, 90,000 jobs nationally), and assembler (DOT code 713.687-026, 34,00 jobs nationally), based on the VE's testimony at the administrative hearing and Medical-Vocational Rule 201.27. (T. 23-24, 62-70.)

Plaintiff argues that the ALJ's Step Five determination is not supported by substantial evidence because (1) the RFC and the related hypothetical posed to the does not properly account for Plaintiff's true limitations, and (2) the VE's testimony concerning job numbers is not reliable because the job numbers the VE cites referred to a broad range of positions and were not limited to

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 119 of 223

Rhondalee T. v. Berryhill, Not Reported in Fed. Supp. (2019)

2019 WL 1100267

the specific DOT titles she identified. (Dkt. No. 9, at 19-25 [Pl.'s Mem. of Law].) Plaintiff contends the VE did not eliminate the jobs that Plaintiff cannot perform within that range of jobs, and the resulting job numbers are therefore ambiguous and do not satisfy Defendant's burden at Step Five. (*Id.* at 25; Dkt. No. 16, at 5-6 [Pl.'s Reply Mem. of Law].) The Court finds these arguments to be without force.

First, as discussed above, the Court finds that the ALJ's findings regarding Plaintiff's impairments and RFC are supported by substantial evidence. The ALJ's decision provides sufficient, supported explanation for his findings, and Plaintiff has not established further limitations based on the evidence of record. Further, the hypothetical posed to the VE accurately reflected the RFC, which the Court has found to be supported by substantial evidence. (T. 20, 69-70.)

Second, as this Court previously indicated in *Walker*, "[r]equiring at least an estimate of jobs in specific titles, where that estimate is either based on sources/literature or the VE's experience/consultation is consistent with the regulations and 'assures that individuals are not denied benefits on the basis of [i]solated jobs that exist only in very limited numbers in relatively few locations outside of the region where [the claimant] lives.'" *Walker*, 2016 WL 4768806, at *8 (quoting *Peterson Moore v. Colvin*, 14-CV-583-JTC, 2016 WL 1357606, at *5 (W.D.N.Y. April 4, 2016); citing *Robinson v. Astrue*, 08-CV-4747, 2009 WL 4722256, at *2 (E.D.N.Y. Dec. 9, 2009) ) (internal quotation marks omitted). Here, as Defendant argues, the VE acknowledged that the numbers on which she relied were not broken down by DOT code, that she would be using a reduced number to account for Plaintiff's specific limitations, and that the numbers she gave were not based solely on the U.S. Statistical Publishing report but also on her judgment as a VE. (Dkt. No. 15, at 14-15 [Def.'s Mem. of Law]; T. 68-69.) Indeed, the VE's testimony indicated that, although she referenced numbers from U.S. Statistical Publishing (which she stated does not report by DOT code), she would give a DOT code that she thought was the best representation of the work in terms of skill, exertional level, and requirements of the job. (T. 68.) The VE did note that more than one DOT code could apply to a category of jobs, that there could be new jobs that were included within the statistical number she provided that were never identified by the DOT code, and that she was not saying the number she gave was the number in a specific DOT code. (*Id.*) When asked by the ALJ about the consistency of her testimony with the DOT, the VE indicated that the DOT does not give guidance about numbers of jobs, but that she did not believe there was any inconsistency with the DOT. (T. 70.) This testimony, based on statistical resources as well as the VE's experience, does not support Plaintiff's argument that the numbers the VE identified grossly overstated the number of jobs available to Plaintiff. (Dkt. No. 16, at 5-6 [Pl.'s Reply Mem. of Law].)

*11  Third, although Plaintiff argues that the VE reduced her overall job numbers to account for a sit-stand option but not for the fact that the VE's numbers included numerous job titles beyond Plaintiff's RFC, the Court's review of the VE's testimony indicates that the numbers provided by the VE were estimates based on her experience and are further supported by her acknowledgment of the fact that they represented the larger job categories rather than specific DOT codes. (Dkt. No. 16, at 5-6 [Pl.'s Reply Mem. of Law]; T. 68-69.) Unlike in *Walker*, the Court finds the VE testimony, adopted by the ALJ, provides a fair estimate of the jobs available that Plaintiff can perform. *Walker*, 2016 WL 4768806, at *8 (citing *Jones-Reid v. Astrue*, 934 F. Supp. 2d 381, 407, n. 13 (D. Conn. May 14, 2012) ). Thus, for the reasons discussed above, the Court finds that the ALJ's Step Five finding is supported by substantial evidence. Remand is not required on this basis.

### IV. CONCLUSION

**WHEREFORE**, for the reason stated herein, it is hereby

**ORDERED**, that Plaintiff's motion for judgment on the pleadings (Dkt. No. 9) is **DENIED**; and it is further

**ORDERED**, that Defendant's motion for judgment on the pleadings (Dkt. No. 15) is **GRANTED**; and it is further

**ORDERED**, that Defendant's decision denying Plaintiff disability benefits is **AFFIRMED**, and it is further

Rhondalee T. v. Berryhill, Not Reported in Fed. Supp. (2019)
Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 120 of 223
2019 WL 1100267

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED**.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2019 WL 1100267

---

### Footnotes

1    Parties consented to review of this matter by a U.S. Magistrate Judge pursuant to 28 U.S.C. § 636(c), Federal Rule of Civil Procedure 73, N.D.N.Y. Local Rule 72.2(b), and General Order 18. Dkt. No. 6.

2    In accordance with recent guidance from the Committee on Court Administration and Case Management of the Judicial Conference of the United States, which was adopted by the Northern District of New York in June 2018 to better protect personal and medical information of non-governmental parties, this Memorandum-Decision & Order will identify the plaintiff by her first name and last initial.

3    The Administrative Transcript is found at Dkt. No. 8. Citations to the Administrative Transcript will be referenced as "T." and the Bates-stamped page numbers as set forth therein will be used rather than the page numbers assigned by the Court's CM/ECF electronic filing system.

---

**End of Document**                                          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Mark K. v. Commissioner of Social Security Administration, Not Reported in Fed. Supp....

2019 WL 4757381

2019 WL 4757381

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

MARK K., Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, Defendant.

5:18-cv-627 (GLS)

|

Signed 09/30/2019

**Attorneys and Law Firms**

FOR THE PLAINTIFF: OF COUNSEL: PETER W. ANTONOWICZ, ESQ., Office of Peter W. Antonowicz, 148 West Dominick Street, Rome, NY 13440.

FOR THE DEFENDANT: HON. GRANT C. JACQUITH, United States Attorney, OF COUNSEL: DAVID L. BROWN, ALEXANDER BROCHE, Special Assistant U.S. Attorneys, 100 South Clinton Street, Syracuse, NY 13261, Ellen E. Sovern, Regional Chief Counsel, Office of General Counsel, Region II, 26 Federal Plaza, Room 3904, New York, NY 10278.

## MEMORANDUM-DECISION AND ORDER

Gary L. Sharpe, Senior District Judge

### I. Introduction

**\*1** Plaintiff Mark K. challenges the Commissioner of Social Security's denial of Supplemental Security Income (SSI), seeking judicial review under 42 U.S.C. § 1383(c)(3). (Compl., Dkt. No. 1.) After reviewing the administrative record and carefully considering Mark's arguments, the Commissioner's decision is reversed and remanded for further administrative proceedings.

### II. Background

On March 9, 2015, Mark filed an application for SSI, alleging a disability onset date of January 1, 2011. (Tr.[1] at 254, 347-52.) After his application was denied, (Tr. at 271-76), he requested a hearing before an Administrative Law Judge (ALJ), (*id.* at 277-79), which was held on December 29, 2016, (*id.* at 200-28). On June 8, 2017, the ALJ issued an unfavorable decision denying the requested benefits. (*Id.* at 7-24.) This became the Commissioner's final determination upon the Appeals Council's denial of review. (*Id.* at 1-6.)

Mark commenced the present action by filing his complaint on May 30, 2018 wherein he sought review of the Commissioner's decision. (Compl.) Thereafter, the Commissioner filed a certified copy of the administrative transcript. (Dkt. No. 8.) Each party filed a brief seeking judgment on the pleadings. (Dkt. Nos. 11, 12.)

### III. Contentions

Case 5:24-cv-00169-DNH-ML   Document 27   Filed 02/05/25   Page 122 of 223
Mark K. v. Commissioner of Social Security Administration, Not Reported in Fed. Supp....
2019 WL 4757381

Mark contends: that (1) the ALJ erred in failing to find his mental impairments non-severe, (Dkt. No. 11 at 1); (2) the ALJ improperly assessed Mark's residual functional capacity (RFC),[2] (*id.* at 4); (3) the ALJ did not properly consider his alleged manipulative limitations, (*id.* at 1); and (4) the ALJ failed to properly consider the opinion of his treating physician, (*id.*).

## IV. Facts

The court adopts the parties' factual recitations to the extent they are consistent with the statement of facts contained in the ALJ's decision and supported by the medical record. (Tr. at 10-20; Dkt. No. 11 at 1-9; Dkt. No. 12 at 1.)

## V. Standard of Review

The standard for reviewing the Commissioner's final decision under 42 U.S.C. § 1383(c)(3) is well established and will not be repeated here. For a full discussion of the standard and the five-step process by which the Commissioner evaluates whether a claimant is disabled under the Act, the court refers the parties to its previous decision in *Christiana v. Comm'r of Soc. Sec. Admin.*, No. 1:05-CV-932, 2008 WL 759076, at *1-3 (N.D.N.Y. Mar. 19, 2008).

## VI. Discussion

### A. Severity Determination

First, Mark contends that the ALJ erred by failing to find his mental impairments "severe." (Dkt. No. 11 at 11-12.) The Commissioner counters, and the court agrees, that the ALJ's severity determination was free from legal error and supported by substantial evidence. (Tr. at 12-15; Dkt. No. 12 at 4-8.)

At step two of sequential evaluation, an ALJ must decide whether a claimant has "severe impairments." 20 C.F.R. § 416.920(a)(4)(ii). If not, the claimant's application is denied. *Id.* If so, evaluations proceed to subsequent sequential steps. *Id.* § 416.920(a)(4). "Impairment(s)" must result from "anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 416.921. "Severe" impairments are those that significantly limit a claimant's physical or mental ability to do basic work activities. *Id.* § 416.922(a). The phrase "significantly limits" is not synonymous with "disability." *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995). Rather, it serves to "screen out *de minimis* claims." *Id.* Consequently, "[a] finding of not severe should be made if the medical evidence establishes only a slight abnormality which would have no more than a minimal effect on an individual's ability to work." *Rosario v. Apfel*, No. 97 CV 5759, 1999 WL 294727, at *5 (E.D.N.Y. Mar. 19, 1999) (internal quotation marks and citations omitted).

 **\*2**  When mental impairments are at issue, step two severity findings are determined after applying a "special technique" set out in 20 C.F.R. § 416.920a(b)-(e), which helps the ALJ determine whether a claimant has medically-determinable mental impairments and whether such impairments are severe. An ALJ first "must specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s) and document [those] findings." *Id.* § 416.920a(b)(1). Next, they must assess the degree of functional limitations, *id.* § 416.920a(b)(2), *i.e.*, the degree to which a claimant's impairments functionally limit his or her "ability to function independently, appropriately, effectively, and on a sustained basis," *id.* § 416.920a(c)(2). To complete this assessment, they must "rate the degree of [claimant's] functional limitation" in four areas: (1) "[u]nderstand, remember, or apply information"; (2) "interact with others"; (3) "concentrate, persist, or maintain pace"; (4) "and adapt or manage oneself." *Id.* § 416.920a(c)(3). The rating scale for these categories is a five-point scale: "[n]one, mild, moderate, marked, and extreme." *Id.* § 416.920a(c)(4). An ALJ will generally conclude that mental impairments are not severe when a claimant receives a rating of "none" or "mild." *Id.* § 416.920a(d)(1).

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 123 of 223

Mark K. v. Commissioner of Social Security Administration, Not Reported in Fed. Supp....

2019 WL 4757381

In this case, the ALJ properly found, based upon substantial evidence in the record, that Mark had no more than mild limitations in any of these areas. (Tr. at 14.) With regard to the first functional area of understanding, remembering, or applying information, there is substantial evidence in the record to support the finding that Mark had no limitations. For example, he is able to manage his medications, (*id.* at 212-13), play computer games, do his own laundry and dishes, and cook his own meals, (*id.* at 214). His thought process was reported as "coherent and goal directed with no evidence of ... disordered thinking." (*Id.* at 758.) Additionally, although Mark points to Dr. James Shapiro's findings of "significant symptoms and limitations," (Dkt. No. 11 at 12), such findings note that Mark's "recent and remote memory skills were intact. He was able to recall three objects immediately and after four minutes[,] restate 4 digits forward and 3 digits backward." (Tr. at 758-59.)

In the second functional area of interacting with others, the ALJ found no more than mild limitations, which is also supported by substantial evidence in the record. For example, although Mark had anger issues in the past, (*id.* at 218), he has maintained a romantic relationship with his girlfriend, (*id.* at 215-16), uses public transportation, (*id.* at 210), has been found to be cooperative, (*id.* at 742, 758, 824, 934, 951), and "[h]is manner of relating, social skills, and overall presentation was adequate," (*id.* at 758.) Additionally, Mark attended group therapy sessions, where he "was able to provide an extemporaneous mini-disclosure to introduce himself to the group ... [and] participated fully in the group process and offered up some personal experience to assist others." (*Id.* at 966.)

In the third functional area of concentrating, persisting, or maintaining pace, the ALJ found that Mark has mild limitations, which is supported by substantial evidence in the record. (*Id.* at 14.) For example, he was observed to have no issues in understanding, coherency, concentrating, or talking, (*id.* at 366), and his "attention," "concentration," "recent memory," and "remote skills" were "intact," (*id.* at 758), as "[h]e was able to do counting, simple calculations like 8x2, and serial 3s from 20 .... [and] was able to recall three objects immediately and after four minutes[,] restate 4 digits forward and 3 digits backward," (*id.* at 758-59.) He also testified that he watched television during the day and played computer games. (*Id.* at 214, 216.)

As for the fourth functional area of adapting or managing oneself, the ALJ found that Mark has no limitations, which is supported by substantial evidence. (*Id.* at 14.) For example, he "is able to independently dress, bathe, and groom," can "manage money," (*id.* at 759), and established care for himself at Madison County Mental Health to control his anger, (*id.* at 218, 930). He also received treatment for substance abuse, completed a program, and reported that he has not used cocaine since 2000. (*Id.* at 931). Therefore, contrary to Mark's contention, at step two, the ALJ properly evaluated the severity of his impairments, and there is substantial evidence to support the ALJ's determination that his mental impairments are non-severe.

## B. RFC

**\*3** As noted above, Mark argues, albeit in one stray sentence, that the ALJ failed to address Mark's mental impairments in his RFC. (Dkt. No. 11 at 4.) For this reason, remand is required. A claimant's RFC "is the most [he] can still do despite [his] limitations," because "impairment(s), and any related symptoms ... may cause physical and mental limitations that affect what [he] can do in a work setting." 20 C.F.R. § 416.945(a)(1). In assessing a claimant's RFC, the ALJ must consider "all of the relevant medical and other evidence," *id.* § 416.945(a)(3), and "all of [his] medically determinable impairments of which [the ALJ] is aware, including [his] medically determinable impairments that are not 'severe,' " *id.* § 416.945(a)(2). The ALJ considers a claimant's RFC at steps four and five of the sequential evaluation. *Id.* § 416.920(a)(4)(iv),(v).

Here, at steps four and five, the ALJ's assessment of Mark's RFC did not include any mental limitations, despite his previous assessment of Mark's mild limitations in the functional areas of interacting with others, and concentrating, persisting, or maintaining pace. (Tr. at 14-15.) Rather, after noting that the analysis of mental limitations for steps two and three differs from the analysis for steps four and five, with the latter steps requiring "a more detailed assessment," the ALJ then stated "the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis." (*Id.* at 15.) However, the ALJ did not include any mental limitations in the RFC, and the ALJ never provided an explanation as to why he chose not to include any mental limitations in the RFC, despite his previous assessment of Mark's mild limitations. *See Farrill v. Astrue,* 486 F. App'x 711, 713 (10th Cir. 2012) (remanding ALJ's denial of claimant's application for SSI because of ALJ's failure to include claimant's previously assessed mental impairments in the RFC). Notably,

the ALJ also did not take the time to include any of his observations of Mark's previously assessed mental limitations in steps four or five. This was error. *See Tedesco v. Saul*, No. CV 18-933, 2019 WL 3219229, at *4-5 (D.N.M. July 17, 2019) (finding that, although ALJ did not include claimant's mental limitations in the RFC, the ALJ "peppered" step four "with observations about Plaintiff's mental impairments"). Rather, the ALJ only focused on Mark's physical limitations. (Tr. at 15-18.) For these reasons, the Commissioner's decision is reversed and remanded for further administrative proceedings.

### C. Remaining Findings and Conclusions

Because Mark's remaining contentions, (Dkt. No. 11 at 12-14), may be impacted by the subsequent proceedings directed by this Order, it would be premature to address them at this juncture.

## VII. Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that the decision of the Commissioner is **REVERSED** and **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for proceedings consistent with this Memorandum-Decision and Order; and it is further

**ORDERED** that the Clerk close this case and provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2019 WL 4757381

---

### Footnotes

1    Page references preceded by "Tr." are to the Administrative Transcript. (Dkt. No. 8).

2    Although Mark does not devote a point heading to this argument, and only addresses it under his statement of facts, it is a salient argument that must be addressed.

---

**End of Document**                                   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

1999 WL 294727
United States District Court, E.D. New York.

Leonidas L. ROSARIO, Plaintiff,

v.

Kenneth S. APFEL, Commissioner of Social Security Defendant.

No. 97 CV 5759.
|
March 19, 1999.

**Attorneys and Law Firms**

Binder & Binder (Charles E. Binder, of counsel), New York, for plaintiff.

Zachary W. Carter, United States Attorney, Eastern District of New York (James F. Doyle, of counsel), Brooklyn, for defendant.

MEMORANDUM AND ORDER

NICKERSON, District J.

 **\*1** Plaintiff Leonidas L. Rosario brought this proceeding to review a final determination of the Commissioner of Social Security denying plaintiff disability insurance benefits under Title II of the Social Security Act. 42 U.S.C. §§ 401 *et seq., * 1381 *et seq.* This court has jurisdiction under 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). The Commissioner now moves for judgment on the pleadings. Plaintiff cross-moves for judgment on the pleadings.

Plaintiff, who applied for benefits March 16, 1994, says that she is disabled physically and mentally and that she has been disabled since June 1, 1989 due to asthma, allergies, and lung problems caused by pneumonia. Plaintiff met the special insured status earnings requirement of the Social Security Act for purposes of establishing entitlement to disability insurance benefits through March 31, 1995.

After plaintiff's application was denied initially and on reconsideration at the administrative level, an Administrative Law Judge, David Z. Nisnewitz, held a hearing on July 5, 1995, at which plaintiff was represented by an attorney. The hearing was translated in Spanish and English. On January 24, 1996, the Administrative Law Judge found that plaintiff was not disabled. On August 8, 1997 the Appeals Council denied review, and this action followed.

I

The Administrative Law Judge made the following formal findings. Plaintiff, 37 years old on the date she was last insured, has not worked since June 1, 1989. The medical evidence establishes that plaintiff suffers from a history of asthma, sinusitis, essential hypertension and obesity, and although her physical impairments are severe, she did not have an impairment or combination of impairments listed in or medically equal to one listed in the social security regulations, 20 C.F.R. § 404, App. 1, Subpt. P. No. 4.

Plaintiff's mental impairment was not severe.

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 126 of 223
Rosario v. Apfel, Not Reported in F.Supp.2d (1999)
1999 WL 294727, 61 Soc.Sec.Rep.Serv. 150

Plaintiff's subjective complaints regarding pain and other symptoms were not credible. She has the residual functional capacity for work except for lifting or carrying more than twenty pounds. She can occasionally climb, bend, and use her hands and feet for repetitive movements. Plaintiff is able to perform her past relevant work as a sewing machine operator, and is not "disabled."

II

*Medical Evidence through March 31, 1995*

Plaintiff testified she had been seeing Dr. Luis Locuratolo, a psychiatrist, approximately twice per year since 1989. An x-ray taken on August 14, 1989 of her paranasal sinuses showed chronic sinusitis.

Plaintiff received post-partum gynecological care at Flushing Hospital Medical Center (Flushing) in 1991. A 1992 Flushing clinic record noted that plaintiff complained of pain on the left side of her body, that she related a history of asthma and allergies, and that she reported that her most recent asthma attack had been two years earlier. Examination findings were normal. Plaintiff's lungs were clear. The physician's impression was that she had no organic disease and that she was "probably depressed." The physician recommended routine blood tests and a psychiatric examination, and prescribed Motrin.

 **\*2**  A chest x-ray of December 30, 1993 showed right lower lobe infiltrate, but the examiner ruled out pneumonitis. The next day plaintiff was admitted to Flushing complaining of cough, fever, and blood-tinged sputum. She said that her last asthma attack was in 1991. Plaintiff was not taking any medications at that time. Physical examination was normal, except chest auscultation showed rhonchi. Laboratory tests showed plaintiff had pneumonia, and the discharge diagnosis was pneumonia and bronchial asthma. She was given antibiotics, Proventil for her asthma, advised to resume her regular diet and activity, and released on January 6, 1994.

An x-ray taken at Flushing on January 21, 1994 of plaintiff's paranasal sinuses showed possible frontal sinusitis. She complained of cough, but had no fever and her lungs were clear. The examining physician found mild tenderness around her left eyebrow, noted her history for frontal sinusitis, and prescribed Seldane and Proventil for her allergies and asthma. The physician also noted that plaintiff was "feeling well" and had no complaints of pain.

On January 31, 1994, plaintiff went to Flushing complaining of pain around the eyebrows. The examining physician found mild tenderness in the frontal region and diagnosed frontal sinusitis. Plaintiff's asthma was stable. A chest x-ray was negative.

On March 15, 1994, plaintiff went to the Flushing pulmonary clinic complaining of sore throat. The examining physician determined that she was clinically stable and suggested x-ray and routine tests. An x-ray showed clear lungs and no active disease.

Nine days later, on March 24, 1994, plaintiff went to Flushing for evaluation at the primary care clinic. Plaintiff's lungs were clear, and other examination findings were unremarkable. The examining physician found her asthma stable and advised her to continue taking Seldane and Proventil.

Dr. Locuratolo's report of April 18, 1994 listed plaintiff's history of complaints of backaches, fatigue, daily headaches, anxiety, depressive disorders, "frequent asthma attacks," allergies, sinusitis, and obesity, and noted that she had recently been hospitalized for pneumonia.

His psychiatric examination was anxiety and depressive disorder, and prescribed Atarax and Doxedin. He concluded that plaintiff appeared unable to hold a job and had been unemployed for one year.

On May 13, 1994 Dr. Herbert M. Lachman, who according to plaintiff is a consultative physician for the Commissioner, examined plaintiff and found left-sided conjunctivitis and rhinitis in both nostrils. Her lungs had equal expansion and were clear

to percussion and auscultation. She had bilateral wheezing and rhonchi. She had no limitation of joint motion, and neurologic examination was normal.

Her pulmonary function tests were essentially normal. The clinician who performed the test noted that the low FEV.5 rating suggested a poor initial effort on plaintiff's part. A chest x-ray was negative.

**\*3** Dr. Lachman diagnosed asthma and noted that plaintiff said her home ventilator helped reduce the frequency of her visits to the emergency room. Plaintiff stated that she had asthma attacks twice a week, she averaged about one or two visits to the emergency room each year, and claimed three hospital admissions since 1989 for asthma, plus one for pneumonia. Other than noting that plaintiff is taking Atarax, Dr. Lachman does not mention anything about her mental or emotional condition.

Dr. Locuratolo submitted a noted to the Social Security Administration on June 30, 1994, stating that plaintiff was disabled.

*Medical Evidence after March 31, 1995*
Dr. Locuratolo wrote a letter to plaintiff's attorneys dated April 17, 1995 in which he reiterated plaintiff's complaints noted on his April 18, 1994 report. Dr. Locuratolo said that plaintiff had chronic sinusitis, allergies, and asthma which was severe at times. He recorded plaintiff's hospitalizations for pneumonia, heart palpations, and high blood pressure. He stated that plaintiff was obese, anemic, short of breath, and had gynecological disorders, that she was nervous, tense, tired, sad, and had crying spells and trouble sleeping, that plaintiff appeared unable to hold a job, and that she had been able to work only until June of 1993.

On June 8, 1995, Dr. Azariah Eshkenazi, a neurologist and psychiatrist who is an Assistant Professor of Psychiatry at Mount Sinai School of Medicine, evaluated plaintiff's mental status at the request of plaintiff's attorneys. He said plaintiff reported to him that she last worked two years earlier, at which time her asthma became much worse, her asthma attacks became "extremely frequent," she had headaches and pain in her left arm, and that as a result of her physical condition, she felt very depressed. She spends most of her days crying, wishes she were dead, has no social life, and mostly stays at home and tries to take care of her children.

Dr. Eshkenazi conducted a mental status examination and found plaintiff's speech to be slow but coherent, and her appearance was one of depression and anxiety. Her thought processes were goal directed and productive, and her affect appropriate. Her memory was fair and sensorium clear, though she had some difficulty concentrating. He diagnosed dysthymic disorder secondary to asthma and generalized anxiety. Dr. Eshkenazi opined that plaintiff was disabled from a psychiatric point of view, but that if her physical condition were to improve, her psychiatric condition might also improve.

On Dr. Eshkanazi's mental residual functional capacity assessment of plaintiff he checked boxes indicating that she was markedly limited in her ability to complete a normal workweek without interruptions from psychologically based symptoms, moderately limited in her abilities to remember and carry out detailed instructions and maintain concentration for extended periods, to perform activities within a schedule, and to make independent plans. He found mild limitations in plaintiff's abilities to respond appropriately to criticism from supervisors and get along with co-workers without distracting them. He determined that plaintiff's ability to understand, remember, and carry out one or two step instructions was not limited, and he found no limitations in plaintiff's ability to remember work-like procedures, ask questions, or maintain socially appropriate behavior.

*Evidence Submitted to the Appeals Council*
**\*4** Dr. Locuratolo submitted a letter dated March 14, 1996 reiterating plaintiff's various conditions that he mentioned in his prior report and letter, and added that plaintiff recently injured her left ankle and had chronic gastroenteritis. He opined that she was unable to hold a job.

*Vocational and Other Evidence*

1999 WL 294727, 61 Soc.Sec.Rep.Serv. 150

Plaintiff was born in the Dominican Republic, where she reached the second or third year of high school. She worked as a sewing machine operator from 1983 to 1989. She quit because of chronic sinusitis and allergies, but resumed work for six months in 1993. Thereafter, she cared for her sister-in-law's young child for an unspecified six month period.

She is separated and has three children at home with her. Her husband contributes some money to support the children, and she sees him weekly, but she testified that "he doesn't love me," and she does not wish to resume the relationship.

As a sewing machine operator, plaintiff was required to sit for eight hours, stand or walk for one hour, lift up to ten pounds, and occasionally bend and reach.

She testified that she has been nervous "all the time" since she stopped working, and that she was hospitalized at Flushing in 1991 for pneumonia, and in 1993 and 1994 for asthma.

Plaintiff reported that she cooks and shops with the help of a neighbor, washes dishes, and sweeps up a bit, and that she becomes fatigued after walking about one block. She testified that she stays at home and does not like to do anything, and that she has had crying spells every day for three years.

III

The court reviews the Commissioner's findings only to determine whether they are "supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Beauvoir v. Chater,* 104 F.3d 1432, 1433 (2d Cir.1997); *see* 42 U.S.C. § 405(g). Substantial evidence is "more than a mere scintilla," which means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420 (1971).

*Physical disability*
Based on the medical evidence for the claimed period of disability, the Commissioner could reasonably conclude that plaintiff was not physically disabled.

Plaintiff's numerous chest examinations and x-rays, in addition to her pulmonary function test, all indicate that her asthma was controlled. She received minimal medical treatment for her asthma. Contrary to her complaint of frequent asthma attacks, there is no record of any hospitalizations for asthma, and in 1992, plaintiff said she had not had an asthma attack in two years. Except for when she had pneumonia in December, 1993, each time she was examined her lungs were clear, and she admitted that her home ventilator reduced the frequency of asthma attacks.

Plaintiff claims that the Administrative Law Judge gave insufficient weight to the opinion of her treating physician, Dr. Locuratolo, who said that she was disabled and unable to work.

**\*5** The regulations provide that the Commissioner will give controlling weight to a "treating source's opinion on the issue(s) of the nature and severity" of a claimant's impairments, but only if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence." 20 C.F.R. § 404.1527(d)(2). *See Schisler v.. Sullivan,* 3 F.3d 566 (2d Cir.1993).

The Administrative Law Judge found that Dr. Locuratolo's opinion was not supported by objective medical evidence. Except for a radiographic report he ordered that indicated chronic sinusitis, Dr. Locuratolo's conclusions about her physical condition appear to have been based on plaintiff's own subjective complaints, not on objective clinical data. Although the Commissioner attempted to secure detailed records from plaintiff's doctors, Dr. Locuratolo's letters were not accompanied by clinical or laboratory reports

to demonstrate how he arrived at his conclusions. Because of substantial medical evidence to the contrary, the Administrative Law Judge could reasonably reject Dr. Locuratolo's finding of disability as to plaintiff's physical complaints.

*Mental disability*

The Administrative Law Judge found that plaintiff's mental condition was not "severe." Specifically, he concluded that "the evidence fails to show that [plaintiff's] anxiety or depression contains sufficient signs and symptoms as to satisfy the criteria found in paragraph A of Listing 12.04. It also fails to reveal the severe degree of functional loss as required by paragraph B of such Listing." *See* 20 C.F.R. § 404, App. 1, Subpt. P, No. 12.04.

It is not clear from the Administrative Law Judge's report whether he made a threshold finding of "not severe" at the second level of the five-step sequential evaluation process required by the regulations, or whether he skipped step two and proceeded directly to step three, where plaintiff's impairment is evaluated in terms of the listed impairments. 20 C.F.R. 1520(a). In any event, the court finds that the Administrative Law Judge did not have substantial evidence to conclude that plaintiff's mental impairment was "not severe," either at the second or third level of inquiry.

An impairment is not "severe" at step two if it does not significantly limit the plaintiff's physical or mental ability to do basic work activities. *See* 20 C.F.R. § 404.1521. A finding that a condition is not severe means that the plaintiff is not disabled, and the Administrative Law Judge's inquiry stops at the second level of the five-step sequential evaluation process. 20 C.F.R. § 404.1520(c).

According to the Commissioner's own policy, the threshold severity test should only be used as a *de minimis* screening device to eliminate frivolous claims. *Dixon v. Shalala,* 54 F.3d 1019, 1030 (2d Cir.1995). A finding of "not severe" should be made if the medical evidence establishes only a "slight abnormality" which would have "no more than a minimal effect on an individual's ability to work." Social Security Ruling 85–28, 1985 WL 56856 at *3 (S.S.A.1985), *quoted in Bowen v. Yuckert,* 482 U.S. 137, 154 n. 12 (1987).

 **\*6**  The Administrative Law Judge's statement that "no reference as to any mental or emotional problems were made while the claimant was treated at Flushing Medical Center" is incorrect. There was a report from the hospital that mentioned she was "probably depressed," and the examiner recommended a psychiatric work-up. There is no evidence that such a work-up was performed.

The absence of other reports on her mental condition from her many examinations at Flushing hospital does not necessarily mean that she did not have a severe mental problem. It appears from the record that she went there primarily for physical complaints. In any event, according to a Social Security Ruling, the absence of medical evidence "is only one factor that the adjudicator must consider in assessing an individual's credibility and must be considered in the context of all of the evidence." Social Security Ruling 96–7p, 1996 WL 374186 at *6 (S.S.A. July 2, 1996).

Although the Administrative Law Judge's finding that a claimant is not credible is entitled to considerable deference, *see McVey v.. Shalala,* 1994 WL 764194 (E.D.N.Y. Oct. 19, 1994), he must set forth his reasons for that conclusion "with sufficient specificity to enable [a reviewing court] to decide whether the determination is supported by substantial evidence." *Ferraris v. Heckler,* 728 F.2d 582, 587 (2d Cir.1984). The Administrative Law Judge could reasonably conclude on the basis of substantial evidence in the record that plaintiff's subjective complaints about her physical condition are not credible, but there is not substantial evidence for the same conclusion as to her mental condition.

Plaintiff consistently complained to Dr. Locuratolo, Dr. Eshkenazi, and in her own testimony, of anxiety and emotional problems, including crying spells and trouble sleeping. *See* Social Security Ruling 96–7p, 1996 WL 374186 at *4–5 (S.S.A. July 2, 1996) (consistency of individual's own statements is one strong indication of credibility, especially those made to treating or examining medical sources).

Of course, plaintiff's subjective statements cannot be the sole basis for a finding of disability. 20 C.F.R. § 404.1528(a). There must be objective medical evidence, such as mental status examinations and psychological tests, which reveal a medical impairment that could reasonably be expected to produce the conditions alleged, and which, when considered with all the evidence, indicates that the plaintiff is disabled. *Id.*

Dr. Eshkenazi's mental status examination of plaintiff conducted a little over two months after her special insured status expired reported that her "mood is one of ... depression and anxiety," though he did find plaintiff oriented to time and place, her speech coherent, thought processes goal directed and productive, her affect appropriate, her memory fair and sensorium clear. There is no evidence that Dr. Eshkenazi conducted psychological tests.

His mental residual functional assessment of plaintiff provides additional evidence that plaintiff's mental disability might preclude her from working. While he indicates plaintiff was not limited or only mildly limited in some categories, he found her "markedly limited" in her ability to complete a normal workweek without interruptions from psychologically based symptoms. "Markedly limited" is defined on the form as "Effectively precludes the individual from performing the activity in a meaningful manner."

 **\*7**  Dr. Eshkenazi also found moderate limitations in her ability to understand, remember, and carry out detailed instructions, sustain concentration for extended periods, perform activities within a schedule, maintain regular attendance and punctuality, interact appropriately with the general public, respond to changes in the work place, use public transportation or travel to unfamiliar places, and set goals or make plans independently. "Moderately limited" is defined on the form as "Significantly affects but does not totally preclude the individual's ability to perform the activity."

The Administrative Law Judge must be permitted some flexibility in evaluating the significance of an impairment that affects some, but not all, of the work related functions, *Goodermote v. Secretary of Health and Human Services,* 690 F.2d 5, 8 (1st Cir.1982).

But findings of markedly and moderately limited in the ability to carry out the kind of basic work activities that are described in the regulations, 20 C.F.R. § 404.1521(b), indicate that the impairments have "more than a minimal effect" on plaintiff's ability to work, and thus a threshold finding of "not severe" is not warranted. *See also Figueroa v. Heckler,* 1984 WL 139 at \*5 (S.D.N.Y. April 4, 1984) (listing cases finding no severity only where no more than "moderate" impairment was rated in any category).

The Administrative Law Judge referred to Dr. Eshkenazi's report selectively, and did not even mention the category checked "markedly limited."

As for the treating physician's evidence, while the objective clinical evidence was sufficient to override Dr. Locuratolo's determination that plaintiff was physically disabled, there is no comparable weight to counter his evaluation of plaintiff's mental condition, especially in view of the length of time of the treating relationship, the fact that Dr. Locuratolo's specialty was psychiatry and he prescribed for her Atarax and other medications for anxiety, and the lack of objective medical evidence to the contrary. *See* C.F.R. § 404.1527(d)(2).

The Administrative Law Judge did not cite any medical opinion or objective medical evidence to counter the opinions of Dr. Locuratolo and Dr. Eshkenazi and plaintiff's own subjective testimony regarding her mental disability. The one consultative physician, Dr. Lachman, made no mention of plaintiff's mental condition.

There is insufficient evidence in the record to conclude that plaintiff's mental condition does not significantly limit her basic work activities, and there is some evidence to conclude that it does.

The court finds that the Commissioner did not have substantial evidence to conclude that plaintiff's mental condition was not severe, whether it be at the second or third levels of the evaluation process, and remands the case for a more complete

determination of plaintiff's mental condition, including seeking a consultative doctor who will examine plaintiff and review the medical records regarding plaintiff's mental impairment. The court is especially interested to know how plaintiff could return to her past work as a sewing machine operator with findings of "markedly limited" and "moderately limited" on her mental residual assessment form.

IV

**\*8** The case is remanded for further administrative proceedings.

Both the Commissioner and the plaintiff's motions for judgment on the pleadings are denied.

So ordered.

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 294727, 61 Soc.Sec.Rep.Serv. 150

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 132 of 223

Vogt on behalf of Vogt v. Commissioner of Social Security, Not Reported in Fed. Supp....

2019 WL 4415277

2019 WL 4415277
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Layla M. VOGT, ON BEHALF OF Allen L. VOGT, Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY, Defendant.

18-CV-231
|
Signed 09/16/2019

**Attorneys and Law Firms**

Sarah A. Frederick, Buffalo, NY, for Plaintiff.

Francis D. Tankard, Jeremiah D. Hayes, Office of the General Counsel Social Security Administration, Kansas City, MO, Padma Ghatage, Social Security Administration Office of General Counsel, New York, NY, for Defendant.

DECISION AND ORDER

LAWRENCE J. VILARDO, UNITED STATES DISTRICT JUDGE

**\*1** On February 12, 2018, the plaintiff, Layla M. Vogt, brought this action under the Social Security Act ("the Act"). She seeks review of the determination by the Commissioner of Social Security ("Commissioner") that Allen L. Vogt was not disabled.[1] Docket Item 1. On October 15, 2018, Vogt moved for judgment on the pleadings, Docket Item 10; on December 13, 2018, the Commissioner responded and cross-moved for judgment on the pleadings, Docket Item 13; and on January 7, 2019, Vogt replied. Docket Item 14.

For the reasons stated below, this Court grants Vogt's motion in part and denies the Commissioner's cross-motion.

**BACKGROUND**

**I. PROCEDURAL HISTORY**

On November 20, 2013, Allen L. Vogt applied for Supplemental Security Income benefits ("SSI"). Docket Item 7 at 114. He claimed that he had been disabled since January 1, 2009, due to chronic obstructive pulmonary disease, hypertension, carpal tunnel syndrome, and neuropathy. *Id.* at 114-15.

On January 22, 2014, Vogt received notice that his application was denied because he was not disabled under the Act. *Id.* at 125-35. He requested a hearing before an administrative law judge ("ALJ"), *id.* at 137-45, which was held on December 28, 2015, *id.* at 78. The ALJ then issued a decision on April 29, 2016, confirming the finding that Vogt was not disabled. *Id.* at 55. Vogt appealed the ALJ's decision, but his appeal was denied, and the decision then became final. *Id.* at 5-7.

**II. HEARING TESTIMONY**

Vogt and his attorney engaged in the following dialog with respect to his carpal tunnel syndrome at the hearing:

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 133 of 223

Vogt on behalf of Vogt v. Commissioner of Social Security, Not Reported in Fed. Supp....

2019 WL 4415277

Q. Can you tell me a little bit about your carpal tunnel currently?

A. Well, as you can see, my left hand is quite a bit smaller than my right and the muscle, muscle loss and whatever.

Q. And do you experience carpal tunnel in—you had problems with both hands?

A. Yes.

Q. Okay. Let's talk about the left hand first. I mean which—is one hand better than the other?

A. My right hand is better than my left hand.

Q. Okay. So let's talk about the left hand first. What are you able to do with your left hand.

A. Not much, virtually nothing.

Q. Can you—

A. I can't pick much of anything up.

Q. Can you pick up, like, a coffee mug or a plate?

A. With my right hand, I usually can pick up with my right hand so I don't break it.

Q. So you tend to drop things?

A. Yes.

Q. Okay, so with your—what's the last thing you lifted with your left hand?

A. I don't—I really don't know.

Q. Okay. So you don't use your left hand for—

A. Not much.

Q. Okay.

Docket Item 7 at 92-93. Later, the ALJ clarified:

Q. So since your surgery you haven't used your left hand for much of anything?

**\*2**  A. No, not much of anything.

*Id.* at 95.

### III. RELEVANT MEDICAL EVIDENCE

The following summarizes the medical evidence most relevant to Vogt's claims. Vogt was examined by several different providers but only three—John Callahan, M.D., an orthopedic surgeon; S. David Miller, M.D., a physiatrist; and David Avino, M.D., an internist—are of significance to this Court's review of Vogt's disability claim.

**A. John Callahan, M.D., Orthopedic Surgeon**

On March 22, 2013, Vogt visited John Callahan, M.D., an orthopedic surgeon, with complaints of "left hand pain." Docket Item 7 at 307. Vogt told Dr. Callahan that his hand pain did not arise from a specific injury but instead that his "symptoms have been present for 5 years." *Id.* Vogt also told Dr. Callahan that he had "a continuously sharp and throbbing pain" and rated "his pain as a 6/10 that is worse with activity." *Id.* He reported "associated numbness, shooting pain, popping, snapping, swelling, tingling, and weakness." *Id.* On April 9, 2013, Dr. Callahan noted that there "is intrinsic atrophy of the left hand." *Id.* at 318. On May 1, 2013, Dr. Callahan noted that although Vogt's left hand did not have a "deformity," there was "hypothenar eminence atrophy and intrinsic atrophy of the hands bilaterally." *Id.* at 305.

On June 4, 2013, Dr. Callahan operated on Vogt to address the carpal tunnel syndrome in his left hand. Docket Item 7 at 275-76. Dr. Callahan explained that Vogt had had "progressive signs and symptoms of ... left carpal tunnel and cubital tunnel syndrome, unresponsive to conservative care to date." *Id.* at 275. Ten days later, Vogt followed up with Dr. Callahan's office and a physician assistant supervised by Dr. Callahan noted upon examination that Vogt had "[a]trophy of the left hand." *Id.* at 302.

On September 12, 2013, Vogt complained to Dr. Callahan that he was still experiencing pain in both hands. *Id.* at 331. Dr. Callahan said that "it takes at least 6 months to get more relief" and that "[i]t may take up to 1 1/2 years to totally get full benefit f[rom] the surgery." *Id.* at 332, 345.

### B. S. David Miller, M.D., Physiatrist

On May 9, 2013, Vogt visited S. David Miller, M.D., a physiatrist. Docket Item 7 at 247-51. Vogt's chief complaint was "[w]eakness and atrophy of the left hand." *Id.* at 247. Vogt explained that his hand impairments "develop[ed] ... over the past few years ... without a clear precipitating event/injury." *Id.* Dr. Miller found that there was "intrinsic atrophy of the left hand with relative sparing of left thenar musculature." *Id.*

### C. David Avino, M.D., Internist

On May 23, 2013, David Avino, M.D., an internist, examined Vogt and conducted a stress test. Docket Item 7 at 258. Dr. Avino noted that Vogt

> exercised for 1 minute and 45 seconds on a standard Bruce protocol. He stopped because of leg pain probably due to peripheral occlusive vascular disease of the lower extremities. He achieved a workload of approximately 3 METS. The resting heart rate was 77 and increased to 147 near maximal exercise. This is 92% of the patient's age predicted maximum heart rate. The resting blood pressure was 170/90 and increased to 220/90 near maximal exercise indicating probably a hypersensitive response to exercise. No angina developed.... The Duke treadmill score was round at 2.

**\*3** *Id.*

### IV. THE ALJ'S DECISION

In denying Vogt's application, the ALJ evaluated Vogt's claim under the Social Security Administration's five-step evaluation process for disability determinations. *See* 20 C.F.R. § 404.1520. At the first step, the ALJ must determine whether the claimant is currently engaged in substantial gainful employment. § 404.1520(a)(4)(i). If so, the claimant is not disabled. *Id.* If not, the ALJ proceeds to step two. § 404.1520(a)(4).

At step two, the ALJ decides whether the claimant is suffering from any severe impairments. § 404.1520(a)(4)(ii). If there are no severe impairments, the claimant is not disabled. *Id.* If there are any severe impairments, the ALJ proceeds to step three. § 404.1520(a)(4).

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 135 of 223

Vogt on behalf of Vogt v. Commissioner of Social Security, Not Reported in Fed. Supp...

2019 WL 4415277

At step three, the ALJ determines whether any severe impairment or impairments meet or equal an impairment listed in the regulations. § 404.1520(a)(4)(iii). If the claimant's severe impairment or impairments meet or equal one listed in the regulations, the claimant is disabled. *Id.* But if the ALJ finds that none of the severe impairments meet or equal any in the regulations, the ALJ proceeds to step four. § 404.1520(a)(4).

As part of step four, the ALJ first determines the claimant's residual functional capacity ("RFC"). *See* §§ 404.1520(a)(4)(iv); 404.1520(d)-(e). The RFC is a holistic assessment of the claimant—addressing both severe and nonsevere medical impairments—that evaluates whether the claimant can perform past relevant work or other work in the national economy. *See* 20 C.F.R. § 404.1545.

After determining the claimant's RFC, the ALJ completes step four. 20 C.F.R. § 404.1520(e). If the claimant can perform past relevant work, he or she is not disabled and the analysis ends. § 404.1520(f). But if the claimant cannot, the ALJ proceeds to step five. 20 C.F.R. §§ 404.1520(a)(4)(iv); 404.1520(f).

In the fifth and final step, the Commissioner must present evidence showing that the claimant is not disabled because the claimant is physically and mentally capable of adjusting to an alternative job. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); 20 C.F.R. § 404.1520(a)(4)(v), (g). More specifically, the Commissioner bears the burden of proving that the claimant "retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy." *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999).

In this case, the ALJ determined at step one that Vogt had not engaged in "substantial gainful activity during the period from his alleged onset date of January 1, 2009, through his date last insured of December 31, 3013." Docket Item 7 at 51. At step two, the ALJ found that Vogt had several medically determinable impairments: "chronic obstructive pulmonary disease ("COPD"), carpal tunnel syndrome, and hypertension." *Id.* But the ALJ then found that Vogt "did not have an impairment or combination of impairments that significantly limited the ability to perform basic work-related activities for 12 consecutive months; therefore [he] did not have a severe impairment or combination of impairments." *Id.* at 52.

## STANDARD OF REVIEW

**\*4**  "The scope of review of a disability determination ... involves two levels of inquiry." *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). The court "must first decide whether [the Commissioner] applied the correct legal principles in making the determination." *Id.* This includes ensuring "that the claimant has had a full hearing under the ... regulations and in accordance with the beneficent purposes of the Social Security Act." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)). Then, the court "decide[s] whether the determination is supported by 'substantial evidence.' " *Johnson*, 817 F.2d at 985 (quoting 42 U.S.C. § 405(g)). "Substantial evidence" means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to correct legal principles." *Johnson*, 817 F.2d at 986.

## DISCUSSION

"[T]he Social Security Amendments Act ... define[s] 'disability' as 'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment.' " *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (quoting 42 U.S.C. § 423(d)(1)(A)). At step two of the sequential evaluation process, a disability claim is rejected only "[i]f [a claimant

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 136 of 223

Vogt on behalf of Vogt v. Commissioner of Social Security, Not Reported in Fed. Supp...

2019 WL 4415277

does] not have any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c).

"Step Two may do no more than screen out *de minimis* claims." *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995). The severity requirement at step two "increases the efficiency and reliability of the evaluation process by identifying at an early stage those claimants whose medical impairments are so slight that it is unlikely that they would be found to be disabled even if their age, education, and experience were taken into account." *Bowen*, 482 U.S. at 153. But the step two analysis is designed only to "weed out at an early stage of the administrative process those individuals who cannot possibly meet the statutory definition of disability." *Id.* at 156 (O'Connor, J., concurring). [2] Conversely, step two "does not permit the Secretary to deny benefits to a claimant who may fit within the statutory definition without determining whether the impairment prevents the claimant from engaging in either his prior work or substantial gainful employment that, in light of the claimant's age, education, and experience, is available to him in the national economy." *Id.* at 158. In other words, "[o]nly those claimants with slight abnormalities that do not significantly limit any 'basic work activity' can be denied benefits without undertaking this vocational analysis." *Id.*

An ALJ's decision that a combination of impairments is no greater than "slight abnormalities that do not significantly limit any 'basic work activity,' " *id.*, must be "supported by 'substantial evidence' in the record as whole." *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002). And a step two finding that a claimant's impairment "is nonsevere is not supported by substantial evidence [when] the evidence on which it is based is inconsistent with evidence that [the claimant's impairment] significantly impaired her ability to do basic work activities." *Parker-Grose v. Astrue*, 462 F. App'x 16, 17-18 (2d Cir. 2012). For example, in *Parker-Grose*, the ALJ found at step two that the claimant's depression was nonsevere. *Id.* at 17. But one psychologist had opined that the claimant "was experiencing depression" and another psychologist noted that she experienced " 'moderate symptoms' including 'moderate difficulty in school, work, and social functioning.' " *Id.* at 18 (quoting Admin. R. 455). In that case, substantial evidence did not support the ALJ's conclusion that the claimant's impairment was nonsevere. *Id.*

 **\*5** A review of the cases sustaining step two findings of nonsevere impairments also is instructive. In *Wavercak v. Astrue*, 420 F. App'x 91 (2d Cir. 2011), for example, the claimant alleged that his sleep apnea was a severe impairment, but at the hearing, "when asked to explain how sleep apnea affected him during the time in question, [the claimant] responded that his fatigue and day-time drowsiness were caused more by the pain in his neck than from any sleep disorder." *Id.* at 93. Because the claimant was "unable" to "point to a medical exhibit in the record that documented the presence of sleep apnea" at any relevant time, finding a nonsevere impairment at step two was supported by the record. *Id.*

Likewise, in *Reynolds v. Colvin*, 570 F. App'x 45 (2d Cir. 2014), the plaintiff argued that the ALJ had erred in determining that the claimant, his wife, "was severely impaired by cancer, but not by neck and back pain" between the years 2001 and 2006. *Id.* at 47. The only evidence supporting the significance of that impairment, however, was a "1989 cervical spine MRI and June 3, 1991 office note ... generated more than a decade prior to the relevant period." *Id.* And it was "undisputed that in the interim, [the] claimant worked at substantial gainful activity, a circumstance making it difficult to infer severe impairment from the earlier records." *Id.* Again, the ALJ's finding of a nonsevere impairment at step two was sustained.

Here, there is little doubt that the ALJ's decision at step two was erroneous. More specifically, the finding that Vogt's combination of impairments is no greater than "slight abnormalities that do not significantly limit any 'basic work activity,' " *Bowen*, 482 U.S. at 158 (O'Connor, J., concurring), is not "supported by 'substantial evidence' in the record as whole," *Veino*, 312 F.3d at 586. In fact, that determination "is inconsistent with evidence that [Allen Vogt's combination of impairments] significantly impaired [his] ability to do basic work activities." *Parker-Grose*, 462 F. App'x at 17-18.

To begin, when Vogt appeared before the ALJ at the hearing, he not only used words to describe the nature and severity of his hand impairment, but he also physically showed the ALJ that his "left hand is quite a bit smaller than [his] right." Docket Item 7 at 92. If that were untrue or inaccurate, one would expect the ALJ to have said otherwise at the hearing or to have corrected the record in his decision in his decision. *See Klemens v. Berryhill*, 703 F. App'x 35, 36 (2d Cir. 2017) (quoting *Calzada v. Astrue*, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010)) ("Among the ALJ's legal obligations is the duty to adequately explain his reasoning

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 137 of 223

Vogt on behalf of Vogt v. Commissioner of Social Security, Not Reported in Fed. Supp...

2019 WL 4415277

in making findings on which his ultimate decision rests, and in doing so he must address all pertinent evidence."); *Thomas v. Colvin*, 826 F.3d 953, 961 (7th Cir. 2016) (ALJs must "confront the evidence in [a claimant's] favor and explain why it was rejected before concluding that [his] impairments [do] not impose more than a minimal limitation on [his] ability to perform basic work tasks."); *Chiappa v. Sec'y of Dep't of Health, Educ. and Welfare*, 497 F. Supp. 356, 358 (S.D.N.Y. 1980) ("ALJs must let the parties and the reviewing courts know, in some intelligible fashion, where they stand on pivotal issues of fact posed by the applications they adjudicate."). But the ALJ did neither. And it is hard to fathom how having one hand with atrophy that made it "quite a bit smaller" than the other could be considered a "slight abnormalit[y] that do[es] not significantly limit any 'basic work activity.' " *Bowen*, 482 U.S. at 158 (O'Connor, J., concurring).

**\*6** That is especially so for Vogt, whose last job was working for eighteen years as a "millwright" at an automobile component manufacturer and who alleged a disability beginning at age fifty-five. Vogt worked with his hands, and he would have had trouble adapting to new types of work at his "advanced age." *See* 20 C.F.R. § 404.1563(e). So Vogt's hand atrophy was likely not just a "slight abnormality." *Bowen*, 482 U.S. at 158 (O'Connor, J., concurring).

Vogt's visible hand atrophy was far from the only evidence in support of his impairment, however. Dr. Callahan and Dr. Miller both documented "atrophy of the left hand" multiple times, *see* Docket Item 7 at 247, 302, 318, consistent with Vogt's testimony that his left hand was smaller. Indeed, Vogt's left-hand impairment was so severe that he required surgery during the relevant period. *Id.* at 275-76. What is more, in 2013 Vogt told his treating physicians that his hand pain had been the same for several years. *Id.* at 307. And there is no indication that Vogt worked from the time he had his hand surgery in 2013 until the hearing date in 2015.

Finally, when Vogt stopped seeing Dr. Callahan for financial reasons, his hand problem had not improved significantly. *Id.* at 331-32. Dr. Callahan then told him that it might take up to a year and a half to get the full benefit of surgery. *Id.* at 332, 345. What that full benefit might be, of course, remained to be seen. But Vogt had done what he could to get medical help for his hand issues, *see, e.g., id.* at 286, and it therefore was not surprising that he did not continue to see Dr. Callahan for medical care that would have to pay for himself. *See id.* (noting on September 4, 2013, that Vogt's "insurance will not cover any more visits [and Vogt] therefore did not wish to schedule anymore [sic] visits").

Vogt's hand atrophy and weakness was not his only impairment either. For example, the ALJ summarily dismissed Vogt's hypertension impairment, finding it to be non-severe because "it has been described as benign ... and well controlled with medication." Docket Item 7 at 54. The ALJ also noted that there "is no evidence that hypertension causes the claimant to be significantly limited in his ability to perform basic work-related activities for 12 consecutive months." *Id.* But those findings also are "not supported by substantial evidence since the evidence on which [they are] based is inconsistent with evidence that [Vogt's hypertension] significantly impaired [his] ability to do basic work activities." *Parker-Grose*, 462 F. App'x at 17-18. Specifically, the ALJ's conclusion is inconsistent with Dr. Avino's stress test showing that Vogt could exercise for only a minute and forty-five seconds before experiencing leg pain due to vascular disease. Docket Item 7 at 258. And in that minute and forty-five seconds, Vogt's blood pressure rose from 170/90 to 220/90 "indicating ... a hypersensitive response to exercise." *Id.* That evidence—unaddressed by the ALJ—suggests that Vogt's hypertension may well have been more than a "slight abnormalit[y] that d[id] not significantly limit any 'basic work activity.' " *Bowen*, 482 U.S. at 158 (O'Connor, J., concurring).

For the foregoing reasons, the ALJ's conclusion that Vogt had no impairments that are anything more than "slight abnormalities that do not significantly limit any 'basic work activity,' " *id.*, is not supported by " ' 'substantial evidence' in the record as whole." *Veino*, 312 F.3d at 586. Of course, that does not mean Vogt was disabled. But the ALJ erred by ending his analysis of Vogt's claims at step two and failing to "determin[e] whether [Vogt's] impairment[s] prevent[ him] from engaging in either his prior work or substantial gainful employment that, in light of [Vogt's] age, education, and experience, is available to him in the national economy." *Bowen*, 482 U.S. at 158 (O'Connor, J., concurring). [3]

## CONCLUSION

**\*7**  For the reasons stated above, the Commissioner's motion for judgment on the pleadings, Docket Item 13, is DENIED, and Vogt's motion for judgment on the pleadings, Docket Item 10, is GRANTED in part and DENIED in part. The decision of the Commissioner is VACATED, and the matter is REMANDED for further administrative proceedings consistent with this decision.[4]

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 4415277

---

## Footnotes

1    Allen Vogt passed away on May 6, 2017, while his claim was pending before the Appeals Council. Docket Item 10-1 at 2-3. Allen Vogt's daughter, Layla Vogt, was subsequently designated as the substitute party on his behalf. Docket Item 10-1 at 2-3. The Commissioner does not challenge the authority of Layla Vogt to bring this action. *See Davis ex rel. Maitland v. Colvin*, 2013 WL 1183000, at \*5 n.14 (N.D.N.Y. Feb. 27, 2013).

2    Justice O'Connor's concurring opinion in *Bowen* has been recognized as the controlling interpretation of the step two standard. *See Dixon v. Shalala*, 54 F.3d 1019, 1030-31 (2d Cir. 1995).

3    This Court "will not reach the remaining issues raised by [Vogt] because they may be affected by the ALJ's treatment of this case on remand." *Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

4    On remand, the ALJ also should consider the cause of Vogt's death. Because a "disability" is defined as "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death," 42 U.S.C. § 423(d)(1)(A), if Vogt died from a medically determinable physical or mental impairment, his death could be evidence that one of the impairments he suffered from could have been "expected to result in death," *id.*

---

**End of Document**                                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 398952

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Barbara TRYON, Plaintiff,

v.

Michael J. ASTRUE, Commissioner of Social Security, Defendants.

No. 5:10–CV–537 (MAD).

|

Feb. 7, 2012.

**Attorneys and Law Firms**

Amdursky, Pelky, Fennell & Wallen, P.C., Gregory R. Gilbert, Esq., of Counsel, Oswego, NY, for Plaintiff.

Social Security Administration, Office of Regional Counsel, Region II, Sixtina Fernandez, Esq., of Counsel, New York, NY, for Defendant.

**MEMORANDUM–DECISION AND ORDER**

MAE A. D'AGOSTINO, District Judge.

**I. INTRODUCTION**

 **\*1** Plaintiff Barbara Tryon, brings the above-captioned action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking a review of the Commissioner of Social Security's decision to deny her application for supplemental social security ("SSI") and disability insurance benefits ("DIB").

**II. BACKGROUND**

On May 23, 2007, plaintiff protectively filed an application for SSI and DIB benefits. (Administrative Transcript at p. 106–118). [1] Plaintiff was 42 years old at the time of the application with no prior work history. Plaintiff claims that she suffered from chronic back and leg pain and problems with her right arm and hand due to a motor vehicle accident in May 2003. (T. 144). Plaintiff claimed to be disabled as of April 27, 2005. On August 29, 2007, plaintiff's applications were denied and plaintiff requested a hearing by an ALJ which was held on September 29, 2009. (T. 21). On November 12, 2009, the ALJ issued a decision denying plaintiff's claim for benefits. (T. 8–16). The Appeals Council denied plaintiff's request for review on March 26, 2010, making the ALJ's decision the final determination of the Commissioner. (T. 1–4). This action followed.

**III. DISCUSSION**

The Social Security Act (the "Act") authorizes payment of disability insurance benefits to individuals with "disabilities." The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment ... which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). There is a five-step analysis for evaluating disability claims:

"In essence, if the Commissioner determines (1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled

if (5) there is not another type of work the claimant can do." The claimant bears the burden of proof on the first four steps, while the Social Security Administration bears the burden on the last step.

*Green–Younger v. Barnhart,* 335 F.3d 99, 106 (2d Cir.2003) (quoting *Draegert v. Barnhart,* 311 F.3d 468, 472 (2d Cir.2002)); *Shaw v. Chater,* 221 F.3d 126, 132 (2d Cir.2000) (internal citations omitted).

A Commissioner's determination that a claimant is not disabled will be set aside when the factual findings are not supported by "substantial evidence." 42 U.S.C. § 405(g); *see also Shaw,* 221 F.3d at 131. Substantial evidence has been interpreted to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The Court may also set aside the Commissioner's decision when it is based upon legal error. *Rosa v. Callahan,* 168 F.3d 72, 77 (2d Cir.1999).

**\*2** Here, the ALJ found at step one that plaintiff has not engaged in substantial gainful activity since the alleged onset date, April 27, 2005. (T. 10). At step two, the ALJ concluded that plaintiff suffered from degenerative disc disease of the lumbar spine which qualified as a "severe impairment" within the meaning of the Social Security Regulations (the "Regulations"). (T. 10). At the third step of the analysis, the ALJ determined that plaintiff did not have an impairment or combination of impairments that meet or equal the severity of any impairment listed in Appendix 1 of the Regulations. (T. 11). The ALJ found that plaintiff had the residual functional capacity ("RFC") to, "perform the full range of light work" and specifically, "during an 8–hour workday, the claimant can lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk for a total of 6 hours, and sit for a total of 6 hours". (T. 12). At step four, the ALJ concluded that plaintiff had no past relevant work. (T. 15). At step five, relying on the medical-vocational guidelines ("the grids") set forth in the Regulations, 20 C.F.R. Pt. 404, Subpt. P, App. 2, the ALJ found that plaintiff had the RFC to perform jobs existing in significant numbers in the national economy. (T. 15). Therefore, the ALJ concluded that plaintiff was not under a disability as defined by the Social Security Act. (T. 16).

In seeking federal judicial review of the Commissioner's decision, plaintiff argues that: (1) the ALJ erred in failing to find that plaintiff's neck and right arm complaints were "severe impairments"; (2) the ALJ failed to properly apply the treating physician rule; (3) the ALJ failed to acknowledge the report from the state agency examining physician, Dr. Shayevitz; (4) the ALJ ignored the applicable Regulations and improperly assessed plaintiff's credibility; and (5) the ALJ's RFC determination is not supported by substantial evidence. (Dkt. No.).

## A. Severity of Impairments

Plaintiff argues that the ALJ erred when he determined that plaintiff's neck and right shoulder impairments were "non-severe". A "severe" impairment is one that significantly limits an individual's physical or mental ability to do basic work activities. *Meadors v. Astrue,* 370 F. App'x 179, 182 (2d Cir.2010) (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). The Regulations define "basic work activities" as the "abilities and aptitudes necessary to do most jobs," examples of which include,

(1) Physical functions such as walking, standing, lifting, pushing, pulling, reaching, carrying, or handling;

(2) Capacities for seeing, hearing, and speaking;

(3) Understanding, carrying out, and remembering simple instructions;

(4) Use of judgment;

(5) Responding appropriately to supervision, co-workers and usual work situations; and

(6) Dealing with changes in a routine work setting.

20 C.F.R. § 404.1521(b); see also Social Security Ruling 85–28, 1985 WL 56856, at \*3–4, Titles II and XVI: Medical Impairments That Are Not Severe (S.S.A.1985).

2012 WL 398952

**\*3** Plaintiff has the burden at step two in the sequential evaluation process to demonstrate the severity of her impairment. *See* 20 C .F.R. § 404.1520(c). The severity analysis at step two may do no more than screen out *de minimis* claims. *Dixon v. Shalala,* 54 F.3d 1019, 1030 (2d Cir.1995). The "mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment" is not, itself, sufficient to deem a condition severe. *McConnell v. Astrue,* 2008 WL 833968, at \*2 (N.D.N.Y.2008) (citing *Coleman v. Shalala,* 895 F.Supp. 50, 53 (S.D.N.Y.1995)). "Often when there are multiple impairments, and the ALJ finds that only some of the impairments, but not others, are severe, any error in the severity analysis is harmless because the ALJ continues with the with the sequential analysis, and does not deny plaintiff's application based on the second step alone." *Kemp v. Comm. of Soc. Sec.,* 2011 WL 3876526, at \*8 (N.D.N.Y.2011).

### 1. Medical Evidence Relating to Neck and Right Arm/Shoulder Impairments

From March 2004 until August 2008, plaintiff received treatment from Syracuse Orthopedic Specialists for complaints of pain in her neck and right arm/shoulder. The record contains a total of twelve treatment notes from Dr. Richard Zogby for the relevant time period and impairments (three visits in 2004; three visits in 2005; one visit in 2006; three visits in 2007 and one visit in 2008). On March 4, 2004, plaintiff complained of right shoulder pain. On examination, Dr. Zogby found, "right shoulder reveals stiffness with pain, internal external rotation". (T. 288). Dr. Zogby noted, "she has really significant problems with her shoulder at this time". On April 2, 2004, plaintiff complained of shoulder pain and the objective examination revealed the same results. Dr. Zogby diagnosed plaintiff with pain in her shoulder and commented, "as far as the shoulder is concerned, I feel this could be something that could be treated by Dr. Cooke who has seen her in the past and I will refer her for that". (T. 284). The record contains no evidence of any treatment with Dr. Cooke. In April 2004, an MRI of plaintiff's right shoulder revealed tendinosis without evidence of a rotator cuff tear and some inflammation with slight impingement . [2] (T. 436, 439). On September 14 2004, Dr. Zogby's objective evaluation contained the same notation, "right shoulder reveals stiffness with pain, internal external rotation". (T. 281). In 2005, 2006 and 2007, plaintiff treated with Dr. Zogby for other impairments but made no complaints of neck or right arm/shoulder pain. During that time, Dr. Zogby offered no diagnosis, treatment or opinion relating to those alleged impairments. Indeed, plaintiff did not make any further complaints regarding her neck or right arm/shoulder until August 2008. On August 5, 2008, Dr. Zogby noted that plaintiff reported pain into her right arm with weakness. Dr. Zogby found pain present in her cervical region and limited range of motion in plaintiff's shoulder. (T. 493–496). On September 13, 2008, Dr. Zogby completed a Medical Assessment Form and opined that plaintiff could occasionally lift/carry up to 10 pounds. (T. 488).

**\*4** On December 6, 2006, plaintiff was examined by Berton Shayevitz, M.D., at the request of the agency. (T. 342). Dr. Shayevitz noted that plaintiff's "principal problem is low back pain" but also noted that since her automobile accident, she suffered pain in her right arm and hand and pain in the right trapezius muscle over the right scapula. Upon examination, the doctor noted that plaintiff was in "no acute distress", her gait and cervical rotation were normal. Forward and lateral flexion of her neck was limited due to tightness and some stiffness. (T. 344). Plaintiff's range of motion in her right shoulder was full except for forward elevation. Dr. Shayevitz diagnosed plaintiff with degenerative disc disease in the low back and cervical radiculopathy down the right arm, "although somewhat lacking in physical findings in the right arm and in the back". (T. 345). Dr. Shayevitz "strongly suspected" degenerative disease in the neck with radiculopathy. (T. 345). Dr. Shayevitz concluded that plaintiff was moderately and markedly limited in sitting, standing, walking, lifting, carrying, bending, pushing and pulling by her low back problem. Plaintiff was also moderately and markedly limited in the use of her right arm and shoulder in terms of lifting, pushing, pulling and carrying. Finally, plaintiff was moderately limited in motions of her neck and activities dependent on neck motions like driving and operating machinery. (T. 346).

In February 2007, plaintiff sought treatment at the New York Pain Center for complaints of pain in her right upper extremity. [3] (T. 356). Upon examination, Linda Ehrich, ANP, writing for Joseph Tiso, M.D., noted that plaintiff exhibited tenderness in her right trapezius. The doctor requested a cervical MRI. [4] On March 1, 2007, plaintiff returned to the Pain Center complaining of neck pain. Upon examination, plaintiff exhibited a normal station and gait, full range of motion in her neck and head and tenderness with flexion, extension and rotation. (T. 355).

### 2. Analysis

The ALJ found that plaintiff's degenerative disc disease in the lumbar spine was a severe impairment. Plaintiff's complaints of pain in her neck and right arm/shoulder and her treatment for said complaints, was sporadic. All objective medical testing evidence relating to her neck and right arm/shoulder was normal. Despite the absence of objective evidence, Dr. Zogby and Dr. Shayevitz opined that plaintiff's ability to do work related activities was impaired by pain in her neck and right arm/shoulder. However, even assuming that the ALJ erred when he failed to acknowledge these opinions and find that plaintiff's neck and right arm/shoulder complaints were medically determinable impairments that limited her ability to do work, that omission does not constitute reversible error. The ALJ's omission of these impairments at Step Two of the analysis amounts to no more than "harmless error" because the ALJ continued with the sequential analysis. In the remaining steps, the ALJ discussed all of plaintiff's medical treatment and considered plaintiff's neck and right arm impairments in determining plaintiff's RFC. Indeed, the ALJ concluded, "plaintiff can lift/carry twenty pounds occasionally and ten pounds frequently". *See O'Grady v. Comm. of Soc. Sec.,* 2011 WL 3652432, at *4 (N.D.N.Y.2011) (the Secretary continued with the analysis and considered the claimant's cervical condition in plaintiff's RFC). As the ALJ proceeded with the analysis and included plaintiff's severe and non-severe impairments in the RFC determination, there is no basis to remand this matter based upon the ALJ's step two analysis.

### B. Application of Treating Physician Rule and Evaluation of Opinion Evidence

 **\*5** Plaintiff argues that the ALJ misapplied the treating physician rule when he failed to assign controlling weight to Dr. Zogby's opinions. Plaintiff also claims that the ALJ failed to evaluate or consider the opinions of the state agency examining physician, Dr. Shayevitz.

Under the Regulations, a treating physician's opinion is entitled to "controlling weight" when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with substantial evidence in [the] case record." 20 C .F.R. § 404.1527(d)(2); *see also Rosa,* 168 F.3d at 78–79; *Schisler v. Sullivan,* 3 F.3d 563, 567 (2d Cir.1993). An ALJ may refuse to consider the treating physician's opinion controlling only if he is able to set forth good reason for doing so. *Saxon v. Astrue,* 781 F.Supp.2d 92, 102 (N.D.N.Y.2011). The less consistent an opinion is with the record as a whole, the less weight it is to be given. *Otts v. Comm'r of Soc. Sec.,* 249 F. App'x 887, 889 (2d Cir.2007) (an ALJ may reject such an opinion of a treating physician "upon the identification of good reasons, such as substantial contradictory evidence in the record").

When an ALJ refuses to assign a treating physician's opinion controlling weight, he must consider a number of factors to determine the appropriate weight to assign, including:

> (i) the frequency of the examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

20 C.F.R. § 404.1527(d)(2). "Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." *Snell v. Apfel,* 177 F.3d 128, 133 (2d Cir.1999)).

The opinion of a treating physician is not afforded controlling weight where the treating physician's opinion contradicts other substantial evidence in the record, such as the opinions of other medical experts. *Williams v. Comm'r of Soc. Sec.,* 236 F. App'x 641, 643–44 (2d Cir.2007); *see also Veino v. Barnhart,* 312 F.3d 578, 588 (2d Cir.2002) (citing 20 C.F.R. § 404.1527(d)(2)). When a treating physician's opinions are inconsistent with even his own treatment notes, an ALJ may properly discount those opinions. *See Halloran v. Barnhart,* 362 F.3d 28, 32 (2d Cir.2004). "While the final responsibility for deciding issues relating to disability is reserved to the Commissioner, the ALJ must still give controlling weight to a treating physician's opinion on

the nature and severity of a plaintiff's impairment when the opinion is not inconsistent with substantial evidence. *See Martin v. Astrue,* 337 F. App'x 87, 89 (2d Cir.2009).

### 1. Medical Evidence

As discussed, plaintiff had twelve visits with Dr. Zogby from March 2004 through August 2008. [5] During those visits, Dr. Zogby's objective examinations of plaintiff's lumbar spine and lower extremities were consistently normal. On nearly every occasion, Dr. Zogby found that plaintiff's station and gait were normal and straight leg raising was negative bilaterally. The range of motion in plaintiff's lower extremities was full and painless. Additionally, as previously noted, Dr. Zogby's objective findings with respect to plaintiff's neck and right arm/shoulder were minimal. In April 2004, Dr. Zogby noted that he reviewed MRI films of plaintiff's lumbar spine and while no report had been prepared, he opined that the films revealed a disk bulge/protrusion at L5–S1 with disk dessication. [6] (T. 285). Dr. Zogby diagnosed plaintiff with discogenic syndrome. [7] Dr. Zogby referred plaintiff to the New York Pain Center for treatment. On August 11, 2004, plaintiff underwent an evaluation at the Pain Center. [8] Upon examination, plaintiff exhibited a normal station and gait and normal range of motion. Due to insurance issues, treatment was deferred. In June 2006, a lumbar discogram revealed concordant pain at L5–S1 with a small anular tear and epidural spread of contrast and some "atypical" increase in her pain symptoms at L3–4 and L4–5. [9] The report of the discogram indicates "no focal disk herniation". On October 3, 2006, plaintiff presented at the Pain Center with complaints of low back pain. The doctor noted that plaintiff's MRI of her lumbar spine was "normal". Upon examination, plaintiff exhibited a normal station and gait, pain upon flexion, extension and rotation and a full range of motion. Plaintiff was scheduled for a nerve block and advised to pursue physical therapy. In January 2007, without any further diagnostic films or additional objective findings, Dr. Zogby diagnosed plaintiff with a herniated disc with myelopathy. [10] (T. 508).

**\*6** In September 2008, Dr. Zogby prepared a Medical Assessment Form regarding plaintiff's ability to do work-related activities. In addition to the restrictions involving carrying and lifting, as discussed above, Dr. Zogby opined that plaintiff could sit for two hours in an eight hour workday and stand/walk for one hour. Dr. Zogby noted that plaintiff's response to treatment and prognosis were "poor". (T. 490).

In 2004 and 2005, plaintiff treated with various physicians at St. Joseph's Hospital Health Center, Family Practice Center. (T.361). On February 18, 2005, plaintiff treated with Sherin Varkey, M.D. for low back pain. (T. 364). Dr. Varkey discussed plaintiff's prior MRI and noted that it revealed that plaintiff suffered from a disc bulge/protrusion at L5–S1 with dessication. Dr. Varkey diagnosed plaintiff with low back pain and noted, "I will find out about who will accept the patient for diskography and a cortisone shot ... and also she wanted some Lortab, which I will write a prescription for chronic low back pain". [11] (T. 364). On April 22, 2005, plaintiff returned to Dr. Varkey complaining of increased back pain. (T. 365). Upon examination, plaintiff had mild tenderness in the lumbar region but her motor exam in both extremities was 5/5, her sensory exam was normal and her reflex exam was 2+ bilaterally in both lower extremities. Dr. Varkey diagnosed plaintiff with discogenic syndrome and provided plaintiff with Lortab and Skelaxin. [12] (T. 365). On July 8, 2005, plaintiff inquired as to whether Dr. Varkey could increase her Lortab prescription. (T. 366). Upon examination, Dr. Varkey noted that plaintiff was, "generally in no apparent distress. Back shows low back pain and mild tenderness on palpation". (T. 366). On March 24, 2006, plaintiff treated with Amber Shaff, M.D. for a follow up for medications. Dr. Shaff noted that plaintiff was taking Lortab and complaining of constipation. (T. 373). Upon examination, Dr. Shaff found a full range of motion, strength at 5/5 in all extremities and no loss of sensation. Dr. Shaff diagnosed plaintiff with chronic back pain and noted that a 2004 MRI of plaintiff's lumbar spine showed "normal spine, no significant disk bulge, herniation or stenosis". Dr. Shaff refilled plaintiff's prescription for Lortab but noted, "I suspect that she may be abusing these pain medications. This is the first time I am seeing her, I discussed with the patient the potential for addiction". (T. 373). Dr. Shaff opined that plaintiff's complaints of constipation were secondary to the pain medication and prescribed a laxative. (T. 374).

### 2. Dr. Zogby

The ALJ assigned "little weight", to Dr. Zogby's assessment explaining:

> Little weight is given to the general opinions of Dr. Borio [13] and Dr. Zogby, concluding that she is "temporary totally disabled", as the determination of whether the claimant is disabled under the definition of the Social Security Act is an issue reserved exclusively to the Commissioner. Further, little weight is also given to Dr. Zogby's assessment form as it is inconsistent with his treatment notes which indicated that while the claimant appeared to be in mild discomfort, palpation of the lumbar area revealed only mild right paraspinal tenderness, her gait was normal, and the straight leg test was negative bilaterally.

**\*7** Upon review of the record, the Court agrees with the ALJ's assessment of Dr. Zogby's opinions. Dr. Zogby's September 2008 opinions regarding plaintiff's limitations are not supported by substantial medical evidence. Plaintiff's physicians at St. Josephs Health Care Center continually noted that plaintiff was in no acute distress, her motor and strength examinations were normal, sensory exams were normal and her range of motion was full. In addition, Dr. Tiso's notes indicate that plaintiff's objective medical testing was normal. While the lumbar MRI report is not part of the record herein, the physicians at St. Joseph's Health Care Center and the physicians at the Pain Center, noted that the films were negative/normal.

Moreover, Dr. Zogby's own objective testing further belies his conclusions. Upon examination, Dr. Zogby consistently found that plaintiff exhibited negative straight leg raising, a normal gait and normal strength testing. Dr. Zogby also stated that plaintiff walked "with no apparent pain or difficulty" finding only that she appeared in "mild pain". The limitations as expressed by Dr. Zogby in his September 2008 examination are far more limiting than any restrictions discussed in his office records and do not coincide with his contemporaneous findings. Accordingly, the ALJ assigned the appropriate weight to these opinions. *See Wynn v. Astrue,* 617 F .Supp.2d 177, 184 (W.D.N.Y.2009) (the significant limitations were not supported by objective assessments such as range of motion and strength tests). Although the Court is aware that deference should be accorded to Dr. Zogby's opinions pursuant to the treating physician rule, the ALJ articulated "good reasons" for failing to afford the opinions such weight. *See Bennett v. Astrue,* 2010 WL 3909530, at \*6 (N.D.N.Y.2010) (citation omitted). Accordingly, the matter will not be remanded for further consideration of this issue.

### 3. Dr. Shayevitz

The treating physician rule does not apply to consulting doctors. *See Goldthrite v. Astrue,* 2008 WL 445770, at \*10 (W.D.N.Y.2008). However, where the ALJ fails to give controlling weight to opinions from plaintiff's treating sources, the Regulations require an ALJ to explain the weight given to the opinions of state agency medical consultants. *Stytzer v. Astrue,* 2010 WL 3907771, at \*7 (N.D.N.Y.2010).

Here, the ALJ was not required to assign controlling weight to Dr. Shayevitz's opinions as he was a consulting physician who examined the plaintiff on one occasion. However, because the ALJ declined to afford "controlling weight" to Dr. Zogby's opinion, the ALJ was required to explain the weight he afforded to other medical evidence. In this regard, the ALJ reasoned:

> I have given great weight to Dr. Putcha because of her specialty as an orthopedic surgeon, and her report is based on a review of the evidence in record. [14] I also give some weight to Dr. Ganesh's consultative examination because of her programmatic expertise and because it is based on an examination of the claimant. [15] (T. 15).

**\*8** The ALJ failed to specifically assign weight to Dr. Shayevitz opinions. However, upon review of the entire decision, it is clear that the ALJ considered and relied upon Dr. Shayevitz's opinions. The ALJ referred to Dr. Shayevitz's examination in the context of discussing plaintiff's right shoulder complaints:

> Berton Shayevitz, M.D. noted that the examination was lacking in physical findings in the claimant's right arm. (T. 11).

The ALJ also cited to Dr. Shayevitz's findings in a discussion of plaintiff's daily activities:

> In terms of activities of daily living, the claimant reported being able to tend to her personal needs; and do light cleaning, laundry and shopping. Socially the claimant lives with her son and boyfriend, socializes with her friends, and uses Facebook as a form of communicating with her friends. With regards to concentration, persistence or pace, the claimant is able to read, write, watch television, and use the Internet without any difficulties. (T. 11).

Finally, the ALJ noted that Dr. Shayevitz's report is consistent with the finding that claimant was capable of performing light work. (T. 13).

Despite the fact that the ALJ failed to specifically assign weight to Dr. Shayevitz's opinion, the ALJ clearly considered the opinion and thus, the Court declines to remand this matter on that basis. *See Barringer v. Comm'r of Social Sec.,* 358 F.Supp.2d 67, 78–79 (N.D.N.Y.2005) (an ALJ's failure to cite specific evidence does not indicate that it was not considered).

### C. Credibility

Plaintiff claims that the ALJ should have considered her efforts to alleviate her pain in connection with plaintiff's credibility assessment. Specifically, plaintiff contends that her "longstanding attempts at pain relief" should enhance her credibility.

"The ALJ has discretion to assess the credibility of a claimant's testimony regarding disabling pain and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant." *Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir.1979). If plaintiff's testimony concerning the intensity, persistence or functional limitations associated with his impairments is not fully supported by clinical evidence, the ALJ must consider additional factors in order to assess that testimony, including: 1) daily activities; 2) location, duration, frequency and intensity of any symptoms; 3) precipitating and aggravating factors; 4) type, dosage, effectiveness and side effects of any medications taken; 5) other treatment received; and 6) other measures taken to relieve symptoms. 20 C.F.R. §§ 404.1529(c)(3)(i)-(vi), 416.929(c)(3)(i)-(vi). The issue is not whether the clinical and objective findings are consistent with an inability to perform all substantial activity, but whether plaintiff's statements about the intensity, persistence, or functionally limiting effects of his symptoms are consistent with the objective medical and other evidence. *See* SSR 96–7p, 1996 WL 374186, at \*2 (SSA 1996). One strong indication of credibility of an individual's statements is their consistency, both internally and with other information in the case record. SSR 96–7p, 1996 WL 274186, at \*5 (SSA 1996).

**\*9** After considering plaintiff's subjective testimony, the objective medical evidence, and any other factors deemed relevant, the ALJ may accept or reject claimant's subjective testimony. *Saxon,* 781 F.Supp.2d at 105 (citing 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4)). An ALJ rejecting subjective testimony must do so explicitly and with specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his decision is supported by substantial evidence.

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 146 of 223
**Tryon v. Astrue, Not Reported in F.Supp.2d (2012)**
2012 WL 398952

*Melchior v. Apfel,* 15 F.Supp.2d 215, 219 (N.D.N.Y.1998) (quoting *Brandon v. Bowen,* 666 F.Supp. 604, 608 (S.D.N.Y.1987) (citations omitted)). The Commissioner may discount a plaintiff's testimony to the extent that it is inconsistent with medical evidence, the lack of medical treatment, and her own activities during the relevant period. *Howe—Andrews v. Astrue,* 2007 WL 1839891, at *10 (E.D.N.Y.2007).

In this case, the ALJ, citing to SSR 96–7p, found plaintiff "not credible" based upon the objective medical evidence and her activities of daily living. (T. 13). Having reviewed the Administrative Transcript in its entirety, the Court finds that the ALJ correctly applied the standard, enumerated in 20 C.F.R. § 404.1529(c)(3)(i)-(iv), in assessing plaintiff's credibility. The ALJ discussed plaintiff's daily activities noting that she was able to grocery shop, do household chores, use the Internet/Facebook, read, play Scrabble and help her son with his homework. (T. 14). The ALJ also commented on plaintiff's pain, the duration of the pain, aggravating factors, plaintiff's medication and plaintiff's attempts to alleviate her pain:

> The claimant also reported having neck pain everyday. She indicated that any activity would exacerbate her pain. More specifically, she cannot sit for more than an hour, and can only walk for a couple of minutes. In addition, she is unable to walk too far due to shooting pain in her leg. Despite taking medication for her pain five times a day, she testified that she still has pain, and is chronically fatigued.

The claimant is unable to drive or visit with friends and family. A side effect of her medication includes constipation, which has caused abdominal pain. She also pursued non-surgical treatments for her back pain, such as medication, injections, physical therapy and transforaminal block; yet, the claimant's symptoms still remain. (T. 12).

The ALJ found plaintiff less than credible because the objective medical testing, including MRI films and clinical findings do not support her testimony. To wit, in February 2004, plaintiff advised her doctors at St. Joseph's Health Care Center that her low back pain "is much improved" and that she "doesn't really have any complaints currently". (T. 360). Moreover, plaintiff discussed her activities of daily living with Dr. Shayevitz and Dr. Kalyani Ganesh. (T. 475). Plaintiff stated that she could cook, clean, do laundry and light chores (with the exception of vacuuming and sweeping). Plaintiff could care for her personal needs, watch television and read. She lived with her significant other, her two children and her two grandchildren. Plaintiff also stated that she liked to socialize with friends. (T. 343).

 **\*10**  Plaintiff argues, without factual or legal support, that the ALJ should have found her credible based upon her persistent efforts to obtain relief from pain. Plaintiff refers to her frequent use of prescription medication and the gastrointestinal side effects; her chiropractor visits and the fact that she received six nerve blocks. Based upon the record, the ALJ properly assessed plaintiff's treatment and applied the Regulations. In October 2003, plaintiff received seven chiropractic treatments. (T. 228). There is no further evidence of any chiropractic treatment. Plaintiff had four physical therapy treatments in 2005 and nine sessions in 2006. (T. 300). Plaintiff has not had any physical therapy since November 2006. With regard to nerve blocks, as with all of plaintiff's medical treatment, the time in between treatments was lengthy. In 2007, Dr. Shaff suspected the plaintiff was abusing Lortab and other pain medications. Plaintiff claims that she "persistently" sought to alleviate her pain, however the substantial medical evidence does not support such efforts sufficient to warrant an enhancement of her credibility.

"To the extent the ALJ's RFC findings rested on his determination of plaintiff's credibility, it was 'within the discretion of the [Commissioner] to evaluate the credibility of plaintiff's complaints and render an independent judgment in light of the medical findings and other evidence regarding the true extent of such symptomatology' ". *Cohen v. Astrue,* 2011 WL 2565659, at *22 (S.D.N.Y.2011) (citations omitted). Taken as a whole, the record supports the ALJ's determination that plaintiff was not entirely credible. The Court finds that the ALJ employed the proper legal standards in assessing the credibility of plaintiff's complaints of pain and adequately specified the reasons for discrediting plaintiff's statements.

## D. RFC

Plaintiff claims that the ALJ's RFC determination that plaintiff could perform the full range of "light work" is not supported by substantial evidence.

Residual functional capacity is:

> "what an individual can still do despite his or her limitations .... Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."

*Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir.1999) (quoting SSR 96–8p, Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims ("SSR 96–8p"), 1996 WL 374184, at *2 (S.S.A. July 2, 1996)). In making the RFC determination, the ALJ must consider a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis. 20 C.F.R. § 404.1545(a).

 **\*11**  Here, the ALJ found that plaintiff had the RFC to perform a full range of light work. Plaintiff argues that the ALJ failed at Step Five of the sequential analysis based upon the same arguments asserted above. The Court has determined that the ALJ assigned the appropriate weight the medical opinion evidence and properly assessed plaintiff's credibility. Thus, the Court finds that the ALJ employed the correct legal standards and that substantial evidence supports the ALJ's RFC determination.

## IV. CONCLUSION
**IT IS HEREBY,**

**ORDERED,** that the decision denying disability benefits be AFFIRMED; and it is further

**ORDERED** that defendant's motion for judgment on the pleadings (Dkt. No. 9) is GRANTED; and it is further

**ORDERED** that plaintiff's complaint is **DISMISSED;** and it is further

**ORDERED** that pursuant to General Order # 32, the parties are advised that the referral to a Magistrate Judge as provided for under Local Rule 72.3 has been RESCINDED, as such, any appeal taken from this Order will be to the Court of Appeals for the Second Circuit, and it is further

**ORDERED** that the Clerk of Court enter judgment in this case.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 398952

2012 WL 398952

## Footnotes

1    "(T.)" refers to pages of the administrative transcript, Dkt. No. 6.

2    The MRI report is not part of the record herein.

3    Plaintiff previously sought treatment and received epidural injections at the Pain Center for lower back

4    There is no indication in the record that this testing was performed.

5    The record also contains four office notes from January 2004 through March 2004. However, those visits were for complaints of pain unrelated to issues presented on this appeal. In addition, the record contains one office note from December 2009 but the record is incomplete.

6    The MRI report is not part of the record herein.

7    Discogenic Syndrome is derangement of an intervertebral disc. *Dorland's Illustrated Medical Dictionary,* 534 (31st Ed.2007).

8    The records indicate that the August 2004 visit was a "follow up". However, the record does not contain any evidence of prior treatment at the Pain Center.

9    A discogram is a radiograph of an intervertebral disk. *Dorland's* at 553.

10   Myelopathy is a functional disturbances or pathological change in the spinal cord, often referring to nonspecific lesions in contrast to the inflammatory lesions of myelitis. *Id.* at 1239.

11   Lortab is a semisynthetic opioid analgesic derived from codeine but having more powerful sedative and analgesic effects. *Dorland's* at 890, 1090.

12   Skelaxin is a centrally acting skeletal muscle relaxant used in the treatment of painful musculoskeletal conditions. *Dorland's* at 1163, 1748.

13   Dr. Joseph Borio was plaintiff's chiropractor. Plaintiff does not dispute the weight afforded to his opinions.

14   Dr. Putcha did not examine plaintiff but performed a review of the record for the agency. Plaintiff does not contest or dispute the weight afforded to her opinions.

15   On July 26, 2007, Dr. Kalyani Ganesh performed an internal medicine consultative examination at the request of the agency. Plaintiff does not contest or dispute the weight afforded to her opinions.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 3876526
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Georgette KEMP, Plaintiff,
v.
COMMISSIONER OF SOCIAL SECURITY, Defendant.

No. 7:10–CV–1244 (GLS/ATB).
|
Aug. 11, 2011.

**Attorneys and Law Firms**

Lawrence D. Hasseler, Esq., for Plaintiff.

Maria Fragassi Santangelo, Special Asst. U.S. Attorney for Defendant.

## REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

**\*1**  This matter was referred to me for report and recommendation by the Honorable Gary L. Sharpe, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d). This case has proceeded in accordance with General Order 18.

## I. PROCEDURAL HISTORY

Plaintiff filed [1] an application for disability insurance benefits on March 4, 2008, claiming disability since February 17, 2007. (Administrative Transcript (hereinafter "T.") at 144–150). Plaintiff's applications were initially denied on June 12, 2008, and she requested a hearing before an ALJ. (T. 46–47, 84). Plaintiff testified at the hearing, which was conducted on May 12, 2010. (T. 24–53).

In his June 25, 2010 decision, the ALJ found that plaintiff was not disabled. (T. 8–23). The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on September 28, 2010. (T. 1–3).

## II. ISSUES IN CONTENTION
The plaintiff makes the following claims:

1. The ALJ failed to properly assess the severity of plaintiff's impairments. (Plaintiff's Brief (Pl.'s Br.) at 9–13).

2. The ALJ failed to properly evaluate plaintiff's residual functional capacity (RFC). (Pl.'s Br. at 13–18).

3. The ALJ erred in determining there was other work the plaintiff could perform in the national economy. (Pl.'s Br. at 18–20).

For the reasons below, the court will recommend affirming the Commissioner's decision.

Case 5:24-cv-00169-DNH-ML     Document 27     Filed 02/05/25     Page 150 of 223
Kemp v. Commissioner of Social Sec., Not Reported in F.Supp.2d (2011)
2011 WL 3876526

## III. APPLICABLE LAW

### A. Disability Standard

To be considered disabled, a plaintiff seeking disability insurance and supplemental security income benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months...." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. § 404.1520 and in 416.920 to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If [she] is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits [her] physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider [her] disabled without considering vocational factors such as age, education, and work experience .... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [she] has the residual functional capacity to perform [her] past work. Finally, if the claimant is unable to perform [her] past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*2 *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. *Id.* However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

### B. Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Rosado v. Sullivan,* 805 F.Supp. 147, 153 (S.D.N.Y.1992) (citing *Johnson v. Bowen,* 817 F.2d 983, 985 (2d Cir.1987)). A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson,* 817 F.2d at 986. In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Ferraris v. Heckler,* 728 F.2d 582, 587 (2d Cir.1984).

2011 WL 3876526

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan,* 923 F.2d 964, 967 (2d Cir.1991). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Williams on behalf of Williams v. Bowen,* 859 F.2d 255, 258 (2d Cir.1988) (citations omitted). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB,* 197 U.S. 229 (1938)); *Williams,* 859 F.2d at 258.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams,* 859 F.2d at 258. However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id. See also Rutherford v. Schweiker,* 685 F.2d 60, 62 (2d Cir.1982).

## IV. MEDICAL EVIDENCE [2]

Plaintiff claims disability, beginning in February or 2007, based on a variety of physical and mental impairments, including scoliosis, affective disorder, substance abuse disorder, asthma, arthritis in her shoulder, high cholesterol, and migraine headaches. The record contains a March 23, 2006 report from Dr. Zofia Mroczka, a neurologist. [3] (T. 237–40). Dr. Mroczka examined the plaintiff and noted that she was no longer taking anti-seizure medication and had been "seizure free for almost two years." (T. 239). Dr. Mroczka stated that a recent MRI of plaintiff's brain showed no abnormalities. (T 239). A CT scan of plaintiff's brain on August 24, 2006, showed no hemorrhage, infarction, or lesions. (T. 235). On October 3, 2006, plaintiff reported that her headaches had improved by eighty percent, and that she had not had a seizure in almost three years. (T. 237). Dr. Mroczka diagnosed plaintiff with tension headaches and a single-episode seizure. [4] *Id.* On June 20, 2007, another CT scan of plaintiff's brain revealed no acute abnormalities. (T. 236).

**\*3** On January 15, 2007, plaintiff went to the Generations Family Health Center (GFHC), complaining of pain in her left shoulder that had been bothering her for a few months. (T. 266). An MRI of plaintiff's shoulder showed moderate arthritis, and the treating nurse, Julie Trainor, referred plaintiff to Dr. Kevin Reagan, an orthopedic surgeon. (T. 266). Plaintiff told Nurse Trainor that she smoked a half-pack of cigarettes per day. (T. 266). During a follow-up visit on February 27, 2007, Nurse Trainor reported that Dr. Reagan gave plaintiff a cortisone injection, and that plaintiff was going to meet with Dr. Reagan on March 7, 2007, to discuss surgical options. (T. 262).

Dr. Reagan performed a left shoulder arthroscopic acromioplasty and distal clavicle resection on April 2, 2007. (T. 251). During the surgery, Dr. Reagan took the plaintiff's shoulder through a range of motion, and noted that there was no further impingement. (T. 251). Plaintiff began physical therapy for her shoulder on April 5, 2007. (T. 250). On April 12, 2007, plaintiff told Nurse Trainor that the physical therapy was already helping. (T. 261). Plaintiff's physical therapist noted that plaintiff reported no pain in her shoulder, and she was discharged from physical therapy on May 2, 2007. (T. 241). On December 4, 2008, plaintiff visited GFHC complaining of pain in her neck and back. (T. 355–56). A few months later, on March 4 and May 27, 2009, she continued to complain of right shoulder pain (T. 346–347, 359–60).

Beginning on August 14, 2006, plaintiff attended "mental health therapy" once or twice per month at United Services, Inc. (T. 272). In April of 2008, Tina Lekacos, a Social Worker from United Services, Inc. completed a "Mental Health Questionnaire" for plaintiff. [5] (T. 272–75). The questionnaire stated that plaintiff was diagnosed with bipolar disorder and cannabis abuse in full remission. (T. 272). The questionnaire also stated that plaintiff often suffered from a depressed mood, occasional suicidal thoughts, and low self-esteem. (T. 272–74). However, the questionnaire also indicated that in the past year, plaintiff's functioning had been gradually improving. (T. 272).

The questionnaire also asked about plaintiff's "Activities of Daily Living" ("ADLs"), "Social Interactions," and "Task Performance." (T. 273–74). Plaintiff had "no problem" using good judgment regarding safety and dangerous circumstances,

respecting/responding appropriately to those in authority, carrying out single-step instructions, focusing long enough to finish simple tasks, and changing from one simple task to another. *Id.* Plaintiff would only have a "slight problem" taking care of personal hygiene, caring for her physical needs, and asking questions or requesting assistance "at times." *Id.* In the categories of handling frustration, the reviewer marked both a slight problem and an obvious problem. (T. 273). With respect to carrying out multi-step instructions, the social worker circled both "no problem" and "a slight problem." (T. 274). Finally, the social worker wrote "unknown" regarding plaintiff's ability to use appropriate coping skills to meet the ordinary demands of a work environment, interacting appropriately with others in a working environment, and getting along with others without distracting them or exhibiting behavioral extremes. (T. 273–74). As a "comment" in reference to plaintiff's ability to get along with others, the social worker wrote that plaintiff "struggles with her mental health symptoms and has low self esteem." (T. 274). In another one of the "comments" boxes, the social worker wrote that if tasks were not simple, plaintiff might have a slight to obvious problem. (T. 274). There was no rating for the ability to perform basic work activities at an appropriate pace and no rating for the length of time that plaintiff would be able to perform basic work activities. [6] (T. 274).

**\*4** Plaintiff continued her treatment at United Services until June 10, 2009. [7] (T. 363–429). In addition to Tina Lekacos, plaintiff worked with various staff members at United Services, On September 3, 2008, Linda Lamoureux, a licensed alcohol and drug abuse counselor, noted that plaintiff was "falling back both in substance use and dealing with mood." (T. 428). Plaintiff told her counselor that plaintiff quit her job because "it was too overwhelming to her." (T. 428). Subsequently, plaintiff complained to her counselors of depression due to homelessness. (*See e.g.* T. 415, 417, 427, 420, 421). She lived in her car with her boyfriend. *Id.* On December 2, 2008, plaintiff told her counselor that she had been involved in an accident with her boyfriend's car in November of 2008, but they were still able to live in the car. [8] (T. 410). She began to feel better when they obtained temporary housing. (T. 403–407). In April of 2009, plaintiff reported she was feeling better because she had a more permanent place to live. (T. 376).

On March 10, 2009, plaintiff's counselor, Linda Lamoureux, noted that plaintiff had been using marijuana for the prior three weeks and was again struggling with depression due to reduced income. (T. 385). Plaintiff left treatment in June 2009, and the Progress Notes for June 3, 2009, indicated that plaintiff's mood was euthymic and she did not appear anxious or depressed. (T. 367).

On August 20, 2009, plaintiff was evaluated by Dr. Muhammad Saleem, a psychiatrist from the Ogdensburg Mental Health Clinic. (T. 430–33 [9] ). Plaintiff told Dr. Saleem that she had frequent suicidal thoughts, but said she did not plan on acting on them. (T. 430–31). She also told Dr. Saleem that she had attempted suicide three times in the past and had been hospitalized in Connecticut four times for psychiatric illness. (T. 430, 435). Dr. Saleem diagnosed bipolar disorder, "depressed," alcohol abuse (by history), cannibis abuse (by history), esophageal reflux, chronic airway obstruction, allergy (unspecified), and epilepsy (unspecified). (T. 431–32). Dr. Saleem measured plaintiff's Global Assessment of Functioning (GAF) at 60. (T. 433). Dr. Saleem concluded that plaintiff needed therapy/counseling to help treat her symptoms of depression and mood swings. (T. 433). He also stated that plaintiff needed help adjusting to her new environment as she had recently moved to the area. *Id.*

Plaintiff continued her treatment with Dr. Saleem. The record contains a report, dated February 12, 2010, stating that the plaintiff was feeling well, her sleep was good, her appetite was good, and she had been taking her medications regularly. (T. 434). Doctor Saleem concluded that plaintiff was "showing improvement" and did not change her medications at that time. *Id.*

Plaintiff was referred to Dr. Ronald Jolda for a consultative examination by the State of Connecticut, Bureau of Rehabilitation Services, Disability Determination Services. (T. 281). In a report, dated May 23, 2008, Dr. Jolda stated plaintiff had a "quiet seizure disorder," and that plaintiff's last two seizures were on November 21, 2002, and January, 2003. (T. 277–280). Plaintiff told Dr. Jolda that she continued to have headaches, but was treating them with over-the-counter analgesics. (T. 277). Dr. Jolda concluded that plaintiff's headaches were tension related. (T. 280). Dr. Jolda also noted that plaintiff suffered from minor scoliosis, and experienced pain in her lower back when she sat or stood for longer than 30 minutes. (T. 278). Plaintiff reported that she would have to change position to alleviate the pain. *Id.* Dr. Jolda indicated that "both shoulders have full [range of

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 153 of 223
Kemp v. Commissioner of Social Sec., Not Reported in F.Supp.2d (2011)
2011 WL 3876526

motion] and are non-tender to palpation and are normal." (T. 279). Plaintiff told Dr. Jolda that she smoked a pack of cigarettes per day. (T. 277). Dr. Jolda stated that plaintiff did not have chronic obstructive pulmonary disease, and that plaintiff had not been hospitalized in the past year for her asthma, but used inhalers and medications regularly. (T. 277, 280).

 **5** Plaintiff was also treated at Heuvelton Health Center ("HHC") in New York State. The record contains a report, dated July 27, 2009, based upon a visit to HHC for a New York State Department of Social Services physical for "medical and financial assistance." (T. 453–54). The report states that plaintiff had recently moved to "the area" to be with her father. (T. 453). The report is signed by Jean Belliger, a Nurse Practitioner (NP). (T. 454). The report states that plaintiff "does not appear to have any physical ailments," and that "for walking there is no evidence of limitations for more than 4 hours a day, for moderate limited, possibly 2 to 4 hours a day standing, sitting, lifting, pushing, pulling, vision, hearing, speaking, stairs, climbing." (T. 453–54).

Plaintiff complained of pain in her right shoulder during a visit to Heuvelton Health Center on October 1, 2009, and stated that she had injured her right shoulder, neck, and back in the November 29, 2008, car accident. (T. 444). The report indicated that when plaintiff was seen at Heuvelton Health Center in July 2009, she did not complain of any physical concerns or shoulder pain. (T. 444). During the October 2009 visit, however, plaintiff reported that she had difficulty bringing her right arm across her shoulder, and NP Bellinger noted that plaintiff appeared to only be able to move her right arm "approximately one-fourth of the normal rotation." (T. 444). Plaintiff told NP Bellinger that she had quit smoking in August 2009, and NP Bellinger stated that plaintiff had audible wheezes posteriorly, and she was taking Advair for her asthma. (T. 456).

On November 4, 2009, plaintiff reported that she could not move her arm higher than a 45–degree angle and that she had "pain releasing across her chest." (T. 446). Plaintiff returned to Heuvelton Health Center on November 17, 2009, for a follow-up visit to review an MRI, which revealed moderate osteoarthritic changes, which were deemed to be posttraumatic or osteoarthritic in nature. (T. 448).

Plaintiff returned to the Heuvelton Health Center on June 28, 2010, complaining of lower back pain, but did not mention shoulder pain, and Allison Smith, Physician Assistant (PA), noted "strength is 5/5 upper and lower extremities." (T.459). PA Smith also noted that plaintiff's lungs were clear, but that plaintiff reported that she smoked seven to eight cigarettes per day and was still using Advair. (T. 459). An x-ray of plaintiff's lumbar spine revealed moderate degenerative changes. (T. 462).

The record contains reports from two non-examining physicians, Dr. Nathaniel Kaplan and Dr. Dinesh Shah. (T. 301–308; 310–17). On June 9, 2008, Dr. Nathaniel Kaplan noted that plaintiff had remained seizure-free since 2003 (nearly five years), despite being off anti-seizure medication, and that she had a "completely normal musculoskeletal exam (just minimal scoliosis but full [range of motion] in back)." (T. 306, 308). Dr. Kaplan wrote that plaintiff would have no limitations pulling or pushing and would be able to pull fifty pounds upward. (T. 302). He concluded that plaintiff had no severe limitations due to arthritis. (T. 306). On August 7, 2008, Dr. Shah also completed a Physical Residual Functional Capacity Assessment, and also reported that plaintiff's musculoskeletal exam was normal, plaintiff's back had a full range of motion, despite minimal scoliosis, and she had no limitations due to arthritis. (T. 315, 317).

## V. TESTIMONY and NON–MEDICAL EVIDENCE

 **6** Born on November 20, 1968, plaintiff was 41 years old at the time of the ALJ's hearing. (T. 25). At the time of the hearing, plaintiff testified that she lived in a house with her boyfriend and his seven year-old son. (T. 31). However, she also stated that she did not provide care for anyone else, and she did not normally provide care for her boyfriend's son. (T. 26, 31). Plaintiff held jobs as a laborer, a sandwich maker, a shift supervisor of a fast food restaurant, and as a salesclerk in a convenience store. (T. 42).

Plaintiff testified that she last worked on January 23, 2003, but stopped working after she had two seizures at work. (T. 26). She testified that the psychiatrists she had been seeing in Connecticut told her that she could not work. (T. 27). Plaintiff testified that she had problems with drugs in the past, but at the time of the hearing, was clean and sober, and stayed clean and sober by going to substance abuse counseling once a week. (T. 34).

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 154 of 223
Kemp v. Commissioner of Social Sec., Not Reported in F.Supp.2d (2011)
2011 WL 3876526

Plaintiff testified that she had suicidal thoughts, but never acted on them. (T. 28). She also testified that she had anxiety attacks in public places or when she went shopping by herself. (T. 28). Plaintiff testified that when she became depressed, she would stay depressed for weeks at time. (T. 34). When depressed, plaintiff testified that she would stay in her pajamas, would not shower or clean, would stay in bed or watch television, and would cry all day. (T. 34–35). Plaintiff testified that her last depressive episode was the week prior to the hearing. (T. 35).

Plaintiff further testified that she did not like to be around other people, including family members, and would rather stay at home alone. (T. 29). Plaintiff testified that her memory and concentration were poor, and she did not like to go on long drives because she would forget where she was going. (T. 29–30). Plaintiff testified that she had problems with authority figures, because she "[could not] take people telling [her] what to do," and when she failed to do exactly, or failed to understand exactly, what her boss told her to do, it would cause problems, and she would often lose her job as a result. (T. 37).

Plaintiff testified that she could cook, do dishes, make beds, and vacuum. (T. 30–31). She also testified that her hobbies were crocheting and reading novels, but that she could only concentrate on reading for five to ten minutes at a time. (T. 29–30). Plaintiff also testified that standing for more than twenty minutes caused her lower back pain, but that she could stand and bend over to touch her knees. (T. 28–29).

Plaintiff testified that on a normal day she would get up around seven o'clock in the morning, eat a bagel or toast with coffee, and smoke a cigarette. (T. 31). She testified that she watched television in her living room, let her three dogs out, and watched more television. (T. 32). Plaintiff testified that, for the rest of the day, she would tidy the house, and her boyfriend would help her with the rest of the housework when he came home from work. (T. 33).

**\*7**  In addition to scoliosis and bipolar disorder, plaintiff testified that she had an enlarged bladder and two fibroid tumors, which gave her urinary incontinence. (T. 38). She testified that the medications she took caused nausea, vomiting, constipation, and fatigue. (T. 38, 40). Plaintiff testified that she continued to have a prescription for Advair and used an albuterol inhaler three to four times per week for her asthma. (T. 39–40).

## VI. ALJ'S DECISION

The ALJ found plaintiff had not engaged in substantial gainful activity since February 17, 2007, the alleged onset date, and plaintiff had the following severe impairments: mild scoliosis, affective disorder, and substance abuse disorder. (T. 11). The ALJ found that the record contained evidence of the following non-severe impairments: asthma, arthritis of the shoulder, high cholesterol, and migraine headaches. (T. 12). However, the ALJ found that plaintiff's allegations of chronic obstructive pulmonary disease (COPD), acid reflux, and irritable bowel syndrome were not supported by medical evidence, and they were thus not medically determinable impairments. (T. 12).

The ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926). (T. 13). The ALJ considered listings 1.00(L) (abnormal curvatures of the spine), 12.04 (affective disorders), and 12.06 (anxiety disorders), but found that plaintiff's impairments did not meet the specific requirements of the listings. (T. 13–14).

The ALJ found that plaintiff could perform light work, [10] except that she was limited to occasional climbing of ladders and scaffolds, and to occasional crouching. (T. 14). Because of plaintiff's mental limitations, the ALJ found that she could only perform one- or two-step tasks and could only have occasional interaction with others. (T. 14). The ALJ further found that the objective medical evidence contradicted plaintiff's testimony, and that plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were not credible to the extent they were inconsistent with the RFC. (T. 17). The ALJ also stated that plaintiff's history of marijuana use, and evidence that her conditions improved when she stopped using drugs, further detracted from her credibility. *Id.*

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 155 of 223
Kemp v. Commissioner of Social Sec., Not Reported in F.Supp.2d (2011)

2011 WL 3876526

Although the ALJ determined plaintiff had past relevant work experience as a laborer, sandwich maker, manager, and sales clerk, he found plaintiff would be unable to return to her previous work due to her impairments. (T. 18). The ALJ consulted a vocational expert (VE), who testified that plaintiff could work as a hand packer, production worker, or production inspector. (T. 43). The VE stated that there were 163,000 hand packer jobs, 100,000 production worker jobs, and 16,000 production inspector jobs in the national economy and 1,800 hand packer jobs, 900 production worker jobs, and 220 production inspector jobs in Connecticut. [11] *Id.* The ALJ found plaintiff was not disabled. (T. 19).

## VII. DISCUSSION

### A. Severe Impairments

#### 1. Applicable Law

**\*8** At Step 2 of the Commissioner's sequential analysis, the ALJ must evaluate whether the plaintiff has a severe impairment that significantly limits her ability to do basic work activities. *See* 20 C.F.R. § 404.1520(a)(ii). Basic work activities include the ability to walk, stand, sit, lift, push, pull, reach, carry, handle, see, speak, and hear. 20 C.F.R. 404.1521(b)(1)-(5). The severity requirement is used to screen out *de minimis* claims. *Dixon v. Shalala,* 54 F.3d 1019, 1030 (2d Cir.1995). The threshold showing required to establish the requisite level of severity is modest, *Hurlbert v. Comm'r of Social Sec.,* No. 6:06–CV–1099, 2009 WL 2823738, at \*10 (N.D.N.Y. Aug. 31, 2009), and where the evidence of impairment rises above the *de minimis* level, further analysis is required. *Kelly v. Astrue,* 09–CV–1359, 2011 WL 817507, at \*4 (N.D.N.Y. Jan.18, 2011) (citing *Dixon v. Shalala,* 54 F.3d 1019, 1030 (2d Cir.1995)). However, a finding that an impairment is not severe may be made *when medical evidence establishes a slight abnormality,* which would have no more than a minimal effect on an individual's ability to work. *Bowen v. Yuckert,* 482 U.S. 137, 154 n. 12, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987) (internal quotations omitted); SSR 88–3c.

Often when there are multiple impairments, and the ALJ finds that only some of the impairments, but not others, are severe, any error in the severity analysis is harmless because the ALJ continues with the with the sequential analysis, and does not deny plaintiff's application based the second step alone. *See Cook v. Astrue,* No. 08–CV–1351, 2011 WL 2490996, at \*4 (N.D.N.Y. May 24, 2011) (RR, Bianchini, M.J.), *adopted* June 22, 2011 (McAvoy, SJ) (finding any error in the severity analysis was harmless because the regulations require that non-severe impairments be considered in addition to severe impairments in determining RFC).

#### 2. Analysis

In this case, plaintiff argues that her asthma, her shoulder impairment, seizure disorder, and her headaches are severe impairments, and that the ALJ erred in determining otherwise. This court finds that the ALJ's findings are supported by substantial evidence, and in any event, any error would have been harmless because the ALJ proceeded beyond step two and considered all of plaintiff's impairments in making the determination that plaintiff could perform other work in the national economy and in determining that plaintiff's claims of additional limitations were not credible. (T. 14–18).

##### a. Asthma

From January through April 2007, plaintiff did not suffer from wheezes, rales, or rhonchi, despite smoking half a pack of cigarettes each day. (T. 261–66). On April 12, 2007, Nurse Trainor counseled plaintiff to stop smoking, but plaintiff continued to smoke through the date of her hearing on May 12, 2010, even though it is clear that smoking could exacerbate plaintiff's allegedly severe asthma. (T. 261, 455; *see* T. 31, 37). On May 23, 2008, Dr. Jolda classified plaintiff's asthma as "mild," and noted that the plaintiff had been not been hospitalized in the previous year for asthma symptoms, had not visited the ER in six months, and had not used an oral steroid in the past year to relieve asthma symptoms. (T. 277, 280). He also found no shortness of breath on exertion. (T. 278). Although plaintiff also alleged that she had chronic obstructive pulmonary disease (COPD), affecting her breathing, Dr. Jolda specifically ruled out COPD in his April 2008 report. (T. 280).

**\*9** On July 27, 2009, NP Bellinger noted that plaintiff's airways were diminished, but no crackles or wheezes were heard. (T. 442). She stated that there was no evidence that plaintiff's asthma would limit her ability to walk more than 4 hours a day or to engage in moderate lifting, pushing, or pulling. (T. 443). The ALJ noted that plaintiff stated she had applied for work as a gas station attendant, and found that this fact detracted from plaintiff's credibility regarding the limiting effect of her asthma-related symptoms because "it is difficult to avoid exposure to fumes while working [in a gas station] environment. (T. 12). The fact that plaintiff has smoked and continues to smoke also belies her claim that she has severe asthma symptoms. The medical evidence supports the ALJ's conclusion that plaintiff's asthma does not limit her capacity to perform basic work activities and is, therefore, not a severe impairment.

### b. Shoulder Impairment

Plaintiff had surgery on her *left* shoulder on April 2, 2007, to repair damage caused by arthritis. (T. 251). After the procedure, the attending surgeon, Dr Reagan, noted there was no further impingement on plaintiff's range of motion. (T. 251). Plaintiff participated in physical therapy for her shoulder from April 5, 2007, through May 2, 2007. (T. 241–250). Upon discharge, plaintiff reported that her pain was a "zero out of ten." (T. 241).

Dr. Jolda found that plaintiff had a full range of motion in her upper extremities and "both shoulders have full [range of motion] and are non-tender to palpation and are normal," even though plaintiff indicated that her left shoulder "sometimes bothers her." (T. 278–79). Although plaintiff told NP Bellinger in October of 2009, that plaintiff hurt her right shoulder in a November 2008 car accident, (T. 444), the medical records generated directly following the accident, show that plaintiff complained only of neck pain. (T. 355, 358). Plaintiff did report right shoulder pain in March and May 2009, but did not report shoulder pain during a July 2009 exam. (T. 346, 359–60, 442). In her July 27, 2009 report, NP Bellinger stated that the plaintiff "does not appear to have any physical ailments." (T. 442). In October of 2009, NP Bellinger repeated that in July of 2009, plaintiff stated that "she did not have any physical concerns [, and] that she was not able to be employed because she [could not] be around a lot of people." (T. 444). An MRI from November 5, 2009, showed plaintiff had moderate osteoarthritic changes in her right shoulder, with moderate marrow edema of the lateral clavicular head and the medial aspect of the acromion, but the cartilage was normal, the bicep tendon was properly seated, and the rotator cuff was intact. (T. 447).

During an examination on June 28, 2010, PA Smith noted that plaintiff's strength in her upper extremities was "five out of five," and there was no evidence that plaintiff complained of shoulder pain during that visit. (*See* T. 459–460). Additionally, plaintiff did not mention any shoulder pain during her June 2010 hearing. (*See* T. 20–45). No doctors found that plaintiff's alleged shoulder pain limited her ability to perform basic work activities. Therefore, the ALJ properly found that plaintiff's alleged shoulder impairment was not severe.

### c. Seizure Disorder and Headaches

**\*10** Plaintiff told Dr. Jolda that she blacked out on Nov. 21, 2002, and that people who were nearby told her she had a seizure. (T. 277). Plaintiff reported that she had another seizure in January 2003. (T. 277–278). Dr. Mroczka, a neurologist, treated plaintiff and took her off anti-seizure medication in early 2006. (T. 239). MRIs of plaintiff's brain in March 2006 revealed nothing abnormal. (T. 239). Furthermore, CT brain scan results from October 2006 showed atrophy consistent with plaintiff's age, but no abnormalities. (T. 237). A second CT scan from June 2007 also showed no abnormalities. (T. 236). Dr. Mroczka also changed plaintiff's diagnosis from seizure disorder on March 23, 2006, to "single episode of seizure" on October 3, 2006, after plaintiff had been seizure-free for three years. (T. 237, 239).

Plaintiff also reported having migraine headaches. (T. 239). However, while plaintiff complained of intense headaches in March 2006, she informed Dr. Mroczka in October 2006 that the headaches had improved by eighty percent. (T. 237–239). In May 2008, plaintiff told Dr. Jolda that she still had tension-type headaches, but Dr. Jolda noted that plaintiff obtained relief for these headaches with over-the-counter medication. (T. 280).

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 157 of 223
Kemp v. Commissioner of Social Sec., Not Reported in F.Supp.2d (2011)

2011 WL 3876526

No doctors found that plaintiff's seizures or headaches limited her ability to perform basic work activities. Plaintiff had been seizure-free for several years. Therefore, the ALJ properly found that plaintiff's seizure disorder and headaches were not severe.

### B. Residual Functional Capacity/Credibility

#### 1. Applicable Law

A claimant's residual functional capacity (RFC) is "what an individual can still do despite his or her limitations," in an ordinary work setting, on a regular and ongoing basis. *Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir.1999). A "regular and ongoing basis" means for 8 hours a day, 5 days a week, or an equivalent schedule. *Id.* When making an RFC determination, the ALJ considers all of claimant's impairments which may limit her ability to work in an ordinary setting on a regular and ongoing basis. 20 C .F.R. § 404.1545(a). The ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R. § § 404.1545, 416.945.

However, an ALJ does not have to accept entirely the credibility of plaintiff's subjective allegations. *Marks v. Apfel,* 13 F.Supp.2d 319, 323 (N.D.N.Y.1998). "An ALJ may properly reject claims of severe, disabling pain after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility." *Lewis v. Apfel,* 62 F.Supp.2d 648, 651 (N.D.N.Y. Apr.22, 1999) (quoting *Gallardo v. Apfel,* No. 96 CIV 9435,1999 WL 185253, at *5 (S.D.N.Y. March 25, 1999)). The ALJ may properly find plaintiff's statements to lack credibility where they are inconsistent with medical findings and plaintiff fails to follow medical advice. Social Security Ruling ("SSR") 96–7p. If the ALJ finds plaintiff's contentions are not credible, the ALJ must state his reasons "explicitly and with sufficient specificity to enable the court to decide whether there are legitimate reasons for the ALJ's disbelief." *Smith v. Astrue,* 09–CV–921, 2011 WL 1205132, at *9 (N.D.N.Y. Mar.7, 2011) (quoting *Brandon v. Bowen,* 666 F.Supp. 604, 608 (S.D.N.Y.1987).

**\*11** In his decision, the ALJ must also specify the functions a claimant is capable of performing. *Martone v. Apfel,* 70 F.Supp.2d at 150 (citing *Ferraris v. Heckler,* 728 F.2d 582, 588 (2d Cir.1984). Furthermore, the RFC assessment must include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue,* 5:09–CV–1120, 2010 WL 3825629 at *6 (N.D.N.Y. Aug.17, 2010) (citing SSR 96–8p). Where substantial evidence in the record exists to support each requirement listed in the regulations, an RFC finding will be upheld. *LaPorta v. Bowen,* 737 F.Supp. 180, 183 (N.D.N.Y.1990).

#### 2. Analysis

Plaintiff contends that the ALJ's determination that plaintiff could perform light work with some limitations was not supported by substantial evidence, that the ALJ failed to give sufficient weight to her subjective allegations regarding the severity of her symptoms, and that he failed to properly consider the evidence in the record. This court, however, finds that the ALJ's RFC finding was supported by substantial evidence, and that he properly found that, to the extent that plaintiff alleged greater limitations, she was not credible.

#### a. Substantial Evidence

The ALJ found plaintiff could perform light work, limited to one- or two-step tasks, and which involved limited climbing or crouching and only occasional interaction with others. (T. 14). The ALJ properly considered all of plaintiff's impairments, including those that were not severe, and he marshaled substantial evidence in the record to support his RFC finding. (T. 14–18).[12]

Dr. Jolda found that plaintiff exhibited no difficulty moving around, that she walked normally, and she had a normal range of motion in her arms and legs. (T. 278–280). Dr. Kaplan and Dr. Shah, although non-examining physicians, stated in their respective reports, dated June 9, 2008, and August 7, 2008, that plaintiff could stand or walk for six hours in an eight hour workday and could frequently lift or carry 25 pounds. (T. 302, 311). They each also noted that plaintiff had no limitations in

manipulating objects, seeing, or communicating. (T. 304, 313). During plaintiff's June 28, 2010 visit to the Heuvelton Health Center, PA Smith noted that the strength in plaintiff's upper and lower extremities was a "five out of five," she walked with a normal gait, and had no obvious deviation in her spine. (T. 459–460).

Dr. Goldberg and Dr. Hahn each noted in their Mental Residual Functional Capacity Assessments, dated June 4, 2008, and August 22, 2008, respectively, that plaintiff had no significant limitations in her ability to remember, understand, and carry out simple directions and had only moderate limitations in her ability to understand, remember, and carry out detailed instructions. (T. 297, 332). Dr. Goldberg also indicated that plaintiff had only mild limitations in her ability to interact socially or to adapt to new situations. (T. 293, 298). Dr. Hahn wrote that plaintiff could understand and perform one or two-step tasks with ordinary levels of supervision. (T. 334). Dr. Hahn further noted that plaintiff could concentrate for at least two hour periods. (T. 334). Dr. Saleem, in his Psychiatric Evaluation dated August 20, 2009, stated that plaintiff's memory was intact, and that her attention and concentration were fair. (T. 431). He also noted that her insight and judgment were fair at the time. (T. 439).

### b. Credibility

**\*12** Plaintiff also argues that the ALJ failed to evaluate plaintiff's credibility in light of the seven factors listed in SSR 96–7p. (Pl.'s Mem. 14). However, the ALJ does not have to explicitly address each factor in his decision, and he adequately explained his credibility determination. *See Briggs v. Astrue,* 09–CV–1422, 2011 U.S. Dist. LEXIS 73098, 2011 WL 2669476, at \*12 (N.D.N.Y. Mar.4, 2011).

The ALJ noted that plaintiff alleged that she had bipolar disorder, seizure disorder, insomnia, acid reflux, asthma, allergies, depression, anxiety, adult attention deficit disorder, high cholesterol, irritable bowel syndrome, scoliosis, arthritis, migraine headaches, nausea, vomiting, insomnia, an enlarged bladder, an ovarian cyst, and incontinence, which kept her from functioning normally. (T. 15–17). Many of these alleged impairments have no medical basis in the record, and as stated above, some are simply not severe.

Dr. Muhammad Saleem, who examined plaintiff on August 20, 2009, assigned plaintiff a GAF of 60.[13] (T. 433). Plaintiff alleged that she had trouble socializing with people and would rather stay at home by herself. (T. 29). However, notes from office visits indicated she interacted appropriately with others. Dr. Lewis Goldberg, as part of his psychiatric review, contacted plaintiff's "treating source," and noted that the information he obtained "indicates that [plaintiff] has no difficulty socializing with clinic staff or in treatment which would indicate the capacity to do so in a work setting." (T. 295). Dr. Jolda noted on May 23, 2008, that plaintiff was "pleasant and cooperative." (T. 288). NP Bellinger noted on July 27, 2009, that plaintiff "interacts appropriately. As [sic] far as maintaining social, appropriate behavior without exhibiting extremes. This is a norm." (T. 454). Dr. Kaplan, in his consultative examination dated June 9, 2008, stated that plaintiff's subjective allegations were "disproportionate to objective findings," and that her account of her symptoms was "only partially credible."[14] (T. 306).

In addition, the ALJ found that evidence of marijuana abuse throughout the covered period further detracted from plaintiff's credibility. (T. 17). Plaintiff stated she stopped using marijuana in May 2009. (T. 365). However, the ALJ noted that at the hearing on May 12, 2010, plaintiff claimed to have been clean and sober "a little over a year and a half." (T. 17; *see also* T. 33). The ALJ's findings are supported by substantial evidence, given plaintiff's inconsistent and overstated allegations, thus, the ALJ's RFC determination is supported by substantial evidence.

### C. Significant Work in the Economy

#### 1. Applicable Law

Because the ALJ found the plaintiff was unable to perform her previous work, the ALJ proceeded to Step 5 of the Commissioner's sequential analysis. Step 5 requires the ALJ to determine whether the plaintiff's impairments prevent her from adjusting to a type of work different from what she has done in the past. 20 C.F.R. § 404.1520(a)(v). The burden of proof at this step shifts to the ALJ to demonstrate that there is other work in the national economy that plaintiff can perform. *Berry v. Schweiker,* 675 F.2d 464, 467

Case 5:24-cv-00169-DNH-ML   Document 27   Filed 02/05/25   Page 159 of 223
Kemp v. Commissioner of Social Sec., Not Reported in F.Supp.2d (2011)
2011 WL 3876526

(2d Cir.1982), 20 C.F.R. § 404.1560(c)(2). The ALJ may, under the appropriate circumstances, rely on the "Medical Vocational Guidelines," contained in 20 C.F.R. Part 404, Subpt. P, App. 2, known as "The Grids." *Zorilla v. Chater,* 915 F.Supp. 662, 667 (S.D.N.Y.1996) (footnotes omitted). But if plaintiff has non-exertional impairments, and if those non-exertional impairments "significantly limit the range of work" permitted by her exertional impairments, the ALJ may be required to consult a vocational expert (VE). *Bapp v. Bowen,* 802 F.2d 601, 606 (2d Cir.1986). In this case, the ALJ utilized a VE.

**\*13** If the ALJ does use a VE, he must present the VE with a set of hypothetical facts to determine whether plaintiff retains the capacity to perform any specific job. *See Aubeuf v. Schweiker,* 649 F.2d 107, 114 (2d Cir.1981). The ALJ may rely on a VE's testimony regarding the availability of work as long as the hypothetical facts the expert is asked to consider are based on substantial evidence and accurately reflect the plaintiff's limitations. *Calabrese v. Astrue,* 358 Fed. Appx. 274, 276 (2d Cir.2009). Where the hypothetical is based on an ALJ's RFC analysis which is supported by substantial facts, the hypothetical is proper. *See id.* at 276–277. The ALJ is not required to pose a hypothetical that includes non-severe impairments. *See Dumas v. Schweiker,* 712 F.2d 1545, 1554 n. 4 (2d Cir.1983). A plaintiff will be found not disabled if the ALJ determines the plaintiff can perform work that exists in the national economy regardless of whether work exists in the immediate area in which plaintiff lives, a specific job vacancy exists for plaintiff, or plaintiff would be hired if she applied. 20 C.F.R. §§ 404.1566(a)(1)-(a)(3).

### 2. Analysis

Plaintiff argues that the hypothetical the ALJ posed to the vocational expert was improper because it did not account for all of plaintiff's impairments, and the ALJ improperly relied on VE's testimony regarding the number of available jobs. (Pl.'s Mem. 18).

The VE testified that a person who could perform work at the medium level, but who could only perform two-step tasks, work with others on a limited basis, and only occasionally climb ladders or scaffolds or crouch could not perform plaintiff's past relevant work, due to the interaction with the public and co-workers. (T. 42).

The VE testified that for work as a hand packer at the unskilled, medium level, 163,000 jobs existed in the national economy and 1,800 jobs existed in the Connecticut regional economy (where plaintiff initially filed her claim). (T. 43). The ALJ later found that plaintiff could only perform "light" work with some limitations, however, the VE testified that the "numbers would be higher at the light level." (T. 43). From his subsequent statements, it is clear that the VE was referring to hand packer jobs that were "light" level jobs. [15] *Id.* He also stated that a similar number of jobs would be available in New York State, and that the "numbers would be fairly similar in the two regions. We are not talking a big difference." (T. 44). The ALJ was entitled to rely on the national job numbers and was not required to find that jobs existed in area where plaintiff lived. *See Colon v. Comm'r of Soc. Sec.,* 6:00–CV0556, 2004 WL 1144059, at \*8 (N.D.N.Y. Mar.22, 2004) (The ALJ properly relied on VE's testimony that 100,000 jobs existed in the national economy, and claimant's contention that jobs were unavailable in his region "failed to consider the proper legal standard.").

As discussed above, the ALJ's RFC determination was supported by substantial evidence, and thus, the hypothetical the ALJ posed to the vocational expert was proper, based on the ALJ's RFC assessment. The ALJ properly applied the correct legal standards, and his findings were supported by substantial evidence from the record.

**\*14 WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that the decision of the Commissioner be **AFFIRMED,** and plaintiff's complaint be **DISMISSED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 3876526

---

## Footnotes

1    In his decision, the Administrative Law Judge (ALJ) stated that plaintiff "protectively filed" her application on January 16, 2008. (T. 9). When used in conjunction with an "application" for benefits, the term "protective filing" indicates that a written statement, "such as a letter," has been filed with the Social Security Administration, indicating the claimant's intent to file a claim for benefits. *See* 20 C.F.R. § 416.340. There are various requirements for this written statement. *Id.* If a proper statement is filed, the Social Security Administration will use the date of the written statement as the filing date of the application even if the formal application is not filed until a future date.

2    The court would point out that plaintiff is originally from Connecticut and many of her medical records are from providers in Connecticut.

3    It appears from Dr. Mroczka's reports that plaintiff was referred to her by plaintiff's primary care providers at Generations Family Health Care Centers ("GFHC"). (T. 237, 239). Although there are only two reports from Dr. Mroczka in the record, the first report states that the plaintiff was in for a "follow-up" appointment, indicating prior treatment by this doctor. (T. 239).

4    The court does note that other medical records indicate plaintiff had suffered from *two* prior seizures, one on November 21, 2002, and another in January 2003, but January 2003 was clearly the last episode of alleged seizures. (*See* T. 277).

5    The questionnaire was co-signed by two other individuals, one of whom is clearly a physician because there appears to be an "MD" after the name, but the signatures are completely illegible. (T. 275).

6    In a note written by Dr. Lewis S. Goldberg, Ph.D., dated May 19, 2008, he wrote that the person completing the "MSQ" only saw the plaintiff for individual counseling, and thus could not comment on plaintiff's ability to work with others or any distracting behaviors. (T. 276). Dr. Goldberg stated that there was a "group therapist" who could comment on these abilities, but that person was "on vacation." (T. 276). Dr. Goldberg's note stated that if he could get some more information from that person, it would help with the MSQ and decision. *Id.* Dr. Goldberg also commented that the plaintiff's "ADLs sound[ed] pretty severe but it is a self-report measure." *Id.* Later, Dr. Goldberg obtained additional information in order to complete his consultative report, discussed below. (*See* T. 295, 299–30).

7    The records indicate that plaintiff's treatment at United Services lasted until June 24, 2009, but a review of the transcript shows that plaintiff cancelled her last two appointments. (T. 361–64).

8    Images of plaintiff's spine taken on November 30, 2008, after plaintiff was involved in a motor vehicle accident, revealed no "evident" abnormality. (T. 358; see also T. 355). The record does not indicate what kind of "images" were taken.

9    The court notes that (T. 435–39) are duplicates of (T. 430–33).

10    "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [plaintiff] must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary

work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. §§ 404.1567(b), 416.967(b).

11    Plaintiff was living in Connecticut when she first filed her disability application. (T. 50–63).

12    Plaintiff also claims that important medical information was missing from the record. (Pl.'s Mem. 15). Plaintiff cites a report from Dr. Goldberg which indicated that some information was unavailable while a therapist was on vacation. (T. 276). This argument is unavailing, because Dr. Goldberg's later notes indicate that he was ultimately able to reach both of plaintiff's therapists at United Services and incorporate their input into his report. (T. 299, 309).

13    The GAF is a scale that indicates the clinician's "judgment of the individual's overall level of functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed., text revision 2000) ("DSM–IV–TR"). The GAF scale ranges from 0 to 100; GAF scores from 60–70 indicate some mild to moderate symptoms or some difficulty in social, occupational, or school situations, but the individual is generally functioning well and has some meaningful interpersonal relationships. DSM–IV–TR at 34.

14    Although Dr. Kaplan did not examine plaintiff, there is nothing in the record to contradict these findings.

15    The ALJ asked whether "these jobs—numbers be consistent also at the light level?" (T. 43). The VE responded that "[t]he numbers would be higher at the light level." *Id.* The ALJ asked the VE whether he had the "DOTs .... for the light level if you can do that." *Id.* The VE then told the ALJ that "a representative DOT for hand packer at the light level would be 902.687–166; for production worker, 726.687–042; and for production inspector, 733.687–062." *Id.* Thus, when the VE testified that the "numbers" would be higher at the light level, he meant the numbers of there were even more of the jobs he mentioned at the light level than at the medium level. *Id.*

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 7784156
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kenneth Ray HENDRICKSON, Plaintiff,

v.

Michael J. ASTRUE, Commissioner of the Social Security Administration, Defendant.

Civil Action No. 5:11–927.
|
Dec. 11, 2012.

### REPORT AND RECOMMENDATION

EARL S. HINES, United States Magistrate Judge.

**\*1** Plaintiff Kenneth Ray Hendrickson ("Hendrickson") brings this action under 42 U.S.C. § 405(g) for review of a decision denying his application for disability-based benefits under the Social Security Act. Complying with General Order # 18, the parties join issues through competing briefs. [1]

### I. Background

Hendrickson applied for disability insurance ("DIB") and supplemental security income ("SSI") benefits claiming disability due to *depression* and *anxiety.* (T. 106–13, 136). [2] His applications, filed on June 25, 2007, alleged that disability commenced on April 28, 2007. *Id.* After being denied benefits initially (T. 66–67), Hendrickson requested a hearing before an administrative law judge ("ALJ"). (T. 76).

ALJ Thomas John S. Pope ("ALJ Pope") conducted a video evidentiary hearing on September 10, 2009. (T. 19, 29–65). Hendrickson was represented by counsel, Jason Mintz, Esq., at the hearing. (T. 19, 29, 31). Hendrickson and an impartial vocational expert gave testimony. [3] ALJ Pope received additional evidence consisting of Hendrickson's medical records, a psychiatric evaluation of a state agency psychiatric consultative examiner, Kristen Barry, Ph.D., and a psychiatric review report and mental residual functional capacity assessment of a state agency psychology medical consultant, E. Kamin, Ph.D.

When ALJ Pope denied Hendrickson's applications (T. 19–28), Hendrickson appealed to the Appeals Council of the Social Security Administration's Office of Hearings and Appeals. (T. 13–14). On June 28, 2011, the Appeals Council denied Hendrickson's request to review. (T. 3–5). This rendered ALJ Pope's opinion the final decision. *See Sims v. Apfel,* 530 U.S. 103, 107 (2000).

Represented by new counsel, Howard D. Olinsky, Esq., Hendrickson timely instituted this case on August 4, 2011. (Dkt. No. 1).

### II. Preliminary Discussion

An initial discussion of the Social Security benefit programs at issue and the administrative decision-making process (including certain terms of art) will aid comprehension of Hendrickson's underlying claim, ALJ Pope's decision and Hendrickson's challenges thereto.

### A. Eligibility for Benefits

*Disability Insurance benefits,* authorized by Title II of the Social Security Act and funded by social security taxes, provide income to insured individuals forced into involuntary, premature retirement by reason of disability. *Supplemental Security Income* benefits, authorized by Title XVI of the Social Security Act and funded by general tax revenues, provide an additional resource to assure that disabled individuals' income does not fall below the poverty line.

Maximum benefits available under SSI are considerably less than under DIB. Here, ALJ Pope found that Hendrickson meets the insurance requirements of the DIB program. The practical effect of that finding makes Hendrickson's SSI application superfluous since Hendrickson, if found to be disabled, obviously would elect the higher benefit available under DIB.

**\*2**  The Social Security Act defines disability as "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3).

### B. Sequential Evaluation Procedure

The law requires *individualized* determinations. *See Heckler v. Campbell,* 461 U.S. 458, 467 (1983). Hence, Commissioner Astrue generally must make both medical and vocational assessments in every case. To satisfy this requirement, the Commissioner utilizes a five-step, sequential evaluation procedure for adjudicating disability-based claims. *See* 20 C.F.R. §§ 404.1520(a), 416.920. [4] This model is "sequential" in the sense that when a decision can be made at an early step, remaining steps are not considered. *See* 20 C.F.R. §§ 404.1520, 416.920. It enjoys judicial approval as a fair and just way for determining disability applications in conformity with the Social Security Act. *See Bowen v. Yuckert,* 482 U.S. 137, 153 (1987) (citing *Heckler,* 461 U.S. at 461) (use of the sequential evaluation process "contribute[s] to the uniformity and efficiency of disability determinations")).

Claimants bear the burden to prove their disability under the first four steps. *DeChirico v. Callahan,* 134 F.3d 1177, 1179–80 (2d Cir.1998). When they do, a *prima facie* case of disability has been proven. *See Mimms v. Heckler,* 750 F.2d 180, 185 (2d Cir.1984). The burden then shifts to the Commissioner in Step 5 to show "that there is work in the national economy that the claimant can do." *Poupore v. Astrue,* 566 F.3d 303, 306 (2d Cir.2009); *see also DeChirico,* 134 F.3d at 1180; *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982); 20 C.F.R. § 416.966.

Specialized rules—some imposed externally by courts—govern the Commissioner's applications of these five steps. Those particularly pertinent to Hendrickson's case are described in the remainder of this section:

#### 1. *Step 2 Severity Determination*

In the Commissioner's view, "[a] 'severe' impairment is one that significantly limits an individual's physical or mental ability to do 'basic work activities.' " *Meadors v. Astrue,* 370 Fed. App'x 179, 182 (2d Cir.2010) (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)); *Green–Younger v. Barnhart,* 335 F.3d 99, 106 (2d Cir.2003); *see also* 20 C.F.R. § 416.921(b) ("An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities"). The phrase "significantly limits," however, is not tantamount to an ultimate determination of disability. In this circuit, a Step 2 severity inquiry serves only to "screen out *de minimis* claims." *Dixon v. Shalala,* 54 F.3d 1019, 1030 (2d Cir.1995). Consequently, "[a] finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' ... [with] ...'no more than a minimal effect on an individual's ability to work.' " *Rosario v. Apfel,* No. 97 CV 5759, 1999 WL 294727, at \*5 (E.D.N.Y. Mar. 19, 1999) (quoting *Bowen,* 482 U.S. at 154 n. 12).

**\*3**  When mental impairments are present, determining severity thereof is a complex undertaking. The Commissioner has promulgated additional regulations that require application of a "special technique" at the second (and third) steps of the five-step framework. *Kohler v. Astrue,* 546 F.3d 260, 265 (2d Cir.2008) (citing 20 C.F.R. § 404.1520a). This technique requires an initial determination of whether the claimant has a "medically determinable mental impairment." 20 C.F.R. § 404.1520a(b)(1). If so, the reviewing authority must then rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c), § 404.1520a(b)(2), which specifies four broad functional areas: (1) activities of daily living; (2) social functioning; (3) *concentration, persistence, or pace* (underscored because of relevance to instant case); and (4) episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3). When the degree of limitation in each of the first three areas is rated "mild" or better, and no episodes of decompensation are identified, the claimant's mental impairment is not "severe." 20 C.F.R. § 404.1520a(d)(1).[5]  Conversely, when a mental impairment is severe, evaluation proceeds to Step 3 to determine whether the impairment meets or is equivalent in severity to any listed mental disorder. 20 C.F.R. § 404.1520a(d)(2)(3).

### 2. *Step 4 Residual Functional Capacity Determination*

When making a Step 4 finding (as to whether a severely impaired claimant can perform past relevant work), an ALJ must first assess and articulate that claimant's "residual functional capacity" ("RFC"), *i.e.,* what that claimant can still do in a work setting (8 hours a day, 5 days a week, or equivalent scheduled) despite physical and/or mental limitations caused by impairments and any related symptoms, such as pain. *See* 20 C.F.R. § 404.1545, 416.945(a); *see also Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir.1999) (defining RFC). Administrative law judges thus decide whether applicants, notwithstanding their impairments, have physical and mental abilities to perform activities generally required by competitive, remunerative work on a regular and continuing basis. *See* SSR 96–p, TITLE II AND XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, 61 Fed.Reg. 34474, 1996 WL 374184, at \*4 (SSA July 2, 1996).

When *physical* impairments are at issue, the Commissioner's regulation and an internal policy ruling (a) identify various ordinary physical functions to be considered in context of an ordinary work schedule, (b) require function-by-function assessments of those activities, and (c) dictate that the ultimate RFC determination account for limitations imposed by both severe and non-severe impairments. *See* 20 C.F.R. §§ 404.1545(a)(2), 404.1545(b), 416.945(a)(2), 416.945(b); SSR 96–8p, 1996 WL 374184, at \* \*5, 7.

When *mental* impairments are in the picture, the RFC assessment ("mental RFC") involves an even more detailed analyses of claimants' functional limitations than were undertaken at Step 2. Mental RFC consists of four broad categories (*i.e.,* understanding and memory; sustained concentration and persistence; social interaction; and adaptation) with a total of twenty subparts that are each reviewed and rated (*i.e.,* "not significantly limited"; "moderately limited"; "markedly limited"; "no evidence of limitation in this category"; and "not ratable on available evidence"). (T. 389–391). Ultimately, "[a]ny impairment-related limitations created by an individual's response to demands of work ... must be reflected in the RFC assessment." SSR 85–15, THE MEDICAL–VOCATIONAL RULES AS A FRAMEWORK FOR EVALUATING SOLELY NONEXERTIONAL IMPAIRMENTS, 1985 WL 56857, at \*5–6 (SSA 1985).

### 3. *Step 5 Evidentiary Burden When Nonexertional Impairments Exist*

**\*4**  At Step 5, the Commissioner can satisfy his burden to show that a claimant can still do work existing in the national economy by eliciting or consulting several extrinsic sources of relevant evidence.[6]  In limited circumstances, moreover, the Commissioner may take administrative notice of disability *vel non* by adopting findings published in *"Medical–Vocational Guidelines,"* commonly called *"the grids." See Roma v. Astrue,* 468 Fed. App'x 16, 20–21 (2d Cir.2012); *Bapp v. Bowen,* 802 F.2d 601, 604 (2d Cir.1986); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 2. When only exertional impairments[7]  are in play, and when an ALJ's findings of residual functional capacity, age, education, and previous work experience coincide with grids parameters, the Commissioner may directly apply the grids to determine whether work exists in the national economy which claimants can perform. *See Martin v. Astrue,* 337 Fed. App'x 87, 91 (2d Cir.2009); *see also* 20 C.F.R. Part 404, Subpart P,

Appendix 2; *see also Thompson v. Barnhart,* 75 Fed. App'x 842, 844 (2d Cir.2003) (Commissioner can meet Step 5 burden "by resorting to the applicable medical-vocational guidelines (the grids)"). [8]

But, when claimants also suffer from nonexertional impairments, [9] direct application of the grids to determine disability is not permitted. The Commissioner nonetheless permits administrative law judges to consult them as a "framework for consideration of how much the claimant's work capability is further diminished in terms of any types of jobs that would be contraindicated by ... nonexertional limitations." 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e)(2). SSR 85–15 addresses this "framework" analysis, and directs that when evaluating nonexertional impairments, an administrative law judge should first consult the grids, along with consideration of the claimant's RFC and vocational factors, to determine the extent of impairment caused by *exertional* limitations. *See* SSR 85–15, 1985 WL 56857, at *3. The administrative judge should next determine how much that claimant's "occupational base," (the entire exertional span from sedentary work through heavy work), is *further reduced* by effects of *nonexertional* impairments. *See id.*

The net effect is that when both exertional and nonexertional impairments are present, an administrative law judge theoretically can find a claimant *disabled* when the grids direct such a finding solely on the basis of severity of exertional impairments. But, when exertional impairments alone generate a grids finding of *not disabled,* an administrative judge then must determine (usually from other evidence) how much nonexertional impairments further diminish that claimant's occupational base. Only when a meaningful occupational base remains can an administrative judge then deny a claim using the grids as a framework. *See Pratts v. Chater,* 94 F.3d 34, 39 (2d Cir.1996) (a claimant's work capacity is "significantly diminished" if there is an additional loss of work capacity that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity).

### III. The Commissioner's Decision

**\*5**  ALJ Pope utilized the sequential evaluation procedure described earlier. (T. 19–28). Findings generally favorable to Hendrickson at the first four steps established a *prima facie* case of disability. At Step 5, however, ALJ Pope concluded that Hendrickson "has not been under a disability" and his claim was denied. (T. 27–28).

ALJ Pope's complete findings and conclusions appear on pages 21—27 of the administrative transcript contained in the record before the court. (Dkt. No. 9). For present purposes, however, it is necessary to identify and then amplify certain findings at sequential Steps 2, 4 and 5:

| | |
|---|---|
| Step 2 | Hendrickson has severe impairments consisting of depression, anxiety, and substance abuse. (T. 21–23). |
| Step 4 | (a) Hendrickson has *physical capacity* to perform a full range of work at all exertional levels; (b) his *mental capacity* for work at all levels is diminished by depression, anxiety and substance abuse; and, consequently, (c) his overall *residual functional capacity* is limited to unskilled work that does not involve working closely with others. (T. 23–26). |
| Step 5 | (a) The grids (Medical–Vocational Rule 204.00) indicate "not disabled" with reference to Hendrickson's exertional impairments (none); (b) Hendrickson's nonexertional limitations, however, erode the occupational base of unskilled work at all exertional levels by 70%; but (c) many remaining jobs exist in the national economy for individuals with Hendrickson's residual functional capacity. (T. 27). |

*A. Step 4 Residual Functional Capacity Assessment*

When making his Step 4 findings summarized above, ALJ Pope gave "great weight" to the opinions and analyses of the two state agency experts identified earlier. Dr. Barry examined Hendrickson. Dr. Kamin conducted an "extensive review of [Hendrickson's] medical records and objective tests from all the claimant's treatment providers." (T. 27). Their respective evaluations relating to concentration, persistence and pace chronicled that Hendrickson:

• has a difficult time handling stress and making appropriate decisions (T. 373, 391);

• has a "guarded" prognosis (T. 374);

• is moderately limited in ability to perform activities with a schedule, maintain regular attendance and be punctual within customary tolerances (T. 389);

• is moderately limited in ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (T. 390);

• is moderately limited in ability to respond appropriately to changes in the work setting (T. 390);

• is moderately limited in ability to work in coordination with or proximity to others without being distracted by them (T. 390); and

• is moderately limited in his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (T. 390).

**\*6** Dr. Kamin also concluded from his overall review of Hendrickson's medical records that Hendrickson has mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, mild difficulties in concentration, persistence or pace, and one or two repeated episodes of deterioration (each of extended duration). (T. 385).

In ALJ Pope's view, this information indicates that Hendrickson's capacity for work-related activity is limited to performing unskilled work and only when not required to work closely with others. ALJ Pope explained:

"[T]he residual functional capacity finding by the undersigned accommodates some difficulties in the claimant's ability to concentrate and focus and his anxiety by providing for unskilled work which does not require working closely with other people. *The unskilled work will allow for a lower level of concentration and focus, and the limited contact with others should lessen the claimant's anxiety level and accordingly reduce the risk of panic attacks."*

(T. 25) (emphasis added).

*B. Step 5 Finding Regarding Ability to Perform Alternative Work*

Hendrickson cannot perform his past relevant work under the RFC rating ascribed to him above. Consequently, the sequential analysis proceeded to Step 5 where the burden rests with the Commissioner to show that Hendrickson can still perform alternative, available work. There, ALJ Pope could not apply the grids (Medical–Vocational Guidelines) directly because Hendrickson has nonexertional impairments. Consequently, ALJ Pope properly elicited extrinsic evidence from an impartial vocational expert, Edward Pagella, CRC, LCPC ("VE Pagella"). (T. 58–64, 101).

As is customary in these type proceedings, VE Pagella provided expert opinions in response to hypothetical questions. (T. 58–64). ALJ Pope asked VE Pagella to assume that a person of Hendrickson's age, education and experience has limitations requiring that he engage only in unskilled work that does not require working closely with others. (T. 59–60). Based on those assumptions, VE Pagella opined that such a person's occupational base will be reduced by 70%. (T. 60–61). VE Pagella also opined that thousands of jobs in the light and sedentary categories exist in the remaining 30% of the occupational base. *Id.* He identified several representative occupations within this remaining occupational base. *Id.*

In sum, VE Pagella provided testimony concerning (a) extent of erosion of Hendrickson's occupational base caused by limitations posed in the hypothetical question posed and (b) availability of a meaningful remaining occupational base for a person with such limitations. Given this evidence, ALJ Pope concluded that Hendrickson is not disabled because there are jobs that he can perform despite his limitations. (T. 27).

## IV. Alleged Errors

Hendrickson claims that ALJ Pope committed multiple errors in his application of sequential Steps 4 and 5. Specifically, Hendrickson contends:

**\*7** • The ALJ failed to develop the record by failing to obtain opinions from Plaintiff's treating physicians.

• The ALJ failed to obtain opinions from Plaintiff's social workers, nurse, and counselors.

• The ALJ's residual functional capacity finding is not supported by substantial evidence and is the product of legal error.

• The ALJ failed to apply appropriate legal standards in assessing Plaintiff's credibility.

• The ALJ's Step 5 determination is unsupported by substantial evidence and is the product of legal error.

(Dkt. No. 12, pp. 1, 8–24).

In response, the Commissioner maintains that ALJ Pope properly evaluated his RFC assessment with substantial evidence at Step 4, sufficiently developed the record of Hendrickson's impairments, and correctly found that Hendrickson could perform other work existing in significant numbers in the national economy at Step 5. (Dkt. No. 14, pp. 15–25).

## V. Judicial Review

The court's limited role is to determine whether (a) the Commissioner applied proper legal standards and (b) the decision is supported by substantial evidence. *See Lamay v. Commissioner of Soc. Sec.,* 562 F.3d 503, 507 (2d Cir.2009), *cert. denied,* —— U.S. ——, 130 S.Ct. 1503 (2010); *Berry,* 675 F.2d at 467; *see also* 42 U.S.C. § 405(g). When proper principles of law were applied, and when the Commissioner's decision is supported by substantial evidence, [10] the Commissioner's findings are conclusive and must be affirmed. *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *see also* 42 U.S.C. § 405(g); *Halloran v. Barnhart,* 362 F.3d 28, 31 (2d Cir.2004).

## VI. Discussion and Analysis

Hendrickson's proffered errors regarding inadequate development of the record and a flawed credibility determination need not be addressed on their merits because a necessary and proper disposition reveals itself by focusing initially on points arguing that (a) correct principles of law were not applied to the Step 4 RFC finding and (b) substantial evidence does not support the Step 5 finding that Hendrickson can still perform alternative, available work. These two points, while analytically distinct, are closely entwined.

*A. Failure to Apply Correct Principles of Law at Step 4*

A legally-correct RFC determination must account for all of a claimant's limitations imposed by both severe and non-severe impairments. *See* discussion in Section II.*B.*2, *supra.* ALJ Pope, giving great weight to the state agency experts' findings and

opinions, found Hendrickson's capacity to perform a full range of work at all exertional levels to be limited only to the extent that such work must be (a) unskilled and (b) not involve working closely with others. (T. 23, 26). This RFC assessment clearly accounts for the state agency experts' determinations that Hendrickson has moderate limitations in working in coordination with or proximity to others, and getting along with coworkers or peers without distracting them or exhibiting behavioral extremes. (T. 25–26). It does not, however, reckon the remaining limitations found by Dr. Barry and Dr. Kamin unless those limitations are subsumed in a generic, catch-all limitation for "unskilled work."

**\*8** ALJ Pope's written decision is thoughtful, considerate and generally meticulous. [11] Hendrickson undisputably has long-standing and severe mental limitations, [12] and ALJ Pope obviously intended to factor them into his residual functional capacity analysis. His unskilled-work limitation is problematic, however, if he intended it to account for all of Hendrickson's other mental impairments.

First, it is not *self-evident* that a person with limited ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances will function more acceptably when assigned only unskilled tasks. Second, the Commissioner's *official definition* of unskilled work does not support such premise, nor does it indicate that unskilled work ameliorates stress, or better enables a worker to complete a normal workday and workweek without interruptions from psychologically-based symptoms, or to work at a consistent pace, or to respond appropriately to changes in the work setting. [13] Third, no *extrinsic evidence* presented to ALJ Pope shows that unskilled work appropriately addresses these additional limitations, and, finally, the Commissioner's brief cites no *other authoritative sources* supporting that supposition.

Intuitively, one might suppose that unskilled work probably involves less stress. In an interpretive Ruling, however, the Commissioner cautions against making such broad assumptions. In SSR 85–15, the Commissioner states unequivocally that "*[a] claimant's condition [due to stress and mental illness] may make performance of an unskilled job as difficult as an objectively more demanding job.*" The Ruling elucidates that mentally impaired individuals' reactions to demands of work stress are highly individualized, and that in some cases, they have difficulty meeting requirements of even low stress jobs. And, of special relevance here, the Ruling emphasizes that "*the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job." Id.* Accordingly the Ruling directs that (a) ALJs make particularized findings about the nature of a claimant's stress, the circumstances that trigger it, and how those factors affect his ability to work, and (b) every impairment-related limitation created by an individual's response to demands of work be reflected in the RFC assessment. *Id.*

Finally, interpretive jurisprudence generally rejects the idea that a broad limitation of "unskilled work" suffices as a detailed assessment of the type required by SSR 96–8p, 1996 WL 374184, at \*4. Thus, an administrative judge may not avoid conducting such a detailed assessment by merely indicating that the claimant can perform simple, unskilled work. *See, e.g., Thompson v. Astrue,* No. 10–CV–6576 CJS, 2012 WL 2175781, at \*13 (W.D.N.Y. May 30, 2012) (when making findings about a claimant's RFC, an ALJ may not avoid conducting such a detailed assessment by merely indicating that the claimant can perform simple, unskilled work); *Sweat v. Astrue,* No. 08–CV–1108 (FJS/VEB), 2011 WL 2532932, at \*6 (N.D.N.Y. May 23, 2011) (on remand ALJ admonished to address the consultative examiners' findings that claimant had difficulty dealing with stress during the relevant time period, as ALJ did not explain how he reconciled those findings with his RFC assessment).

**\*9** For all these reasons, a conclusion that ALJ Pope did not apply correct principles of law when making his RFC determination is warranted. He did not make particularized findings about the nature of Hendrickson's stress, the circumstances that trigger it, and how those factors affect his ability to work. He did not—possibly could not under evidence before him—sufficiently connect the dots between all of Hendrickson's impairments and his RFC finding.

*B. Substantial Evidence Error at Step Five*

Given a legally-flawed RFC finding, a Step 5 error was sure to follow. ALJ Pope used his RFC as the basis for his hypothetical question to the vocational expert. Thus, his hypothetical question failed to include all of Hendrickson's nonexertional limitations.

(T. 58–64). Specifically, ALJ Pope's hypothetical question to the vocational expert did not include limitations related to Hendrickson's stress or three of the five other moderate impairments listed earlier. (T. 58–64, 373, 389–91).

For expert vocational opinion to constitute substantial evidence, the hypothetical question posed to the vocational expert must include all limitations supported by medical evidence in the record. *See Dumas v. Schweiker,* 712 F.2d 1545, 1553–54 (2d Cir.1983) (The Commissioner may rely on a vocational expert's testimony concerning the availability of jobs suited to a hypothetical person's capabilities so long as the hypothetical is based on substantial evidence.); *see also Burns v. Barnhart,* 312 F.3d 113, 123 (3d Cir.2002) ("A hypothetical question posed to a vocational expert must reflect all of a claimant's impairments.... Where there exists in the record medically undisputed evidence of specific impairments not included in a hypothetical question ..., the expert's response is not considered substantial evidence." (internal citations and quotation marks omitted)). The reason for this requirement is that it is important for the vocational expert to understand the full extent of the applicant's disability so that the expert does not declare an applicant capable of undertaking work in the national or local economy that the applicant cannot truly perform.

VE Pagella expressed opinions concerning the extent to which Hendrickson's job base is eroded by nonexertional limitations and also the existence and extent of jobs within the remaining occupational basis that Hendrickson can perform. Because the hypothetical question on which VE Pagella based these opinions failed to account for additional specific impairments that are medically undisputed, his testimony does not constitute substantial evidence. [14] ALJ Pope adduced no other evidence that Hendrickson is capable of performing jobs existing in significant numbers in the national economy. Thus, his conclusion that Hendrickson is not disabled lacks substantial evidentiary support. In this circumstance, reversal and remand are warranted.

### VII. Recommendation

1. The Commissioner's decision should be **REVERSED** and the case **REMANDED** pursuant to 42 U.S.C. § 405(g), sentence four, for further proceedings including reexamination of: (a) Hendrickson's difficulties in handling stress, including but not limited to his moderate limitations in the areas of ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and ability to respond appropriately to changes in the work setting; and (b) the extent to which Hendrickson's occupational base is eroded by his difficulties handling stress and the moderate limitations listed above.

**\*10** 2. To guard against necessity for further actions seeking judicial review, the court also should request that, on remand, the Commissioner also reflect on *all* errors asserted in this action as set forth herein at Section IV.

### VIII. Objections

Parties have fourteen (14) days to file specific, written objections to the Report and Recommendation. Such objections shall be filed with the Clerk of the Court.

**FAILURE TO OBJECT TO THE REPORT, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**

*Thomas v. Arn,* 474 U.S. 140, 155 (1985); *Graham v. City of New York,* 443 Fed. App'x 657, 658 (2d Cir.2011); *FDIC v. Hillcrest Assocs.,* 66 F.3d 566, 569 (2d Cir.1995); *see also* 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and NDNY Local Rule 72.1(c).

Signed on the *10* day of *December* 2012.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 7784156

---

### Footnotes

1    General Order # 18 is dated September 23, 2003 (superseding January 24, 2002 and September 19, 2001 general orders). (Dkt. No. 3).

2    "T." followed by a number refers to the page of the administrative

3    ALJ Pope presided over the hearing from Chicago, Illinois. Hendrickson appeared and testified through interactive video in Syracuse, New York. The impartial vocational expert, Edward Pagella, appeared by telephone. (T. 19).

4    In this circuit, the Commissioner's five-step sequential procedure is described as follows:

        1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

        2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

        3. If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment [that meets or equals a] listed [impairment] in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

        4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

        5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform.

    *Shaw v. Chater,* 221 F.3d 126, 132 (2d Cir.2000) (citing *DeChirico v. Callahan,* 134 F.3d 1177, 1179–80 (2d Cir.1998) (citing 20 C.F.R. §§ 404. 1520, 416.920)).

5    "[A] pplication of the special technique [must] be documented." *Petrie v. Astrue,* 412 Fed. App'x 401, 408 (2d Cir.2011) (citing 20 C.F.R. § 404.1520a(e)). "Generally, a medical or psychological consultant will complete a standard document, known as a 'Psychiatric Review Technique Form' ("PRTF")." *Id.* "Pursuant to the regulations, the ALJ's written decision must 'reflect application of the technique, and ... "include a specific finding as to the degree of limitation in each of the [four] functional areas." ' " *Id.* (quoting 20 C.F.R. § 404.1520a(e)(2)).

6    Generally, the Commissioner elicits or consults two principal sources of evidence relevant to whether claimants can perform alternative, available work. First, witnesses qualified as "Vocational Experts" may testify as to whether jobs exist for a person with the claimant's precise abilities. *See* 20 C.F.R. §§ 404.1566(e), 416. 966(e); *see also* SSR 00–4p, POLICY INTERPRETATION RULING: TITLES II AND XVI: USE OF VOCATIONAL EXPERT AND VOCATIONAL SPECIALIST EVIDENCE, AND OTHER RELIABLE OCCUPATIONAL INFORMATION IN DISABILITY DECISIONS, 2000 WL 1898704, at *1–2 (SSA Dec. 4, 2000). Second, a United States Department of Labor publication titled *Dictionary of Occupational Titles* ("DOT") can assist in determining when a claimant's

residual work skills can be used in other work and the specific occupations in which they can be used. *See* 20 C.F.R. §§ 404.1560(d)(1), 416.966(d)(1); *see also* SSR 00–4p, 2000 WL 1898704, at *1–2.

7    "An exertional impairment is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only a claimant's ability to meet ... strength demands of jobs (*i.e.,* sitting, standing, walking, lifting, carrying, pushing, and pulling)." *Bogardus–Fry v. Astrue,* No. 7:11–CV–883 (MAD), 2012 WL 3779132, at *15 n.14 (N.D.N.Y. Aug. 31, 2012) (citing 20 C.F.R. §§ 404.1569a(b), 416.969a(b); *Rodriguez v. Apfel,* No. 96 Civ. 8330(JGK), 1998 WL 150981, at *10, n.12 (S.D.N.Y. Mar. 31, 1998)).

8    The grids are a matrix of general findings—established by rule—as to whether work exists in the national economy that a person can perform. "The grids take into account a claimant's RFC, as well as [his] age, education, and work experience." *Calabrese v. Astrue,* 358 Fed. App'x 274, 276 & n.1 (2d Cir.2009) (citing *Rosa v. Callahan,* 168 F.3d 72, 78 (2d Cir.1999)). Ultimately, the grids yield a decision of "disabled" or "not disabled." *Zorilla v. Chater,* 915 F.Supp. 662, 667 & n.2 (S.D.N.Y.1996) (citing 20 C.F.R. § 404.1567(a)).

9    "Nonexertional limitations" are "limitations and restrictions imposed by your impairment(s) and related symptoms, such as pain, affect [ing] only your ability to meet ... demands of jobs other than ... strength demands...." *See* 20 C.F .R. §§ 404.1569a(c)(1), 416.969a(c)(1). A nonexertional limitation is an impairment-caused limitation affecting such capacities as mental abilities, vision, hearing, speech, climbing, balancing, stooping, kneeling, crouching, crawling, reaching, handling, fingering, and feeling. Environmental restrictions (*e.g.,* difficulty tolerating some physical features of certain work settings, such as dust and fumes) are also considered to be nonexertional limitations. *See* 20 C.F.R. §§ 404.1569a (c)(1) (v), 416.969a (c)(1)(v).

10    "Substantial evidence" is a term of art. It means less than a "preponderance" (usual standard in civil cases), but "more than a mere scintilla," or "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Moran v. Astrue,* 569 F.3d 108, 112 (2d Cir.2009); *Halloran v. Barnhart,* 362 F.3d 28, 31 (2d Cir.2004). Stated another way, to be "substantial," evidence need only be "enough to justify, if the trial were submitted to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *National Labor Relations Bd. v. Columbian Enameling & Stamping Co.,* 306 U.S. 262, 299– 300 (1939), *cited in* Harvey L. McCormick, Social Security Claims and Procedures § 672 (4th ed.1991).

11    ALJ Pope acknowledged that SSR 96–8p requires that the mental residual functional capacity assessment used at steps 4 and 5 requires a more detailed assessment by itemizing the various functions contained in the broad categories found in paragraph B and paragraph C of the adult mental disorders listing in 12.00 of the Listing impairments. (T. 22–23).

12    Treatment notes and a multitude of Global Assessment of Functioning ("GAF") scores document Hendrickson's serious mental limitations. "The GAF is a scale promulgated by the American Psychiatric Association to assist 'in tracking the clinical progress of individuals [with psychological problems] in global terms.' " *Kohler,* 546 F.3d at 262 n.1 (citing *Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed.2000)). GAF "ranks psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *Pollard v. Halter,* 377 F.3d 183, 186 (2d Cir.2004).

Hendrickson has been diagnosed with several GAF ratings, ranging in June 2007 from 20 (GAF score 11–20 indicates an individual is in "[s]ome danger of hurting self or others ... or occasionally fails to maintain minimal personal hygeine ... or gross impairment in communication") (T. 251–52) to a GAF of 35 (GAF score 31–40 indicates an individual has "[s]ome impairment in reality testing or communication ... or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood") (T. 233). *See Diagnostic and Statistical Manual of Mental Disorders* (*"DSM–IV–TR"* ) 34 (4th ed.2000). In July 2007, he was diagnosed with a GAF of 30 (T. 278, 299, 300). *See id.* In January 2008, his GAF was rated at 37 (T. 397) and, later, at 42 (GAF score 41–50 indicates an individual has "[s]erious

symptoms ... or any serious impairment in social, occupational, or school functioning") (T. 402). *See id.* In August 2009, Hendrickson's GAF was scored at 50. *See id.*

Treatment notes also reflect that Hendrickson's episodes are triggered by major stresses. (T. 427).

13    The basic demands of unskilled work include abilities (on a sustained basis) to understand, carry out and remember simple instructions; make simple work-related decisions; respond appropriately to supervision, coworkers, and usual work situations; and deal with changes in a routine work setting. SSR 96–9, POLICY INTERPRETATION RULING TITLES II AND XVI: DETERMINING CAPABILITY TO DO OTHER WORK–IMPLICATIONS OF A RESIDUAL FUNCTIONAL CAPACITY FOR LESS THAN A FULL RANGE OF SEDENTARY WORK, 1996 WL 374185, at *9 (SSA July 2, 1996).

14    The Second Circuit has nor directly addressed the question of whether an ALJ's hypothetical question to a VE must specifically account for limitations in concentration, persistence, and pace. Other circuits, however, have addressed the issue and answer in the affirmative. *See, e.g., Winschel v. Commissioner of Soc. Sec.,* 631 F.3d 1176, 1180–81 (11th Cir.2011) (ALJ erred by failing to either "explicitly include[ ]" or "implicitly account for" moderate limitations in maintaining concentration, persistence, and pace in a hypothetical); *Stewart v. Astrue,* 561 F.3d 679, 685 (7th Cir.2009) (restricting hypothetical to ability to do "simple, routine tasks that do not require constant interactions with coworkers or the general public" does not accurately describe documented limitations in concentration, persistence, or pace); *Bowers v. Astrue,* 271 Fed. App'x 731, 733 (10th Cir.2008) (hypothetical including limitations for simple, repetitive, and routine work with a low stress level and only brief contact with the public did not account for impairment in concentration and attention); *Ramirez v. Barnhart,* 372 F.3d 546, 554 (3d Cir.2004) (hypothetical restriction to simple one or two-step tasks did not account for limitations in concentration); *Kasarsky v. Barnhart,* 335 F.3d 539, 544 (7th Cir.2003) (hypothetical about a person with borderline intelligence did not account for deficiencies in concentration); *Newton v. Chater,* 92 F.3d 688, 695 (8th Cir.1996) (hypothetical limiting claimant to performing only simple tasks did not account for deficiencies in concentration, persistence, or pace).

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 1117515
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Joe L. CHARLAND, Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY, Defendant.

Case No. 1:13-CV-492 (GTS/WBC)

|

Signed 03/22/2016

**Attorneys and Law Firms**

LAW OFFICES OF DAVID C. BURAN, 78 Severance Green, Suite 106, OF COUNSEL: DAVID C. BURAN, ESQ., Colchester, VT 05446, Counsel for Plaintiff.

U.S. SOCIAL SECURITY ADMIN., OFFICE OF REG'L GEN. COUNSEL – REGION II, 26 Federal Plaza, Room 3904, OF COUNSEL: DAVID L. BROWN, ESQ., DAVID B. MYERS, ESQ., New York, NY 10278, Counsel for Defendant.


### DECISION and ORDER

GLENN T. SUDDABY, Chief United States District Judge

 **\*1** Currently before the Court, in this Social Security action filed by Joe L. Charland ("Plaintiff") against the Commissioner of Social Security ("Defendant" or "the Commissioner") pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), are (1) the Report and Recommendation of United States Magistrate Judge William B. Mitchell Carter, filed on March 9, 2016, recommending that Plaintiff's motion for judgment on the pleadings be granted, and that Defendant's motion for judgment on the pleadings be denied, and (2) Defendant's objections to the Report and Recommendation. (Dkt. Nos. 20-21.)


## I. DEFENDANT'S OBJECTIONS

Generally, Defendant makes two arguments in objection to the Magistrate Judge's recommendation that remand is required because the ALJ's physical residual functional capacity ("RFC") finding that Plaintiff could perform "sedentary work as defined in 20 CFR 404.1576(a)" (1) failed to provide a proper function-by-function assessment of Plaintiff's physical abilities, and (2) was not supported by substantial evidence because the record did not include a medical opinion that Plaintiff could perform the physical requirements of sedentary work, specifically sitting for six hours and standing/walking for two hours during an eight-hour workday.

First, Defendant argues that the Magistrate Judge's recommendation that the ALJ's RFC determination failed to provide a proper function-by-function assessment should be rejected because (1) the ALJ provided a legally sufficient function-by function assessment by stating that Plaintiff had the physical RFC to perform "sedentary work as defined in 20 CFR 404.1576(a)," and (2) even if the Court finds that the ALJ erred in this regard, any such error would be harmless under the facts of this case. (Dkt. No. 21 at 2-5.)

Second, Defendant argues that the Magistrate Judge's recommendation that the ALJ's RFC determination was not supported by substantial evidence should be rejected because the Magistrate Judge applied the incorrect legal standard and should have affirmed the ALJ's RFC determination under the substantial evidence standard of review. (*Id.* at 5-8.)

Case 5:24-cv-00169-DNH-ML   Document 27   Filed 02/05/25   Page 174 of 223

Charland v. Commissioner of Social Security, Not Reported in Fed. Supp. (2016)

2016 WL 1117515

## II. APPLICABLE LEGAL STANDARD

A district court reviewing a magistrate judge's Report and Recommendation "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). Parties may raise objections to the magistrate judge's Report and Recommendation, but they must be "specific written objections," and must be submitted "[w]ithin 14 days after being served with a copy of the recommended disposition." Fed. R. Civ. P. 72(b)(2); *accord,* 28 U.S.C. § 636(b) (1)(C). "A judge of the court shall make a de novo determination of those portions of the [Report and Recommendation] ... to which objection is made." 28 U.S.C. § 636(b)(1)(C); *accord,* Fed. R. Civ. P. 72(b)(2). "Where, however, an objecting party makes only conclusory or general objections, or simply reiterates his original arguments, the Court reviews the Report and Recommendation only for clear error." *Caldwell v. Crosset,* 9-CV-0576, 2010 WL 2346330, at * 1 (N.D.N.Y. June 9, 2010) (quoting *Farid v. Bouey,* 554 F. Supp. 2d 301, 307 [N.D.N.Y. 2008]) (internal quotation marks omitted).

## III. ANALYSIS

**\*2** While Defendant's objections somewhat reiterate her arguments presented in her initial brief, the Court finds that the objections constitute specific challenges to the Report and Recommendation. (*Compare* Dkt. No. 21 *with* Dkt. No. 17.) Therefore, the Court conducts a de novo review of the portions of the Magistrate Judge's Report and Recommendation addressed in Defendant's objections. For the ease of analysis, Defendants objections will be addressed out of order below.

### A. Whether the ALJ's Physical RFC Determination Was Supported by Substantial Evidence

The court agrees with the Magistrate Judge that the ALJ's physical RFC determination was not supported by substantial evidence for the reasons stated in the Magistrate Judge's Report and Recommendation. (Dkt. No. 20 at 6-8, 10-13.) To these reasons, the Court adds the following analysis.

Social Security regulations define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of ... [a plaintiff's] impairment(s), including ... [a plaintiff's] symptoms, diagnosis and prognosis, what ... [a plaintiff] can still do despite impairment(s), and ... [a plaintiff's] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2).

"The ALJ is not permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion or for any competent medical opinion." *Greek v. Colvin,* 802 F.3d 370, 375 (2d Cir. 2015); *accord, Rosa v. Callahan,* 168 F.3d 72, 79 (2d Cir. 1999). Moreover, an ALJ cannot assess a plaintiff's RFC based on the ALJ's own interpretation of the medical evidence. *See Balsamo v. Chater,* 142 F.3d 75, 81 (2d Cir. 1998) (holding that an "ALJ cannot arbitrarily substitute his own judgment for competent medical opinion"); *accord, House v. Astrue,* 11-CV-915, 2013 WL 422058, at \*4 (N.D.N.Y. Feb. 1, 2013) (holding that remand was necessary where there was no medical source opinion supporting the ALJ's RFC determination); *Larkin v. Colvin,* 13-CV-0567, 2014 WL 4146262, at \*9 (N.D.N.Y. Aug. 19, 2014) (holding that remand was required where the record lacked a broad assessment of Plaintiff's physical functional limitations from an acceptable medical source).

Here, the ALJ determined that Plaintiff had the physical RFC to perform sedentary work without a medical opinion indicating that Plaintiff could perform all of the exertional requirements of sedentary work, most notably standing and walking for two hours during an eight-hour workday. 20 C.F.R. § 404.1567(a); SSR 83-10, 1983 WL 31251 (1983). The Court recognizes that, "where the medical evidence shows relatively little physical impairment, an ALJ permissibly can render a common sense judgment about functional capacity even without a physician's assessment." *See House,* 2013 WL 422058, at \*4. However, that is not the case in the present matter because the ALJ determined that Plaintiff's lumbar spine impairments and obesity were severe impairments. (T. 12.)

Accordingly, the Court accepts and adopts the Magistrate Judge's recommendation that the ALJ's RFC determination was not supported by substantial medical evidence and that remand is required for the ALJ (1) to obtain a comprehensive function-by-

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 175 of 223

Charland v. Commissioner of Social Security, Not Reported in Fed. Supp. (2016)

2016 WL 1117515

function opinion of Plaintiff's physical work-related abilities and limitations from an acceptable medical source, and (2) reassess the RFC in light of the new medical opinion evidence. (Dkt. No. 20 at 6-8, 10-13.)

**B. Whether the ALJ Erred by Failing to Provide a Function-by-Function Assessment of Plaintiff's Physical Abilities and Limitations in the RFC Determination**

**\*3**  For the reasons set forth in Part III.A. of this Decision and Order, this matter is being remanded for the ALJ to obtain additional medical opinion evidence and reassess the RFC based on the new evidence. Therefore, the Court need not, and will not, reach this issue.

**ACCORDINGLY**, it is

**ORDERED** that the Magistrate Judge's Report and Recommendation (Dkt. No. 20) is **ACCEPTED** to the extent that it recommends that remand is required for the ALJ (1) to obtain a comprehensive function-by-function opinion of Plaintiff's physical work-related abilities and limitations from an acceptable medical source, and (2) reassess Plaintiff's physical RFC in light of the new medical opinion evidence; and it is further

**ORDERED** that the Commissioner's determination is **VACATED**; and it is further

**ORDERED** that the matter is **REMANDED** to the Commissioner of Social Security for further administrative proceedings consistent with this Order.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 1117515

---

**End of Document**                                                        © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 598331

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Sandra A. WALTERS, Plaintiff,

v.

Michael J. ASTRUE, Commissioner of Social Security, Defendant.

No. 11–CV–640 (VEB).

|

Feb. 15, 2013.

**Attorneys and Law Firms**

Karen S. Southwick, Olinsky Law Group, Syracuse, NY, for Plaintiff.

Sixtina Fernandez, John M. Kelly, Social Security Administration, Office of Regional General Counsel, New York, NY, for Defendant.

## DECISION AND ORDER

VICTOR E. BIANCHINI, United States Magistrate Judge.

## I. INTRODUCTION

**\*1** In April of 2007, Plaintiff Sandra A. Walters applied for supplemental security income ("SSI") benefits and disability insurance benefits ("DIB") under the Social Security Act. Plaintiff alleges that she has been unable to work since April of 2005 due to physical impairments. The Commissioner of Social Security denied Plaintiff's applications.

Plaintiff, by and through her attorneys, Olinsky Law Group, Karen S. Southwick, Esq., of counsel, bring this action seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). The parties, by and through their respective counsel, consented to the jurisdiction of a United States Magistrate Judge on February 10, 2012. (Docket No. 15).

## II. BACKGROUND

The relevant procedural history may be summarized as follows:

On April 24, 2007, and April 26, 2007, Plaintiff applied for SSI benefits and DIB, alleging that she had been unable to work since April 15, 2005. (T at 84–85, 93, 106, 514). [1] The applications were denied initially and Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"). A hearing was held in Syracuse, New York, on December 23, 2009, before ALJ Robert E. Gale. Plaintiff appeared with her attorney and testified. (T at 10).

On March 26, 2010, ALJ Gale issued a written decision finding that Plaintiff was not disabled within the meaning of the Social Security Act during the relevant time period and denying Plaintiff's claims for benefits. (T at 7–18). The ALJ's decision became the Commissioner's final decision on April 8, 2011, when the Appeals Council denied Plaintiff's request for review. (T at 1–4).

2013 WL 598331, 187 Soc.Sec.Rep.Serv. 184

Plaintiff, by and through her attorneys, timely commenced this action by filing a Complaint on June 8, 2011. (Docket No. 1). The Commissioner interposed an Answer on November 30, 2011. (Docket No. 8). The parties, through their respective attorneys of record, consented to the jurisdiction of a United States Magistrate Judge on February 10, 2012. (Docket No. 16). Plaintiff filed a Brief on March 2, 2012. (Docket No. 16). The Commissioner filed a Brief on May 16, 2012. (Docket No. 20).

Plaintiff requests that this case be remanded for the calculation of benefits. The Commissioner agrees that a remand is warranted, but argues that the remand should be for the purpose of rehearing and reconsideration of certain issues (as opposed to the calculation of benefits).

Pursuant to General Order No. 18, issued by the Chief District Judge of the Northern District of New York on September 12, 2003, this Court will proceed as if both parties had accompanied their briefs with a motion for judgment on the pleadings. [2]

For the reasons set forth below, the Commissioner's motion is granted, Plaintiff's motion is denied, and this case is remanded for further administrative proceedings.

## III. DISCUSSION

### A. Legal Standard

A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled. *See* 42 U.S.C. §§ 405(g), 1383c(3); *Wagner v. Sec'y of Health & Human Servs.,* 906 F.2d 856, 860 (2d Cir.1990). Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied, or it was not supported by substantial evidence. *Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir.1987) ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."); *see Grey v. Heckler,* 721 F.2d 41, 46 (2d Cir.1983); *Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir.1979).

**\*2** "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and it has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *See Rutherford v. Schweiker,* 685 F.2d 60, 62 (2d Cir.1982).

If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." *Rosado v. Sullivan,* 805 F.Supp. 147, 153 (S.D.N.Y.1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." *Valente v. Sec'y of Health & Human Servs.,* 733 F.2d 1037, 1041 (2d Cir.1984).

The Commissioner has established a five-step sequential evaluation process to determine whether an individual is disabled as defined under the Social Security Act. *See* 20 C.F.R. §§ 416.920, 404.1520. The United States Supreme Court recognized the validity of this analysis in *Bowen v. Yuckert,* 482 U.S. 137, 140–142, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987), and it remains the proper approach for analyzing whether a claimant is disabled. [3]

While the claimant has the burden of proof as to the first four steps, the Commissioner has the burden of proof on the fifth and final step. *See Bowen,* 482 U.S. at 146 n. 5; *Ferraris v. Heckler,* 728 F.2d 582 (2d Cir.1984).

The final step of the inquiry is, in turn, divided into two parts. First, the Commissioner must assess the claimant's job qualifications by considering his or her physical ability, age, education, and work experience. Second, the Commissioner must determine whether jobs exist in the national economy that a person having the claimant's qualifications could perform. *See* 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. §§ 416.920(g); 404.1520(g); *Heckler v. Campbell,* 461 U.S. 458, 460, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983).

## B. Analysis

### 1. Commissioner's Decision

The ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2010, and had not engaged in substantial gainful activity since April 15, 2005, the alleged onset date. (T at 12).

The ALJ found that Plaintiff had the following impairments considered "severe" under the applicable Social Security Regulations (the "Regulations"): tarsal tunnel syndrome and lumbar radiculopathy. (T at 12). However, the ALJ determined that Plaintiff's medically determinable impairments did not meet or equal one of the impairments listed in Appendix I of the Regulations (the "Listings"). (T at 13).

**\*3** After reviewing the medical evidence, the ALJ concluded that Plaintiff retained the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) and 416.967(a), except that she was limited to occasional bending. (T at 13–17). The ALJ found that Plaintiff could perform her past relevant work as a clerk, as that job did not require the performance of work-related duties precluded by Plaintiff's residual functional capacity. (T at 17).

Accordingly, the ALJ determined that Plaintiff had not been under a "disability," as that term is defined under the Act, from the alleged onset date (April 15, 2005) through the date of the ALJ's decision (March 26, 2010), and was therefore not entitled to benefits. (T at 18). As noted above, the ALJ's decision became the Commissioner's final decision on April 8, 2011, when the Appeals Council denied Plaintiff's request for review. (T at 1–4).

### 2. Remand

"Sentence four of Section 405(g) provides district courts with the authority to affirm, reverse, or modify a decision of the Commissioner 'with or without remanding the case for a rehearing.' " *Butts v. Barnhart,* 388 F.3d 377, 385 (2d Cir.2002) (quoting 42 U.S.C. § 405(g)). Remand is "appropriate where, due to inconsistencies in the medical evidence and/or significant gaps in the record, further findings would ... plainly help to assure the proper disposition of [a] claim." *Kirkland v. Astrue,* No. 06 CV 4861, 2008 WL 267429, at \*8 (E.D.N.Y. Jan.29, 2008).

In the Second Circuit a remand for the sole purpose of calculating benefits is the appropriate remedy if "the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose." *Parker v. Harris,* 626 F.2d 225, 235 (2d Cir.1980); *see also Butts v. Barnhart,* 388 F.3d 377, 385–86 (2d Cir.2004) (remand for calculation of benefits warranted where there is "no apparent basis to conclude that a more complete record might support the Commissioner's decision....") (quoting *Rosa v. Callahan,* 168 F.3d 72, 83 (2d Cir.1999)); *Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir.1987) (remand for calculation of benefits appropriate where record "compel[s] but one conclusion under the ... substantial evidence standard.").

### a. ALJ's Failure to Provide Function–by–Function Assessment

The Commissioner acknowledges that the ALJ's decision was deficient and concedes that a remand is necessary (Docket No. 20, at p. 2). In particular, as the Commissioner recognizes, the ALJ erred by failing to provide a function-by-function assessment of the Plaintiff's residual functional capacity ("RFC").

2013 WL 598331, 187 Soc.Sec.Rep.Serv. 184

Pursuant to the Social Security Regulations, an ALJ's assessment of the claimant's RFC must include a function-by-function analysis of the claimant's functional limitations or restrictions and an assessment of the claimant's work-related abilities on a function-by-function basis. With regard to physical limitations, this means the ALJ must make a function by function assessment of the claimant's ability to sit, stand, walk, lift, carry, push, pull, reach, handle, stoop, or crouch. 20 C.F.R. § 404.1513(c)(1); §§ 404.1569a(a), 416.969a(a); *Martone v. Apfel,* 70 F.Supp.2d 145, 150 (N.D.N.Y.1999). Once the function-by-function analysis is completed, the RFC may be expressed in terms of exertional levels of work, *e.g.,* sedentary, light, medium, heavy, and very heavy. *Hogan v. Astrue,* 491 F.Supp.2d 347, 354 (W.D.N.Y.2007).

**\*4**  The ALJ in this case did not provide a function-by-function analysis with regard to Plaintiff's physical RFC. Rather, he simply expressed the RFC in terms of an exertional level of work (*i.e.* sedentary work). (T at 13). The Second Circuit has not yet decided whether the failure to provide a function-by-function assessment of a claimant's RFC is *per se* grounds for a remand.

At least three circuit courts of appeal have concluded that a function-by-function analysis is desirable, but not an absolute requirement if the rationale for the ALJ's RFC assessment can be readily discerned. *See Bayliss v. Barnhart,* 427 F.3d 1211, 1217 (9th Cir.2005) ("Preparing a function-by-function analysis for medical conditions or impairments that the ALJ found neither credible nor supported by the record is unnecessary."); *Depover v. Barnhart,* 349 F.3d 563, 567 (8th Cir.2003) (an ALJ does not fail in his or her duty to assess a claimant's RFC on a function-by-function basis merely because the ALJ does not address all areas regardless of whether a limitation is found); *Delgado v. Comm'r of Soc. Sec.,* 30 F. App'x 542, 547 (6th Cir.2002). [4]

District courts in the Second Circuit have reached conflicting conclusions. *See, e.g., Wood v. Comm'r of Soc. Sec.,* No. 06–CV–157, 2009 WL 1362971, at *6 (N.D.N.Y. May 14, 2009) (collecting cases); *McMullen v. Astrue,* 05–CV–1484, 2008 WL 3884359, at *6 (N.D.N.Y. Aug.18, 2008); *Brown v. Barnhart,* No. 01–CV–2962, 2002 WL 603044, at *5–7 (E.D.N.Y.Apr.15, 2002) ("In sum, because the ALJ did not properly apply the legal standard in Social Security Ruling 96–8p for assessing residual functional capacity, I cannot properly conclude that his finding that the claimant retained the residual functional capacity to do her past work was supported by substantial evidence."); *Matejka v. Barnhart,* 386 F.Supp.2d 198, 208 (W.D.N.Y.2005) ("The ALJ's decision did not address the plaintiff's ability to sit, stand, or walk ... Since the ALJ failed to make a function-by-function analysis of plaintiff's RFC, his determination that she had the RFC for sedentary work is not supported by substantial evidence."); *but see Casino–Ortiz v. Astrue,* 2007 WL 2745704, at *13 (S.D.N.Y. Sept.21, 2007) (sustaining ALJ's decision, notwithstanding failure to provide function-by-function analysis); *Novak v. Astrue,* No. 07 Civ. 8435, 2008 WL 2882638, at *3 & n. 47 (S.D.N.Y. July 25, 2008) ("The A.L.J. must avoid perfunctory determinations by considering all of the claimant's functional limitations, describing how the evidence supports her conclusions, and discussing the claimant's ability to maintain sustained work activity, but she need not provide a narrative discussion for each function."); *but see Martin v. Astrue,* No. 05–CV–72, 2008 WL 4186339, at *16 (N.D.N.Y. Sept. 9, 2008) (declining to remand, despite finding that the ALJ grouped the functions in his function-by-function analysis because "treating the activities separately would not have changed the result of the RFC determination").

**\*5**  This Court has concluded that, in limited circumstances, the ALJ's failure to provide a function-by-function analysis might constitute harmless error, [5] provided the absence of the analysis does not frustrate meaningful review of the ALJ's overall RFC assessment *See Goodale v. Astrue,* No. 11–CV–821, 2012 WL 6519946, at *7 (N.D.N.Y. Dec. 13, 2012). However, with that said, this Court has also taken great care to emphasize that the function-by-function assessment is an important regulatory requirement (which, ultimately, is designed to ensure that careful consideration is given to any and all of the claimant's work-related limitations) that should not (and, indeed, may not) be lightly set aside or in any way treated casually. *See Desmond v. Astrue,* No. 11–CV–0818, 2012 WL 6648625, at *6 n. 8 (N.D.N.Y. Dec. 20, 2012).

In the present case, the ALJ's failure to provide a function-by-function assessment frustrates meaningful review and requires a remand. Social Security Ruling 96–9p provides, in pertinent part, as follows:

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 180 of 223
Walters v. Astrue, Not Reported in F.Supp.2d (2013)
2013 WL 598331, 187 Soc.Sec.Rep.Serv. 184

The ability to perform the full range of sedentary work requires the ability to lift no more than 10 pounds at a time and occasionally to lift or carry articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one that involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. "Occasionally" means occurring from very little up to onethird of the time, and would generally total no more than about 2 hours of an 8–hour workday. Sitting would generally total about 6 hours of an 8–hour workday. Unskilled sedentary work also involves other activities, classified as "nonexertional," such as capacities for seeing, manipulation, and understanding, remembering, and carrying out simple instructions.

Dr. Carrie Jones, Plaintiff's treating physician, opined that Plaintiff was "appropriate for a sedentary position and occasional 10 pounds lifting restriction." (T at 379, 417). However, Dr. Jones did not feel that Plaintiff could return to her "prior position." (T at 379).

Dr. John Cambareri, Plaintiff's treating orthopedic surgeon, indicated that Plaintiff could perform "light duty work" and was "temporarily disabled from her job." (T at 239). Dr. Martin Schaeffer, a treating physician, opined that Plaintiff was limited to "no weights greater than 10–pounds and no repetitious type bending or lifting ...." (T at 476).

The ALJ afforded "great weight" to these opinions. [6] (T at 17). However, the ALJ appears not to have realized that the treating providers did not expressly indicate whether, for example, Plaintiff could sit for prolonged periods or engage in the occasional walking or standing necessary to perform sedentary work. Although Dr. Jones and Dr. Cambareri used generic descriptions related to Plaintiff's RFC ("sedentary" and "light duty" respectively), it is not clear how they defined those terms and there is no indication as to whether the doctors' definitions are co-extensive with the definitions found in the Social Security Regulations.

 *6  This is precisely the sort of gap the function-by-function requirement is designed to avoid. In other words, by requiring the ALJ to carefully consider each of the various functional limitations, the function-by-function requirement works to prevent the ALJ from making assumptions, reaching conclusions not supported by the evidence, or otherwise failing to recognize gaps in the medical record.

Dr. Myra Shayevitz, the consultative examiner, opined that "sitting in a prolonged manner is uncomfortable" for Plaintiff and "there may be limitations which are significant in any prolonged sitting, standing, or walking." (T at 440). The ALJ discounted this assessment as inconsistent with the treating physicians' opinions. (T at 17). However, for the reasons outlined above, the treating physicians did not actually provide functional assessments concerning prolonged sitting, standing, or walking. The general references to "sedentary" or "light duty" work were not sufficient grounds upon which to discount other evidence, including the opinion of a consultative examiner, indicating limitations inconsistent with the requirements of sedentary work. Before discounting Dr. Shayevitz's opinion, [7] the ALJ should have re-contacted the treating physicians and requested clarification of their opinions concerning Plaintiff's functional limitations. After further development of the record in this regard, the ALJ should be sure to perform the function-by-function assessment required under the Regulations.

### b. Past Relevant Work

In addition, as the Commissioner acknowledges, the ALJ's past relevant work analysis was flawed. "[I]n the fourth stage of the SSI inquiry, the claimant has the burden to show an inability to return to her previous specific job and an inability to perform her past relevant work generally." *Jasinski v. Barnhart,* 341 F.3d 182, 185 (2d Cir.2003) (citing SSR 82–62). A claimant is not disabled if she can perform her past relevant work, either as she actually performed it, or as it is generally performed in the

2013 WL 598331, 187 Soc.Sec.Rep.Serv. 184

national economy. *See* SSR 82–61; *Jock v. Harris,* 651 F.2d 133, 135 (2d Cir.1981) (noting that "the claimant has the burden to show an inability to return to her previous specific job and an inability to perform her past relevant work generally").

"Determination of the claimant's ability to perform past relevant work requires a careful appraisal of (1) the individual's statements as to which past work requirements can no longer be met and the reason(s) for his or her inability to meet those requirements; (2) medical evidence establishing how the impairment limits ability to meet the physical and mental requirements of the work; and (3) in some cases, supplementary or corroborative information from other sources such as employers, the *Dictionary of Occupational Titles,* etc., on the requirements of the work as generally performed in the economy." *Speruggia v. Astrue,* No. 05–CV–3532, 2008 WL 818004, at \*12–\*13 (E.D.N.Y. Mar.26, 2008).

 **\*7**  In this case, the ALJ found that Plaintiff was capable of performing her past relevant work as a clerk. (T at 17). The ALJ's finding is supported by two sentences of text. In the first sentence offered in support of his find, the ALJ referenced the *Dictionary of Occupational Titles* ("DOT") and noted that the DOT identifies clerk positions at the sedentary level that begin with a specific vocational preparation ("SVP") score of 2. [8] In the second sentence, the ALJ summarily stated that a comparison of Plaintiff's RFC and "the physical and mental demands of this work" indicate that Plaintiff is able to perform the work as it is generally performed. (T at 17).

However, the DOT lists numerous different types of "clerk" with differing exertional and non-exertional demands (e.g. shipping and receiving clerk, stock clerk, administrative clerk, file clerk, production clerk, sales clerk, data entry clerk, railroad-maintenance clerk). The ALJ did not identify which of the clerk positions he considered and which of the positions had physical and mental demands consistent with Plaintiff's RFC. Moreover, Plaintiff provided a description of the work requirements of her past relevant work as a clerk (T at 118), but the ALJ's conclusory, two-sentence decision does not indicate whether he considered the exertional and nonexertional demands of Plaintiff's work as actually performed.

The ALJ's analysis at step four clearly did not satisfy the applicable standard, which requires "a careful appraisal of (1) the individual's statements as to which past work requirements can no longer be met and the reason(s) for his or her inability to meet those requirements; (2) medical evidence establishing how the impairment limits ability to meet the physical and mental requirements of the work; and (3) in some cases, supplementary or corroborative information from other sources such as employers, the Dictionary of Occupational Titles, etc., on the requirements of the work as generally performed in the economy." SSR 82–62. A remand for reconsideration and clarification on this point is therefore necessary.

### c. Remand for Rehearing and Further Development of the Record

For the foregoing reasons, this Court has no hesitancy in granting the Commissioner's motion requesting remand. This Court finds that a remand for rehearing is appropriate, as opposed to a remand solely for the purpose of calculating benefits.

As noted above, courts should remand for development of the evidence (as opposed to solely for calculation and payment of benefits), "[w]here there are gaps in the administrative record or the ALJ has applied an improper legal standard." *Rosa v. Callahan* 168 F.3d 72, 82–83 (2d Cir.1999) (quotation omitted); *see also Williams v. Apfel,* 204 F.3d 48, 50 (2d Cir.1999) (holding "a remand for further proceedings is the appropriate remedy when an erroneous step four determination has precluded any analysis under step five").

 **\*8**  This Court finds that a remand for calculation of benefits, which is appropriate only where the record "compel[s] but one conclusion under the ... substantial evidence standard," *Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir.1987), is not warranted here. It is possible that, upon further development of the record and reconsideration, the ALJ may conclude that Plaintiff is not disabled. Two of her treating physicians found her capable of performing some work (described in one instance as "sedentary" and in another as "light duty"). It may be the case that the treating physicians' definitions of those terms and assessments of Plaintiff's limitations do support a finding that Plaintiff was not disabled within the meaning of the Social Security Act during the relevant time period. As such, a remand for reconsideration (as opposed to calculation of benefits) is the appropriate remedy. *See*

*Rodriguez v. Astrue,* No. 11–Civ–7720, 2012 WL 4477244, at \*42 (S.D.N.Y. Sep't 28, 2012) ("Depending on the nature of any additional evidence procured by the ALJ to fill gaps in the record and his supplemental findings, it is certainly possible that he may defensibly conclude that plaintiff is not disabled. Hence we recommended that the court order remand for reconsideration rather than calculation of benefits.").

### III. CONCLUSION

For the foregoing reasons, this case is remanded to the Commissioner for further administrative proceedings pursuant to sentence four of Section 405(g).

### IV. ORDERS

It is hereby ORDERED that the Commissioner's motion for judgment on the pleadings, which requests a remand for rehearing and reconsideration, is GRANTED; and it is further

ORDERED, that Plaintiff's motion for judgment on the pleadings is DENIED to the extent it requests a remand solely for the calculation of benefits; and it is further;

ORDERED, that this case is remanded to the Commissioner of Social Security for further proceedings consistent with this Decision and Order; and it is further

ORDERED, that the Clerk of the Court shall enter judgment accordingly.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 598331, 187 Soc.Sec.Rep.Serv. 184

---

### Footnotes

1    Citations to "T" refer to the Administrative Transcript. (Docket No. 9).

2    General Order No. 18 provides, in pertinent part, that "[t]he Magistrate Judge will treat the proceeding as if both parties had accompanied their briefs with a motion for judgment on the pleadings ."

3    This five-step process is detailed as follows:

    First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.

    If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.

    If the claimant has such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.

> If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity.
>
> Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.
>
> Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

*Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982) (per curiam); *see also Rosa v. Callahan,* 168 F.3d 72, 77 (2d Cir.1999); 20 C.F.R. §§ 416.920, 404.1520.

4    The Third Circuit and Seventh Circuit have reached similar conclusions, albeit in unpublished decisions. *See Bencivengo v. Comm'r of Soc. Sec.,* 251 F.3d 153 (3d Cir.2000) ("Although SSR 96–8p requires a 'function-by-function evaluation' to determine a claimant's RFC, case law does not require the ALJ to discuss those capacities for which no limitation is alleged."); *Zatz v. Astrue,* 346 F. App'x 107, 111 (7th Cir.2009) ("[A]n ALJ need not provide superfluous analysis of irrelevant limitations or relevant limitations about which there is no conflicting medical evidence.").

5    Several courts have recognized the general applicability of the harmless error rule to the review of disability denial claims. *See, e.g., Duvergel v. Apfel,* No. 99 Civ. 4614, 2000 WL 328593, at *11 (S.D.N.Y.Mar.29, 2002); *Walzer v. Chater,* 93 Civ. 6240, 1995 WL 791963 at *9 (S.D.N.Y.Sept.26, 1995).

6    Under the "treating physician's rule," the ALJ must give controlling weight to the treating physician's opinion when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(d)(2); *Halloran v. Barnhart,* 362 F.3d 28, 31–32 (2d Cir.2004); *Shaw v. Chater,* 221 F.3d 126, 134 (2d Cir.2000).

     Even if a treating physician's opinion is deemed not to be deserving of controlling weight, an ALJ may nonetheless give it "extra weight" under certain circumstances. In this regard, the ALJ should consider the following factors when determining the proper weight to afford the treating physician's opinion if it is not entitled to controlling weight: (1) length of the treatment relationship and the frequency of examination, (2) nature and extent of the treatment relationship, (3) supportability of opinion, (4) consistency, (5) specialization of the treating physician, and (6) other factors that are brought to the attention of the court. C.F.R. § 404.1527(d)(1)-(6); *see also de Roman,* 2003 WL 21511160, at *9; Shaw, 221 F.3d at 134; *Clark v. Comm'r of Soc. Sec.,* 143 F.3d 115, 118 (2d Cir.1998); *Schaal v. Apfel,* 134 F.3d 496, 503 (2d Cir.1998).

7    It is well settled that an ALJ is entitled to rely upon the opinions of both examining and non-examining State agency medical consultants, since such consultants are deemed to be qualified experts in the field of social security disability. *See* 20 C.F.R. §§ 404.1512(b)(6), 404.1513(c), 404.1527(f)(2), 416.912(b) (6), 416.913(c), and 416.927(f)(2); *see also Leach ex. Rel. Murray v. Barnhart,* No. 02 Civ. 3561, 2004 WL 99935, at 9 (S.D.N.Y.Jan.22, 2004) ("State agency physicians are qualified as experts in the evaluation of medical issues in disability claims. As such, their opinions may constitute substantial evidence if they are consistent with the record as a whole.").

8    SVP "is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job—worker situation. An SVP of 2 means anything beyond a short demonstration, up to and including one month." *Reynolds v. Comm'r of Social Security,* No. 11–CV–778, 2012 2050410, at *5 n. 2 (N.D.N.Y. June 6, 2012).

---

End of Document    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 184 of 223
Herrington v. Berryhill, Not Reported in Fed. Supp. (2019)

2019 WL 1091385

2019 WL 1091385
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Johnny HERRINGTON, Plaintiff,

v.

Nancy A. BERRYHILL, Acting Commissioner of Social Security, Defendant.

No. 3:18-cv-0315(WIG)
|
Signed 03/08/2019

**Attorneys and Law Firms**

Michael F. Magistrali, Torrington, CT, for Plaintiff.

James Desir, U.S. Attorney's Office, Susan Reiss, Social Security Administration—NY Office of the General Counsel, New York, NY, for Defendant.

## RULING ON PENDING MOTIONS

WILLIAM I. GARFINKEL, United States Magistrate Judge

**\*1** This is an administrative appeal following the denial of the plaintiff, Johnny Herrington's, application for Title XVI supplemental security income benefits ("SSI"). It is brought pursuant to 42 U.S.C. § 405(g). [1] Plaintiff now moves for an order reversing the decision of the Commissioner of the Social Security Administration ("the Commissioner"), or in the alternative, an order remanding his case for a rehearing. [Doc. # 23]. The Commissioner, in turn, has moved for an order affirming her decision. [Doc. # 26]. After careful consideration of the arguments raised by Plaintiff, and thorough review of the administrative record, the Court affirms the Commissioner's decision.

## LEGAL STANDARD

"A district court reviewing a final ... decision [of the Commissioner of Social Security] pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), is performing an appellate function." *Zambrana v. Califano*, 651 F.2d 842 (2d Cir. 1981). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, [are] conclusive...." 42 U.S.C. § 405(g). Accordingly, the district court may not make a *de novo* determination of whether a plaintiff is disabled in reviewing a denial of disability benefits. *Id.*; *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990). Rather, the court's function is to first ascertain whether the Commissioner applied the correct legal principles in reaching her conclusion, and then whether the decision is supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). Therefore, absent legal error, a decision of the Commissioner cannot be set aside if it is supported by substantial evidence. *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982). Substantial evidence is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971) ). It must be "more than a scintilla or touch of proof here and there in the record." *Williams*, 859 F.2d at 258. If the Commissioner's decision is supported by substantial evidence, that decision will be sustained, even where there may also be substantial evidence to support the plaintiff's contrary position. *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982).

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 185 of 223
Herrington v. Berryhill, Not Reported in Fed. Supp. (2019)
2019 WL 1091385

## BACKGROUND

### 1. Facts

**\*2**  Plaintiff filed his SSI application on December 13, 2012, alleging his disability began on that date. His claim was denied at both the initial and reconsideration levels. Thereafter, Plaintiff requested a hearing. On February 4, 2014, a hearing was held before an administrative law judge. On February 26, 2014, a decision was issued denying Plaintiff's claim. Plaintiff then sought review with the Appeals Council. The Appeals Council granted Plaintiff's request for review on July 28, 2015 and remanded the matter for a subsequent hearing. Specifically, the remand order directed the administrative law judge to do following: (1) give further consideration to Plaintiff's maximum residual functional capacity during the entire period at issue and provide rationale with specific reference to evidence of record in support of the assessed limitations; and (2) obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on Plaintiff's occupational base and to determine whether he has acquired any skills that are transferable to other occupations. (R. 180-81). Administrative Law Judge Deirdre R. Horton (the "ALJ") held the subsequent hearing on August 22, 2016. Plaintiff appeared with an attorney. Plaintiff and a vocational expert ("VE") testified at the hearing. On October 25, 2016, the ALJ issued a partially favorable decision: she found Plaintiff was not disabled from December 13, 2012 through July 21, 2015, and that he became disabled as of July 22, 2015. Plaintiff timely requested review of the ALJ's decision by the Appeals Council. On January 4, 2018, the Appeals Council denied review, making the ALJ's October 2016 decision the final determination of the Commissioner. This action followed.

Plaintiff has a high school education and can communicate in English. (R. 25). He was fifty-two years old on the date his SSI application was filed. Plaintiff has past work experience as a truck driver. (R. 24). Plaintiff's complete medical history is set forth in the Joint Stipulation of Facts filed by the parties. [Doc. # 23-2]. The Court adopts this stipulation and incorporates it by reference herein.

### 2. The ALJ's Decision

The Commissioner must follow a sequential evaluation process for assessing disability claims. The five steps of this process are as follows: (1) the Commissioner considers whether the claimant is currently engaged in substantial gainful activity; (2) if not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities; (3) if the claimant has a "severe impairment," the Commissioner must ask whether, based solely on the medical evidence, the claimant has an impairment which "meets or equals" an impairment listed in Appendix 1 of the regulations (the Listings). If so, and it meets the durational requirements, the Commissioner will consider the claimant disabled, without considering vocational factors such as age, education, and work experience; (4) if not, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has the residual functional capacity to perform his or her past work; and (5) if the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work in the national economy which the claimant can perform. 20 C.F.R. § 416.920(a)(4)(i)-(v). The claimant bears the burden of proof on the first four steps, while the Commissioner bears the burden of proof on the final step. *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014).

In this case, at Step One, the ALJ found that Plaintiff has not engaged in substantial gainful activity since the SSI application date. (R. 17). At Step Two, the ALJ found Plaintiff's hepatitis, cirrhosis, degenerative disc disease, and obesity are severe impairments. (*Id.*). At Step Three, the ALJ concluded Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. (*Id.*). Next, the ALJ determined Plaintiff retains the following residual functional capacity [2]:

> Plaintiff can perform light work except he can frequently climb ramps and stairs and never climb ladders, ropes, or scaffolds. He can work in a setting free of concentrated exposure to unprotected heights or moving machinery. He can frequently balance and occasionally crouch, kneel, and crawl. He can work

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 186 of 223

Herrington v. Berryhill, Not Reported in Fed. Supp. (2019)

2019 WL 1091385

in a setting where he is permitted to change positions one or two times per hour to stretch for one to two minutes.

(R. 18). At Step Four, the ALJ found Plaintiff has been unable to perform any past relevant work since the alleged onset date. (R. 24-25). At Step Five, the ALJ relied on the testimony of the VE to conclude that, prior to July 22, 2015, there were jobs existing in significant numbers in the national economy Plaintiff could perform. (R. 25). Specifically, the VE testified that a person with Plaintiff's vocational factors and the assessed RFC could have performed the positions of final inspector, small products inspector, and mail clerk. (R. 26). The ALJ also found that, beginning on July 22, 2015, the date Plaintiff's age category changed to an individual of advanced age, a finding of disabled is reached by direct application of Medical-Vocational Rule 202.06. (*Id.*). Accordingly, the ALJ found Plaintiff to be disabled as of July 22, 2015, but not before.

## DISCUSSION

**\*3**  On appeal, Plaintiff avers that the ALJ should have found him disabled as of his alleged onset date, December 13, 2012. In support of this position, Plaintiff argues (1) the ALJ erred in weighing the medical opinion evidence; (2) the ALJ erred in assessing his credibility; and (3) the ALJ failed to consider the combination of his impairments in determining his RFC. The Court will address these points in turn.

### 1. Weighing of Opinion Evidence

Plaintiff first claims that the ALJ erred in her weighing of the medical opinion evidence. The ALJ must evaluate medical opinions, along with the other evidence of record, when determining a claimant's RFC. When evaluating opinion evidence, a treating source's opinion on the nature or severity of a claimant's impairments should be given controlling weight when it is well-supported by, and not inconsistent with, other substantial evidence in the record. *See* 20 C.F.R. § 416.927(c)(2). When a treating physician's opinion is not given controlling weight, the ALJ must consider several factors in determining how much weight it should receive. *See Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015); *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008). Those factors include "(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013). After considering these factors, the ALJ is required to "comprehensively set forth [her] reasons for the weight assigned to a treating physician's opinion." *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004). In so doing, the ALJ must provide "good reasons" for the weight assigned. *Burgess*, 537 F.3d at 129. An ALJ's failure to provide good reasons for the weight given to a treating source's opinion is grounds for remand. *Halloran*, 362 F.3d at 33. An ALJ is not required to "slavish[ly] recite[ ]each and every factor where the ALJ's reasoning and adherence to the regulation are clear." *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013).

Opinion evidence can come from several types of sources, including from "acceptable medical sources," such as treating physicians, and from "other medical sources" such as nurses and nurse practitioners. *See* 20 C.F.R. § 416.913. When considering opinions from "other medical sources," the ALJ should use the same factors as those for evaluating the opinion of a treating physician. 20 C.F.R. § 416.927(f)(1). The ALJ "generally should explain the weight given to opinions from these sources or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning." 20 C.F.R. § 416.927(f)(2).

Opinion evidence can also come from state agency medical consultants who review a claimant's medical file but do not treat or examine the claimant. *See* 20 C.F.R. § 416.927(e). These consultants are "experts in the Social Security disability programs," and ALJs must "consider their findings of fact about the nature and severity of an individual's impairment(s)." *Titles II & XVI: Consideration of Admin. Findings of Fact by State Agency Med. & Psychological Consultants & Other Program Physicians & Psychologists at the Admin. Law Judge & Appeals Council*, SSR 96-6P (S.S.A. July 2, 1996). Opinions from state agency

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 187 of 223

Herrington v. Berryhill, Not Reported in Fed. Supp. (2019)

2019 WL 1091385

medical consultants can be given weight when they are supported by evidence in the record. *Id.* In fact, the opinion of a state agency medical consultant can override the opinion of a treating source when it is supported by the medical evidence. *See Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995); *see also Camille v. Colvin*, 652 F. App'x 25, 28 (2d Cir. 2016) (an ALJ can find a non-examining source's opinion "more reliable" than an opinion of a treating source). The record in this case contains opinion evidence from these three types of sources.

**\*4** First, Dr. Aulepp, Nurse Weyant, and Nurse Conn, Plaintiff's treatment providers when he was in Bureau of Prisons custody (the "BOP providers"), on three occasions in 2011 restricted him to lifting no more than fifteen pounds and no ladders or upper bunks. (R. 629-30, 639, 689). The ALJ gave these assessments little weight, reasoning that they were made more than a year prior to the alleged disability onset date and were inconsistent with objective clinical findings. (R. 22).

The Court finds no error with the ALJ's weighing of the opinions from the BOP providers. The restrictions the BOP providers imposed were well outside of the relevant period, which detracts from their relevance. *See Harris v. Colvin*, No. 2:14-CV-63-JMC, 2015 WL 282014, at \*6 (D. Vt. Jan. 22, 2015) (that an opinion was rendered outside of the relevant time period is "a proper factor for the ALJ to consider"). In addition, the ALJ considered these opinions in the context of the record as a whole, and provided good reasons for discounting them in that context. The ALJ specifically details the objective clinical findings inconsistent with the restrictions from the time Plaintiff was incarcerated. These findings include Plaintiff having steady gait and no problems ambulating (R. 416), full range of motion and no tenderness, swelling, or muscle spasm (R. 424, 675), normal gait (R. 425), and full strength and range of motion in arms and legs (R. 676). In addition, an August 2011 imaging study revealed only degenerative changes in the cervical spine, and a May 7, 2012 lumbar x-ray showed mild degenerative disc disease. (R. 659, 810). The ALJ also discusses treatment records from after Plaintiff's period of incarceration. Specifically, the ALJ's decision cites and refers to treatment notes showing Plaintiff presenting in no acute distress (R. 507, 511, 577, 718, 729, 755, 859, 866, 993); having normal strength (R. 737, 859, 870, 877, 889); exhibiting no back tenderness upon examination (R. 738, 743, 748, 993); and having normal range of motion (R. 745). In addition, the ALJ's decision relies on treatment notes from Plaintiff's long-time health care provider, Nurse Kurey, whom Plaintiff saw for chronic pain. Nurse Kurey's notes indicate that Plaintiff's reported daily activities increased significantly once he began taking opiate medication. For example, Plaintiff remained active completing household chores and outdoor activities including yardwork. (R. 847, 853, 857, 864, 875, 903, 976). He was also able to go boating and fishing. (R. 879, 887, 736). Thus, Plaintiff's claim that the ALJ did not consider all of the evidence in the record in evaluating the opinions of the BOP providers cannot prevail. *See Decker v. Astrue*, No. 11 CIV. 5593(PGG) (GWG), 2013 WL 4804197, at \*5 (S.D.N.Y. Sept. 9, 2013) (advising that an ALJ's decision should be "read as a whole" when addressing a claim of error). Since the evidence described above is inconsistent with, and does not support, the opinions of the BOP providers, the ALJ was justified in discounting the fifteen-pound lifting limitation.

Next, the medical providers Plaintiff saw for chronic pain, Dr. O'Keefe and Nurse Kurey, submitted several medical source statements.

In January 2014, Nurse Kurey completed a physical medical source statement in which she listed Plaintiff's diagnoses as chronic pain, neck pain, and low back pain with a fair prognosis. (R. 750). She identified the clinical findings and objective signs of these condition as Plaintiff walking with a limp, being unable to flex fully at the lumbar spine, having decreased range of motion in his neck, and having pain upon palpitation. (*Id.*). She opined Plaintiff could sit for one hour and twenty minutes at a time and stand for one hour and ten minutes at a time, and would need a job that permits shifting positions at will. (R. 751). Nurse Kurey stated Plaintiff must walk for five minutes every hour during an eight-hour workday. (*Id.*). She opined that Plaintiff would need to take two or three fifteen-minute breaks during a work day due to fatigue, pain, and adverse effects of medication. (*Id.*). She said Plaintiff could never lift more than twenty pounds, rarely lift ten pounds, and occasionally lift less than ten pounds. (R. 752). She said Plaintiff would be off task twenty-five percent or more of the workday, and that he was capable of low stress work. (R. 753).

**\*5** In July 2016, Nurse Kurey and Dr. O'Keefe completed a physical medical source statement in which they diagnosed Plaintiff with lumbar radiculopathy and neck pain, with a poor prognosis. (R. 984). They stated he had decreased lumbar and cervical range of motion and weakness. (*Id.*). They found Plaintiff could sit for thirty minutes at a time, stand for ten minutes at a time,

2019 WL 1091385

and sit for two hours and stand or walk for less than two hours total in an eight-hour workday. (R. 985). Nurse Kurey and Dr. O'Keefe stated Plaintiff needed a job that permits shifting position at will, would need to walk for five minutes every hour, and would need two-to-four ten-to-fifteen-minute unscheduled breaks during a work day due to his pain and adverse effects of medication. (*Id.*). They opined Plaintiff could rarely lift ten pounds and never lift twenty pounds. (R. 986). They said Plaintiff would be off task twenty-five percent or more of the workday. (R. 987).

Nurse Kurey also submitted a narrative statement on August 12, 2016, in which she opined that Plaintiff was unable to work due to chronic pain, and would not be able to sustain full-time or even part-time employment. (R. 989). She noted that Plaintiff has increased function and mobility with use of opiate medications, and without the medications he would be unable to function. (*Id.*).

The ALJ attributed all three of these opinion to Nurse Kurey and gave them little weight. (R. 23). She reasoned that Nurse Kurey was not an acceptable medical source and that the degree of limitation the opinions describe is inconsistent with clinical observations of other treatment providers and Plaintiff's reported activities of daily living in Nurse Kurey's notes.

Plaintiff initially argues that the ALJ erred in attributing these positions only to Nurse Kurey. He posits that the medical source statement from January 2014 was co-signed by Dr. Kober. There is a marking on the form that could be another signature, but it is not clear, if it is, from whom. Thus, the Court will not go as far as to declare that an unclear notation on the form is the signature of Dr. Kober. The ALJ did err, however, in attributing the July 2016 opinion to only Nurse Kurey, as that form was clearly co-signed by Dr. O'Keefe. Any attribution errors are harmless in this case, though, because the ALJ still applied the relevant factors for weighing opinion evidence, regardless of whether the opinion came from an acceptable or other medical source. And, the ALJ provided sufficient justification for discounting these opinions. As discussed above, clinical findings are inconsistent with the degree of limitation to which Nurse Kurey and Dr. O'Keefe opine. In particular, their opinions are not supported by Nurse Kurey's own treatment notes (discussed above) documenting Plaintiff's relatively significant activities of daily living. When a treating source's opinion is inconsistent with a claimant's reported daily activities, an ALJ may decline to give it controlling weight. *See Fox v. Colvin*, 589 F. App'x 35, 36 (2d Cir. 2015). Likewise, an opinion may be discounted when it is inconsistent with the source's examination findings. *See Coger v. Comm'r of Soc. Sec.*, 335 F. Supp. 3d 427, 436 (W.D.N.Y. 2018).

The opinions of Nurse Kurey and Dr. Koger are also inconsistent with treatment notes from Dr. Kober who, in contrast to Nurse Kurey's findings of abnormal gait, consistently noted Plaintiff's gait to be normal. (R. 755, 862, 866, 873, 883, 907). Dr. Kober's examination notes also indicate Plaintiff's medication was working well for controlling his pain and was effective in managing his chronic lower back pain. (R. 728, 882).

Plaintiff also argues that the ALJ failed to follow the regulations and instead created her own legal standard for evaluating opinion evidence. The ALJ stated that Nurse Kurey's and Dr. O'Keefe's opinions failed to "provide a persuasive rationale supported by compelling evidence" to justify the limitations to which they opined. (R. 23). The Court finds that, despite this language, the ALJ's decision does appropriately consider the factors provided in 20 C.F.R. § 416.927. In all, the Court finds that the ALJ did not err in giving little weight to these opinions.

 **\*6** Finally, two state agency medical consultants provided medical opinions based on their review of the record. At the initial level, Dr. Bernstein opined Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand or walk for a total of six hours in a workday, and sit for a total of six hours in a workday. (R. 149). He stated Plaintiff could frequently climb ramps and stairs, frequently balance, and occasionally climb ladders, ropes, and scaffolds, stoop, kneel, crouch, and crawl. (R. 150). At the reconsideration level, Dr. Honeychurch agreed with the findings of Dr. Bernstein. (R. 159-60). The ALJ gave these opinions great weight, reasoning that they were supported by specific evidence. (R. 24). The ALJ also noted that although there was additional evidence submitted after the consultants' review, that evidence did not contradict their findings. (*Id.*).

The Court finds no error with the ALJ's decision to give great weight to the opinions of Drs. Bernstein and Honeychurch. When, as here, an opinion of a non-examining state agency medical consultant is consistent with substantial evidence in the record,

---

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 189 of 223

Herrington v. Berryhill, Not Reported in Fed. Supp. (2019)

2019 WL 1091385

it can be afforded controlling weight. *See Cyr v. Astrue*, No. 3:10-cv-1032(CFD)(TPS), 2011 WL 3652493, at *11 (D. Conn. Aug. 19, 2011). Based on the objective medical evidence discussed above, the ALJ was justified in relying on the opinions of Drs. Bernstein and Honeychurch.

In all, the Court finds that the ALJ did not err in her evaluation of the opinion evidence; the weight provided to Plaintiff's treatment providers is supported by substantial evidence and the reasoning behind that weight is explained thoroughly.

### 2. Credibility Assessment

Second, Plaintiff argues that the ALJ's credibility assessment is flawed. Specifically, he claims that the ALJ failed to evaluate the type, dosage, effectiveness, and side effects of his medication and treatment, and she improperly rejected his testimony as to the severity of his impairments.

In evaluating a claimant's credibility, the ALJ is required to take into account the claimant's reports of pain and other limitations. 20 C.F.R. § 416.929. The ALJ is not, however, required to accept the claimant's subjective complaints without question. *Taylor v. Astrue,* No. 3:09-cv-1049(MRK)(WIG), 2010 WL 7865031, at *9 (D. Conn. Aug. 31, 2010). Instead, the ALJ must weigh the credibility of the claimant's complaints in light of the other evidence of record. The regulations set forth a two-step process for this evaluation. First, the ALJ must determine whether the claimant suffers from "a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms." *Cichocki v. Astrue*, 534 F. App'x 71, 75 (2d Cir. 2013). If so, the ALJ must next " 'evaluate the intensity and persistence of [the claimant's] symptoms' to determine the extent to which the symptoms limit the claimant's capacity for work." *Id.* (citing 20 C.F.R. § 416.929(c) ). In doing so, the ALJ considers "all of the available evidence" from medical and nonmedical sources, including objective medical evidence, but will not reject a claimant's subjective assessment of the intensity and persistence of his pain "solely because the available objective medical evidence does not substantiate the claimant's statements." *Id.* (citing 20 C.F.R. § 416.929(c)(2) ). If a claimant's testimony about his symptoms is not fully supported by objective medical evidence, the ALJ must "make a finding on the credibility of the [claimant's] statements." *Id.* at 76. In so doing, the ALJ will consider "(1) daily activities; 2) location, duration, frequency and intensity of any symptoms; 3) precipitating and aggravating factors; 4) type, dosage, effectiveness and side effects of any medications taken; 5) other treatment received; and 6) other measures taken to relieve symptoms." *Mason v. Comm'r of Soc. Sec.*, No. 3:17-CV-1308(MPS), 2018 WL 6680921, at *5 (D. Conn. Dec. 19, 2018) (citation omitted). "The ALJ's decision 'must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the [ALJ] gave to the individual's statements and the reasons for that weight.' " *Cichocki*, 534 F. App'x at 76 (quoting Social Security Ruling 96–7p, 1996 WL 374186, at *2). In making a credibility assessment, the ALJ must provide more than a "single, conclusory statement that the claimant is not credible or simply to recite the relevant factors," but "remand is not required where the evidence of record permits [the court] to glean the rationale of an ALJ's decision." *Id.* (citation omitted). The court should not "second-guess the credibility finding in [a] case where the ALJ identified specific record-based reasons for [the] ruling." *Stanton v. Astrue*, 370 F. App'x 231, 234 (2d Cir. 2010).

**\*7** The Court finds that the ALJ properly evaluated Plaintiff's credibility. First, she adequately considered the type, dosage, effectiveness, and side effects of Plaintiff's medication and treatment. The treatment notes upon which the ALJ relies – particularly those of Nurse Kurey and Dr. Kober – document Plaintiff's ability to function when he was taking his medication. It was not unreasonable for the ALJ to find that these reports were inconsistent with Plaintiff's allegations. In *Roe v. Colvin*, No. 1:13-CV-1065(GLS), 2015 WL 729684, at *6 (N.D.N.Y. Feb. 19, 2015), the court upheld and ALJ's finding that claimant's pain "was not so severe as to be disabling" when the record contained evidence that, overall, the claimant's pain was controlled with medication, despite some breakthrough pain, limited side effects of the pain medications, and some limitations in the upper extremity remained.

Further, the ALJ provided specific reasons for her credibility determination, including that Plaintiff's subjective complaints were unsupported by his reported activities of daily living or the objective medical evidence. Plaintiff posits that the ALJ overexaggerated his activities of daily living in assessing his credibility. The Court's review of the record, however, reveals

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 190 of 223

Herrington v. Berryhill, Not Reported in Fed. Supp. (2019)

2019 WL 1091385

evidence of Plaintiff's daily activities consistent with what the ALJ's decision described. And, it is beyond cavil that activities of daily living are an appropriate factor for an ALJ to consider when assessing a claimant's credibility. *See Poupore v. Astrue*, 566 F.3d 303, 307 (2d Cir. 2009) (evidence that claimant was able to provide child care, sometimes vacuum and wash dishes, occasionally drive, watch television, read, and use the computer supported the ALJ's adverse credibility finding); *Coger*, 335 F. Supp. 3d at 436 (explaining that the law is "clear" that activities of daily living are proper for an ALJ to consider when making a credibility determination); *Carter v. Comm'r of Soc. Sec.*, No. 514-CV-1315(GTS)(WBC), 2015 WL 8029511, at *6 (N.D.N.Y. Nov. 12, 2015), *report and recommendation adopted sub nom. Carter v. Colvin*, No. 514-CV-1315(GTS)(WBC), 2015 WL 8180368 (N.D.N.Y. Dec. 7, 2015) (an ALJ can properly rely on activities of daily living as one factor in the credibility analysis).

Furthermore, it is the function of the Commissioner, and not the reviewing court, to appraise the claimant's credibility. *See Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983). "Credibility findings of an ALJ are entitled to great deference and therefore can be reversed only if they are 'patently unreasonable.' " *Pietrunti v. Dir., Office of Workers' Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997) (citing *Lennon v. Waterfront Transport,* 20 F.3d 658, 661 (5th Cir. 1994) ). When, as here, the ALJ lays out specific reasons for finding a claimant not entirely credible, the "credibility determination is generally entitled to deference." *Selian*, 708 F.3d at 420.

### 3. Combination of Impairments

Finally, Plaintiff argues that the ALJ did not consider the combination of his impairments in determining his RFC. Specifically, he claims the ALJ failed to incorporate limitations to account for fatigue caused by his cirrhosis and obesity.

"It is well-settled that the ALJ must consider all of [a claimant's] impairments individually, and in combination, even if an impairment, when considered separately, would not be of sufficient severity to serve as a basis for eligibility for disability benefits." *Gallegos v. Colvin*, No. 3:13-CV-393 JBA, 2014 WL 4635418, at *20 (D. Conn. Sept. 11, 2014). In formulating an RFC, it is necessary to evaluate a claimant's impairments in combination, "since RFC is whatever ability one retains after the effects of *all* impairments (exertional and non-exertional; environmental and non-environmental; severe and non-severe) have been considered." *Echevarria v. Astrue*, No. 3:08-CV-01396(VLB), 2010 WL 21190, at *2 (D. Conn. Jan. 5, 2010).

 **\*8** Here, the ALJ explicitly acknowledged the requirement to consider all of Plaintiff's impairments. *See* R. 18 ("the Undersigned has considered all symptoms," and the "combined effect of these medically determinable impairments."). The ALJ considered Plaintiff's obesity, in combination with his other impairments, and reduced the RFC accordingly. (R. 19). In addition, "[t]he ALJ's review of plaintiff's medical records demonstrates that [s]he assessed an RFC that was based upon the combination of all of plaintiff's impairments." *See Whitley v. Colvin*, No. 3:17-CV-00121(SALM), 2018 WL 1026849, at 9-10 (D. Conn. Feb. 23, 2018) (finding no error when the ALJ explicitly acknowledged the requirement to consider all impairments, and the decision indicated the ALJ properly reviewed the medical records in formulating the RFC); *Gallegos*, 2014 WL 4635418, at *20 (same). Accordingly, the ALJ did not fail to consider Plaintiff's impairments in combination when determining his RFC.

### Conclusion

After a thorough review of the record and consideration of all of the arguments Plaintiff has raised, the Court finds that the ALJ did not commit legal error and that her opinion is supported by substantial evidence. Accordingly, the Court grants Defendant's Motion to Affirm the Decision of the Commissioner [Doc. # 26] and denies Plaintiff's Motion to Reverse the Decision of the Commissioner [Doc. # 23].

This is not a recommended ruling. The consent of the parties allows this magistrate judge to direct the entry of a judgment of the district court in accordance with the Federal Rules of Civil Procedure. Appeals can be made directly to the appropriate United States Court of Appeals from this judgment. *See* 28 U.S.C. § 636(c)(3); Fed.R.Civ.P. 73(c). The Clerk is directed to enter judgment in favor of the defendant and close this case.

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 191 of 223

Herrington v. Berryhill, Not Reported in Fed. Supp. (2019)

2019 WL 1091385

SO ORDERED, this 8th day of March, 2019, at Bridgeport, Connecticut.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 1091385

---

**Footnotes**

1    Under the Social Security Act, the "Commissioner of Social Security is directed to make findings of fact, and decisions as to the rights of any individual applying for a payment under [the Act]." 42 U.S.C. §§ 405(b)(1) and 1383(c)(1)(A). The Commissioner's authority to make such findings and decisions is delegated to administrative law judges ("ALJs"). *See* 20 C.F.R. § 416.1429. Claimants can in turn appeal an ALJ's decision to the Social Security Appeals Council. *See* 20 C.F.R. § 416.1467. If the appeals council declines review or affirms the ALJ opinion, the claimant may appeal to the United States district court. Section 205(g) of the Social Security Act provides that "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C § 405(g).

2    Residual functional capacity ("RFC") is the most a claimant can do in a work setting despite his or her limitations. 20 C.F.R. § 416.945(a)(1).

---

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Alexandrea R. R. v. Berryhill, Not Reported in Fed. Supp. (2019)

2019 WL 2269854

2019 WL 2269854
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

ALEXANDREA R. R., Plaintiff,

v.

Nancy A. BERRYHILL, Acting Commissioner of Social Security, Defendant.

5:18-CV-121
|
Signed 05/28/2019

**Attorneys and Law Firms**

OLINSKY LAW GROUP, OF COUNSEL: HOWARD D. OLINSKY, ESQ., 300 S. State Street, Suite 420 Syracuse, NY 13202, Attorneys for Plaintiff.

OFFICE OF REGIONAL GENERAL COUNSEL SOCIAL SECURITY ADMINISTRATION REGION II, OF COUNSEL: SIXTINA FERNANDEZ, ESQ. Special Ass't United States Attorney, 26 Federal Plaza, Room 3904, New York, NY 10019, Attorneys for Defendant.


**MEMORANDUM–DECISION and ORDER**

DAVID N. HURD, United States District Judge

**I. INTRODUCTION**

**\*1** Plaintiff Alexandrea R. R. [1] ("Alexandrea" or "plaintiff") brings this action seeking review of defendant Commissioner of Social Security's ("Commissioner" or "defendant") final decision denying her application for Supplemental Security Income ("SSI"). Both parties have filed their briefs, and defendant has filed the Administrative Record on Appeal. The motions will be considered on the basis of these submissions without oral argument. [2]


**II. BACKGROUND**

On November 14, 2014, [3] Alexandrea filed an application for SSI alleging that her various mental impairments rendered her disabled beginning on January 31, 2014. R. at 222-28, 251. [4] Plaintiff's claim was initially denied on January 20, 2015. *Id.* at 140-44.

At Alexandrea's request, a hearing was held before Administrative Law Judge ("ALJ") Kenneth Theurer on January 6, 2016. R. at 97-127. Plaintiff, represented by non-attorney Michael Eason, appeared and testified. *Id.* The ALJ also heard testimony from Vocational Expert ("VE") Joseph Atkinson. *Id.*

Thereafter, the ALJ issued a written decision denying Alexandrea's application for benefits through February 9, 2017, the date of his decision. R. at 10-19. The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review. *Id.* at 1-3.


**III. DISCUSSION**

Alexandrea R. R. v. Berryhill, Not Reported in Fed. Supp. (2019)

2019 WL 2269854

## A. Standard of Review

A court's review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence and the correct legal standards were applied. *Poupore v. Astrue*, 566 F.3d 303, 305 (2d Cir. 2009) (per curiam). "Substantial evidence means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Id.* (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

If the Commissioner's disability determination is supported by substantial evidence, that determination is conclusive. *See Williams*, 859 F.2d at 258. Indeed, where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's decision must be upheld—even if the court's independent review of the evidence may differ from the Commissioner's. *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982); *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992).

**\*2** However, "where there is a reasonable basis for doubting whether the Commissioner applied the appropriate legal standards," the decision should not be affirmed even though the ultimate conclusion reached is arguably supported by substantial evidence. *Martone v. Apfel*, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

## B. Disability Determination—The Five-Step Evaluation Process

The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In addition, the Act requires that a claimant's:

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

*Id.* § 423(d)(2)(A).

The ALJ must follow a five-step evaluation process in deciding whether an individual is disabled. *See* 20 C.F.R. §§ 404.1520, 416.920. At step one, the ALJ m ust determine whether the claimant has engaged in substantial gainful activity. A claimant engaged in substantial gainful activity is not disabled, and is therefore not entitled to benefits. *Id.* §§ 404.1520(b), 416.920(b).

If the claimant has not engaged in substantial gainful activity, then step two requires the ALJ to determine whether the claimant has a severe impairment or combination of impairments which significantly restricts his physical or mental ability to perform basic work activities. *Id.* §§ 404.1520(c), 416.920(c).

If the claimant is found to suffer from a severe impairment or combination of impairments, then step three requires the ALJ to determine whether, based solely on medical evidence, the impairment or combination of impairments meets or equals an

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 194 of 223

Alexandrea R. R. v. Berryhill, Not Reported in Fed. Supp. (2019)
2019 WL 2269854

impairment listed in Appendix 1 of the regulations (the "Listings"). *Id.* §§ 404.1520(d), 416.920(d); *see also id.* Pt. 404, Subpt. P, App. 1. If the claimant's impairment or combination of impairments meets one or more of the Listings, then the claimant is "presumptively disabled." *Martone*, 70 F. Supp. 2d at 149 (citing *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984)).

If the claimant is not presumptively disabled, step four requires the ALJ to assess whether—despite the claimant's severe impairment—he has the residual functional capacity ("RFC") to perform his past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). The burden of proof with regard to these first four steps is on the claimant. *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996) (citing *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983)).

If it is determined that the claimant cannot perform his past relevant work, the burden shifts to the Commissioner for step five. *Perez*, 77 F.3d at 46. This step requires the ALJ to examine whether the claimant can do any type of work. 20 C.F.R. §§ 404.1520(g), 416.920(g).

 **\*3** The regulations provide that factors such as a claimant's age, physical ability, education, and previous work experience should be evaluated to determine whether a claimant retains the RFC to perform work in any of five categories of jobs: very heavy, heavy, medium, light, and sedentary. *Perez*, 77 F.3d at 46 (citing 20 C.F.R. § 404, Subpt. P, App. 2).

"[T]he Commissioner need only show that there is work in the national economy that the claimant can do; [she] need not provide additional evidence of the claimant's residual functional capacity." *Poupore*, 566 F.3d at 306 (citing 20 C.F.R. § 404.1560(c)(2)).

## C. ALJ's Decision

Applying this five-step disability determination process, the ALJ found that: (1) Alexandrea had not engaged in any substantial gainful activity since November 14, 2014, the application date; (2) plaintiff's mood disorder, anxiety disorder, psychosis, panic disorder, and sleep disorder were all severe impairments within the meaning of the Regulations; (3) these mental impairments, whether considered individually or in combination, did not meet or equal any of the Listings. R. at 12-15.

At step four, the ALJ determined that while Alexandrea had no exertional limitations, her severe mental impairments limited her ability to do work-related mental activities. R. at 17. After analyzing the evidence in the record, the ALJ found plaintiff retained the RFC to:

> understand and follow simple instructions and directions; perform simple tasks with supervision and independently; maintain attention/concentration for simple tasks; regularly attend to a routine and maintain a schedule; and relate to and interact with others to the extent necessary to carry out simple tasks, although she should avoid work requiring more complex interaction or joint efforts to achieve work goals. The claimant should not have interaction with the public. She can handle reasonable levels of simple, work-related stress, in that she can make simple decisions directly related to the completion of her tasks and work in a position where she is not responsible for the work of others and with little change in daily routine, work duties or processes.

R. at 15.

Next, the ALJ determined that Alexandrea had no past relevant work. R. at 17. However, the ALJ found that plaintiff's RFC, considered together with her age and education, allowed her to perform jobs such as "laundry worker," "kitchen helper," and "mail clerk." *Id.* at 18. Because these jobs fit in with plaintiff's assessed limitations and were present in sufficient numbers in the national economy, the ALJ concluded plaintiff was not disabled during the relevant time period. *Id.* at 18-19. Accordingly, the ALJ denied plaintiff's application for benefits.

Alexandrea R. R. v. Berryhill, Not Reported in Fed. Supp. (2019)

2019 WL 2269854

**D. Alexandrea's Appeal**

Alexandrea contends the ALJ made two, related errors at step four of the sequential disability analysis. According to plaintiff, the ALJ (1) failed to reconcile certain portions of a consultative examiner's opinion with the overall RFC assessment; and (2) improperly rejected plaintiff's subjective testimony about the intensity, persistence, and limiting effects of her psychiatric symptoms.

Where, as here, the ALJ finds at step two that a claimant has one or more "severe" impairments but determines at step three that the claimant is not presumptively disabled, the ALJ must go on to make an RFC finding, which is an assessment of "what an individual can still do despite his or her limitations." *Cox v. Astrue*, 993 F. Supp. 2d 169, 183 (N.D.N.Y. 2012) (McAvoy, J.) (adopting Report & Recommendation of Bianchini, M.J.) (quoting *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999)).

**\*4** "In making a residual functional capacity determination, the ALJ must consider a claimant's physical abilities, mental abilities, [and symptomatology], including pain and other limitations which could interfere with work activities on a regular and continuing basis." *Adams v. Colvin*, 2016 WL 3566859, at \*3 (N.D.N.Y. June 24, 2016) (quoting *Pardee v. Astrue*, 631 F. Supp. 2d 200, 210 (N.D.N.Y. 2009) (Mordue, J.)).

"The claimant's RFC is determined based on all of the relevant medical and other evidence in the record, including the claimant's credible testimony, objective medical evidence, and medical opinions from treating and consulting sources." *Rivera v. Comm'r of Soc. Sec.*, 368 F. Supp. 3d 626 (S.D.N.Y. 2019) (citations omitted).

"In practice, administrative law judges rely principally on medical source opinion and subjective testimony when assessing impaired individuals' ability to engage in work-related activities." *Adams*, 2016 WL 3566859, at \*3 (quoting *Casey v. Comm'r of Soc. Sec.*, 2015 WL 5512602, at \*10 (N.D.N.Y. Sept. 15, 2015) (Suddaby, J.)).

**a. Medical Source Opinions**

Alexandrea contends the ALJ failed to "adequately account for certain limitations" assessed by both Christina Caldwell, Psy.D., and S. Bhutwala, Ph.D., two medical source opinions in the record. Pl.'s Mem. at 14. [5]

Broadly speaking, the Regulations divide evidence from a claimant's medical sources into three categories: (1) treating; (2) acceptable; and (3) other. [6] The most important of these is the treating source category, which includes a claimant's "own physician, psychologist, or other acceptable medical source" who has provided "medical treatment or evaluation and who has, or has had an ongoing treatment relationship" with the claimant. *Martin v. Colvin*, 2016 WL 1383507, at \*5 (N.D.N.Y. Apr. 7, 2016) (citation omitted).

The opinion of a treating source regarding the nature and severity of a claimant's impairments is entitled to *controlling* weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." *Martin*, 2016 WL 1383507, at \*5 (quoting *Cobbins v. Comm'r of Soc. Sec.*, 32 F. Supp. 3d 126, 134 (N.D.N.Y. 2012)).

However, "[a] treating physician's statement that the claimant is disabled cannot itself be determinative." *Martin*, 2016 WL 1383507, at \*5 (quoting *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)). And when a treating source's opinion contradicts other substantial evidence in the record, such as the opinions of other medical experts, an ALJ may afford it less than controlling weight. *Id.* (citation omitted). In fact, a treating physician's opinion may also be properly discounted, or even entirely rejected, when: (1) it is internally inconsistent; (2) the source lacks underlying expertise; (3) the opinion is brief, conclusory, or unsupported by clinical findings; or even where (4) it "appears overly sympathetic such that objective impartiality is doubtful and goal-oriented advocacy reasonably is suspected." *Id.* (citation omitted).

**\*5** Where an ALJ decides to afford a treating source's opinion less than controlling weight, he must still consider various factors in determining how much weight, if any, to give the opinion, including: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) what evidence supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the area of specialization of the physician in contrast to the condition being treated; and (6) any other factors which may be significant in claimant's particular case. 20 C.F.R. §§ 404.1527(c), 416.927(c).

Beyond this so-called "treating physician rule," the same six factors set forth above apply with equal force to the evaluation of the remaining categories of medical evidence recognized by the Regulations: the "acceptable" and "other" sources mentioned earlier. *Martin*, 2016 WL 1383507, at \*5. The former, those deemed "acceptable" sources, include "licensed physicians (medical or osteopathic doctors, psychologists, optometrists, podiatrists, and speech-language pathologists.)" *Id.* (citation omitted). The latter category, deemed "other" in Administration parlance, are "ancillary providers such as nurse practitioners, physician assistants, licensed clinical social workers, and therapists." *Id.*

Importantly, only evidence from a "treating" or "acceptable" source can be relied upon to establish the *existence* of a medically determinable impairment. *Martin*, 2016 WL 1383507, at \*5 (citation omitted). However, evidence from all three sources "can be considered when determining severity of impairments and how they affect individuals' ability to function." *Id.*

Finally, while the six-factor analysis set forth above applies in all cases except where "controlling" weight is given to a treating physician's opinion, an ALJ need not mechanically recite these factors as long as the record reflects a proper application of the substance of the rule. *See, e.g., Petrie v. Astrue*, 412 F. App'x 401, 407 (2d Cir. 2011) (summary order) (noting that an ALJ need not expressly recite each factor so long as it is "clear from the record as a whole that the ALJ properly considered" them).

Alexandrea argues the ALJ's RFC finding should have included greater limitations in her ability to interact with others (including co-workers, supervisors, and the public) and, relatedly, in her ability to deal with stress. Plaintiff's challenge implicates three medical opinions in the record: (1) a January 9, 2015 psychiatric evaluation by Christina Caldwell, Psy.D., a consultative examiner; (2) a January 20, 2015 opinion by S. Bhutwala, Ph.D., a state agency psychological consultant; and (3) an August 22, 2014 progress note by Dawn M. Rung, LMSW, a licensed master social worker.

On January 9, 2015, Dr. Caldwell conducted a consultative psychological evaluation of Alexandrea. R. at 405-09. Dr. Caldwell's medical source statement concluded that plaintiff evidenced no limitations in her ability to follow and understand simple directions and instructions or in her ability to maintain attention and concentration, a regular schedule, or in her ability to learn new tasks. *Id.* at 407-08.

However, Dr. Caldwell concluded that Alexandrea evidenced "mild to moderate limitation" in her ability to perform simple tasks independently, "moderate limitation" in her ability to perform "complete [*sic*] tasks independently," and "moderate limitation" in her ability to make appropriate decisions. R. at 407-08. Dr. Caldwell further concluded that plaintiff evidenced "moderate to marked limitation in the ability to relate adequately with others and to appropriately deal with stress." *Id.*

**\*6** On January 20, 2015, state agency consultant Dr. Bhutwala reviewed Alexandrea's record, including Dr. Caldwell's recent consulting opinion, before concluding that plaintiff "retain[ed] the ability for simple work in a low contact setting." R. at 128-39. As with Dr. Caldwell's opinion, Dr. Bhutwala acknowledged that plaintiff suffered from a number of limitations in her ability to handle more complex tasks as well as "moderate" limitations in her ability to work with others, including supervisors, co-workers, and the general public. *Id.*

Alexandrea argues the ALJ's RFC fails to match up with these findings. According to plaintiff, the ALJ did not account for limitations in how frequently plaintiff would be able to interact with others. In plaintiff's view, the ALJ failed to consider how

Alexandrea R. R. v. Berryhill, Not Reported in Fed. Supp. (2019)

2019 WL 2269854

plaintiff's "moderate to marked" limitation in the ability to relate adequately with others would impact her ability "to tolerate the supervision necessary to help her complete tasks." Pl.'s Mem. at 16.

Alexandrea links this argument to her related claim that the ALJ failed to account for the specific limitations posed by her difficulties with work-related stress. Plaintiff argues that the ALJ totally failed to account for "what causes [p]laintiff's stress and how it affects her." Pl.'s Mem. at 17. In support of this claim, plaintiff points to the August 22, 2014 progress note that memorializes one of plaintiff's therapy sessions with Ms. Rung. R. at 372.

There, Ms. Rung indicated that she was "not opposed" to Alexandrea doing some volunteer work, but felt that it should be limited to no more than "10 to 15 hours a week because of several factors that [plaintiff] continues to struggle with." R. at 372. In Ms. Rung's opinion, it was not "feasibl[e]" for plaintiff to "try working part-time" while her application for SSI remained pending. *Id.*

Alexandrea emphasizes that Ms. Rung's reluctance to support her plan to return to work, even on a part-time basis, clearly springs from "the simple fact that going back to work would cause a change in Plaintiff's life [that] could cause her to decompensate." Pl.'s Mem. at 18. In support of that argument, plaintiff points out that a change in her environment caused her to decompensate in November 2015, when she required six days of inpatient treatment after moving to South Carolina. *Id.*

Upon review, these arguments are rejected. In essence, Alexandrea faults the ALJ because his final RFC finding does not precisely track the findings of any one medical opinion in the record. But "there is no requirement that the ALJ pick one RFC and use that particular evaluation in its entirety." *Kitka v. Comm'r of Soc. Sec.*, 2016 WL 825258, at *9 (N.D.N.Y. Feb. 9, 2016) (Report & Recommendation) (Baxter, M.J.), *adopted by* 2016 WL 865301 (N.D.N.Y. 2, 2016).

Rather, "it is the ALJ's responsibility to 'choose between properly submitted medical opinions and other competent evidence to piece together an overall [RFC] assessment.' " *Robles v. Colvin*, 2016 WL 814926, at *4 (N.D.N.Y. Feb. 29, 2016) (quoting *Crofoot v. Comm'r of Soc. Sec.*, 2013 WL 5493550, at *8 (N.D.N.Y. 2013)).

Alexandrea correctly argues that her ability to handle work-related stress is an important component of the RFC determination. "Because stress is highly individualized, mentally impaired individuals may have difficulty meeting the requirements of even so-called low stress jobs, and the Commissioner must therefore make specific findings about the nature of a claimant's stress, the circumstances that trigger it, and how those factors affect his [or her] ability to work." *Herb v. Comm'r of Soc. Sec.*, 366 F. Supp. 3d 441, 447 (W.D.N.Y. 2019) (citation omitted).

 **\*7** However, "even without explicitly referencing a stress limitation, an RFC determination may adequately account for a claimant's stress-related limitations. For example, an RFC limiting a plaintiff to occasional interaction with co-workers and the public, and to the performance of simple, routine tasks, may account for the plaintiff's stress-related limitations." *Herb*, 366 F. Supp. 3d at 447.

The ALJ discharged his duty in this case by assessing a number of limitations in Alexandrea's ability to perform work-related mental tasks, and by including a number of specific restrictions in recognition of plaintiff's ability to handle work-related stressors. *See, e.g.*, R. at 15 ("[S]he can make simple decisions directly related to the completion of her tasks and work in a position where she is not responsible for the work of others and with little change in daily routine, work duties or processes."). Plaintiff's disagreement with the ultimate factual determinations that the ALJ drew from this record evidence is not a basis for remand. Accordingly, this argument will be rejected.

### b. Subjective Testimony

Second, Alexandrea argues the ALJ improperly assessed her credibility. Specifically, plaintiff argues the ALJ discounted her testimony for three inappropriate reasons: (1) she never worked at substantial gainful activity levels; (2) she was not receiving

Case 5:24-cv-00169-DNH-ML   Document 27   Filed 02/05/25   Page 198 of 223

Alexandrea R. R. v. Berryhill, Not Reported in Fed. Supp. (2019)
2019 WL 2269854

mental health treatment at the time of her first hospitalization; and (3) she indicated a desire to return to school or to work. Pl.'s Mem. at 18.

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.' " *Adams*, 2016 WL 3566859, at *7 (quoting *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999)).

"Where the record evidence does not fully support a claimant's testimony, the ALJ must employ a two-step analysis to evaluate the claimant's reported symptoms." *Adams*, 2016 WL 3566859, at *7 (citations omitted). "First, the ALJ must determine whether, based on the objective medical evidence, a claimant's medical impairments could reasonably be expected to produce the pain or other symptoms alleged." *Id.* "Second, if the medical evidence establishes the existence of such impairments, the ALJ must evaluate the intensity, persistence, and limiting effects of those symptoms to determine the extent to which the symptoms limit the claimant's ability to do work." *Id.*

"At this second step, the ALJ must consider: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to relieve his pain or other symptoms; (5) other treatment the claimant receives or has received to relieve his pain or other symptoms; (6) any measures that the claimant takes or has taken to relieve his pain or other symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to his pain or other symptoms." *Adams*, 2016 WL 3566859, at *7 (citations omitted).

"As before, an ALJ's '[f]ailure to expressly consider every factor set forth in the regulations is not grounds for remand where the reasons for the ALJ's determination of credibility are sufficiently specific to conclude that he considered the entire evidentiary record in arriving at his determination.' " *Adams*, 2016 WL 3566859, at *8 (quoting *Camille v. Colvin*, 104 F. Supp. 3d 329, 345 (W.D.N.Y. 2015)).

 **8**  "In other words, an ALJ 'must discuss the relationship between the plaintiff's medically determinable impairment, the plaintiff's reported symptoms, his conclusions regarding the plaintiff's functioning, and why the plaintiff's reported symptoms are or are not consistent with the evidence in the record.' " *Adams*, 2016 WL 3566859, at *8 (quoting *Deeley v. Astrue*, 2011 WL 454505, at *5 (N.D.N.Y. Feb. 3, 2011) (Scullin, J.)).

Upon review, this argument is also rejected. At the outset, the ALJ acknowledged that Alexandrea experienced limiting effects arising from her subjective symptomatology. *See* R. at 16 ("This does not mean the claimant has no pain or symptoms."). However, the ALJ offered five reasons why he elected against fully crediting plaintiff's statements "concerning the intensity, persistence and limiting effects of these symptoms." *Id.*

Alexandrea is correct that these reasons included her poor work history, the circumstances surrounding her brief hospitalization in January of 2014, and her desire to return to school or work. R. at 16-17. But there is nothing inappropriate about considering these factors in the context of a larger discussion of the record evidence.

A closer look at the ALJ's credibility determination reveals that Alexandrea's challenge relies on mischaracterizations of his reasoning. For instance, plaintiff reads the ALJ's mention of her poor work history and his observation that she expressed the desire to return to work or school to mean that the ALJ assumed she "was simply lazy." Pl.'s Mem. at 17.

But the ALJ never called Alexandrea lazy. Rather, the ALJ noted that plaintiff's poor work history "demonstrates a limited attachment to the labor force" and that plaintiff "indicated a desire to return to work and/or school." R. at 16-17. It is beyond cavil that the ALJ "is entitled to consider a claimant's work history when assessing credibility, though it is only one factor out of many and not by itself dispositive." *Lugo v. Comm'r of Soc. Sec.*, 2017 WL 4005621, at *11 (N.D.N.Y. Sept. 11, 2017) (Suddaby, J.).

Case 5:24-cv-00169-DNH-ML   Document 27   Filed 02/05/25   Page 199 of 223
Alexandrea R. R. v. Berryhill, Not Reported in Fed. Supp. (2019)
2019 WL 2269854

To that end, there is nothing wrong with observing, as Dr. Caldwell also did in this case, that Alexandrea was fired from two jobs and laid off from a third, R. at 405, or that plaintiff's own testimony about these jobs indicated she was fired for reasons that might well have been unrelated to her mental symptomatology, *id.* at 104-06 (hearing testimony).

This kind of evidence is at least slightly helpful in assessing the overall credibility of Alexandrea's claim that the limiting effects of her mental impairments still preclude her from doing any work. *Cf. Rivera v. Schweiker*, 717 F.2d 719, 725 (2d Cir. 1983) ("A claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability."). This is especially so when the record makes clear that the ALJ considered the challenged factors as just two among many others in assessing plaintiff's credibility. *See* R. at 16-17.

Alexandrea further objects to the ALJ's observation that, at the time of her "very brief hospitalization in January 2014," she "was not receiving any mental health treatment, and she was not on any medication." R. at 16. According to plaintiff, this observation is totally inappropriate: "[t]o find that she cannot be believed because she did not seek treatment until she had a psychotic break is illogical. It is akin to saying that someone with a heart condition cannot be believed because they did not seek treatment prior to having a heart attack[.]" Pl.'s Mem. at 19-20.

 **\*9** Again, though, this argument is a mischaracterization of the ALJ's reasoning. Where, as here, a claimant testifies that the limiting effects of their impairments render gainful employment impossible, the ALJ is obligated to determine whether or not the claimant's statements about their subjective, day-to-day experience of pain and other symptoms matches up with the rest of the record.

The ALJ is often looking to see whether a claimant's testimony during the benefits hearing is in line with statements they have made to their own treatment providers at some point in the past. This inquiry by the ALJ is typically warranted, because a claimant's condition is usually not static. Some symptomatology abates or even disappears with appropriate treatment. Some do not. After all, treatment for some symptoms or conditions might exacerbate others or even cause new ones.

In other cases, the ALJ is trying to figure out whether the claimant might be malingering. For instance, assume that a claimant initially presented to doctors with severe symptomatology arising from a medical condition, received treatment for that condition, and later reported to medical providers that the treatment lessened the symptoms associated with that condition. This hypothetical claimant would rightly draw some measure of scrutiny from the fact finder if he or she later went on to claim to other entities—such as those responsible for meting out disability benefits, like an ALJ—that the symptoms remained so severe as to be totally disabling.

But even that is not what happened here. Rather, the ALJ noted Alexandrea's hospitalization in January of 2014 to signal a recognition that, at one point, plaintiff's symptomatology was severe enough to warrant an inpatient hospital stay of some duration. R. at 16. The ALJ then cited plaintiff's subsequent treatment—including counseling and medication—as evidence that her condition did not remain static; *i.e.*, treatment improved the condition and lessened the symptoms that led to the hospital stay in the first place. *Id.* This improvement is documented in progress notes throughout 2014, 2015, and 2016, and these notes are discussed seriatim by the ALJ. *Id.* at 16-17.

In other words, contrary to Alexandrea's misleading assertion, the ALJ did not cite plaintiff's hospitalization as evidence that she should not be believed. Rather, plaintiff's hospitalization, and the subsequent course of treatment following her hospitalization, provided context for understanding where plaintiff's symptoms stood at the time she testified about their continued severity before the ALJ. Accordingly, this argument will be rejected.

## IV. **CONCLUSION**

The ALJ applied the appropriate legal standards and supported his written decision with substantial evidence in the record.

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 200 of 223
Alexandrea R. R. v. Berryhill, Not Reported in Fed. Supp. (2019)
2019 WL 2269854

Therefore, it is

ORDERED that

    1. Alexandrea's motion for judgment on the pleadings is DENIED;

    2. The Commissioner's motion for judgment on the pleadings is GRANTED;

    3. The Commissioner's decision is AFFIRMED; and

    4. Alexandrea's complaint is DISMISSED.

The Clerk of the Court is directed to enter a judgment accordingly and close the file.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 2269854

---

## Footnotes

1    In accordance with a May 1, 2018 memorandum issued by the Judicial Conference's Committee on Court Administration and Case Management and adopted as local practice in this District, only claimant's first name and last initial will be used in this opinion.

2    Pursuant to General Order No. 18, consideration of this matter will proceed as if both parties had accompanied their briefs with a motion for judgment on the pleadings.

3    Other records refer to plaintiff's filing date as December 8, 2014, *see, e.g.*, R. at 222, but the distinction is immaterial to this appeal.

4    Citations to "R." refer to the Administrative Record. Dkt. No. 8.

5    Pagination corresponds with CM/ECF.

6    On January 18, 2017, the Social Security Administration made revisions to the rules regarding the evaluation of medical evidence. Because plaintiff's claim was filed before March 27, 2017, the prior policies govern here. *See, e.g., Daniels on behalf of D.M.G. v. Comm'r of Soc. Sec.*, 2018 WL 5019746, at *6 n.13 (S.D.N.Y. Sept. 30, 2018) (explaining the elimination of the treating physician rule and related changes); *Perez v. Comm'r of Soc. Sec.*, 2019 WL 359980, at *6-*7 nn. 6-8 (E.D.N.Y. Jan. 29, 2019) (explaining various changes effective to claims filed after March 27, 2017).

End of Document        © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 201 of 223

Monroe v. Commissioner of Social Security, Not Reported in Fed. Supp. (2016)

2016 WL 7971330

2016 WL 7971330
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Richard MONROE, Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY, Defendant.

5:15-CV-1235 (GTS/WBC)
|
Signed 12/29/2016

**Attorneys and Law Firms**

OLINKSY LAW GROUP, 300 S. State St., Ste. 420, OF COUNSEL: HOWARD D. OLINSKY, ESQ., Syracuse, NY 13202, Counsel for Plaintiff.

U.S. SOCIAL SECURITY ADMIN. OFFICE OF REG'L GEN. COUNSEL—REGION II, 26 Federal Plaza—Room 3904, OF COUNSEL: VERNON NORWOOD, ESQ., New York, NY 10278, Counsel for Defendant.


### REPORT and RECOMMENDATION

William B. Mitchell Carter, U.S. Magistrate Judge,

 **\*1**  This matter was referred for report and recommendation by the Honorable Judge Suddaby, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d). (Dkt. No. 12.) This case has proceeded in accordance with General Order 18.

Currently before the Court, in this Social Security action filed by Richard Monroe ("Plaintiff") against the Commissioner of Social Security ("Defendant" or "the Commissioner") pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), are the parties' cross-motions for judgment on the pleadings. (Dkt. Nos. 10, 11.) For the reasons set forth below, it is recommended that Plaintiff's motion be granted in part and denied in part, and Defendant's motion be granted in part and denied in part.


## I. RELEVANT BACKGROUND

### A. Procedural History
On October 1, 2012, Plaintiff applied for a period of Disability Insurance Benefits ("SSD") under Title II, and Supplemental Security Income ("SSI") under Title XVI, of the Social Security Act. (T. 106.) Plaintiff's application was initially denied, after which he timely requested a hearing before an Administrative Law Judge ("the ALJ"). On February 25, 2014, Plaintiff appeared before the ALJ, Bruce S. Fein. (T. 23-59.) On July 16, 2014, ALJ Fein issued a written decision finding Plaintiff not disabled under the Social Security Act. (T. 5-22.) On August 19, 2015, the Appeals Council ("AC") denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (T. 1-3.) Thereafter, Plaintiff timely sought judicial review in this Court.


### B. The ALJ's Decision
Generally, in his decision, the ALJ made the following five findings of fact and conclusions of law. (T. 10-18.) First, the ALJ found that Plaintiff met the insured status requirements through March 31, 2017 and Plaintiff had not engaged in substantial

2016 WL 7971330

gainful activity since February 1, 2012. (T. 10.) Second, the ALJ found that Plaintiff had the severe impairment of lumbar disc degeneration with radiculopathy. (*Id.*) Third, the ALJ found that Plaintiff did not have an impairment that meets or medically equals one of the listed impairments located in 20 C.F.R. Part 404, Subpart P, Appendix. 1. (T. 14.) Fourth, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work. (*Id.*)[1] The ALJ specifically found that Plaintiff could: lift and carry 20 pounds occasionally and 10 pounds frequently; sit for six hours and stand/walk for six hours in an eight hour workday, with normal breaks; engage in all postural activities occasionally, but could not climb ropes, ladders, or scaffolds. (*Id.*) Fifth, the ALJ determined that Plaintiff was incapable of performing his past relevant work; however, there were jobs that existed in significant numbers in the national economy Plaintiff could perform. (T. 16-17.)

## II. THE PARTIES' BRIEFINGS ON PLAINTIFF'S MOTION

### A. Plaintiff's Arguments
**\*2** Plaintiff makes four separate arguments in support of his motion for judgment on the pleadings. First, Plaintiff argues the ALJ abused his discretion in failing to order a consultative examination to assess and clarify the extent of Plaintiff's intellectual impairment. (Dkt. No. 10 at 8-12 [Pl.'s Mem. of Law].) Second, Plaintiff argues that the RFC determination was not supported by substantial evidence. (*Id.* at 12-15.) Third, Plaintiff argues that the credibility determination was not supported by substantial evidence. (*Id.* at 15-17.) Fourth, and lastly, Plaintiff argues that the ALJ erred at step five because he failed to consult a vocational expert ("VE"). (*Id.* at 17-19.)

### B. Defendant's Arguments
In response, Defendant makes four arguments. First, Defendant argues that a consultative intelligence examination was not warranted. (Dkt. No. 11 at 6-10 [Def.'s Mem. of Law].) Second, Defendant argues that the ALJ correctly assessed Plaintiff's RFC. (*Id.* at 10-12.) Third, Defendant argues that the ALJ properly assessed Plaintiff's credibility. (*Id.* at 12-14.) Fourth, and lastly, Defendant argues that the ALJ was not required to consult a VE. (*Id.* at 14-16.)

## III. RELEVANT LEGAL STANDARD

### A. Standard of Review
A court reviewing a denial of disability benefits may not determine de novo whether an individual is disabled. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied, or it was not supported by substantial evidence. *See Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."); *Grey v. Heckler*, 721 F.2d 41, 46 (2d Cir. 1983); *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979).

"Substantial evidence" is evidence that amounts to "more than a mere scintilla," and has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *See Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

"To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).

If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 203 of 223
Monroe v. Commissioner of Social Security, Not Reported in Fed. Supp. (2016)

2016 WL 7971330

[Commissioner's]." *Rosado v. Sullivan,* 805 F. Supp. 147, 153 (S.D.N.Y. 1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." *Valente v. Sec'y of Health & Human Servs.,* 733 F.2d 1037, 1041 (2d Cir. 1984).

### B. Standard to Determine Disability

The Commissioner has established a five-step evaluation process to determine whether an individual is disabled as defined by the Social Security Act. *See* 20 C.F.R. §§ 404.1520, 416.920. The Supreme Court has recognized the validity of this sequential evaluation process. *See Bowen v. Yuckert,* 482 U.S. 137, 140-42, 107 S. Ct. 2287 (1987). The five-step process is as follows:

> **\*3** (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a 'residual functional capacity' assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin,* 758 F.3d 146, 150 (2d Cir. 2014).

## IV. ANALYSIS

### A. Duty to Order a Consultative Examination

A consultative examination is used to "try to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to allow [the ALJ] to make a determination or decision" on the claim. *Tankisi v. Comm'r of Soc. Sec.,* 521 Fed.Appx. 29, 32 (2d Cir. 2013) (citing 20 C.F.R. §§ 404.1519a(b), 416.919a(b)).

The ALJ has discretion to order a consultative examination to further develop the evidentiary record. *See Serianni v. Astrue,* No. 6:07-CV-250, 2010 WL 786305, *5 (N.D.N.Y. Mar. 1, 2010) (citing *Hughes v. Apfel,* 992 F.Supp. 243, 248 (W.D.N.Y. 1997); *see* 20 C.F.R. §§ 404.1517, 416.917). "Several courts have held ... that in fulfilling the duty to conduct a full and fair inquiry, an ALJ is required to order a consultative examination where the record establishes that such an examination is necessary to enable the ALJ to render a decision." *Serianni,* 2010 WL 786305 at *5.

However, the ALJ is not required to order a consultative examination if the facts do not warrant or suggest the need for it. *Tankisi,* 521 Fed.Appx. at 32; *see also Lefever v. Astrue,* 5:07-CV-622, 2010 WL 3909487, at *7 (N.D.N.Y. Sept. 30, 2010), *aff'd* 443 Fed.Appx. 608 (2d Cir. 2011).

In addition, "[w]here a plaintiff suggests a possible mental impairment, but no treatment has been recommended or received, the ALJ must assess whether there is any evidence of work-related functional limitations resulting from the possible mental impairment." *Serianni,* 2010 WL 786305, at *5 (citing *Haskins v. Comm'r of Soc. Sec.,* No. 5:05-CV-292, 2008 WL 5113781, at *7, n. 5 (N.D.N.Y. Nov. 25, 2008)).

Plaintiff argues that the ALJ "abused his discretion in failing to order a consultative examination to assess and clarify the extent of [Plaintiff's] intellectual impairment." (Dkt. No. 10 at 8-12 [Pl.'s Mem. of Law].) Plaintiff's argument focuses on the need for further testing to evaluate Plaintiff's ability in reading, math, and general intellectual abilities. (*Id.*)

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 204 of 223

Monroe v. Commissioner of Social Security, Not Reported in Fed. Supp. (2016)

2016 WL 7971330

Here, the ALJ concluded that despite Plaintiff's alleged illiteracy, the record failed to indicate that his illiteracy caused more than a minimally adverse effect on his ability to work. (T. 13.) The ALJ further noted that Plaintiff graduated high school in special education (T. 13) and testified that he could not read or write very well (T. 15); however, the ALJ concluded that Plaintiff was able to work at a substantial gainful activity level for many years, which called into question his allegation of a severe intellectual impairment (T. 8).

Dennis Noia, Ph.D. conducted a consultative psychiatric examination on November 19, 2012. (T. 282-285.) Dr. Noia observed that Plaintiff's speech was intelligible and fluent and his expressive and receptive language was "moderately adequate." (T. 283.) Dr. Noia observed that Plaintiff's thought processes were coherent, and goal directed, with no evidence of disordered thinking. (*Id.*) He noted Plaintiff was able to do counting and some simple calculations, but could not do serial 3s because of weak arithmetic skills. (T. 284.) Dr. Noia stated that Plaintiff's intellectual functioning was estimated to be in the borderline range and his general fund of knowledge appeared to be somewhat limited. (*Id.*)

 **\*4** In a medical source statement Dr. Noia opined that Plaintiff appeared capable of: understanding and following simple instructions and directions; performing simple and some complex tasks with supervision and independently; maintaining attention and concentration for tasks; attending to a routine and maintaining a schedule; learning new tasks; making appropriate decisions; relating to and interacting moderately well with others; and dealing with stress. (T. 284.)

Courts have found that an ALJ had sufficient information, and did not abuse his discretion in deciding not to order a consultative examination to assess Plaintiff's intelligence, where Plaintiff graduated high school in general education classes, was employed, and was described by providers as being of average intelligence and having average intellect. *Cox v. Astrue*, 993 F. Supp. 2d 169, 178 (N.D.N.Y. 2012); *see also Miller v. Colvin*, No. 6:15-CV-0552, 2016 WL 4402035, at \*6 (N.D.N.Y. Aug. 18, 2016) (ALJ did not err in declining to order a consultative exam where there was substantial evidence that plaintiff did not suffer work related functional limitations); *Krach v. Comm'r of Soc. Sec.,* No. 3:13-CV-1089, 2014 WL 5290368, at \*9 (N.D.N.Y. Oct. 15, 2014) (ALJ had sufficient information and a consultative examination was not necessary where the ALJ was aware of plaintiff's education level, need for resource room help during her secondary education for math and reading, struggles with writing, and her alleged difficulty in understanding through reading); *Simon v. Colvin*, No. 6:12-CV-6381, 2013 WL 4094612, at \*7 (W.D.N.Y. Aug. 13, 2013) (ALJ did not err in failing to order consultative examination where the record was complete with notes from plaintiff's treating providers including therapy sessions and psychiatric evaluations).

Courts have also held that an ALJ did not abuse his discretion in failing to order additional intellectual testing where a consultative examiner noted that although plaintiff appeared to be in the borderline to low average range of intelligence, the examiner went on to opine that the plaintiff was capable of performing the basic demands of unskilled work. *Washington v. Astrue*, No. 5:12-CV-39, 2012 WL 6044877, at \*3 (N.D.N.Y. Dec. 5, 2012); *see also Slater v. Comm'r of Soc. Sec.*, No. 5:14-CV-255, 2015 WL 6157396, at \*4 (N.D.N.Y. Oct. 20, 2015).

However, Courts have remanded for intellectual testing where the record did not contain objective testing, plaintiff had significant educational difficulties (only completing the sixth grade), never held employment, and was unable to perform tasks such as learning to drive or manage finances. *Wallace v. Colvin*, 120 F. Supp. 3d 300, 305 (W.D.N.Y. 2015); *see also Jarvis v. Colvin*, No. 6:15-CV-1016, 2016 WL 4148352, at \*5 (N.D.N.Y. Aug. 4, 2016) (ALJ failed to discuss plaintiff's cognitive functioning at all in the RFC determination, despite AC remand ordering ALJ to do so); *Dufresne v. Astrue*, No. 5:12-CV-00049, 2013 WL 1296376, at \*1 (N.D.N.Y. Mar. 8, 2013), *report and recommendation adopted*, No. 5:12-CV-0049, 2013 WL 1289759 (N.D.N.Y. Mar. 27, 2013) (ALJ failed to develop record by failing to order intelligence evaluation where record contained evidence of plaintiff's limited intellectual functioning, including plaintiff's failure to graduate from high school or obtain GED, and opinion of consultative examiner that plaintiff suffered from cognitive delays and estimating his intelligence to be in the deficient range); *Laveck v. Astrue*, 2012 WL 4491110, \*6 (N.D.N.Y. 2012) (ALJ failed to develop record by not ordering an intelligence exam where ALJ failed to discuss plaintiff's learning disability, plaintiff testified that she had poor school performance and consultative psychiatric exam suggested low average cognitive functioning).

Monroe v. Commissioner of Social Security, Not Reported in Fed. Supp. (2016)

2016 WL 7971330

**\*5** Here, the ALJ did not abuse his discretion in failing to order a consultative examination to assess and clarify the extent of Plaintiff's intellectual impairment, because the record contained sufficient information for the ALJ to make a determination. As an initial matter, the ALJ discussed Plaintiff's alleged intellectual impairment throughout his decision. At step two, the ALJ determined that Plaintiff's mental impairments were non-severe. (T. 13.) The ALJ further discussed Plaintiff's intellectual impairments in formulating his RFC determination. (T. 15-16.)

The ALJ was aware of Plaintiff's education level and his alleged difficulty in reading and math. (T. 12-13, 15-16.) The record contained education records indicating that Plaintiff graduated high school with an Individualized Education Program ("IEP") diploma. (T. 242.) School records further indicated that Plaintiff was able to understand and follow simple oral directions, was able to express simple ideas orally, and could express ideas on paper, but did not use correct grammar, syntax, or punctuation. (T. 243.) At the chronological age of 20 Plaintiff was in the 12 th grade and reading at a "4B" level. (*Id.*) Plaintiff was estimated to be in the "low average" intellectual functioning range. (T. 244.)

Dr. Noia opined that although Plaintiff's cognitive functioning appeared to be in the "borderline range" and he had "weak arithmetic skills," he was capable of performing the basic demands of unskilled work. (T. 284-285.) *see Washington,* 2012 WL 6044877, at \*3 (consultative intelligence exam was unnecessary because the consultative examiner opined that although plaintiff had borderline to low average intellectual functioning he was capable of performing unskilled work); *see also Slater*, 2015 WL 6157396, at \*4. Further, as noted by the ALJ, Plaintiff worked successfully for years despite his alleged intellectual impairments. (T. 8); *see Haskins v. Comm'r of Soc. Sec.,* No. 5:05-CV-292, 2008 WL 5113781, at \*7 n.5 (N.D.N.Y. Nov. 25, 2008) (the ALJ committed no error when he did not pursue a consultative evaluation because the evidence did not suggest work-related functional limitations stemming from any mental impairment). Indeed, Plaintiff informed Dr. Noia that he stopped working due to "medical problems," not his intellectual impairments. (T. 282.)

Therefore, the ALJ did not abuse his discretion in not ordering a consultative examination to evaluate Plaintiff's intelligence because the record was sufficiently complete for the ALJ to make a determination. The record contained Plaintiff's educational records indicating he graduated high school with an IEP diploma, the record contained Plaintiff's work history indicating that despite his alleged intellectual limitations Plaintiff was able to maintain substantial gainful employment, and the record contained a consultative examination which indicated that despite his borderline intellectual functioning he was capable of performing the basic mental demands of unskilled work.

In the alternative, even assuming Plaintiff was illiterate as he alleges, illiteracy would not necessarily preclude him from performing the demands of unskilled work. The Regulations define illiteracy as an "inability to read or write" and "someone [is] illiterate if [he] cannot read or write a simple message such as instructions or inventory lists even though [he] can sign [his] name. Generally, an illiterate person has had little or no formal schooling." 20 C.F.R. §§ 404.1564(b)(1), 416.964(b)(1).

Plaintiff argues that "[i]t is reasonable to assume that even unskilled work at the sedentary or light level would generally require more mental-based skills than heavier labor-driven jobs, such as basic reading, writing, and math skills." (Dkt. No. 10 at 10 [Pl.'s Mem. of Law].) However, the Regulations state that illiteracy would not preclude someone with Plaintiff's age from performing light or sedentary work. The Medical-Vocational Guidelines set forth at 20 C.F.R. Part 404, Subpart P, Appendix 2 (commonly called "the Grids") state:

> **\*6** While illiteracy or the inability to communicate in English may significantly limit an individual's vocational scope, the primary work functions in the bulk of unskilled work relate to working with things (rather than with data or people) and in these work functions at the unskilled level, *literacy or ability to communicate in English has the least significance.* Similarly, the lack of relevant work experience would have little significance since the bulk of unskilled jobs require no qualifying work experience. The capability for light work, which includes the ability to do sedentary work, represents the capability

for substantial numbers of such jobs. This, in turn, represents substantial vocational scope for younger individuals (age 18-49) even if illiterate or unable to communicate in English.

20 C.F.R. § Pt. 404, Subpt. P, App. 2, § 202.00(g) (emphasis added).

For sedentary work, the Regulations state:

> While illiteracy or the inability to communicate in English may significantly limit an individual's vocational scope, the primary work functions in the bulk of unskilled work relate to working with things (rather than with data or people) and in these work functions at the unskilled level, *literacy or ability to communicate in English has the least significance.* Similarly the lack of relevant work experience would have little significance since the bulk of unskilled jobs require no qualifying work experience. Thus, *the functional capability for a full range of sedentary work represents sufficient numbers of jobs to indicate substantial vocational scope for those individuals age 18-44 even if they are illiterate or unable to communicate in English.*

20 C.F.R. § Pt. 404, Subpt. P, App. 2, § 201.00(i) (emphasis added).

Therefore, contrary to Plaintiff's argument, the Regulations indicate that even if illiterate, there would still be a substantial number of jobs that Plaintiff could perform at the full range of light and sedentary positions.

### B. The ALJ's RFC Determination

A plaintiff's RFC is the most he can do despite his limitations. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). Further, a plaintiff's RFC is his maximum remaining ability to do sustained work activities in an ordinary setting on a regular and continuing basis, and the RFC assessment must include a discussion of the plaintiff's abilities on that basis. "A regular and continuing basis means eight hours a day, for five days a week, or an equivalent work schedule." *Pardee v. Astrue*, 631 F. Supp. 2d 200, 210 (N.D.N.Y. 2009). In determining a plaintiff's RFC, the ALJ can consider a variety of factors, including a treating physician's or examining physician's observations of limitations, plaintiff's subjective allegations of pain, physical and mental abilities, as well as the limiting effects of all impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a).

The relevant factors considered in determining what weight to afford an opinion include the length, nature and extent of the treatment relationship, relevant evidence which supports the opinion, the consistency of the opinion with the record as a whole, and the specialization (if any) of the opinion's source. 20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6).

Here, the ALJ afforded "great evidentiary weight" to the medical opinion of the consultative examiner, Kalyani Ganesh, M.D. (T. 14.) The ALJ reasoned that Dr. Ganesh's opinion was entitled to great weight because she examined Plaintiff and was familiar with the rules governing Social Security disability adjudication. (*Id.*)

On November 19, 2012, Dr. Ganesh examined Plaintiff and provided a medical source statement. (T. 286-288.) On examination Dr. Ganesh observed that Plaintiff was in no acute distress, had a normal gait and stance, could not walk on heels and toes, could not squat, used no assistive devices, and was able to change and get on and off the exam table without assistance. (T. 287.) Dr. Ganesh noted full range of motion in Plaintiff's cervical, thoracic, and lumbar spine. (*Id.*) Dr. Ganesh noted full range of motion in Plaintiff's upper and lower extremities. (*Id.*) She observed that Plaintiff's joints were stable, non-tender, with no redness, heat, swelling or effusion. (T. 288.) Dr. Ganesh noted trace edema in Plaintiff's extremities. (*Id.*)

Monroe v. Commissioner of Social Security, Not Reported in Fed. Supp. (2016)

2016 WL 7971330

**\*7**  In a medical source statement Dr. Ganesh opined that Plaintiff had "no gross physical limitations noted to sitting, standing, and the use of upper extremities. Mild limitation to walking and climbing." (T. 288.)

Plaintiff argues that Dr. Ganesh's opinion was too vague to constitute substantial evidence and was not consistent with other evidence in the record concerning his leg edema and low back impairment. (Dkt. No. 10 at 12-15 [Pl.'s Mem. of Law].) Plaintiff further argues that the ALJ's RFC is not supported by substantial evidence because the ALJ's decision failed to provide a "bridge" between the medical evidence in the record and his ultimate RFC determination. (*Id.*)

It is well settled that an ALJ is entitled to rely upon the opinions of both examining and non-examining State agency medical consultants, since such consultants are deemed to be qualified experts in the field of social security disability. *See* 20 C.F.R. §§ 404.1512(b)(6), 404.1513(c), 404.1527(e), 416.912(b)(6), 416.913(c), 416.927(e); *see Baszto v. Astrue,* 700 F. Supp. 2d 242, 249 (N.D.N.Y. 2010); *Lewis v. Colvin,* 122 F. Supp. 3d 1, at 7 (N.D.N.Y. 2015); *Heagney-O'Hara v. Comm'r of Soc. Sec.,* 646 Fed.Appx. 123, 126 (2d Cir. 2016); *Monette v. Colvin,* No. 15-3399, 2016 WL 3639510 (2d Cir. July 7, 2016); *Snyder v. Colvin,* No. 15-3502, 2016 WL 3570107, at \*1 (2d Cir. June 30, 2016).

A consultative examiner's report which concludes that a plaintiff's condition is "mild" or "moderate," without additional information, does not allow an ALJ to infer that a plaintiff is capable of performing the exertional requirements of work. *See Curry v. Apfel,* 209 F.3d 117, 123 (2d Cir. 2000), *superseded by statute on other grounds; see Selian v. Astrue,* 708 F.3d 409, 421 (2d Cir. 2013) (consultative examiner's opinion was "remarkably vague" and meaning was left to the ALJ's "sheer speculation"); *see Carrube v. Astrue,* No. 3:08-CV-0830, 2009 WL 6527504, at \*8 (N.D.N.Y. Dec. 2, 2009) (remanding where consultative examiner's opinion on plaintiff's ability to lift weight, was so vague that the court "cannot fathom what might support the ALJ's conclusion that Plaintiff could lift and carry twenty-five to fifty pounds"), *report and recommendation adopted by,* 2010 WL 2178499 (N.D.N.Y. May 28, 2010).

Although a consultative examiner's opinion may use terminology that, on its face, is vague, such language does not render the consultative examiner's opinion useless in all situations. *Zongos v. Colvin,* No. 5:12-CV-1007, 2014 WL 788791, at \*10 (N.D.N.Y. Feb. 25, 2014) ("[W]hether an [ALJ's] reliance on a consultative examiner's vague opinion is reversible error is contextual rather than *per se.* Reviewing courts must weigh the impact of vague opinion in its unique factual circumstance.").

Courts have held that terms such as "mild" and "moderate" pass substantial evidence muster when medical evidence shows relatively little physical impairment. *Waldau v. Astrue,* No. 5:11-CV-925, 2012 WL 6681262, at \*4 (N.D.N.Y. Dec. 21, 2003); *Walker v. Astrue,* No. 08-CV-0828, 2010 WL 2629832, at \*7 (W.D.N.Y. June 11, 2010) (finding that where the medical evidence shows relatively little physical impairment, an ALJ permissibly can render a common sense judgment about functional capacity even without a physician's assessment); *see Tolhurst v. Comm'r of Soc. Sec.,* No. 5:15-CV-0428, 2016 WL 2347910, at \*5 (N.D.N.Y. May 4, 2016) (holding that a consultative examiner's opinion was too vague to support a finding that plaintiff could perform sedentary work because the ALJ determined, at step two, that plaintiff suffered from back disorders, knee disorders, and Factor V Leiden; and therefore, plaintiff did not have relatively little physical impairments).

**\*8**  Further, courts have held that a consultative examiner's conclusion was not impermissibly vague where the conclusion was "well supported by his extensive examination." *Waldau,* 2012 WL 6681262, at \*4; *Mauzy v. Colvin,* No. 5:12-CV-866, 2014 WL 582246, at \*9 (N.D.N.Y. Feb. 13, 2014). Courts have also held that medical source statements from consultative examiners which provide vague language may be rendered "more concrete" by the facts in the underlying opinion and other opinion evidence in the record. *Davis v. Massanari,* No. 00-CV-4330, 2001 WL 1524495, at \*8 (S.D.N.Y. Nov. 29, 2001) (a consultative examiner's opinion was not too vague where "the facts underlying that opinion and the other medical opinions in the record lend it a more concrete meaning"); *see Sweeting v. Colvin,* No. 12-CV-0917, 2013 WL 5652501, at \*8 (N.D.N.Y. Oct. 15, 2013) (plaintiff's contention that consultative examiner's use of the term "moderate" in his opinion was vague lacked merit as consultative examiner made specific findings based on physical examination of plaintiff); *Melton v. Colvin,* No. 13-CV-6188, 2014 WL 1686827, at \*13 (W.D.N.Y. Apr. 29, 2014) (substantial evidence supported ALJ's RFC determination that

2016 WL 7971330

plaintiff could perform sedentary work where consultative examiner opined plaintiff had moderate limitations in lifting and carrying and other objective evidence in the record to supported this determination).

Although the Second Circuit has made it clear that the opinions of State agency medical consultants, such as Dr. Ganesh, may constitute substantial evidence to support an ALJ's RFC determination, the opinion of such examiner must still be supported by substantial evidence in the record. *See Diaz v. Shalala,* 59 F.3d 307, 313 n. 5 (2d Cir. 1995) ("[T]he opinions of nonexamining sources [can] override treating sources' opinions provided they are supported by evidence in the record."); *see also Suttles v. Colvin,* 654 Fed.Appx. 44, 46 (2d Cir. 2016) (the ALJ properly accorded great weight to consultative examiner's opinion because it was consistent with the evidence in the record).

In *Heagney-O'Hara,* the Second Circuit concluded that the ALJ's RFC determination was supported by the opinion of the consultative examiner because the opinion was consistent with the objective medical record. *Heagney-O'Hara,* 646 Fed.Appx. at 126. In *Monette,* the Court stated that the ALJ properly relied on the opinion of a consultative examiner because the opinion was "consistent with the record at large and the applicable regulations." *Monette,* 2016 WL 3639510, at *2. In *Snyder,* the Court held that "the consulting psychologist opinion was consistent with other medical evidence and was supported by substantial evidence" and therefore constituted substantial evidence to support the ALJ's RFC determination. *Snyder,* 2016 WL 3570107, at *1.

Here, the ALJ afforded Dr. Ganesh's opinion "great evidentiary weight" because the doctor examined Plaintiff and was familiar with Social Security rules. (T. 14.) The ALJ's decision failed to indicate which evidence in the record supported Dr. Ganesh's opinion besides her own examination. In addition, as outlined below, evidence in the record conflicted with Dr. Ganesh's examination which the ALJ failed to address and resolve.

The Court does not require a recitation of each and every factor in the Regulation where the ALJ's reasoning and adherence to the regulation are clear; however, a terse analysis of an opinion, especially one upon which the ALJ primarily based his RFC determination, prevents meaningful review. *See Woytowicz v. Comm'r of Soc. Sec.,* No. 5:15-CV-0906, 2016 WL 6427787, at *6 (N.D.N.Y. Oct. 5, 2016), *report and recommendation adopted,* No. 5:15-CV-0906, 2016 WL 6426385 (N.D.N.Y. Oct. 28, 2016) (citation omitted).

In addition, there were conflicts in the record which the ALJ failed to resolve. Dr. Ganesh examined Plaintiff in 2012; however, subsequent treatment notations and objective medical imaging conflict with Dr. Ganesh's examination and findings. For example, notations from June 2013 indicated Plaintiff was in "moderate distress," used a cane, had a moderately antalgic gait, and limited range of motion in his spine. (T. 329.) Notations from September of 2013 indicated Plaintiff was in "mild distress," utilized a cane, and had limited range of motion in his spine. (T. 321.) In January of 2014, Plaintiff appeared in "mild distress," used a cane, had a moderately antalgic gait, and had limited range of motion in his spine. (T. 352.) In addition, an MRI conducted in August of 2013, revealed "moderate to marked" facet degenerative changes at multiple levels with early disc bulge resulting in foraminal narrowing and "significant" canal stenosis at multiple levels. (T. 317.) Although the ALJ noted these findings in his decision (T. 12) [2], he failed to resolve the conflicts between these findings and Dr. Ganesh's findings.

**\*9** In sum, consultative examiner Dr. Ganesh's opinion may constitute substantial evidence if his opinion was supported by the record; however, the ALJ's conclusory analysis of the doctor's opinion was not made in accordance with the Regulations and the ALJ failed to resolve inconsistencies in the record, thus preventing meaningful review. Further, a review of the record as a whole appears to indicate that Plaintiff's impairments, specifically his back impairment, may have become more symptomatic after Dr. Ganesh's examination. Under the Regulations a consultative examiner is not required to review a plaintiff's medical record. 20 C.F.R. § 404.1519n. However, because the consultative examination in this case occurred prior to Plaintiff undergoing objective medical imaging and treatment, it may be prudent on remand to request a treating source statement and/or a new consultative examination [3]. Therefore, remand is recommended for a proper analysis of the medical opinion evidence in the record.

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 209 of 223

Monroe v. Commissioner of Social Security, Not Reported in Fed. Supp. (2016)

2016 WL 7971330

## C. The ALJ's Credibility Determination

A plaintiff's allegations of pain and functional limitations are "entitled to great weight where ... it is supported by objective medical evidence." *Rockwood v. Astrue*, 614 F. Supp. 2d 252, 270 (N.D.N.Y. 2009) (quoting *Simmons v. U.S. R.R. Ret. Bd.*, 982 F.2d 49, 56 (2d Cir. 1992)). However, the ALJ "is not required to accept [a plaintiff's] subjective complaints without question; he may exercise discretion in weighing the credibility of the [plaintiff's] testimony in light of the other evidence in the record." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979)). "When rejecting subjective complaints, an ALJ must do so explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief." *Rockwood*, 614 F. Supp. 2d at 270.

The ALJ must employ a two-step analysis to evaluate the claimant's reported symptoms. *See* 20 C.F.R. §§ 404.1529, 416.929. First, the ALJ must determine whether, based on the objective medical evidence, a plaintiff's medical impairments "could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. §§ 404.1529(a), 416.929(a). Second, if the medical evidence establishes the existence of such impairments, the ALJ must evaluate the intensity, persistence, and limiting effects of those symptoms to determine the extent to which the symptoms limit the claimant's ability to do work. *See id.*

At this second step, the ALJ must consider: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to relieve his pain or other symptoms; (5) other treatment the claimant receives or has received to relieve his pain or other symptoms; (6) any measures that the claimant takes or has taken to relieve his pain or other symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to his pain or other symptoms. 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii), 416.929(c)(3)(i)-(vii).

Here, the ALJ determined that Plaintiff's medically determinable impairments could reasonably be expected to cause his alleged symptoms; however, his statements concerning the intensity, persistence and limiting effects of his symptoms were not credible. (T. 16.) The ALJ stated "[t]he medical evidence simply does not contain findings establishing the presence of impairments that could cause the reported symptoms at the severity reported." (*Id.*) The ALJ further stated that Plaintiff's statements were not supported because his treatment was conservative in nature, and he refused injections and physical therapy. (*Id.*)

 **\*10** Plaintiff argues that the ALJ erred in his credibility determination based on Plaintiff's conservative treatment because the ALJ failed to consider the reasons for this type of treatment, such as lack of insurance. (Dkt. No. 10 at 15-16 [Pl.'s Mem. of Law].) Plaintiff further argues that the ALJ's credibility determination was flawed because the ALJ erred in his evaluation of the medical opinion evidence in the record. (*Id.* at 17.)

Because remand is recommended for an evaluation of the medical opinion evidence in the record, remand is also recommended for a new credibility analysis based on that evaluation.

## D. The ALJ's Step Five Determination

Plaintiff argues that the ALJ erred in his step five determination because he failed to seek testimony from a VE and instead relied on the Grids. (Dkt. No. 10 at 17-19 [Pl.'s Mem. of Law].) Because remand is recommended for a proper analysis of the medical opinion evidence in the record, remand is therefore recommended for step five determination based on that review.

**ACCORDINGLY**, based on the findings above, it is

**RECOMMENDED**, that the Plaintiff's motion for judgment on the pleadings be **GRANTED in PART and DENIED in PART**, and the Commissioner's determination be **GRANTED in PART and DENIED in PART**, and the matter be **REMANDED** for further proceedings under sentence four of 42 U.S.C. § 405(g) and consistent with this report.

2016 WL 7971330

Pursuant to 28 U.S.C. § 636 (b)(1) and Local Rule 72.1(c), the parties have **FOURTEEN (14) DAYS** within which to file written objections to the foregoing report. Any objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636 (b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 7971330

---

**Footnotes**

1    Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time. 20 C.F.R. §§ 404.1567(b), 416.967(b).

2    Of note, elsewhere in his determination the ALJ refers to the findings of the lumbar MRI as "benign." (T. 15.) However, the MRI report stated Plaintiff had "moderate to marked" degenerative changes at multiple levels and "significant" canal stenosis. (T. 317-318.) The ALJ's decision failed to clarify how findings of "moderate to marked" and "significant" translate to "benign."

3    The record contained a medical source statement dated January 23, 2013, completed by Plaintiff's treating nurse practitioner and signed by a physician in the same practice. (T. 347-349.) The ALJ afforded the statement no weight. (T. 15.) Plaintiff did not argue that the ALJ erred in his assessment of this statement. (Dkt. No. 10 [Pl.'s Mem. of Law].)

---

**End of Document**                                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 318838

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

Richard MONROE, Plaintiff,

v.

Carolyn W. COLVIN Acting Commissioner of Social Security, Defendant.

15-CV-1235 (GTS/WBC)

|

Signed 01/23/2017

**Attorneys and Law Firms**

OLINSKY LAW GROUP, 300 S. State Street, Suite 420, OF COUNSEL: HOWARD D. OLINSKY, ESQ., Syracuse, NY 13202, Counsel for Plaintiff.

U.S. SOCIAL SECURITY ADMIN., OFFICE OF REG'L GEN. COUNSEL – REGION II, 26 Federal Plaza, Room 3904, OF COUNSEL: VERNON NORWOOD, ESQ., New York, NY 10278, Counsel for Defendant.

**<u>DECISION and ORDER</u>**

GLENN T. SUDDABY, Chief United States District Judge

**\*1** Currently before the Court, in this Social Security action filed by Richard Monroe ("Plaintiff") against the Commissioner of Social Security ("Defendant" or "the Commissioner") pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), is the Report and Recommendation of United States Magistrate Judge William B. Mitchell Carter, recommending that Plaintiff's motion for judgment on the pleadings be granted in part and denied in part, and that Defendant's motion for judgment on the pleadings be granted in part and denied in part. (Dkt. No. 13.) Objections to the Report and Recommendation have not been filed, and the time in which to do so has expired. (*See generally,* Docket Sheet.)

A district court reviewing a magistrate judge's Report and Recommendation "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). Parties may raise objections to the magistrate judge's Report and Recommendation, but they must be "specific written objections," and must be submitted "[w]ithin 14 days after being served with a copy of the recommended disposition." Fed. R. Civ. P. 72(b)(2); *accord,* 28 U.S.C. § 636(b)(1)(C). When no objection is made to a report and recommendation, the Court subjects that report and recommendation to only a clear error review. Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a "clear error" review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id.*; *see also Batista v. Walker,* 94-CV-2826, 1995 WL 453299, at \*1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal quotation marks and citations omitted).

After carefully reviewing the relevant papers herein, including Magistrate Judge Carter's thorough Report and Recommendation, the Court can find no clear error in the Report and Recommendation. Magistrate Judge Carter employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. (Dkt. No. 13.)

**ACCORDINGLY**, it is

Monroe v. Colvin, Not Reported in Fed. Supp. (2017)

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 212 of 223

**ORDERED** that Magistrate Judge Carter's Report and Recommendation (Dkt. No. 13) is **ACCEPTED** and **ADOPTED** in its entirety; and it is further

**ORDERED** that Plaintiff's motion for judgment on the pleadings (Dkt. Nos. 10) is **GRANTED** in part, and **DENIED** in part; and it is further

**ORDERED** that the Commissioner's determination is **VACATED**; and it is further

**ORDERED** that the matter is **REMANDED** to the Commissioner of Social Security for further proceedings consistent with the specific instructions outlined in the Report and Recommendation.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 318838

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 213 of 223
Cherry v. Commissioner of Social Security, Not Reported in Fed. Supp. (2019)

2019 WL 1305961

2019 WL 1305961
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Lamont C. CHERRY, Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY, Defendant.

17-CV-7999 (VEC)
|
Signed 03/22/2019

**Attorneys and Law Firms**

Lamont C. Cherry, New York, NY, pro se.

Allison Rovner, United States Attorney's Office, New York, NY, for Defendant.

OPINION AND ORDER

VALERIE CAPRONI, United States District Judge

**\*1**  Plaintiff Lamont Cherry, proceeding *pro se*, brought this action seeking review of the denial of his application for Social Security benefits, pursuant to 42 U.S.C. §§ 1381–1385. *See* Compl., Dkt. 2. The Commissioner of Social Security (the "Commissioner") has moved for judgment on the pleadings, pursuant to Federal Rule of Civil Procedure 12(c). *See* Notice of Mot., Dkt. 15. On November 16, 2018, Magistrate Judge Kevin Fox entered a Report and Recommendation ("R&R") recommending that the Commissioner's motion be denied and that the case be remanded to the Commissioner for reconsideration of Plaintiff's application. *See* R&R, Dkt. 24. The Commissioner objected to the R&R, and Plaintiff responded to the Commissioner's objections. *See* Defs.' Second Mem. of Law, Dkt. 28; Pl.'s Second Mem. of Law, Dkt. 31. For the following reasons, the Commissioner's objections to the R&R are SUSTAINED. The R&R is NOT ADOPTED. The Commissioner's motion for judgment on the pleadings is GRANTED. This case is DISMISSED.

**I. Legal Standards**

In reviewing an R&R, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). When specific objections to the R&R are made, "[t]he district judge must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3); *see also United States v. Male Juvenile*, 121 F.3d 34, 38 (2d Cir. 1997). When reviewing the submissions of a *pro se* litigant, the submissions must be "construed liberally and interpreted 'to raise the strongest arguments that they suggest.' " *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (quoting *Pabon v. Wright*, 459 F.3d 241, 248 (2d Cir. 2008) ).

A district court must affirm the Commissioner's decision to deny benefits unless the decision is "based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." *Greek v. Colvin*, 802 F.3d 370, 374–75 (2d Cir. 2015) (per curiam); *see also* 42 U.S.C. § 405(g). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Greek*, 802 F.3d at 375 (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) ). The "substantial evidence" standard is "a very deferential standard of review—even more so than the 'clearly erroneous' standard." *Brault v. Soc. Sec. Admin., Com'r*, 683 F.3d 443, 448 (2d Cir. 2012)(citing *Dickinson v. Zurko*, 527 U.S. 150, 153 (1999) ). The standard means that "once an ALJ finds facts, [a court] can reject those facts 'only if a reasonable

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 214 of 223

Cherry v. Commissioner of Social Security, Not Reported in Fed. Supp. (2019)

2019 WL 1305961

factfinder would have to conclude otherwise.' " *Id.* (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994) ); *see also Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999).

To be "disabled," a claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A claimant will be found to be disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 1382c(a)(3)(B).

**\*2** The Commissioner must follow a five-step analysis to evaluate disability claims:

> *First*, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity. If so, the claimant is not disabled. *Second*, if the claimant is not working, the Commissioner must determine whether the claimant has a "severe" impairment, *i.e.*, an impairment that limits his ability to do physical or mental work-related activities. If not, the claimant is not disabled. *Third*, if there is a severe impairment, the Commissioner determines if the impairment meets or equals the criteria of a *per se* disabling impairment contained in Appendix 1 to 20 C.F.R. Part 404, Subpart P (Listings of Impairment). If the claimant's impairment does not meet or equal a listed impairment, before proceeding to step four, the Commissioner determines, based on all the relevant medical and other evidence of record, the claimant's "residual functional capacity," ["RFC"] which is what the claimant can still do despite the limitations imposed by his impairment. *Fourth*, the Commissioner considers whether the claimant's residual functional capacity permits him to return to his past relevant work. If so, the claimant is not disabled. *Fifth*, if the claimant cannot return to his past work, the Commissioner considers, based on the claimant's residual functional capacity and vocational factors, whether the claimant can do other work existing in significant numbers in the national economy. If so, the claimant is not disabled.

*Greek*, 802 F.3d at 373 n.2 (citations omitted) (emphasis added); *see also Selian v. Astrue*, 708 F.3d 409, 417–18 (2d Cir. 2013). "The claimant bears the burden of proof in the first four steps of the sequential inquiry; the Commissioner bears the burden in the last." *Selian*, 708 F.3d at 418; *see also Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

## II. Background

Plaintiff applied for benefits on April 29, 2014, asserting that he was disabled due to an injury to his left ankle and psychological issues. *See* R. 184; *see also id.* at 158–65, 179–99. [1] Plaintiff's application was initially denied on June 23, 2014. *See id.* at 10, 72–75. Plaintiff subsequently requested a hearing by an administrative law judge ("ALJ") to review the denial. *See id.* at 76–82.

An ALJ held a hearing on June 14, 2016. *See id.* at 25–42. Plaintiff, who was then represented by counsel but also incarcerated, and Plaintiff's attorney both attended the hearing by telephone. *See id.* at 27. Plaintiff and a vocational expert ("VE") testified. *See id.* at 29–42. Plaintiff testified that he was disabled due to his left-ankle injury, limitations in the movement of his right shoulder, anxiety attacks, and bipolar disorder. [2] *See id.* at 30. In addition to taking testimony, the ALJ also reviewed Plaintiff's medical records and opinions from several of Plaintiff's health care providers. *See id.* at 10, 13–18.

**\*3** In a written decision entered September 2, 2016, the ALJ found that Plaintiff was not disabled and affirmed the denial of Plaintiff's application. *See id.* at 10–20. At the first step of the five-step analysis, the ALJ found that Plaintiff had not engaged in any substantial gainful activity since the application date. *See id.* at 12. At the second step, the ALJ found that Plaintiff's psychological issues did not constitute a "severe impairment" under the Social Security laws, *see id.* at 13–15; the ALJ found,

2019 WL 1305961

however, that Plaintiff's ankle and shoulder conditions, combined with Plaintiff's obesity, constituted a "severe" impairment, *see id.* at 12.[3] At the third step, the ALJ found that Plaintiff's impairments were not *per se* disabling under the law. *See id.* at 15. The ALJ then found that, notwithstanding these impairments, Plaintiff had the RFC to perform "light work" with "frequent" bending, stooping, reaching, handling, and fingering.[4] *See id.* at 16–18. Proceeding to Step Four, the ALJ found that Plaintiff had no past relevant work. *See id.* at 18. And at Step Five, the ALJ found that Plaintiff was able to perform work that existed in significant numbers in the national economy and, therefore, that Plaintiff was not "disabled" within the meaning of the Social Security laws. *See id.* at 18–19. Accordingly, the ALJ affirmed the denial of Plaintiff's claim. *See id.* at 19–20.

Plaintiff petitioned the Social Security Agency's ("SSA") Appeals Council for review of the ALJ's decision; the Appeals Council denied Plaintiff's request on September 25, 2017. *See id.* at 1–6, 157. On October 17, 2017, Plaintiff, proceeding *pro se*, filed the Complaint, seeking review of the agency's decision. *See* Compl. The Commissioner subsequently moved for judgment on the pleadings. *See* Notice of Mot.

On November 16, 2018, the Magistrate Judge issued the R&R recommending that the Commissioner's motion be denied. *See* R&R. The R&R concluded that the ALJ's determination of Plaintiff's RFC was "not supported by substantial evidence" and was contradicted by a medical opinion on which the ALJ purported to rely. *Id.* at 11–12. The R&R also found that the ALJ erred in concluding that Plaintiff was capable of performing a significant number of jobs in the national economy. *See id.* at 12–13. In addition, the R&R found that technical problems relating to Plaintiff's telephone connection during the administrative hearing made judicial review of the hearing unduly "difficult," warranting remand. *Id.* at 13–14. Accordingly, the R&R recommended that the Commissioner's motion be denied and that this case be remanded back to the Commissioner for further proceedings. *See id.* at 15.

The Commissioner objected to the R&R, *see* Def.'s Second Mem. of Law, and Plaintiff responded to those objections, *see* Pl.'s Second Mem. of Law.

### III. The ALJ's RFC Determination Was Supported by Substantial Evidence

The ALJ found that Plaintiff had the RFC to perform "light work" with "frequent" bending, stooping, reaching, handling, and fingering. R. 16–18. The Magistrate Judge concluded that this finding was not supported by substantial evidence. *See* R&R at 11–12. The Commissioner objects to the Magistrate Judge's conclusion. *See* Def.'s Second Mem. of Law at 10–14.

#### A. The Applicable Law

**\*4** An ALJ's RFC determination need not "perfectly correspond with" any single medical opinion. *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013). Rather, the ALJ is "entitled to weigh all of the evidence available to make an RFC finding that [is] consistent with the record as a whole." *Id.* "Genuine conflicts in the medical evidence are for the [ALJ] to resolve" in the first instance. *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); *see also Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008).

#### B. The ALJ's Factual Findings

In making his RFC finding, the ALJ relied in large part on the medical opinion of Dr. Chaim Shtock, a consultative examiner. *See* R. 17–18; *see also* R. 239–42. After conducting a physical examination of Plaintiff, Dr. Shtock opined that Plaintiff had no limitations with "heavy lifting," "kneeling," "crouching," "sitting long periods," "frequent bending," "performing overhead activities using both arms," or "using both hands for fine and gross manual activities." R. 241. Dr. Shtock opined that Plaintiff had a "moderate limitation" with "squatting," "frequent stair climbing," and "walking long distances." *Id.* He also opined that Plaintiff had a "mild to moderate limitation with standing long periods." *Id.* Dr. Shtock stated that, other than the impairments discussed, Plaintiff had "no other physical functional deficits." *Id.*[5]

Case 5:24-cv-00169-DNH-ML   Document 27   Filed 02/05/25   Page 216 of 223

Cherry v. Commissioner of Social Security, Not Reported in Fed. Supp. (2019)

2019 WL 1305961

As to Plaintiff's left ankle condition, Dr. Shtock observed that Plaintiff walked with a "limping gait," was "unable to walk on his toes," and had "difficulty walking on his heels." *Id.* at 240. Dr. Shtock also noted, however, that Plaintiff did not use an assistive device to walk, was able to get onto and off of the exam table without assistance, and complained that he experienced "aggravated" ankle pain only after "prolonged" periods of walking or standing. *Id.* at 239–40. Dr. Shtock observed that Plaintiff's range of motion in his left ankle was somewhat limited and that his muscle strength in the ankle was "4+/5" (rather than a full "5/5"). *Id.* at 241. Dr. Shtock found that, apart from Plaintiff's left ankle, Plaintiff had full muscle strength in all "bilateral lower extremities." *Id.* at 241.

The ALJ found that Dr. Shtock's opinion about Plaintiff's ankle was consistent with the treatment notes of Plaintiff's treating physicians. *See id.* at 18. Dr. Shtock's observations regarding the ankle's range of motion, for example, were similar to the range of motion recorded by Plaintiff's treating physicians. *See id.* at 241; *see also id.* at 233, 308, 310, 314. These physicians diagnosed Plaintiff with chronic tendinitis. *See id.* at 308, 311. Plaintiff also reported to his treating physicians that he exercised vigorously, *see, e.g., id.* at 260, and he complained of being unable to walk or stand only after a prolonged period of time, *see id.* at 192, 195–96, 239, 313—lending support to Dr. Shtock's view that Plaintiff's ankle posed only a "moderate" limitation and that Plaintiff's impairments were limited to "walking *long* distances," "standing *long* periods," and "*frequent* stair climbing," *see id.* at 241 (emphasis added).

**\*5** Additionally, the ALJ noted that Plaintiff had reported to his doctors that medication and physical therapy reduced his ankle pain considerably (from an "eight out of ten" to a "five out of ten"), *see id.* at 17; *see also id.* at 199, 239, 300–05, 311, 315–16, 319, but that Plaintiff had stopped attending physical therapy and had not attended a prescribed follow-up appointment with an orthopedist, *see id.* at 17. In the ALJ's view, Plaintiff's failure to follow up with these appointments indicated that "there had been medical improvement" in Plaintiff's ankle condition and that Plaintiff had "found further treatment unnecessary." *Id.* at 17.

As to Plaintiff's shoulder condition, Dr. Shtock did not observe any limitations. *See id.* at 240 (recording a full range of motion in Plaintiff's shoulders), 241 (opining that Plaintiff had "no limitations" with "heavy lifting" or with "performing overhead activities using both arms"). The ALJ also noted that an X-ray of the shoulder showed no abnormalities or injuries, *see id.* at 17, 234; that Plaintiff reported having at least some range of motion in his shoulder, *see id.* at 16, 32–33, 36–37; and that Plaintiff complained only of "moderate discomfort" in the shoulder, *see, e.g., id.* at 17, 294. The record also makes clear that the pain in Plaintiff's shoulder was, at worst, intermittent, *see id.* at 36–37, 292; that medication reduced the pain, *see id.* at 284, 292, 295; and that Plaintiff did not require physical therapy or other extensive treatment for the shoulder. Nevertheless, the ALJ credited Plaintiff's testimony that he had difficulty lifting heavy objects due to the shoulder pain. *See id.* at 17, 32–33, 36–37.

Finally, the ALJ observed that Plaintiff is obese, a condition that the ALJ believed could exacerbate Plaintiff's ankle- and shoulder-related limitations. *See id.* at 17–18.

### C. The ALJ's RFC Determination

The ALJ concluded that Plaintiff was capable of performing "light work" with "frequent" bending, stooping, reaching, handling, and fingering. *Id.* at 18. This conclusion was supported by substantial evidence.

### 1. Plaintiff's Ankle Condition

Although "light work" requires walking or standing for up to three-quarters of a workday, it requires that a person be capable of performing these activities only "intermittently." *Poupore v. Astrue*, 566 F.3d 303, 305 (2d Cir. 2009) (per curiam); *see also* 20 C.F.R. § 416.967(b); SSR 83-10, 1983 WL 31251, at \*5–6 (S.S.A. 1983) ("[T]he full range of light work requires standing or walking, *off and on*, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time." (emphasis added) ). There is substantial evidence that Plaintiff was able to perform this level of work, as he reported to his physicians that he was unable to walk and stand only after prolonged periods of time, *see id.* at 192, 195–96,

Cherry v. Commissioner of Social Security, Not Reported in Fed. Supp. (2019)

2019 WL 1305961

239, 313, and, consistent with these reports, Dr. Shtock found that Plaintiff had limitations only with "standing long periods" and "walking long distances," *id.* at 241.

Although Plaintiff reported "sharp" pain in his ankle, *id.* at 33, the ALJ reasonably found that Plaintiff's "statements concerning the intensity, persistence, and limiting effects" of that pain were exaggerated, given that his medical records did not reflect the same level of pain, that Dr. Shtock opined that Plaintiff had only moderate limitations in this area, and that Plaintiff had stopped attending physical therapy sessions that had helped reduce his pain. *Id.* at 16–17; *see also Campbell v. Astrue*, 465 F. App'x 4, 7 (2d Cir. 2012) ("[W]hile an ALJ 'is required to take the claimant's reports of pain and other limitations into account,' he or she is 'not require[d] to accept the claimant's subjective complaints without question.' " (citations omitted) (quoting 20 C.F.R. § 416.929 and *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) ) ); *Mancuso v. Astrue*, 361 F. App'x 176, 178–79 (2d Cir. 2010).

*6 Additionally, although Plaintiff testified that he needed to elevate his ankle periodically while sitting, *see* R. 35–36, this testimony did not require a different RFC determination. Contrary to Plaintiff's testimony, Dr. Shtock found that Plaintiff had "no limitation with sitting long periods," *id.* at 241, and Plaintiff had not explained the need for ankle elevation while sitting prior to the ALJ's hearing, *see, e.g., id.* at 196, 232, 313. The VE also testified that a person could elevate his leg up to 12 inches without it interfering with his ability to perform sedentary work, *see id.* at 41.

### 2. Plaintiff's Shoulder Condition

Light work requires the ability to lift up to 20 pounds at a time, *see* 20 C.F.R. § 416.967(b); there was substantial evidence that Plaintiff was capable of performing such work. Dr. Shtock found that Plaintiff had a full range of motion in his shoulders and that Plaintiff had "no limitation" with "heavy lifting" or with "performing overhead activities." R. 241. Plaintiff also did not require extensive treatment for the shoulder, and an X-ray revealed no abnormalities or injuries. *See id.* at 234. Indeed, Plaintiff did not even raise his shoulder condition in his initial disability application, *see id.* at 184, 195–96; he complained of it only during the hearing with the ALJ and intermittently with his doctors, *see id.* at 32. Accordingly, there was more than substantial evidence that Plaintiff was capable of lifting up to 20 pounds. [6]

The ALJ's finding that Plaintiff was capable of performing frequent bending, stooping, reaching, handling, and fingering, *id.* at 18, was also supported by substantial evidence. Although Plaintiff testified about his shoulder pain, *see id.* at 32, Dr. Shtock opined that Plaintiff had a full range of motion in his elbows, forearms, wrists, and fingers, *see id.* at 240. Dr. Shtock also observed that Plaintiff had full grip strength in both hands; that Plaintiff had no limitations with heavy lifting, kneeling, crouching, bending, or with "fine and gross manual activities"; and that Plaintiff had no "physical functional deficits," other than those relating to his ankle. *Id.* at 240–41. Further, as discussed, Plaintiff's treatment notes reflect, at best, a mild and intermittent shoulder condition that was responsive to medication and that did not require extensive treatment. There is no evidence in the record that Plaintiff had any other difficulty using his arms, hands, or fingers. Accordingly, the ALJ's finding was supported by substantial evidence. [7]

### 3. Conclusion

Taking a step back from the applicable legal standard, and applying a dose of common sense, Plaintiff is clearly not entitled to Social Security benefits. He is a 40-year-old man with, at worst, tendonitis, a mild shoulder strain, and no other physical impairments. Even if this Court were not obligated to defer to the ALJ's decision—which it is—no reasonable person could find that Plaintiff is so impaired that he is unable to work in any jobs that exist in the national economy. *See* 42 U.S.C. § 1382c(a) (3)(A)–(B).

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 218 of 223

Cherry v. Commissioner of Social Security, Not Reported in Fed. Supp. (2019)

2019 WL 1305961

**\*7** For all these reasons, the ALJ's RFC determination was supported by substantial evidence. To the extent that the Commissioner objects to the R&R on this ground, the objection is sustained.

### D. The R&R's Other Conclusions

The Commissioner objects to two other portions of the R&R. First, the R&R asserted, without explanation, that the ALJ's finding that Plaintiff was capable of performing frequent reaching and handling was "not based on or consistent with" Dr. Shtock's opinion. R&R at 12. The Commissioner's objection to this assertion is sustained. As discussed, Dr. Shtock found no limitations with respect to Plaintiff's ability to perform "overhead activities" or "fine and gross manual activities." R. 241. Put in the terms of the Social Security regulations, Dr. Shtock's finding constituted his opinion that Plaintiff had no limitations with "reaching" or "handling." *See Johnson v. Berryhill*, No. 3:16-CV-01050, 2017 WL 2381272, at \*12 (D. Conn. June 1, 2017) (under the Social Security regulations, "fine and gross hand manipulation" involves "reaching," "handling," and "fingering"). Nevertheless, in light of Plaintiff's testimony regarding his shoulder pain and Plaintiff's intermittent complaints to his treating physicians about shoulder pain, the ALJ reasonably concluded that Plaintiff had some limitations with reaching and handling (specifically, that Plaintiff was limited to "frequent," as opposed to "continuous," reaching and handling). *See* R. 17. The ALJ was entitled to credit Plaintiff's testimony notwithstanding Dr. Shtock's contrary finding that Plaintiff had no limitations. *See Matta*, 508 F. App'x at 56 (an ALJ's findings need not "perfectly correspond with any of the opinions of medical sources cited in [the ALJ's] decision"); *Genier*, 606 F.3d at 49 (an ALJ "may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record"). In any event, to the extent that the ALJ deviated from Dr. Shtock's opinion regarding limitations on Plaintiff's ability to reach and handle, the ALJ's findings were *more* favorable to Plaintiff than Dr. Shtock's; Plaintiff, therefore, has no basis to complain about the ALJ's conclusion. For all these reasons, the Commissioner's objection is sustained.

The R&R also asserted that the ALJ's finding regarding Plaintiff's ability to perform frequent reaching and handling is inconsistent with the ALJ's statement that Plaintiff's conditions were "likely to ... limit his ability to perform reaching/handling between one third and two thirds of the time during a typical workday." R&R at 11–12 (quoting R. 17). The Commissioner objects to that assertion, *see* Def.'s Second Mem. of Law at 13–14; the objection is sustained. As discussed, the Social Security regulations define "frequently" as "occurring [between] one-third to two-thirds" of a workday. SSR 83-10, 1983 WL 31251, at \*6 (S.S.A. 1983); *see also Stottlar v. Colvin*, No. 5:13-CV-00047, 2014 WL 3956628, at \*15 (N.D.N.Y. Aug. 13, 2014). Read in context, the ALJ's statement that Plaintiff's conditions would "limit his ability to perform reaching/ handling between one third and two thirds of the time during a typical workday" was clearly a typo: the statement should have said that Plaintiff was limited to "perform[ing] reaching/handling *to* between one third and two thirds of the time during a typical workday." R. 17. Indeed, the ALJ's opinion contained numerous other typos, and there is no other indication that he made contradictory findings in the opinion. Accordingly, the Commissioner's objection to this portion of the R&R is sustained.

**\*8** Although not addressed in the R&R, Plaintiff objects to the ALJ's RFC determination on the ground that the ALJ did not personally examine Plaintiff or otherwise take steps personally to assess Plaintiff's limitations at the time of the hearing. *See* Pl.'s Second Mem. of Law at 7. Plaintiff asserts that his condition is "getting worse each day," a factor that the ALJ should have taken into account. *Id.* at 8. This objection is meritless. The relevant time period for the Commissioner's assessment was the period between the date of the alleged onset of disability (December 2013, *see* R. 179) and the date of the Commissioner's decision (September 25, 2017, *see id.* at 1–6). *See Collins v. Comm'r of Soc. Sec.*, 960 F. Supp. 2d 487, 501 (S.D.N.Y. 2013). Evidence relevant to the Plaintiff's condition after the Commissioner's decision—such as evidence that Plaintiff's condition is currently worsening—warrants a remand only if the evidence bears upon the "severity and continuity" of impairments that existed during the relevant time period. *See id.* (quoting *Pollard v. Halter*, 377 F.3d 183, 194 (2d Cir. 2004) ). Plaintiff has made no such showing. Where, as here, "there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999); *see also* R. 27–28 (Plaintiff's attorney stating that the record of Plaintiff's medical history was complete).

Cherry v. Commissioner of Social Security, Not Reported in Fed. Supp. (2019)

2019 WL 1305961

## IV. The ALJ's Analysis at "Step Five" Was Supported by Substantial Evidence

At the fifth step of the ALJ's analysis, the ALJ was required to determine whether Plaintiff could, in light of his RFC, perform jobs existing in significant numbers in the national economy. *See Greek*, 802 F.3d at 373 n.2. In the R&R, the Magistrate Judge found that the Commissioner had failed to carry his burden at this step. *See* R&R at 12–13. The Commissioner objects to the Magistrate Judge's conclusion.

### A. The Applicable Law

To make his determination at Step Five, the ALJ consulted the Medical-Vocational Guidelines contained in Appendix 2 of 20 C.F.R. Part 404, Subpart P, commonly known as the "grid." *See* R. 19; *McDonough v. Astrue*, 672 F. Supp. 2d 542, 570–71 (S.D.N.Y. 2009). As one Court in this District has explained:

> The grid takes into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience. Based on these factors, the [grid] indicates whether the claimant can engage in any other substantial gainful work which exists in the national economy. As a general matter, the result listed in the grid is dispositive on the issue of disability. Exclusive reliance on the grid, however, is inappropriate where the guidelines fail to describe the full extent of the claimant's physical limitations.

*Id.* at 570 (citations and internal quotation marks omitted); *see also Bapp v. Bowen*, 802 F.2d 601, 605–06 (2d Cir. 1986). Put differently, an ALJ may rely exclusively on the grid to determine whether the claimant can perform a significant number of jobs in the economy—and therefore whether the claimant is "disabled" under the Social Security laws—as long as the claimant does not have any "non-exertional limitations" that "significantly diminish" the range of available work indicated in the grid. *See Gaiser v. Comm'r of Soc. Sec.*, No. 13-CV-8234, 2015 WL 3536604, at *12 (S.D.N.Y. June 5, 2015); *McDonough*, 672 F. Supp. 2d at 571.

If a claimant's non-exertional limitations significantly diminish his range of work, the ALJ may be required to obtain testimony from a VE in order to make the Step Five determination. *See McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014). The ALJ may adduce this testimony through a hypothetical question, as long as the hypothetical is based on substantial evidence and "accurately reflect[s] the limitations and capabilities of the claimant involved." *Id.* (citations and internal quotation marks omitted). If the hypothetical question posed to the VE fails to "include or otherwise implicitly account for all of [the claimant's] impairments," then the VE's opinion cannot support the ALJ's conclusions, unless the error is "harmless." *Johnson*, 2017 WL 2381272, at *12 (quoting *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1181 (11th Cir. 2011) ).

 **\*9**  An erroneous hypothetical question is harmless only if other "substantial evidence in the record" supports the ALJ's conclusions, *Johnson*, 2017 WL 2381272, at *12, or if "the hypothetical 'otherwise implicitly account[ed] for [the] claimant's limitations,' " *McIntyre*, 758 F.3d at 151 (quoting *Winschel*, 631 F.3d at 1181).

### B. Application to This Case

Here, the ALJ consulted the grid and found that Plaintiff "essentially has the residual functional capacity to perform the full range of light work." R. 19. Put differently, the ALJ found that Plaintiff's non-exertional limitations—those with respect to bending, stooping, reaching, handling, and fingering—did not significantly diminish the range of light work available to Plaintiff in the grid. If this finding was correct, then the ALJ was entitled to conclude, based exclusively on the grid, that Plaintiff was not disabled. *See McDonough*, 672 F. Supp. 2d at 571.

The Court need not determine whether this finding was correct, however, because the ALJ consulted a VE in order to be sure to account for Plaintiff's non-exertional limitations. *See* R. 19, 38–41. The ALJ asked the VE whether a person of Plaintiff's age,

2019 WL 1305961

education, and work experience who was limited to "sedentary work" and to "frequent[ ]" reaching, handling, and fingering could perform any jobs existing in the national economy. *Id.* at 38. The VE stated that significant numbers of jobs existed in the national economy that such a person could perform, including work as a "table worker," a "touch-up screener," and a "stone setter." *Id.* at 38–39. Based on this testimony, the ALJ concluded that the Commissioner had carried his burden at Step Five and that Plaintiff was not disabled. *See id.* at 19.

The R&R asserts that the ALJ's hypothetical question did not accurately reflect Plaintiff's limitations, inasmuch as the hypothetical did not include Plaintiff's limitations with bending and stooping. *See* R&R at 13. The Commissioner argues that this omission was harmless, *see* Def.'s Second Mem. of Law at 16, and the Court agrees. Limitations on bending and stooping do not, as a matter of law, significantly diminish the range of light work available to a claimant. *See Felder v. Astrue*, No. 10-CV-5747, 2012 WL 3993594, at *17 (E.D.N.Y. Sept. 11, 2012) ("According to the SSA's rulings, an inability to bend, stoop, crouch, or kneel more than occasionally would not substantially affect an individual's ability to perform light or sedentary work." (citing *McDonaugh*, 672 F. Supp. 2d 571) ); *see also* SSR 85-15, 1985 WL 56857, at *2–3 (1985). Because the ALJ was not required to obtain the VE's opinion regarding Plaintiff's bending and stooping limitations, the ALJ's failure to include these limitations in his hypothetical question to the VE was harmless. [8]

**\*10** The R&R also asserts that the question posed to the VE did not accurately reflect Plaintiff's capabilities, as the question asked for jobs at the "sedentary" exertional level (whereas Plaintiff was capable of performing work at the more active "light" exertional level). *See* R&R at 12. The Commissioner argues that this issue does not require remand, *see* Def.'s Second Mem. of Law at 14–15, and the Court agrees. Under the Social Security regulations, a person who can do light work can, as a matter of law, also do sedentary work, "unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 416.967(b); *see also Poupore*, 566 F.3d at 305. Accordingly, courts have repeatedly affirmed the Commissioner's decisions in which a VE hypothetical was phrased in terms of "sedentary work" even though the ALJ's RFC finding was for "light work." *See* Def.'s Second Mem. of Law at 15–16 (collecting cases). As the Court has discussed, there was substantial evidence that Plaintiff did not have "additional limiting factors," as Dr. Shtock and others found that Plaintiff had no limitations with respect to fingering and the ability to sit for extended periods of time. *See* R. 241. Accordingly, Plaintiff was capable of performing all of the "sedentary" jobs that the VE discussed, and the VE's testimony adequately supported the ALJ's conclusion that Plaintiff was not disabled.

For all these reasons, the ALJ's analysis at "Step Five" was legally correct and was supported by substantial evidence. The Commissioner's objections to this portion of the R&R are sustained. [9]

## V. Technical Difficulties During the Administrative Hearing Do Not Warrant Remand
In the R&R, the Magistrate Judge found that the ALJ "had significant difficulty hearing and understanding" Plaintiff's testimony during the hearing, making the hearing record "incomplete and deficient" and warranting remand for a new hearing. R&R at 14. Plaintiff raises similar arguments. *See* Pl.'s Second Mem. of Law at 5–6. The Commissioner objects to that portion of the R&R. *See* Def.'s Second Mem. of Law at 17–20.

As an initial matter, Plaintiff consented to conducting the hearing by telephone, *see* R. 28, and at no time did Plaintiff or his attorney object or ask to terminate the hearing due to technical difficulties, *see id.* at 27–41. Additionally, each time the ALJ or Plaintiff had difficulty hearing each other, the information was repeated, and each party indicated that he understood. *See, e.g.*, *id.* at 30–31, 34, 36. Although a few of Plaintiff's words in the transcript were recorded as inaudible, the ALJ did not ask Plaintiff to repeat himself at those times, suggesting that although the stenographer who transcribed the hearing was unable to make out what was being said, the ALJ was able to hear and understand Plaintiff's answers. *See, e.g., id.* at 33, 35. Plaintiff's answers on these points were also clearly reflected in the treatment notes of his physicians and in his application paperwork, which the ALJ reviewed. Plaintiff also has not articulated what else he would have said or how a better telephonic connection would have made any difference in the outcome of the hearing. Thus, despite some technical difficulties, Plaintiff received a full and fair hearing before the ALJ. Under similar circumstances, numerous courts have denied applications for remand. *See,*

2019 WL 1305961

*e.g., Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 31–32 (2d Cir. 2013); Def.'s Second Mem. of Law at 19–20 (collecting cases). Accordingly, the Commissioner's objection to this portion of the R&R is sustained.

## VI. Substantial Evidence Supported the ALJ's Finding that Plaintiff's Psychological Issues Were Not Severe Impairments

**\*11**  At the second step of the five-step analytical process, the ALJ determined that Plaintiff's psychological issues did not constitute a "severe impairment" within the meaning of the Social Security laws. *See* R. 12–13. The Commissioner moved for a judgment on the pleadings on this ground, *see* Def.'s First Mem. of Law, Dkt. 16, at 12–15, but the R&R did not address the issue. The Court finds that the ALJ's conclusion was supported by substantial evidence.

When determining whether a claimant is disabled due to a mental impairment, an ALJ must apply a " 'special technique' at the second and third steps of the five-step framework." *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). "This technique requires the [ALJ] to determine first whether the claimant has a 'medically determinable mental impairment.' If the claimant is found to have such an impairment, the reviewing authority must 'rate the degree of functional limitation,' " across "four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation." *Id.* at 265–66 (citations and footnote omitted) (quoting 20 C.F.R. § 404.1520a(b)–(c) ). "[I]f the degree of limitation in each of the first three areas is rated 'mild' or better, and no episodes of decompensation are identified, then the reviewing authority generally will conclude that the claimant's mental impairment is not 'severe' and will deny benefits." *Id.* at 266 (citing 20 C.F.R. § 404.1520a(d) ).

The ALJ properly applied this framework. First, the ALJ found that Plaintiff had a medically determinable mental impairment, as Plaintiff had been diagnosed with bipolar disorder. *See* R. 13. This finding was supported by substantial evidence, including Plaintiff's own testimony. *See id.* at 30, 257, 267, 318. The ALJ then rated the degree of Plaintiff's limitation across the four functional areas. *See id.* at 13. As to the activities of daily living, the ALJ found that Plaintiff had "no limitation," *id.* at 13, because Plaintiff had previously reported that he was "able to dress, bathe, and groom, cook, clean, do laundry, shopping, manage his own money, and use public transportation," *id.* at 244; *see also id.* at 192–94, 239. As to Plaintiff's social functioning, the ALJ also found that Plaintiff had "no limitation," *id.* at 13, because Plaintiff stated that he frequently speaks to friends on the phone, plays board games with friends, and visits family, *see id.* at 192, 195, 239, 244.

As to Plaintiff's concentration, persistence, and pace, the ALJ found that Plaintiff had a "mild limitation." *Id.* at 13. This conclusion was supported by substantial evidence. Although Plaintiff told his doctors that he had difficulty concentrating, *see id.* at 246, he also stated that was generally able to "finish what [he] start[s]," *id.* at 198, and his treating medical professionals observed that he appeared attentive, alert, oriented, and coherent during their examinations, *see id.* at 244, 247, 277–78. Plaintiff also reported that he was able to, and enjoyed, playing the keyboard, reading, writing poetry, and drawing. *See id.* at 194, 244. During a consultative examination, Plaintiff was able to count, count backwards, and conduct "simple calculations," although he was unable to count correctly by multiples of three; accordingly, the consultative examiner rated his attention and concentration as "mildly impaired." R. 244. Based on all of this evidence, the ALJ reasonably concluded that Plaintiff had only "mild" limitations in his concentration, persistence, and pace. *See id.* at 13.

**\*12**  Finally, as to the fourth functional area, the ALJ correctly observed that the record contains no evidence of episodes of decompensation. *Id.* at 13.

Because the ALJ rated the first three functional areas as "mild" or better, and because the ALJ found that Plaintiff had not suffered any episodes of decompensation, the ALJ properly found that Plaintiff's psychological issues did not constitute a severe impairment. *See id.* at 13–14. [10]

## VII. Conclusion

Case 5:24-cv-00169-DNH-ML    Document 27    Filed 02/05/25    Page 222 of 223
Cherry v. Commissioner of Social Security, Not Reported in Fed. Supp. (2019)
2019 WL 1305961

For all the foregoing reasons, the Commissioner's objections to the R&R are SUSTAINED. The R&R is NOT ADOPTED. The Commissioner's motion for judgment on the pleadings (Dkt. 15) is GRANTED. The Clerk of Court is respectfully directed to terminate all open motions and to CLOSE the case. The Clerk is also respectfully directed to MAIL a copy of this order to Plaintiff at the address listed in Dkt. 32.

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2019 WL 1305961

---

## Footnotes

1    "R." refers to pages of the certified administrative record that the Commissioner filed on January 17, 2018 (Dkt. 11).

2    Plaintiff had not raised his shoulder condition in his initial application. *See* R. 184, 195–96.

3    The ALJ also noted that Plaintiff had been diagnosed with hyperlipidemia, hypertension, and asthma but found that these conditions were not "severe" impairments. R. 13.

4    A "frequent" movement is one that is performed more often than an "occasional" movement but less often than a "continuous" movement. *See Castle v. Comm'r of Soc. Sec.*, No. 1:13-CV-543, 2014 WL 2215759, at *2 & n.6 (N.D.N.Y. May 29, 2014) (citing SSR 83–10, 1983 WL 31251, at *5–6 (1983) ). A person can perform a movement "frequently" if he can perform it "from one-third to two-thirds of the time." *Id.* at n.6.

     "Light work" involves lifting no more than 20 pounds, with frequent lifting or carrying of objects weighing up to 10 pounds, and either non-continuous walking or standing for approximately six hours in an eight-hour workday or sitting most of the time with some pushing and pulling of leg or arm controls. *See Mezzacappa v. Astrue*, 749 F. Supp. 2d 192, 206 n.12 (S.D.N.Y. 2010) (citing 20 C.F.R. § 404.1567(a)–(b) ). "Light work" is distinguishable from "sedentary work," which involves lifting no more than ten pounds and only "occasional" walking and standing. *See id.* If a person can perform light work, he can also perform sedentary work, unless the person has additional limiting factors. *See id.*

5    The ALJ stated that some of Dr. Shtock's descriptions were "vague and conclusory," such as Dr. Shtock's use of the terms "moderate" and "mild." R. 18. The ALJ correctly recognized, however, that Dr. Shtock's use of these terms was accompanied by specific medical findings from Plaintiff's physical examination and that Dr. Shtock's opinion was consistent with the treatment notes of Plaintiff's treating physicians. *See id.* Dr. Shtock's opinion, therefore, was not "so vague as to render it useless" in evaluating Plaintiff's condition. *Curry v. Apfel*, 209 F.3d 117, 123–24 (2d Cir. 2000).

6    The Court also notes that 20 pounds is the absolute *maximum* weight that a person must be able to carry in order to be capable of "light work." 20 C.F.R. § 404.1567(b); *Mezzacappa*, 749 F. Supp. 2d at 207. More commonly, light work requires carrying objects of 10 pounds or less. *See id.* "Medium work," by contrast, requires carrying a maximum of 50 pounds at a time and frequent carrying of objects weighing 25 pounds or less. *See* 20 C.F.R. § 404.1567(c).

7    To be clear, the Court is unaware of any evidence in the record that indicates that Plaintiff was able to bend, stoop, and finger only "frequently," as opposed to "continuously." Nevertheless, inasmuch as the ALJ limited Plaintiff's capabilities to "frequent" bending, stooping, and fingering, that limitation benefited Plaintiff's application for benefits and, thus, does not warrant remand.

Cherry v. Commissioner of Social Security, Not Reported in Fed. Supp. (2019)

2019 WL 1305961

8    The R&R asserts that the question of whether bending and stooping limitations require VE testimony should have been decided by the ALJ in the first instance. *See* R&R at 13. The ALJ, however, did consider this question in the first instance when he stated that Plaintiff "essentially has the residual functional capacity to perform the *full range* of light work." R. 19 (emphasis added); *see also id.* at 17 ("[T]he claimant has been *fully capable* of performing light exertion level work." (emphasis added) ).

9    The R&R also asserts that the term "frequently" is not defined in the Social Security regulations, making it erroneous for the ALJ to use that term in his hypothetical question to the VE. *See* R&R at 12. That is incorrect. The term "frequently" has been defined in prior Social Security rulings, which are binding on the SSA. *See* Social Security Ruling 83-10, 1983 WL 31251, at *5–6 (S.S.A. 1983) (" 'Frequent' means occurring from one-third to two-thirds of the time."); *Sullivan v. Zebley*, 493 U.S. 521, 531 n.9 (1990).

Additionally, the R&R asserts that because no substantial evidence supports the finding that Plaintiff can perform frequent reaching and handling, the ALJ erred by including this condition in his hypothetical question. *See* R&R at 12. As the Court has discussed, the R&R's premise is incorrect: there is more than substantial evidence to support that finding.

10    In making this finding, the ALJ credited the opinion of a consultative examiner, Dr. Toula Georgiou, over the opinion of a nurse practitioner who had treated Plaintiff, Veronica Ogula. *See* R. 13–14. The ALJ reasoned that Georgiou was a doctor of psychology, whereas Ogula was a nurse practitioner with "no special credentials as a mental health provider"; accordingly, the ALJ found that Ogula was not an "acceptable medical source" whose opinions were entitled to controlling weight. *Id.* at 14. This conclusion was proper under the Social Security regulations. *See* SSR 06-03P, 2006 WL 2329939, at *2 (S.S.A. Aug. 9, 2006) (nurse practitioners are not "acceptable medical sources" whose opinions are "entitled to controlling weight" in the ALJ's analysis); *Goldsmith v. Berryhill*, No. 17-CV-483, 2018 WL 4328832, at *3 (S.D.N.Y. Sept. 11, 2018).

The ALJ also explained that Ogula's conclusions that Plaintiff had an "extreme loss" of functionality and that Plaintiff's mental disorder would require him to be absent from work more than three times per month were "not at all consistent" with Ogula's contemporaneous treatment notes, which indicated that Plaintiff was cooperative, alert, oriented, and attentive during examination sessions. *Id.* at 15; *see also id.* at 320–21. The ALJ's conclusion was supported by substantial evidence, as Plaintiff's other treating medical professionals had repeatedly made similar observations. *See e.g., id.* at 246–47, 275–78. Finally, the ALJ noted that Ogula had evaluated Plaintiff using a checkbox form, *see id.* at 14, 317–22, which the Second Circuit has called "only marginally useful for purposes of creating a meaningful and reviewable factual record," *Halloran v. Barnhart*, 362 F.3d 28, 31 n.2 (2d Cir. 2004). In sum, the ALJ's decision to credit the opinion of Georgiou over that of Ogula was legally proper and was supported by substantial evidence.

---

**End of Document**                                        © 2025 Thomson Reuters. No claim to original U.S. Government Works.